John A. Bicks (NY 2032498)
SONNENSCHEIN NATH & ROSENTHAL LLP
1221 Avenue of the Americas
New York, NY 10020-1089
Telephone: (212) 768-6700

and

Monika J. Machen (IL 6273699)
SONNENSCHEIN NATH & ROSENTHAL LLP
233 South Wacker Drive, Suite 7800
Chicago, Illinois 60606-6404
Telephone: (312) 876-8000

*Proposed Attorneys for Debtors and Debtors in
Possession*

Michael A. Condyles (VA 27807)
Peter J. Barrett (VA 46179)
KUTAK ROCK LLP
Bank of America Center
1111 East Main Street, Suite 800
Richmond, Virginia 23219-3500
Telephone: (804) 644-1700

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE EASTERN DISTRICT OF VIRGINIA
# RICHMOND DIVISION

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| MOVIE GALLERY, INC., et al.,[1] | ) Case No. 10-30696-DOT |
| | ) |
| Debtors. | ) |
| | ) |

## AFFIDAVIT OF STEVE MOORE, CHIEF
## RESTRUCTURING OFFICER OF MOVIE GALLERY, INC.,
## IN SUPPORT OF FIRST DAY MOTIONS

| | | |
|---|---|---|
| STATE OF VIRGINIA | ) | |
| | ) | ss: |
| COUNTY OF HENRICO | ) | |

Steve Moore, being duly sworn, deposes and states:

1.     I am the Chief Restructuring Officer of Movie Gallery, Inc. ("Movie Gallery"), a

corporation organized under the laws of the State of Delaware and one of the above-captioned

---

[1]     The Debtors in the cases are Movie Gallery, Inc., Hollywood Entertainment Corporation, Movie Gallery US, LLC, MG Real Estate, LLC, and HEC Real Estate, LLC.

John A. Bicks (NY 2032498)
SONNENSCHEIN NATH & ROSENTHAL LLP
1221 Avenue of the Americas
New York, NY 10020-1089
Telephone: (212) 768-6700

and

Monika J. Machen (IL 6273699)
SONNENSCHEIN NATH & ROSENTHAL LLP
233 South Wacker Drive, Suite 7800
Chicago, Illinois 60606-6404
Telephone: (312) 876-8000

Michael A. Condyles (VA 27807)
Peter J. Barrett (VA 46179)
KUTAK ROCK LLP
Bank of America Center
1111 East Main Street, Suite 800
Richmond, Virginia  23219-3500
Telephone:  (804) 644-1700

*Proposed Attorneys for Debtors and Debtors in
Possession*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## RICHMOND DIVISION

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| MOVIE GALLERY, INC., et al.,[1] | ) Case No._____ (     ) |
| | ) |
| Debtors. | ) |
| | ) |

## AFFIDAVIT OF STEVE MOORE, CHIEF
## RESTRUCTURING OFFICER OF MOVIE GALLERY, INC.,
## IN SUPPORT OF FIRST DAY MOTIONS

| | | |
|---|---|---|
| STATE OF VIRGINIA | ) | |
| | ) | ss: |
| COUNTY OF HENRICO | ) | |

Steve Moore, being duly sworn, deposes and states:

1.      I am the Chief Restructuring Officer of Movie Gallery, Inc. ("Movie Gallery"), a

corporation organized under the laws of the State of Delaware and one of the above-captioned

---

[1]    The Debtors in the cases are Movie Gallery, Inc., Hollywood Entertainment Corporation, Movie Gallery US,
LLC, MG Real Estate, LLC, and HEC Real Estate, LLC.

debtors and debtors in possession (collectively, the "Debtors"). In this capacity, I am generally familiar with the Debtors' day-to-day operations, business and financial affairs and books and records.

2.      On the date hereof (the "Commencement Date"), each of the Debtors filed a petition with the Court under chapter 11 of the Bankruptcy Code. The Debtors are operating their businesses and managing their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"). No request for the appointment of a trustee or examiner has been made in these chapter 11 cases, and no committees have been appointed or designated. Concurrently with the filing of this Motion, the Debtors have sought procedural consolidation and joint administration of these chapter 11 cases.

3.      To enable the Debtors to minimize the adverse effects of the commencement of these chapter 11 cases on their businesses, the Debtors have requested various types of relief in their "first day" motions and applications (each, a "First Day Motion"). The First Day Motions seek relief intended to allow the Debtors to effectively transition into chapter 11 and minimize disruption of the Debtors' business operations, thereby preserving and maximizing the value of the Debtors' estates. I am familiar with the contents of each First Day Motion (including the exhibits thereto), and I believe that the relief sought in each First Day Motion: (a) is necessary to enable the Debtors to operate in chapter 11 with minimal disruption or loss of productivity and value; (b) constitutes a critical element to achieving a successful reorganization of the Debtors; and (c) best serves the Debtors' estates and creditors' interests.

4.      Except as otherwise indicated, all facts set forth herein are based upon my personal knowledge of the Debtors' operations and finances, information learned from my review of relevant documents and information supplied to me by other members of the Debtors'

management and the Debtors' advisors. I am authorized to submit this Affidavit on behalf of the Debtors, and, if called upon to testify, I could and would testify competently to the facts set forth herein.

5.     Part I of this Affidavit describes the Debtors' business, their capital structure and the circumstances surrounding the commencement of these chapter 11 cases. Part II sets forth the relevant facts in support of each of the First Day Motions.[2]   A summary corporate organization chart is attached to this Affidavit as Exhibit A.

## PART I.

## OVERVIEW OF THE DEBTORS' BUSINESS OPERATIONS

**A.     Description of the Debtors' Businesses**

6.     Movie Gallery and its Debtor and non-Debtor subsidiaries ("the Company") collectively comprise the second largest North American home entertainment specialty retailer. The Company currently operates approximately 2,415 retail stores in North America located throughout all 50 states that rent and sell DVDs, video games and video game equipment. Almost all of the Company's retail stores are leased, not owned. The Company operates three distinct brands — Movie Gallery, Hollywood Video and Game Crazy. Through a non-debtor subsidiary, Movie Gallery Canada, Inc., the Company also currently operates 184 Movie Gallery stores located throughout Canada.

7.     Since Movie Gallery's initial public offering in August 1994, the Company has grown from 97 stores to a high of nearly 4,800 stores through a combination of acquisitions and new store openings. In April 2005, the Company completed its acquisition of Hollywood Entertainment Corporation ("Hollywood"), which included the Hollywood Video and Game

---

[2]   Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the relevant First Day Motion.

Crazy branded stores. The rationale behind that acquisition was that Movie Gallery's eastern-focused, rural and secondary market presence and Hollywood's western-focused, prime urban and suburban superstore locations would combine to form a strong nationwide geographical store footprint. Prior to and in connection with the 2007 Bankruptcy Cases (as discussed in more detail below), the Company closed over 1,700 stores. Moreover, since the conclusion of the 2007 Bankruptcy Cases, the Company has closed approximately 715 additional locations, bringing it to a current operating store count of approximately 2,600 stores in North America as of the Commencement Date.

8.    The Movie Gallery branded stores are primarily located in small towns and suburban areas of cities with populations between 3,000 and 20,000, where the primary competitors are independently owned stores and small regional chains. The typical size of a Movie Gallery store is approximately 4,200 square feet and the store carries a broad selection of between 2,700 and 16,000 movies and video games for rental, as well as new and used movies and games for sale at competitive prices.

9.    Hollywood Video branded stores are typically located in high-traffic, high-visibility, urban and suburban locations with convenient access and parking. Hollywood focuses on providing a superior selection of movies and games for rent, as well as new and used movies and video games for sale. The typical Hollywood Video store is approximately 6,600 square feet and carries over 25,000 movies and video games for rental.

10.    The Game Crazy branded locations are dedicated game retail stores where game enthusiasts can buy, sell and trade new and used video game hardware, software and accessories. The Game Crazy locations are located primarily within Hollywood Video stores. As of the Commencement Date, approximately 257 Hollywood Video stores included an in-store Game Crazy department. A typical Game Crazy department carries approximately 9,000 new and used

video games, as well as hardware and accessories and occupies an area of approximately 700 to 900 square feet within the store. In addition, as of the Commencement Date, the Company operated approximately 14 free-standing Game Crazy stores.

11.    In 2009, the aggregate annual revenues of the Debtors and their non-Debtor affiliates, including rental revenue and product sales, exceeded $1.4 billion. Of this amount, approximately 52% was attributed to DVD or BluRay rentals, 21% to the sale of new and used gaming products, 12% to the sale of previously-rented DVDs and video games, 7% to game rentals, 5% to the sale of concessions and other miscellaneous products, and 3% to the sale of movies and movie-related products and merchandise.

*The Exclusive Rental Window*

12.    Many movie studios' current movie distribution strategy provides an exclusive window for the packaged media channel before a movie is available to pay-per-view, video-on-demand and other television distribution channels. This period of exclusivity has been in place since the mid-1980s. The exclusive period typically lasts for 45 to 60 days after a movie's release. This period of exclusivity is intended to maximize revenue to the movie studio in the packaged media channel prior to a movie being released to other distribution channels, including pay-per-view, video-on-demand, premium or pay cable and other television distribution. Exclusive windows have historically been used to protect each distribution channel from downstream channels, principally protecting theaters from home video, home video from pay-per-view and video-on-demand, and pay-per-view or video-on-demand from premium cable and other television channels. Recently, certain major studios established another exclusive window during which movies are available for sale and rental at "brick and mortar" retail locations such as those operated by the Debtors, but not through online channels and automated kiosks.

*New Release Movie Pricing to Home Video Retailers*

13.     In 1998, the major studios and the larger home video retailers, including Movie Gallery and Hollywood, began entering into revenue-sharing arrangements as an alternative to the historical rental pricing structures, which had required home video retailers to pay a pre-determined lump-sum purchase price for movie titles.

14.     Generally, the Debtors can acquire movies in one of three ways.  First, the Debtors can acquire movies for a single up-front lump sum payment (referred to as a "Fixed Buy").  Second, the Debtors can acquire movies for a lower up-front payment coupled with an obligation to return or destroy some percentage of the movies at the end of a specified term (a "Copy Depth Program").  Third, the Debtors can acquire movies for a significantly lower up-front payment coupled with an agreement by the Debtors to share with the studios an agreed-upon percentage of the proceeds of future rentals and sales of previously-viewed videos (referred to as a "Revenue Sharing Agreement").

15.     While Fixed Buy transactions and Copy Depth Programs are relatively straightforward, Revenue Sharing Agreements are somewhat more complicated.  Generally, a Revenue Sharing Agreement requires the Debtors to pay an up-front amount (the "Up-Front Charge") upon delivery of or within a certain time period following delivery of new movies.  Additionally, for a specific period of time, often approximately six months (the "Revenue Share Term"), the Debtors are obligated to pay the studio a fixed percentage of the proceeds of any rentals or sales of the movie (the "Revenue Share Percentage").[3]  In most cases, the Debtors' obligation to make payments to the studio is not triggered until the Debtors' Revenue Share Percentage amount owing for a particular movie exceeds the Up-Front Charge previously paid

---

[3] Revenue Sharing Agreements often require the payment of a guaranteed minimum amount per rental or per sale transaction, effectively setting a floor on the per-transaction amount payable to the studios.

for that particular movie. These payment obligations, once triggered, are referred to as "Overage Obligations."

16.      For example, if the Up-Front Charge for a particular movie is $5 per copy and the Debtors purchase 100,000 copies of that movie, the Debtors will pay $500,000 in Up-Front Charges.[4] Next, assume that the agreed-upon Revenue Share Percentage is 25% and that the Debtors charge $4 per rental. Under this scenario, the Revenue Share Payment would equal $1 per rental but, because the Debtors had paid the $500,000 Up-Front Charge, the Debtors would not owe any Overage Obligations for the first 500,000 rentals. However, for each rental after 500,000, the Debtors would owe $1 per rental on account of Overage Obligations.

17.      The Debtors prefer acquiring new movies through Revenue Sharing Agreements as opposed to Fixed Buy transactions. Because the Debtors' per-copy cost under Revenue Share Agreements is much lower than under Fixed Buy and the amounts the Debtors pay are tied to the revenue generated by the title, the Debtors can typically afford to order significantly more copies of any given movie under a Revenue Sharing Agreement than they can under a Fixed Buy transaction. Correspondingly, because the per-copy cost under a Fixed Buy is higher than under a Revenue Share Agreement and a Fixed Buy provides no downside protection in the event that the movie is not as popular expected, the Debtors must purchase more conservatively and order fewer titles under Fixed Buy than they would under a Revenue Sharing Agreement. This, in turn, means that fewer copies of Fixed Buy titles will be available for rental in the Debtors' stores, increasingly the likelihood that a title may be "sold out" and be unavailable to the Debtors' customers. Under this scenario, the Debtors are more likely to miss out on potential rental revenue on desirable movies due to the lower number of copies available, and the Debtors'

---

[4] Currently, the Company pays its Studios cash-in-advance for Up-Front Charges. Historically, the Debtors received significantly better payment terms for Up-Front Charges.

customers are more likely to be disappointed and may seek the title for rentals or purchase elsewhere.

18.     In 2009, more than 75% of the Company's new release movie rental revenue was generated by titles acquired under Revenue Sharing Agreements.  Maintaining good relations with their studio suppliers, including ongoing access to Revenue Sharing Agreements for new movie releases, is critical to the Debtors' business operations and ability to successfully reorganize.

**B.     Corporate History and Structure**

19.     Movie Gallery was co-founded in 1985 by J.T. Malugen and H. Harrison Parrish. While Movie Gallery grew steadily larger through a series of acquisitions and new store openings, it virtually doubled in size in 2005 with its acquisition of Hollywood.

*Hollywood Acquisition*

20.     On April 27, 2005, the Company completed a cash acquisition of Hollywood.  At the time of the acquisition, the Company's combined pro-forma annual revenue was in excess of $2.6 billion and the combined enterprise included approximately 4,800 stores located in all 50 states, Canada and Mexico.  The acquisition substantially increased the Company's presence on the West Coast and in urban areas.  Hollywood's predominantly West Coast urban superstore locations did not overlap significantly with Movie Gallery's rural and suburban store locations concentrated in the eastern half of the United States.

21.     The Company paid $862 million to purchase all of Hollywood's outstanding common stock and refinanced approximately $380 million of Hollywood's debt.

22.     The Hollywood acquisition was financed using Hollywood's cash on-hand of approximately $180 million, the issuance of new senior secured credit facilities guaranteed by all of the Company's domestic subsidiaries in an aggregate principal amount of $870 million (the

"2005 Credit Facilities"), and the issuance of $325 million of 11% senior unsecured notes (the "11% Senior Notes"). As part of the refinancing of Hollywood's debt, Hollywood also executed a tender offer for its $225 million principal amount 9.625% Senior Subordinated Notes due 2011 (the "9.625% Senior Subordinated Notes"), pursuant to which $224.6 million of the notes were tendered.

23. Thus, the Hollywood acquisition effectively doubled the size of the Company by store count, but also left it with a significantly more leveraged capital structure and significantly increased operating expenses.

24. Integration efforts following the Hollywood Acquisition initially focused on consolidating the leadership functions in the brands. To that end, the Company integrated its human resources and benefits, legal, real estate, construction and lease administration, accounting and finance, payroll, loss prevention and collections, distribution and product purchasing functions across both the Movie Gallery and Hollywood Brands. The Company merged senior field leadership responsibilities for the Hollywood and Movie Gallery brands in early 2008, but Game Crazy remained a separate operating unit. In January 2009, the Company realigned the field management organization to allow field leadership to assume responsibility for all three brands, including Game Crazy.

*Events Leading Up to the 2007 Bankruptcy Filing*

25. In the years following the Hollywood acquisition, the Company -- with its now highly-leveraged capital structure -- struggled with steadily increasing competition from direct competitors such as Blockbuster and Netflix as well as indirect competition from pay-per-view and cable television. During the same period, a number of industry-wide factors also combined to negatively impact the store-based rental market: cannibalization of rentals by low-priced movies available for sale; growth of the mail delivery and online rental segment; the standard

DVD format nearing the end of its life cycle; competing high definition DVD formats delaying content release and consumer acceptance; growth of DVD dispensing kiosk machines operated by our competitors and the proliferation of alternative consumer entertainment options including movies available through video-on-demand, TIVO/DVR, digital cable, satellite TV, broadband, internet and broadcast television.

26.    While this increased competition and the negative industry trends had been apparent for some time, both became more pronounced during the first half of 2007. As a result, the Company experienced significantly greater than expected declines in revenue during the second quarter of 2007, primarily resulting from competitive pricing and increased marketing activities by Blockbuster and Netflix relating to their competing on-line subscription rental services; a greater than expected customer acceptance of Blockbuster's "Total Access" program, which combined elements of in-store and online movie rentals; increased marketing activities by the "brick and mortar" operations of Blockbuster and a disparate group of smaller local and regional operations as well as competitors who operate DVD dispensing kiosk machines, such as RedBox; and continued competition from mass merchants, downloading services, supermarkets, pharmacies, convenience stores, bookstores and other retailers selling both new and previously viewed movies. These factors, along with the trends discussed above, had a significant negative impact on the Company's business during the first half of 2007.

27.    During the second quarter of 2007, the Company incurred significant losses from operations as a result of the industry conditions and increased competition described above. The Company's operating results caused it to breach certain of the financial covenants contained in the 2005 Credit Facilities. Subsequent to the end of the second quarter of 2007, the Company also experienced a severe contraction in trade terms, including decisions by many of the Company's significant vendors, including many of the movie studios, to cease extending the

Company trade credit and, instead, require cash-in-advance for new deliveries. Consequently, the Company's liquidity was significantly and adversely affected.

*The 2007 Bankruptcy Filings*

28.     As a result of the business, liquidity and related challenges described above, by the third quarter of 2007, the Company concluded that it needed to restructure its balance sheet, bring in significant new capital, and close a large number of underperforming locations. Thus the Company, in consultation with its legal and financial advisors, determined at that time to pursue a pre-negotiated plan of reorganization which would permit it to meet all of these objectives, and which would be implemented -- to the largest extent possible on a consensual basis -- through the Chapter 11 process.

29.     Through pre-filing discussions with key creditor constituents, the Company secured their agreement to the principal terms of a plan of reorganization which would, among other things: (i) convert approximately $400 million of then-existing funded Company debt into equity of the reorganized Company; (ii) raise $50 million of new capital for the Company through a rights offering; (iii) provide the Company with a $100 million exit financing facility; and (iv) provide for the conversion into equity of substantially all of the unsecured claims against the Company. Another critical component of the agreed plan was the agreement of the Company's major studio vendors to enter into accommodation agreements with the Company whereby the studio vendors would continue to supply the Company with product on agreed credit terms in return for the Company's agreement (subject to the approval of the bankruptcy court) to pay all of the outstanding pre-petition amounts owed to the studio vendors.

30.     Having negotiated the material terms of the proposed reorganization, the Company commenced voluntary Chapter 11 cases (the "2007 Bankruptcy Cases") on behalf of each of the Debtors in the United States Bankruptcy Court for the Eastern District of Virginia

(the "Bankruptcy Court") on October 16, 2007. On or about February 15, 2008, the Company

filed its Second Amended Joint Plan of Reorganization of Movie Gallery, Inc. and its Debtor

Subsidiaries under Chapter 11 of the Bankruptcy Code (the "2008 Plan") and accompanying

disclosure statement. Thereafter, the Company solicited votes on the 2008 Plan, which was

ultimately approved by the requisite holders of every voting class. The Bankruptcy Court

confirmed the 2008 Plan on April 9, 2008. Thereafter, the 2008 Plan became effective and was

substantially consummated, including: (i) the funding of the $100 million exit facility; (ii) the

closing of the $50 million rights offering; (iii) the closing of the loan transactions required to

reinstate all of the Company's first-lien secured debt and approximately $117 million of its

second-lien secured debt on amended terms; (iv) the conversion to equity of $325 million of the

Company's 11% Senior Notes; and (v) the conversion to equity of $72 million of second-lien

secured debt held by Sopris Capital Advisors LLC ("Sopris").

31.    As part of the Bankruptcy Court's Order confirming the 2008 Plan (the

"Confirmation Order"), the Bankruptcy Court made certain findings of fact and conclusions of

law related to the Prepetition Revolver Indebtedness, the Prepetition First Lien Indebtedness and

the Prepetition Second Lien Indebtedness (each as defined below). Specifically, the

Confirmation Order set forth the Bankruptcy Court's findings, among other things, with respect

to each of those three credit facilities (i) that the facilities were each an essential element of the

2008 Plan, (ii) that the Debtors' entry into and consummation of the transactions contemplated by

each of the facilities was in the best interests of the Debtors and their creditors, (iii) that the

Debtors had exercised reasonable business judgment in determining to enter into each of the

facilities, and (iv) that the terms and conditions of each of the credit facilities had been

negotiated in good faith, at arm's-length, and were fair and reasonable. Based upon these

findings of fact and conclusions of law, in the Confirmation Order the Bankruptcy Court

expressly reaffirmed and approved the terms and conditions of each of the three credit facilities,
and further ordered that, upon execution and delivery of the agreements and documents relating
to each of the three facilities, that each such facility would thereby be in full force and effect and
valid, binding and enforceable in accordance with its terms without the need for any further
notice to or action, order or approval of the Bankruptcy Court, or other act or action under
applicable law, regulation, order or rule.  This reaffirmation and approval of the terms of the
three credit facilities by the Bankruptcy Court thus also approved, *inter alia*, the intercreditor
provisions of those facilities, including the repayment priority of the Prepetition Revolver
Indebtedness over the Prepetition First Lien Indebtedness, and the rights of the holder of the
Prepetition Revolver Indebtedness to exercise a "sweep" of all Company cash in excess of $15
million in the event of a default.  Finally the Bankruptcy Court held in the Confirmation Order (i)
that the loans and other extensions of credit contemplated by each of the credit facilities and the
granting of liens to secure such loans and other extensions of credit was approved and authorized
in all respects, and (ii) that the granting of such liens, the making of such loans and other
extensions of credit and the consummation of the transactions contemplated by each of the credit
facilities did not constitute a fraudulent conveyance or transfer under state or federal law and that
such liens would be unavoidable for all purposes.

32.     As described above, the 2008 Plan provided that substantially all of the general
unsecured claims outstanding against the Company as of the commencement of the 2007
Bankruptcy Cases were to be converted into equity of reorganized Movie Gallery.[5]  Also

---

[5] The 2008 Plan also provided holders of general unsecured claims in certain classes with the option (to be exercised
at the time they voted their claims) to elect to receive a cash payment (defined in the 2008 Plan as the "Cash-
Out Election") in lieu of stock in the reorganized Company, in an amount equal to 50% of the pro forma value
attributed to the reorganized Company's stock.  Pursuant to the 2008 Plan, the funds to make payments for the
Cash-Out Election were to be provided by Sopris, in return for which Sopris would acquire the shares
attributable to the claims that elected to receive the Cash-Out Election treatment.  A number of eligible
unsecured creditors timely elected the Cash-Out Election, and Sopris subsequently transferred a cash amount

pursuant to the 2008 Plan, William Kaye was appointed as the Plan Administrator (the "Plan Administrator") for the 2008 Plan, and in that capacity was charged with, inter alia, supervising the reconciliation of outstanding, unresolved pre-petition claims asserted against the Company. Upon information and belief, that claims reconciliation process is ongoing, but has yet to be completed by the Plan Administrator. As a result, pursuant to the consummation of the 2008 Plan, common shares of the reorganized Company have at this point only been issued to (i) former holders of the Company's now-extinguished 11% Senior Notes, and (ii) Sopris, on account of (a) the second lien debt which Sopris voluntarily converted to equity under the 2008 Plan and (b) the $50 million rights offering (backstopped by Sopris) which was consummated in connection with the 2008 Plan. Upon information and belief, no common shares of the reorganized Company have yet been issued to any other parties in interest in connection with the consummation of the 2008 Plan.[6]

*Events Subsequent to the Consummation of the 2008 Plan*

33.    Following the confirmation and consummation of the 2008 Plan, the Company emerged from chapter 11 with a somewhat less leveraged capital structure and approximately 3,000 operating stores. However the reorganized Company still had a total of more than $750 million in outstanding secured debt. Moreover, the reorganized Company also continued to face significant and ongoing operational challenges, including steadily increasing competition from DVD dispensing kiosk machines operated by Redbox as well as a widening array of media and

---

sufficient to cover the required payments (approximately $6 million) into an escrow account maintained by counsel to the official committee of unsecured creditors appointed in the 2007 Bankruptcy Cases.

[6] As described below, following consummation of the 2008 Plan, certain holders of First Lien Debt voluntarily exchanged that First Lien Debt for common shares of the Company. As a result, some common shares of the Company were also issued to those debt holders in connection with those debt-for-equity exchanges.

entertainment outlets, compounded by the dramatic economic downturn that began in earnest in the fall of 2008.

34.    As a result, despite the deleveraging and underperforming store closures that had been achieved through the implementation of the 2008 Plan, the Company's financial performance continued to deteriorate through the end of 2008 and into the first two quarters of 2009. The Company's total revenue deteriorated from $2.0 billion in 2008, to $1.4 billion in 2009, dramatically decreasing the Company's cash flow from operations over the same period. Operating loss for the 2009 fourth quarter was $129.3 million compared to operating loss of $84.8 million in the fourth quarter of 2008.

35.    The Company worked diligently throughout late 2008 and 2009 to identify and implement steps across every aspect of its business operations to improve its financial performance. Those steps included the implementation of new marketing and customer programs, including Game Zone retail game sections and the PowerPlay subscription program. They also included ongoing efforts by the Company to identify underperforming store locations and either take available steps to improve their performance, or if necessary, take appropriate steps to close and exit those locations. As a result of those efforts directed at underperforming stores, throughout 2009 the Company was able to achieve total negotiated annualized rent reductions in excess of $7.5 million on more than 600 stores.

36.    In addition to pursuing opportunities to improve the financial performance of the business, the Company also identified and pursued opportunities to continue to improve its capital structure. In particular, during 2008, the Company retired over $158 million of First Lien Debt through agreements with the holders of that debt to convert the debt into common equity of the Company. Also, during 2008 and 2009, the Company purchased and retired over $88 million of its outstanding First Lien Debt at significant discounts to face value, through a series of cash

purchases at prices ranging from $0.35 to $0.59 on the dollar. Through these efforts, the Company reduced its total outstanding First Lien Debt by over $246 million during 2008 and 2009.

37.    Nevertheless, the Company's overall financial performance continued to deteriorate and liquidity began to suffer significantly by the third quarter of 2009. As a result of the liquidity challenges, by the beginning of the 2009 fourth quarter the Company was delinquent on a significant amount of its payables and faced the prospect of looming defaults under its loan agreement covenants.

*Events Leading Up to the Filing of these Chapter 11 Cases*

38.    A number of factors have led to the filing of these chapter 11 cases. First, the video rental and retail sale industry remains highly competitive. The Company faces direct competition from competitors such as Blockbuster, Netflix and Redbox, indirect competition from cable television and internet sources which provide on-demand and streaming videos, as well as competition from big-box retailers who continue to sell DVDs at increasingly cheaper prices. The Company's video game business has also been hurt by a decline in sales of Wii software and hardware as well as games in the music genre. At the same time, the number of high-profile video game titles launched in 2009 was significantly lower than in previous years.

*Challenging Industry Conditions*

39.    The Company competes with national, regional and local video retail operations, including: "brick and mortar" operations of Blockbuster and a disparate group of smaller local and regional operations; mail-delivery video rental subscription services such as Netflix; DVD dispensing kiosks operated by Redbox; mass merchants, downloading services, supermarkets, pharmacies, convenience stores, bookstores and other retailers; and non-commercial sources such as libraries. Substantially all of the Company's Hollywood brand stores compete with

stores operated by Blockbuster, most in very close proximity, as well as numerous Redbox kiosks. The Company's Movie Gallery brand stores generally operate in smaller, less competitive markets against regional and local competitors.

40.     One of the most significant industry-wide factors affecting the Company's performance since the 2007 Bankruptcy Cases has been cannibalization of rentals by DVD dispensing kiosks operated by Redbox which offer low priced rentals and convenience. From mid-2008 through the third quarter of 2009, Redbox more than doubled the number of kiosks in its network while its revenues increased from $390 million in 2008 to an estimated $760 million in 2009. During this same period, the Company's performance continued to be affected by the negative industry trends that had led to the 2007 Bankruptcy Cases, many of which had become even more pronounced.

41.     The Company also competes with cable, satellite and pay-per-view television systems as well as a growing number of internet video providers. Digital cable and digital satellite services have continued to increase household penetration. The Company estimates that cable or satellite television is available in over 90 million households. These systems offer multiple channels dedicated to pay-per-view and, in many cases, video-on-demand, and allow the Company's competitors to transmit a significant number of movie titles to consumers' homes at the touch of a button.

42.     Finally, since 2007, an entirely new front of competition has developed in the form of internet services, such as iTunes and Google's Youtube, which permit customers to access an ever-growing number of streaming video titles for rental or sale directly over the internet. With the continued growth and proliferation of high speed internet access into American homes, this sector of video distribution is expected to continue to negatively impact the Company's overall business.

43.     Collectively, these factors have had a significant negative impact on the Company's business, and are expected to continue to have a negative impact on the Company and the overall video retail industry.

44.     Throughout 2009, the Company incurred significant losses from operations as the decline in revenue resulting from the current industry conditions and increased competition described above outpaced the Company's ability to reduce its fixed cost structure composed largely of store rent and labor costs and corporate general and administrative expense. During 2009, the Company's revenue decreased by over $546.3 million and despite numerous initiatives, the Company was only able to cut operating expenses by $186.7 million. By the fourth quarter of 2009, it was apparent to the Company's management that these operating results would cause the Company to breach certain of the financial covenants contained in the Prepetition First Lien Term Credit Agreement (as defined below). Indeed, by the beginning of the fourth quarter of 2009, the Company had determined that more than half of its operating store locations were operating at a negative cash flow. Absent the filing of these chapter 11 cases and the corresponding ability to exit a substantial number of underperforming stores and further deleverage its capital structure, the Company likely would not be able to continue as a going concern.

*Employees*

45.     As of January 28, 2010, the Company employed approximately 19,082 employees, including approximately 3,970 full-time employees and 15,112 part-time employees. None of the Company's employees are represented by a labor union.

C.   **Summary of Prepetition Indebtedness**

*The 2008 Credit Facilities*

46.    Prior to the commencement of the 2007 Bankruptcy Cases, the Debtors had obtained (a) approximately $725 million in secured loans, advances and other credit accommodations pursuant to the terms and conditions set forth in the First Lien Credit and Guaranty Agreement, dated as of March 8, 2007 (the "Old First Lien Credit Agreement"), among the respective Debtors as borrower and the guarantors party thereto, the banks, financial institutions and other lenders parties thereto (the "Old First Lien Lenders"), Goldman Sachs Credit Partners L.P. ("GSCLP"), as lead arranger and syndication agent, and Wachovia Bank, National Association, as collateral agent and documentation agent, and (b) an additional $175 million in secured term loans pursuant to the terms and conditions set forth in the Second Lien Credit and Guaranty Agreement, dated as of March 8, 2007 (the "Old Second Lien Credit Agreement"), among the respective Debtors as borrower and the guarantors party thereto, the banks, financial institutions and other lenders parties thereto, GSCLP as lead arranger and syndication agent, and Wells Fargo Bank, National Association, as successor administrative agent and collateral agent.

47.   During the 2007 Bankruptcy Cases, the revolving credit loans under the Old First Lien Credit Agreement were refinanced by the Debtors' debtor-in-possession financing (the "2007 DIP Facility"). As part of the consummation of the 2008 Plan, the 2007 DIP Facility was repaid out of the proceeds of the $100 million revolving credit facility established pursuant to the Revolving Credit and Guaranty Agreement, dated as of May 20, 2008 (as amended by Amendment No. 1 thereto, dated as of July 21, 2009, the "Prepetition Revolving Credit Agreement"), by and among the Debtors, the lenders party thereto from time to time, The Bank of New York, as administrative agent (together with its permitted successors in such capacity,

the "Revolver Administrative Agent") and Deutsche Bank Americas as collateral agent (the "Collateral Agent"). The Lenders and Agents under the Prepetition Revolving Credit Agreement are referred to as the "Prepetition Revolver Parties."

48. The Old First Lien Credit Agreement also provided for a term loan facility and a synthetic letter of credit facility. These facilities were continued as part of the consummation of the 2008 Plan pursuant to the Amended and Restated First Lien Credit and Guaranty Agreement, dated as of May 20, 2008 (as amended by Amendment No. 1 thereto, dated as of July 21, 2009 the "Prepetition First Lien Term Credit Agreement"), by and among the Debtors, the lenders party thereto from time to time, Wilmington Trust Company, as Administrative Agent (together with its permitted successors in such capacity, "First Lien Term Administrative Agent") and the Collateral Agent, as collateral agent. On the consummation of the 2008 Plan, there were outstanding under the Prepetition First Lien Term Credit Agreement (a) term loans in the aggregate principal amount of $602,988,750 and (b) letters of credit in the aggregate face amount of $21,900,000. The lenders and agents under the Prepetition First Lien Term Credit Agreement are referred to as the "Prepetition First Lien Parties."

49. As part of the consummation of the 2008 Plan, the term loan facility under the Old Second Lien Credit Agreement was continued pursuant to the Amended and Restated Second Lien Credit and Guaranty Agreement, dated as of May 20, 2008 (as amended by Amendment No. 1 thereto, dated as of July 21, 2009 the "Prepetition Second Lien Term Credit Agreement"), by and among the Debtors, the lenders party thereto from time to time, and Wells Fargo Bank, N.A., as administrative and collateral agent. On the consummation of the 2008 Plan there were outstanding under the Prepetition Second Lien Credit Agreement term loans in the aggregate principal amount of $117,141,029.56. The lenders and agents under the Prepetition Second Lien Term Credit Agreement are referred to as the "Prepetition Second Lien Parties."

50.    As of the Commencement Date, the Debtors were indebted to the Prepetition Revolver Parties in respect of all outstanding obligations under the Prepetition Revolving Credit Agreement and the "Credit Documents" thereunder (the "Prepetition Revolver Loan Documents") in the aggregate principal amount of not less than $100 million and all interest, fees and charges accrued and accruing thereon and chargeable with respect thereto, and as to the extent provided for in the Prepetition Revolver Loan Documents, all costs and expenses of the lenders and agents thereunder (including, without limitation, attorneys' fees and legal expenses) (collectively, the "Prepetition Revolver Indebtedness"). As of the Commencement Date, the Prepetition Revolver Indebtedness was in default and bearing interest at a daily rate equal to the "Base Rate" plus 8.75% per annum

51.    As of the Commencement Date, the debtors were indebted to the Prepetition First Lien Parties in respect of all outstanding obligations under the Prepetition First Lien Term Credit Agreement and the "Credit Documents" thereunder (the "Prepetition First Lien Loan Documents") in the aggregate principal amount of not less than $394,369,000 consisting of (a) term loans in the aggregate principal amount of $370,869,000, (b) reimbursement obligations in respect of synthetic letters of credit of approximately $20,729,000 and (c) all interest, fees and charges accrued and accruing thereon and chargeable with respect thereto, and as to the extent provided for in the Prepetition First Lien Loan Documents, all costs and expenses of the Prepetition First Lien Parties (including, without limitation, attorneys' fees and legal expenses) (items (a), (b) and (c), collectively, the "Prepetition First Lien Indebtedness"). As of the Commencement Date, the Prepetition First Lien Indebtedness was in default and bearing interest at a daily rate equal to the "Base Rate" plus 8.75% per annum  for term loans, and the "Adjusted Eurodollar Rate" plus 5.9% per annum, for letters of credit.

52.    As of the Commencement Date, the Debtors are indebted to the lenders and agents under the Prepetition Second Lien Loan Agreement in respect of all outstanding obligations under the Prepetition Second Lien Credit Agreement and the "Credit Documents" thereunder (the "Prepetition Second Lien Loan Documents") in the aggregate principal amount of not less than $146,325,000 million, consisting of (a) term loans in the aggregate principal amount of $146,325,000 and (b) all interest, fees and charges accrued and accruing thereon and chargeable with respect thereto, and as to the extent provided for in the Prepetition Second Lien Loan Documents, all costs and expenses of the Prepetition Second Lien Loan Parties (including, without limitation, attorneys' fees and legal expenses) (items (a) and (b) together, the "Prepetition Second Lien Indebtedness").    As of the Commencement Date, the Prepetition Second Lien Indebtedness was in default and bearing interest at the "Base Rate" plus 14% per annum (all of which interest is payable in kind).

*Recent Store Closing Initiatives*

53.    Prior to the Commencement Date, the Debtors conducted an extensive review of their store portfolio with the objective of identifying and closing unprofitable store locations. Throughout the third and fourth quarters of 2009, the Debtors closed approximately 560 store locations.    Among their First Day Motions, the Debtors have filed motions for authority to commence store closing sales and for approval of streamlined procedures to reject unprofitable store leases.    The Debtors will continue to evaluate stores and will make decisions whether to close such other stores on a rolling basis throughout these chapter 11 cases.    As set forth herein, the Company currently expects that it will need to close a significant number of its existing stores in order to get to a smaller base of profitable stores around which the Company hopes to be able to reorganize.

# PART II.

# FIRST DAY MOTIONS

**A.    Motion of the Debtors for an Order Directing Joint Administration of their Related Chapter 11 Cases (the "Joint Administration Motion")**

54.    Many of the motions, hearings and orders in these chapter 11 cases will jointly affect each and every Debtor.  By jointly administering these chapter 11 cases, I believe that the Debtors will be able to reduce fees and costs in connection with the administration of these cases by avoiding the duplication of effort associated with, for example, filing multiple duplicative documents in the Debtors' various individual cases, monitoring each of the Debtors' individual dockets and maintaining individual case files for each of the Debtors that will largely duplicate one another.  In addition, I believe that the ability of parties in interest to monitor these cases will be facilitated by having all pleadings grouped together on one docket.  Joint administration also will relieve the Court of the burden of entering duplicative orders and maintaining duplicative files.  Finally, supervision of the administrative aspects of the chapter 11 cases by the U.S. Trustee will be simplified.

**B.    Motion of the Debtors for Authority to (A) Prepare a List of Creditors in Lieu of Submitting a Formatted Mailing Matrix and (B) File a Consolidated List of the Debtors' 30 Largest Unsecured Creditors (the "Consolidated Matrix Motion")**

55.    After consultation with the proposed notice, claims and balloting agent for the Debtors, I believe that preparing the consolidated list of all of the Debtors' creditors in the format or formats currently maintained by the Debtors in the ordinary course of their business will be sufficient to permit the notice, claims and balloting agent to provide prompt notice to all applicable parties.

56.    Many creditors are shared among certain of the Debtors, and the Debtors would expend significant resources and effort to reconcile their accounts to accurately attribute each creditor's claim against each Debtor.

57.    The Debtors are complex enterprises with operations throughout North America and consequently have well more than 10,000 potential unsecured creditors.  I believe that requiring each of the Debtors to file a separate top twenty creditors list in each of their respective cases would generate less valuable information concerning the Debtors' overall creditor body than would a consolidated list.  It is my understanding that the consolidated list of creditors would facilitate the review of claims by the U.S. Trustee or any party in interest in a voluminous filing like these chapter 11 cases.  Moreover, compiling separate top twenty lists would consume an excessive amount of the Debtors' scarce time and resources.

58.    It is my understanding that the Debtors have already prepared a single, consolidated list of all of the Debtors' creditors and, with the assistance of the notice, claims and balloting agent, are prepared to make such list available upon request and will be capable of undertaking all necessary mailings.

**C.    Motion of the Debtors for an Order (A) Granting an Extension of Time to File Statements of Financial Affairs and Schedules of Assets and Liabilities, Current Income and Expenditures and Executory Contracts and Unexpired Leases and (B) Authorizing the Scheduling of the Meeting of Creditors as Set Forth Herein (the "Schedules and Statements Motion")**

59.    The Debtors have more than 10,000 creditors.  Further, the conduct and operation of the Debtors' business operations require the Debtors to maintain voluminous books and records and complex accounting systems.  Given the size and complexity of their business operations, the number of creditors, and the fact that certain prepetition invoices have not yet been received or entered into the Debtors' financial accounting system, the Debtors have begun, but have not yet finished, compiling the information required to complete the Statements and Schedules.

60.    Accordingly, I believe it is in the Debtors' best interest to obtain an extension of 45 days from the time period provided for under Local Bankruptcy Rule 1007-1(c) to file the

Schedules and Statements, which would provide the Debtors with a total of 60 days after the Commencement Date to file the Schedules and Statements.

61.     Moreover, to the extent such relief is necessary, I believe it is necessary for the U.S. Trustee to schedule the meeting with creditors under section 341 of the Bankruptcy Code more than 40 days following the Commencement Date in light of the proposed extension of time to file the Schedules and Statements.

**D.    Motion of the Debtors for an Order Approving the Form and Manner of Notice of Commencement of Cases (the "Form of Notice of Commencement Motion")**

62.     It is my understanding that the proposed form of Notice of Commencement of these chapter 11 cases will provide sufficient notice of these chapter 11 cases to parties in interest.

**E.    Motion of the Debtors for an Order Establishing Certain Notice, Case Management and Administrative Procedures (the "Case Management Motion")**

63.     It is my understanding that hundreds of creditors and other parties in interest will likely file requests for service of filings in these cases. I also expect that numerous motions and applications will be filed in these cases. As a result, it is my understanding that the requested Case Management Procedures will significantly assist in the administration of these chapter 11 cases.

**F.    Motion of the Debtors for an Expedited Hearing on "First Day Motions" (the "Expedited Hearing Motion")**

64.     It is my understanding that an expedited hearing on the First Day Motions is appropriate under these circumstances and is consistent with past practices in virtually every significant chapter 11 case, where various relief is required at the outset of the case to ensure a smooth transition into chapter 11. The relief sought in the First Day Motions is essential to avoid substantial disruption to the normal operations of the Debtors' business.

## PART III.

## RETENTION RELATED MOTIONS

**A.    Application of the Debtors for an Order Authorizing the Employment and Retention of Sonnenschein Nath & Rosenthal LLP as Attorneys for the Debtors and Debtors in Possession Effective *Nunc Pro Tunc* to the Petition Date (the "SNR Retention Application")**

65.    The Debtors seek to retain SNR as their attorneys because SNR has extensive experience and knowledge in the field of debtors' and creditors' rights and business reorganizations under chapter 11 of the Bankruptcy Code. In addition, SNR possesses extensive experience and knowledge practicing before bankruptcy courts.

66.    I am aware that SNR has been actively involved in major chapter 11 cases and has represented debtors in many cases. Additionally, SNR represented the Debtors prior to the Commencement Date and, therefore, will be able to quickly respond to any and all issues that may arise during these chapter 11 cases. During its prior representation of the Debtors and in preparation for these chapter 11 cases, SNR has become familiar with the Debtors' business and affairs and many of the potential legal issues that may arise in the context of these chapter 11 cases. Accordingly, I believe that SNR is both well-qualified and uniquely able to represent the Debtors in these chapter 11 cases in an efficient and timely manner.

**B.    Application of the Debtors for an Order Authorizing the Employment and Retention of Kutak Rock LLP as Attorneys for the Debtors and Debtors in Possession (the "Kutak Rock LLP Retention Application")**

67.    The Debtors seek to retain Kutak Rock as their local counsel and conflicts counsel because Kutak Rock has extensive experience and knowledge in the field of debtors' and creditors' rights and business reorganizations under chapter 11 of the Bankruptcy Code. In addition, Kutak Rock possesses extensive expertise and knowledge practicing before this Court. Finally, Kutak Rock has extensive familiarity with the Company as a result of having served as

co-counsel to the Company and certain of its subsidiaries as debtors in their 2007 Bankruptcy

Cases.

**C.     Application of the Debtors for an Order Authorizing the Employment and Retention of Moelis & Company as Investment Banker and Financial Advisor for the Debtors Effective *Nunc Pro Tunc* to the Petition Date (the "Moelis Retention Application")**

68.     The Debtors seek to retain Moelis as their financial advisor and investment banker

because, among other things, Moelis has extensive experience and an excellent reputation in

providing high quality financial advisory and investment banking services to debtors and

creditors in bankruptcy reorganizations and other restructurings.

69.     I believe that the resources, capabilities and experience of Moelis in advising the

Debtors are crucial to the Debtors' successful restructuring.   An experienced investment bank

and financial advisor such as Moelis fulfills a critical need that complements the services offered

by the Debtors' other restructuring professionals.   Broadly speaking, Moelis will assist in the

evaluation of strategic alternatives and render financial advisory services to the Debtors in

connection with their ongoing restructuring efforts.   For these reasons, the Debtors require the

services of a capable and experienced investment bank and financial advisory firm such as

Moelis.

70.     Furthermore, as a result of the prepetition work performed on behalf of the

Debtors, I believe that Moelis acquired significant knowledge concerning the Debtors and their

business and is now intimately familiar with the Debtors' financial affairs, debt structure,

operations and related matters.   Likewise, in providing prepetition services to the Debtors,

Moelis' professionals have worked closely with the Debtors' management and their other

advisors.   Accordingly, I believe that Moelis has developed relevant experience and expertise

regarding the Debtors that will assist it in providing effective and efficient services in these

chapter 11 cases.

**D.** **Application of the Debtors for an Order Authorizing the Employment and Retention of DJM Realty, LLC as Real Estate Consultant for the Debtors and Debtors in Possession (the "DJM Realty Retention Application")**

71.     The Debtors seek to retain DJM because of DJM's significant qualifications and experience in real estate restructuring matters.   For over 15 years, DJM has had extensive experience solving complex real estate problems and evaluating and selling real estate, leases and businesses.  I believe that DJM will assist the Debtors in the evaluation of their real estate holdings and efforts to secure improved lease terms and overall lower occupancy costs at many of the Debtors leased store locations.  Moreover, DJM has served as real estate consultant in many complex bankruptcy cases.  Accordingly, I believe that DJM is both well qualified and uniquely able to provide real estate services in these chapter 11 cases in an efficient and timely manner.

**E.** **Motion of the Debtors for an Order Authorizing the Assumption by the Debtors of the Store Closing Consulting Agreement with Gordon Brothers Group (the "Store Closing Agency Agreement Assumption Motion")**

72.     The Debtors seek to assume the store closing consulting agreement (the "Consulting Agreement") with Gordon Brothers Group.   It is my understanding that the Consulting Agreement is an executory contract within the meaning of section 365 of the Bankruptcy Code — the failure of the Debtors to perform under the Consulting Agreement would constitute a breach of the Consulting Agreement, excusing the performance of the other party.

73.     After a thorough and careful selection process, which included the Debtors' obtaining proposals from the three leading national store liquidation firms, the Debtors selected Gordon Brothers to assist the Debtors in efficiently closing the large number of stores that the Debtors expect to close during these cases and liquidating the inventory located in those stores. Gordon Brothers regularly undertakes such retentions by large, multi-unit retailers, and has

established a highly successful track record at obtaining maximum value for the liquidation of inventory and fixtures located in closing stores. As a result, the Debtors have committed to compensating Gordon Brothers in accordance with the fee structure set forth more fully in the Store Closing Agency Agreement Assumption Motion. Accordingly, I believe assumption of the Consulting Agreement is in the best interests of the Debtors and their estates.

**F.    Application of the Debtors for an Order Authorizing the Employment and Retention of Kurtzman Carson Consultants LLC ("KCC") as Notice, Claims and Balloting Agent for the Debtors and Debtors in Possession (the "Kurtzman Carson Consultants LLC Retention Application")**

74.    KCC is well-qualified to serve in this capacity because of its experience and the competitiveness of its fees.

75.    The notice, claims and balloting services provided by KCC will not duplicate the services that the Debtors' retained professionals would provide in these chapter 11 cases. It is my understanding that KCC will carry out unique functions and will use reasonable efforts to coordinate with the Debtors' retained professionals to avoid unnecessary duplication of services. I believe that the rates to be charged by KCC for its services in connection with the notice, claims and balloting services are competitive and comparable to the rates charged by its competitors for similar services. Moreover, KCC has particular familiarity with the Debtors, having served as notice, claims and balloting agent for the Debtors in the 2007 Bankruptcy Cases.

**G.    Application of the Debtors for an Order Authorizing the Employment and Retention of Corliss Moore & Associates, LLC ("CMA") as Chief Restructuring Officer (the "Corliss Moore Retention Application")**

76.    The Debtors seek to retain CMA to continue its role as Chief Restructuring Officer of the Debtors. CMA was first retained by the Debtors in that capacity on December 28, 2009. Since that time, two principals of CMA -- myself and Robert Corliss -- have been on-site and supervising the day-to-day operations of the Debtors, including providing oversight and

direction to the Debtors' senior management team. In addition, CMA has been extensively evaluating and assessing the status of the Debtors' business and reporting to the Debtors' board of directors with its findings and strategic recommendations.

77.    CMA's principals have significant experience in providing restructuring services, including to large multi-unit retailing companies. I believe that CMA's services rendered to the Debtors prepetition in the capacity of Chief Restructuring Officer have already provided substantial value leadership as well as enhanced focus on improving the profitability of the Company's core business. Moreover, I believe that it is in the best interests of the Debtors and their estates for CMA to continue to serve in the capacity of Chief Restructuring Officer post-petition, to optimize the possibility of achieving a successful reorganization of the Company's business.

**H.    Application of the Debtors for an Order Authorizing the Employment and Retention of Burr Pilger & Mayer LLP as Accountants and Auditors for the Debtors and Debtors in Possession (the "Burr Pilger & Mayer LLP Retention Application")**

78.    The Debtors seek to retain Burr Pilger & Mayer LLP ("BPM") as their accountant, auditor and tax services provider because, among other things, BPM has extensive experience and an excellent reputation in providing high quality accounting, auditing and tax services to debtors and creditors in bankruptcy reorganizations and other restructurings.

79.    BPM has served in the capacity of accountant and auditor to the Debtors since the conclusion of the 2007 Bankruptcy Cases. As a result, BPM has acquired significant knowledge of the Debtors and their business and is now intimately familiar with the Debtors' financial affairs, debt structure, operations and related matters. Likewise, in providing prepetition services to the Debtors, BPM's professionals have worked closely with the Debtors' management and their other advisors. Accordingly, I believe that BPM has developed relevant experience and

expertise regarding the Debtors that will assist BPM in continuing to provide effective and efficient audit, tax and accounting services to the Debtors during these chapter 11 cases.

I.   **Motion of the Debtors for an Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business (the "OCP Motion")**

80.   The Debtors retain various attorneys, accountants and other professionals in the ordinary course of their business (each, an "OCP"). The OCPs provide services for the Debtors in a variety of matters unrelated to these chapter 11 cases, including legal services with regard to specialized areas of the law, accounting services, auditing and tax services and certain consulting services. A list of the Debtors' current OCPs is attached to the OCP Motion as Exhibit B.

81.   The Debtors seek authorization to continue, in their sole discretion, to retain and compensate the OCPs on a postpetition basis in accordance with the procedures for retention and compensation of OCPs, as reflected on Exhibit 1 annexed to Exhibit A attached to the OCP Motion, without the need for each OCP to file formal applications for retention and compensation (collectively, the "OCP Procedures"). Additionally, the Debtors seek to reserve the right to retain additional OCPs from time to time during these cases subject to the OCP Procedures.

82.   I believe that without the background knowledge, expertise and familiarity that the OCPs have relative to the Debtors and their operations, the Debtors undoubtedly would incur additional and unnecessary expenses in educating replacement professionals about the Debtors' business and financial operations. Moreover, I believe that the Debtors' estates and their creditors are best served by avoiding any disruption in the professional services that are required in connection with the day-to-day operation of the Debtors' business. Additionally, in light of the substantial number of OCPs and the significant costs associated with the preparation of retention applications for professionals who will receive relatively modest fees, I believe that it

would be impractical, inefficient and extremely costly for the Debtors and their legal advisors to prepare and submit individual applications and proposed retention orders for each OCP.

**Operational Motions**

**J.      Motion of the Debtors for an Order (A) Authorizing, but not Directing, the Debtors to Pay Certain Prepetition (I) Wages, Salaries, Bonuses and Other Compensation, (II) Reimbursable Employee Expenses and (III) Employee Medical and Similar Benefits and (B) Authorizing and Directing Banks and Other Financial Institutions to Honor All Related Checks and Electronic Payment Requests (the "Wages and Benefits Motion")**

83.      As of the Commencement Date, the Debtors and their non-Debtor affiliates employ approximately 19,082 employees of whom approximately 3,970 are full-time employees (the "Full-Time Employees") and approximately 15,112 are part-time employees (the "Part-Time Employees"). Approximately 16,562 employees are paid on an hourly basis and approximately 520 employees are paid salary. As of December 31, 2009, the Debtors' Movie Gallery business unit had approximately 9,480 employees and the Debtors' Hollywood Video business unit had approximately 9,602 employees. Movie Gallery Canada, Inc., a non-Debtor entity, operates the Debtors' Canadian operations and has approximately 1,325 employees, each of whom are paid directly by Movie Gallery Canada, Inc.

84.      The employees perform a variety of critical functions, including customer service, inventory control, management, marketing, purchasing and sales, shipping, tax, technical services and other tasks. I believe that the employees' skills and their acquired knowledge and understanding of the Debtors' operations, customer relations and infrastructure are essential to the effective reorganization of the Debtors' business.

### a.      Employee Obligations

#### i.      Unpaid Compensation

85.      In the ordinary course of business, the Debtors incur payroll obligations to the employees. Such obligations generally comprise wages and salaries, but may also include

incentive bonuses and commissions awarded for sales productivity and goal attainment. The Debtors pay their employees periodic payments for wages and salaries, no less frequently than twice a month. Approximately 79% of the Debtors' payroll is made by direct deposit through electronic transfer of funds directly to employees with the other 21% of employees receiving checks. Of those employees receiving payroll through electronic transfer of funds, approximately 63% receive their payroll at a bank account and 37% receive their payroll on an electronic pay card. On average, the Debtors have payroll expenses of approximately $18.8 million per month.

86. Because all of the employees are paid in arrears, as of the Commencement Date, some of the employees have not been paid all of their prepetition wages. Additionally, some employees may be entitled to compensation because (a) discrepancies may exist between the amounts previously paid and the amounts that should have been paid and (b) some payroll checks issued to employees prior to the Commencement Date may not have been presented for payment or may not have cleared the banking system and, accordingly, have not been honored and paid as of the Commencement Date.

87. The Debtors believe that, as of the Commencement Date, approximately $4.2 million in accrued wages, salaries and other compensation (but excluding reimbursable expenses, commissions and vacation pay) earned prior to the Commencement Date remains unpaid to employees (the "Unpaid Compensation"). The Debtors believe that only 20 employees are owed more than $10,950 for Unpaid Compensation, bonuses, commissions or cash for vacation pay in those states that require accrued vacation benefits to be paid to employees at the time of termination. Nevertheless, to the extent that the Debtors determine that any employee holds claims greater than $10,950 against the Debtors for Unpaid Compensation, vacation pay or commissions, the Debtors seek authorization through the Wages Motion to pay such employees the full amount of any prepetition Unpaid Compensation, vacation pay or commissions,

including the portion that exceeds the $10,950 cap imposed by sections 507(a)(4) and 507(a)(5). The Debtors believe that such payments are justified by the critical nature of the services provided by such employees.

88.    In addition, the Debtors procure the services of temporary workers and consultants who work on an hourly basis and whose services are procured through employment agencies. The Debtors remit compensation for the temporary workers' services directly to the applicable employment agencies, which in turn pay the temporary workers (the "Temporary Compensation"). The Debtors incur approximately $730,000 in Temporary Compensation obligations per month. The Debtors also have contracts with approximately 15 independent contractors who provide services for legal, real estate and bulk sales, etc., matters (the "Contractor Services"). The Debtors believe that, as of the Commencement Date, approximately $36,260 in unpaid commissions and other payments are outstanding for the Contractor Services. I am unaware of any temporary worker being owed more than $10,950.  I am aware of one consultant who is owed more than $10,950.  That consultant is owed $20,160.

ii.    Deductions and Withholdings

89.    During each applicable pay period, the Debtors routinely deduct certain amounts from paychecks, including, without limitation, (a) garnishments, child support and similar deductions and (b) other pre-tax and after-tax deductions payable pursuant to certain of the Employee benefit plans discussed herein (such as an Employee's share of health care benefits and insurance premiums, contributions under flexible spending plans, 401(k) contributions, legally ordered deductions and miscellaneous deductions) (collectively, the "Deductions").  The Debtors forward the amount of the Deductions to the appropriate third-party recipients.  On average, the Debtors have deducted approximately $1.0 million from the Employees' paychecks per month.  Due to the commencement of these chapter 11 cases, however, certain Deductions

34

that were deducted from Employees' earnings may not have been forwarded to the appropriate third-party recipients prior to the Commencement Date.

90.     Further, the Debtors are required by law to withhold from an Employee's wages amounts related to federal, state and local income taxes, social security and Medicare taxes for remittance to the appropriate federal, state or local taxing authority (collectively, the "Withheld Amounts"). The Withheld Amounts are approximately $2.8 million per month. The Debtors must then match from their own funds for social security and Medicare taxes and pay, based on a percentage of gross payroll, additional amounts for federal and state unemployment insurance (the "Employer Payroll Taxes," and together with the Withheld Amounts, the "Payroll Taxes"). The Company's Payroll Taxes, including both the employee and employer portions, for 2009 were approximately $4.4 million per month. Prior to the Commencement Date, the Debtors withheld the appropriate amounts from employees' earnings for the Payroll Taxes but such funds may not yet have been forwarded to the appropriate taxing authorities.

iii.     Honoring Checks for, and Payment of, Reimbursable Expenses

91.     Prior to the Commencement Date and in the ordinary course of their business, the Debtors reimbursed employees for certain expenses incurred on behalf of the Debtors in the scope of their employment (the "Reimbursable Expenses"). The Reimbursable Expenses include, without limitation, certain expenses for (a) car allowances, (b) business relocation expenses and (c) travel expenses for meals, hotels and rental cars.

92.     The Debtors provide car allowances to certain Employees whose responsibilities require them to travel extensively (each, a "Car Allowance"). As of the Commencement Date, approximately 22 Employees receive a monthly Car Allowance at an aggregate cost to the Debtors of $11,500 per month. The Debtors also pay for gas, oil and mileage for certain employees at a cost of approximately $244,000 per month. Additionally, the Debtors provide

35

fleet vehicles to 126 Employees. Fleet maintenance costs are approximately $84,300 per month, and the fleet lease payments cost the Debtors approximately $29,300 per month.

93.    Moreover, the Debtors offer certain employees reimbursement for relocation expenses to incent desirable candidates to accept positions with the Debtors (the "Relocation Expenses"). As of the Commencement Date, no Relocation Expenses remain unpaid.

94.    The Reimbursable Expenses were all incurred on the Debtors' behalf and with the understanding that they would be reimbursed.

           iv.    Prepetition Employee Bonus Plans and Sales Commission Programs

95.    In the ordinary course of business, certain of the Debtors' employees participate in quarterly or annual incentive-based bonus plans depending on their position and department. Salaried employees who work at the Debtors' headquarters or the Debtors' distribution centers may be eligible for bonuses if the Debtors attain certain EBITDA targets. Full-Time hourly employees in the Debtors' distribution centers who have been employed for at least 90 days may also be eligible to receive bonuses based on productivity, quality and safety. Further, retail managers, including store managers, district managers and regional managers responsible for overseeing operations at the Debtors' store locations may be eligible for certain bonuses based on maintaining certain behaviors that maximize revenue earned by their store, district or region. The Debtors refer collectively to the bonus plans described above as the "Bonus Plans."

96.    As of the Commencement Date, the Debtors' obligations for the Bonus Plans are approximately $359,031 for all employees at the retail and field level, which is approximately .002% of the Debtors' total annual payroll. Under all the Bonus Plans, a total of 127 employees are entitled to receive bonuses and the maximum potential bonus payout for any individual is $40,465.

97.     Prior to the Commencement Date, to incent store managers and employees in their racking, retail video, game and tanning stores to maximize sales, the Debtors offered various commissions programs. The Debtors also pay commissions to certain asset managers to incent the negotiation of the largest possible rent reductions with landlords. The Debtors' total obligations as of the Commencement Date for these commissions is approximately $48,973.

### b.     Employee Benefits

#### i.     Medical, Dental and Vision Plans

98.     The Debtors offer their employees the ability to participate in a number of insurance and benefits programs, including health care and dental plans, vacation time and other paid leaves of absence, retirement savings plans, flexible benefit plans, life insurance, accidental death and dismemberment insurance, short-term and long-term disability insurance and accident insurance (collectively, the "Employee Benefit Programs").

99.     The Debtors' primary medical, dental, vision and prescription drug plan for Full-Time Employees is the Movie Gallery/Hollywood Group Health Care and Dental Plan (the "Medical and Dental Insurance Plan"). The Medical Insurance Plan is a self-insured plan that provides health care coverage to approximately 2,392 full-time employees and 2,211 dependents. The Medical Insurance Plan costs the Debtors approximately $1.5 million per month in gross claims and approximately $85,000 per month in administrative fees paid to the third party administrator ("TPA"). Prior to the Commencement Date, certain employees filed claims in the approximate amount of $350,000 under the Medical Insurance Plan which have not yet been paid. Approximately $85,000 in administrative fees owed to the TPA were also unpaid at the Commencement Date. The Dental Insurance Plan is a fully-insured plan that provides dental care to approximately 2,600 full-time employees and 2,328 dependents. The Debtors pay approximately $38,000 per month in company-paid premiums, and Employees pay

approximately $71,000 per month for employee-paid premiums.  As of the Commencement Date, the Debtors have collected approximately $71,000 in premiums from employees that have not yet been remitted to the insurer.

100.    The Debtors also offer a fully-insured plan, HMSA Blue Cross Blue Shield Plan of Hawaii, to cover approximately six employees located in Hawaii (the "Hawaii Plan"). This coverage costs the Debtors approximately $1,000 in premiums per month.

101.    The Debtors provide separate health care plans to part-time employees.  The Colonial Health Advantage Plan (the "Colonial Plan"), is a Limited Benefit Hospital Confinement Indemnity and Accidental Death and Dismemberment plan in which approximately 298 employees and 70 dependents participate.  The Debtors provide term life and accident insurance through Colonial Life as well, in which 231 and 321 employees, respectively, participate.  A dental discount program, the Careington Series 500 Dental Network, and a vision discount program, the VSP Choice Access Plan (collectively, the "Careington Plan") offer vision and dental discounts to approximately 650 employees and 180 dependents. Premium contributions for the Colonial Plan and the Careington Plan are paid fully by the part-time employees who participate in the program. The Debtors believe that they do not have any prepetition obligations under these Plans, but approximately $40,000 in employee contributions are yet to be remitted to the carrier.

102.    The Debtors maintain excess insurance through Zurich North America to cover any medical expenses under the Debtors' Medical Insurance Plan that exceed $150,000 per year per employee, up to a maximum lifetime payment of $1.85 million per employee (the "Stop Loss Insurance"). The Debtors pay a monthly premium of approximately $83,000 per month for the Stop Loss Insurance.

ii.    Workers' Compensation

38

103.   The Debtors provide workers' compensation insurance for their employees at the statutorily-required level for each state (the "Workers' Compensation Program"). These benefits are currently provided for employees through Liberty Insurance Corporation and Liberty Mutual Insurance Company (collectively, "Liberty").[7] Liberty administers and pays the Debtors' workers' compensation claims, subject to the Debtors' deductible of $500,000 per incident. The Debtors expect to pay annual insurance premiums and fees to Liberty in an aggregate amount of approximately $1 million for the policy period from April 2, 2010 through March 31, 2011 (the "Policy Period"). The Debtors expect to pay additional claims handling fees of approximately $175,000 for the Policy Period. The Debtors project that their deductible payments will be $1 million for the Policy Period.

104.   Certain benefits under the Workers' Compensation Program have been incurred prepetition but have yet to be fully paid, and certain other claims were filed prepetition but have yet to be resolved. As of the Commencement Date, the Debtors estimate that outstanding workers' compensation claims are approximately $7 million. A letter of credit covers virtually all exposure for such claims. For the claims administration process to operate in an efficient manner and to ensure that the Debtors comply with their state law requirements, claim assessment, determination and adjudication must continue.

        iii.     Vacation, Sick Leave and Other Leaves of Absence

105.   The Debtors provide vacation time to their full-time employees as a paid time-off benefit (the "Vacation Time"). The amount of Vacation Time available to a particular employee and the rate at which such Vacation Time accrues is generally determined by the employee's position and the length of full-time employment. When a full-time employee elects to take

---

[7]   Employees in Oregon and Wisconsin are covered by Liberty Insurance Corporation and employees in all other states are covered by Liberty Mutual Insurance Company.

Vacation Time, that employee is paid his or her regular hourly or salaried rate. Employees generally may not cash out their unused Vacation Time at the time of termination, unless the applicable state law requires the Debtors to cash out Vacation Time for such employees. For employees in those states that require employers to cash out Vacation Time, the Debtors estimate that approximately $658,176 of earned but unused Vacation Time has accrued as of the Commencement Date.

106.    In addition, in the ordinary course of business, the employees are eligible for sick leave due to illness or injury up to five days per year ("Sick Leave"). The employees may not cash out their unused Sick Leave upon termination.

107.    The Debtors also allow their employees to take certain other leaves of absence for personal reasons, many of which are required by law ("Leaves of Absence"). Leaves of Absence include family medical leaves, pregnancy, adoption and foster care leaves, military leaves, jury duty, voting leaves, personal leaves and bereavement leaves.

iv.    Employee Savings and Retirement Plans

108.    The Debtors, in their discretion, may make matching contributions under the 401(k) Plan at the end of the plan year. The Debtors maintain a retirement savings plan meeting the requirements of Section 401(k) of the Internal Revenue Code for the benefit of all employees (the "401(k) Plan"). Employees who are over the age of 21 and who have completed 90 days of employment are automatically enrolled in the 401(k) Plan (the "Participants") unless they opt out. Temporary workers and independent contractors are not eligible to participate in the 401(k) Plan. The 401(k) Plan allows for automatic pre-tax salary deductions of eligible compensation up to the limits set by the Internal Revenue Code. Approximately 9,200 employees currently participate in the 401(k) Plan, and the approximate monthly amount withheld from the

participants' paychecks for 401(k) contributions is $300,000. The Debtors, in their discretion, may make matching contributions under the 401(k) Plan at the end of the plan year.

### c.   Additional Employee Benefits

   i.   Life Insurance, Accidental Death and Dismemberment Insurance, Short and Long-Term Disability Benefits and Accident Insurance

109.   The Debtors provide all full-time employees with primary life insurance coverage and primary accidental death and dismemberment insurance through Reliance Standard, a third-party insurer (the "Life and AD&D Insurance"). This coverage costs the Debtors approximately $15,300 per month. Full-time employees are also offered the opportunity to purchase supplemental life insurance through the Movie Gallery/Hollywood Group Supplemental Life and Accidental Death and Dismemberment Insurance Programs (the "Supplemental Life and AD&D Insurance"), the premiums for which are paid entirely by the electing employee. The Debtors estimate that approximately 1,842 employees have elected to purchase Supplemental Life and AD&D Insurance. The Debtors estimate that they have withheld approximately $15,500 in employee contributions for Supplemental Life and AD&D Insurance prior to the Commencement Date, which amount has not yet been transferred to Reliance Standard.

110.   The Debtors also provide full-time employees with access to whole life insurance through Unum, a third-party insurer (the "Whole Life Insurance"), the premiums for which are paid entirely by the electing employee. The Debtors estimate that approximately 866 employees have elected to purchase Whole Life Insurance. The Debtors estimate that they have withheld approximately $20,000 in employee contributions for Whole Life prior to the Commencement Date, which amount has not yet been transferred to Unum.

111.   In addition, the Debtors provide full-time employees with short- and long-term disability benefits through Reliance Standard (the "Short-Term Disability Benefits" and the "Long-Term Disability Benefits," respectively). The Debtors pay for basic disability coverage

for all full-time employees. This coverage costs the Debtors approximately $35,000 per month. Full-time employees may purchase additional Short-Term Disability Benefits and Long-Term Disability Benefits at their own cost. The Debtors estimate that approximately 1,630 employees have elected to pay for additional disability benefits, and, prior to the Commencement Date, the Debtors withheld approximately $15,000 in employee contributions for such additional disability benefits, which amount has not yet been transferred to Reliance Standard.

112.    The Debtors also offer full-time employees the opportunity to purchase accident insurance benefits through the Movie Gallery/Hollywood Group Accident Insurance Program (the "Accident Insurance") from UNUM Provident, the premiums of which are paid entirely by the electing employee. The Debtors estimate that approximately 1,200 employees have elected to purchase Accident Insurance. The Debtors estimate that they withheld approximately $27,000 in employee contributions for Accident Insurance prior to the Commencement Date, which amount has not yet been transferred to UNUM Provident.

a.   Flexible Benefit Plan

113.    The Debtors offer their full-time employees the ability to contribute a portion of their pre-tax compensation to flexible spending accounts to pay for eligible out-of-pocket health care and dependent care premiums and expenses (the "Flexible Benefit Plan"). Approximately 251 employees participate in the health care portion of the Flexible Benefit Plan and approximately 20 employees participate in the dependent care portion of the Flexible Benefit Plan. The administration of the Flexible Benefit Plan costs the Debtors approximately $1,350 per month, and the approximate monthly amount withheld from participants paychecks for FSA contributions is $25,300.

### d.    COBRA

114.    Eligible individuals whose employment is involuntarily terminated between September 1, 2008 and February 28, 2010, and who elect Consolidated Omnibus Budget Reconciliation Act ("COBRA") coverage and pay 35% of the full cost of the premium, are entitled to the benefit of a 65% subsidy of the COBRA premium under the American Recovery and Reinvestment Act of 2009 ("ARRA"). Generally, the 65% COBRA premium subsidy under ARRA is paid by the federal government via a payroll tax credit to the employer. The subsidy may continue for up to fifteen (15) months (extended from nine months by the 2010 Department of Defense Appropriations Act, P.L. 111-118, enacted on December 19, 2009) after the first day of the first month for which the subsidy applies. The subsidy generally ends on the earliest of the individual's eligibility for Medicare, other group health plan coverage (subject to certain limitations), or at the end of the maximum period of coverage required under COBRA. By this Motion, the Debtors seek authority to make COBRA subsidy payments as required by federal law.

115.    I believe that authorizing and directing banks and other financial institutions to receive, process, honor and pay all checks presented for payment and electronic payment requests made by the Debtors related to (i) Unpaid Compensation and Temporary Compensation, (ii) Deductions and Payroll Taxes, (iii) Reimbursable Expenses, (iv) the Bonus Plans and the Commissions, (v) the Employee Benefit Programs and (vi) COBRA, whether or not such checks were presented or such electronic payment requests were submitted prior to or after the Commencement Date, would be beneficial to the Debtors. It is my understanding that these checks or wire transfer requests are drawn on identifiable payroll and disbursement accounts. Accordingly, checks or wire transfer requests, other than those relating to authorized payments, will not be honored inadvertently. Moreover, it is my understanding that if the Court grants the

relief requested at the hearing on the First Day Motions, the Debtors will have sufficient cash reserves to promptly pay all Employee Wages and Benefits, to the extent described herein, on an ongoing basis and in the ordinary course of their business.

**K.    Motion of the Debtors for an Order Authorizing, but not Directing, the Debtors to Continue Their Customer Programs and Honor Prepetition Commitments Related Thereto (the "Customer Programs Motion")**

116.    Before the Commencement Date, in the ordinary course of their business, the Debtors engaged in certain practices to develop and sustain positive reputations in the marketplace for their products and services, including, but not limited to, offering gift certificates, store credit, membership programs, coupons, service contracts, a return policy for certain goods and participation in charity programs (collectively, the "Customer Programs"). The common goals among the Customer Programs have been to develop customer loyalty, encourage repeat business and ensure customer satisfaction, thereby retaining current customers, attracting new ones and, ultimately, increasing revenue. I believe that the continuation of these Customer Programs is critical for the Debtors to retain their core customers.

### a.    Gift Certificates

117.    Prior to the Commencement Date, the Debtors sold pre-paid and reloadable gift cards, pre-paid and reloadable electronic discount rental cards and gift certificates for use in the Debtors' stores (collectively, the "Gift Certificates"). These Gift Certificates are available for purchase at the Debtors' stores, through business-to-business sales and at certain third party retail locations. As of the Commencement Date, obligations on account of Gift Certificates remained outstanding as some Gift Certificates sold prepetition have not yet been redeemed. The Debtors estimate that the cash value of outstanding Gift Certificates as of the Commencement Date is approximately $5 million, however, customers may only redeem the Gift Certificates for goods

or services, not a cash refund (unless required by state law).[8]  Moreover, when customers redeem

a Gift Certificate, they often purchase goods and services in excess of the amount of the Gift

Certificate.

### b.    Store Credits

118.    The Debtors offer several promotions through which their customers can purchase

or earn store credits for free or reduced charges for rentals, goods or services (collectively, the

"Store Credits"), which Store Credits include the following:

i.    The Debtors offer their customers the option of making an initial deposit toward the purchase of a movie, game console, game or piece of equipment that has not yet been released so that a participating customer is assured that the item will be available to purchase immediately upon its release (the "Pre-Order Program"). Under the Pre-Order Program, when the item arrives and the customer purchases the item, their deposit is deducted from the purchase price.[9]

ii.    The Debtors also provide customers with an early return credit (the "Early Return Credit Program") for videos that are returned on the day following their rental.  The Early Return Credit Program encourages customers to return their videos early, which contributes to higher inventory levels.  Customers may not redeem early return credits for cash.

iii.    The Debtors offer their Game Crazy customers the option of purchasing disc refurbishing punch cards (the "Disc Refurbishing Cards"), which entitle the purchaser to refurbish their game discs five times.  Disc refurbishing helps maintain discs in their original condition by eliminating scratches.  Disc Refurbishing Cards may not be redeemed for cash.

iv.    The Debtors also offer their customers a trade-in program through which customers can pay for future purchases by trading in used game consoles, games, pieces of equipment, DVDs or Blu-Ray discs.  Customers may not redeem trade-in store credit for cash.

---

[8] All financial information is based on the Debtors' last accounting period, which closed on January 3, 2010.

[9] If the customer decides not to purchase the item when it arrives, the customer is entitled to a refund of the deposit or may apply the deposit to another pre-order item.

    v.    The Debtors provide customers with a guaranteed in stock program (the "Guaranteed In Stock Program") where select titles will be in stock and available for rent, or the customer will receive a free rental for the same title at a later date. The free rental can only be redeemed at the issuing location and may not be redeemed for cash. The Debtors also provide customers with a recommendation program (the "We Recommend Program") where select titles will be on a recommendation list. If a customer rents any movie on the recommendation list and is not satisfied in any way with the rental, the customer may request a free rental upon the return of the paid rental. The free rental is good for 30 days and is only valid at the issuing location and may not be redeemed for cash.

119.    The Debtors estimate that their total obligations as of the Commencement Date for the Store Credits are approximately $2 million.

### c.    Rental Subscription Programs

120.    Prior to the Commencement Date, the Debtors offered their customers monthly and yearly video and gaming membership subscription programs (collectively, the "Membership Programs"), which programs include the following:

    i.    The Debtors' Hollywood Video and Movie Gallery stores run a store-specific monthly rental membership program, known as "PowerPlay" (the "PowerPlay Program"). PowerPlay has four levels of membership with varying prices corresponding to varying numbers of movies and games that customers may have outstanding at a time. The PowerPlay Program allows members to rent movie and game titles by using PowerPlay credits that are purchased monthly on an auto-renewal or pre-paid basis. There are approximately 934,146 PowerPlay Program members.

    ii.    The Debtors offer their Game Crazy customers the option of enrolling in an annual membership program, known as the Most Valuable Player program (the "GCMVP Program"). Membership in the GCMVP Program entitles members to additional credit for trade-ins, discounts on used games and accessories, and free disc refurbishing. Members of the GCMVP Program constitute some of the Debtors' best and most loyal customers. There are approximately 486,231 GCMVP Program members.

    iii    The Debtors, through their service provider Trilegiant Corporation, offer add-on benefits to the GCMVP program, known as the "MVP Plus Program". In addition to receiving the benefits of the GCMVP Program, MVP Plus Program members for an additional

monthly fee also receive additional discounts at third party dining, retail and entertainment locations. Members also receive 5% cash back on up to $5,000 of purchases made at Game Crazy store locations. There are approximately 13,000 MVP Plus Program Members.

121.  The Debtors' obligations as of the Commencement Date for the Rental Subscription Programs are approximately $20 million, however, members may only receive goods and services for such obligations, not a cash refund.

### d.     Service Contracts

122.  When the Debtors sell new and used game consoles, they offer their customers the option of purchasing service contracts for the consoles (each, a "Game Console Service Contract"). These Game Console Service Contracts obligate the Debtors to either repair a damaged console or provide the customer with a replacement console.

123.  The Debtors also offer a disc maintenance service (the "Game Guard Program") for unlimited disc refurbishing of a customer's game discs. The Game Guard Program obligates the Debtors to either repair a damaged disc or provide the customer with a replacement disc. The Debtors refer to the Game Console Service Contracts, the Play Guard Program and the Game Guard Program as the "Service Contracts." The Debtors' obligations as of the Commencement Date for the Service Contracts are approximately $11 million.

### e.     Free and Discounted Rental Coupons

124.  The Debtors run various promotions in their stores in conjunction with certain third parties whereby the Debtors provide customers with coupons for free or reduced charges for video or game rentals (the "Coupons"). For instance, the Debtors' Game Crazy stores maintain a free rental with pre-order program whereby customers who pre-order a new video game receive a coupon for a free movie rental at a Hollywood Video or Movie Gallery store.

125.   Also, the Debtors' Game Crazy stores maintain a 12 free rental with console purchase program whereby customers who purchase a new or used game console receive 12 free game or movie rental coupons (each rental is valid for a specific month) at Hollywood Video or Movie Gallery Stores.  Members of these programs are generally loyal customers who will likely continue their membership in such programs if the Debtors continue to honor the coupons. Further, such coupons may only be redeemed for video or game rentals, not a cash refund.

126.   The Debtors also run various sweepstakes promotions in their stores in conjunction with certain movie and game titles and release events (the "Sweepstakes").  For instance, customers who buy the video game Major League Baseball 2K10 would be entered into a sweepstakes drawing to win an official MLB autographed baseball jersey.  Sweepstakes prizes are not redeemable for cash.

### f.      Guarantees and Returns

127.   It is my understanding that certain customers also hold contingent claims against the Debtors for refunds, returns, exchanges or free rentals relating to goods sold in the ordinary course of business prior to the Commencement Date (the "Guarantees").  It is difficult to estimate with precision the aggregate amount of potential Guarantee claims for goods purchased prior to the Commencement Date.  Based on historical data, however, the Debtors estimate that outstanding obligations as of the Commencement Date for Guarantees are approximately $700,000.

### g.      Customer Service

128.   The Debtors routinely answer customer inquiries and solve customer disputes. Historically, the Debtors have employed various means for resolving customer disputes, including but not limited to the distribution of gift cards and cash.  By this Motion, Debtors request that they be allowed to continue to address customer inquiries and disputes in a manner

consistent with how such matters were handled prepetition. It is critical that the Debtors retain the ability to resolve customer disputes in an effective matter to maintain their customer base.

### h.   Charitable Programs

129.   From time to time, the Debtors participate in charitable programs. One such program is the Debtors' commitment to Starlight, a charitable organization that raises money to provide entertainment to children in hospitals. Another program is the Helen Keller Foundation , a charitable organization that raises money for sight, speech and hearing research and education. The Debtors contribute approximately $157,000 annually to Starlight and Helen Keller. As of the Commencement Date, the Debtors had outstanding obligations to Starlight and Helen Keller of approximately $6,000. The Debtors' participation with Starlight and Helen Keller provides the community with significant benefits, while also enhancing the Debtors' image and profile in its customers' communities.

130.   I believe that paying prepetition commitments under the Customer Programs will benefit the Debtors and their creditors by allowing the Debtors' operations to continue without interruption. In essence, the Debtors hope to continue during the postpetition period those Customer Programs that they believe were effective prepetition. I also believe that the relief requested in the Customer Programs Motion is necessary to preserve the Debtors' relationships with its retail customers as well as corporate goodwill to preserve and grow the value of the business. I believe that the importance of these Debtors' customers to the business cannot be underestimated. I believe that the Debtors' Customer Programs have generated valuable goodwill and repeat business and have contributed to the Debtors' overall revenue. If the Debtors do not honor their obligations under the Customer Programs, I believe that the Debtors risk alienating their customers and encouraging customers to procure products from the Debtors' competition, all to the detriment of the Debtors and their business.

L.    **Motion of the Debtors for an Order (A) Authorizing, but not Directing, the Debtors to Remit and Pay Certain Taxes and Fees and (B) Authorizing and Directing Banks and Other Financial Institutions to Honor Related Checks and Electronic Payment Requests (the "Taxes Motion")**

131.    In the ordinary course of the Debtors' businesses, the Debtors (a) collect sales taxes from their customers and incur taxes, including, but not limited to, use, income, franchise, gross receipts, real and personal property and other taxes in operating their businesses (collectively, the "Taxes") and (b) charge fees and other similar charges and assessments (collectively, the "Fees") on behalf of various taxing, licensing and regulatory authorities (collectively, the "Authorities") and pay Fees to such Authorities for licenses and permits required to conduct the Debtors' businesses. The Taxes and Fees are paid to the respective Authorities in accordance with all applicable laws and regulations.

132.    Each of the Taxes and Fees incurred by the Debtors fall under one of the following categories: (a) sales and use taxes; (b) income taxes; (c) franchise taxes; (d) real and personal property taxes; and (e) business license fees, annual report taxes and other charges and assessments.

a.    **Sales and Use Taxes**

133.    The Debtors collect and remit rental and sales taxes in connection with the rental and sale of goods to their customers. Generally, rental and sales taxes collected from customers are remitted to the Authorities in the month following their collection. The Debtors also may be responsible for remitting use taxes on account of the purchase of various supplies and fixtures. Use taxes typically arise if a supplier does not have business operations in the state in which it is supplying goods and does not charge state taxes. The Debtors remit approximately $8.4 million per month to Authorities, on average, in sales and use taxes.

### b.   Income and Franchise Taxes

134.   Certain Debtors pay income and franchise taxes to Authorities. Income taxes are based on taxable income. Franchise taxes may be based on a flat fee, net operating income or capital employed. Certain jurisdictions assess both franchise taxes and income taxes, while others assess either franchise taxes or income taxes depending on which results in a higher tax. Moreover, some jurisdictions require estimated income and franchise tax payments to be remitted on a quarterly basis if the estimated taxes exceed a certain threshold.

### c.   Real and Personal Property Taxes

135.   In addition, under applicable law, state and local governments in jurisdictions where the Debtors' operations are located are granted the authority to levy property taxes against the Debtors' real and personal property. The Debtors typically pay the property taxes on their real and personal property in the ordinary course of business as such taxes are invoiced, which typically covers taxes for the prior year or quarter, depending on how the applicable tax is assessed.

### d.   Business License Fees, Annual Report Taxes and Other Taxes

136.   The Debtors also are required to obtain business licenses, health permits and second hand dealer permits and pay corresponding fees in many jurisdictions in which they operate. The criteria to obtain these licenses and permits vary significantly by jurisdiction. Moreover, the method of calculating and the deadlines for making payments vary by jurisdiction. In some states, the Debtors are required to pay annual reporting fees to state governments to remain in good standing for purposes of conducting business within the state. Further, the Debtors are required to pay various business taxes in certain states. These taxes may be based on gross receipts, rental receipts or other bases determined by the taxing jurisdiction.

137.   The Debtors operate approximately 2,600 retail stores across North America, and I believe that any disputes that could impact the Debtors' ability to conduct business in a particular jurisdiction could have a wide-ranging and adverse effect on the Debtors' operations as a whole.  In fact, the Debtors' failure to pay the Taxes and Fees could have a material adverse impact on the Debtors' business operations in several ways:  (a) the Authorities may initiate audits of the Debtors, which would divert unnecessarily their attention away from the reorganization process; (b) the Authorities may attempt to suspend the Debtors' operations, file liens, seek to lift the automatic stay and pursue other remedies that will harm the estates; and (c) certain directors and officers could potentially become subject to personal liability, which would likely distract those key employees from their important duties related to the Debtors' restructuring.

138.   The Debtors estimate that the total amount of prepetition Taxes and Fees owing to the various Authorities will not exceed approximately $12 million.  The Debtors believe that timely payment of such Taxes and Fees is appropriate in these chapter 11 cases.  Some of these outstanding tax liabilities are for trust fund taxes that the Debtors have collected and hold in trust for the benefit of the Authorities.  Therefore, the Debtors understand that these funds do not constitute property of their estates and could not otherwise be used by them.  In addition, unpaid taxes may result in penalties, the accrual of interest, or both.

**M.  Motion of the Debtors for an Order (A) Authorizing, but not Directing, the Debtors to Pay Prepetition Claims of Shippers, Warehousemen and Other Lien Claimants and (B) Authorizing and Directing Banks and Other Financial Institutions to Honor Related Checks and Electronic Payment Requests (the "Shippers Motion")**

139.   The movie and game rental and sale business is shipping intensive.  To ensure that the Debtors' stores receive timely deliveries of video titles, video games and other merchandise, the Debtors have developed an intricate distribution system.

140.    The Debtors operate three primary distribution centers in the United States (collectively, the "Distribution Centers").  The Debtors use the Distribution Centers to receive bulk deliveries of movies, games, concessions and other related products (the "Retail Goods") from their suppliers, including movie studios, video game manufacturers and concessionaires (the "Vendors").  The Debtors then repackage those bulk deliveries for distribution to the Debtors' individual store locations.  The Debtors' supply and delivery system depends upon the use of reputable domestic common carriers, shippers, truckers, shipping auditing services and customs agents (collectively, the "Shippers") to deliver products to and from the Distribution Centers, as well as a network of third-party contractors to store goods while in transit (the "Warehousemen").  The Debtors' pricing policies, marketing strategies and fundamental business operations rely on their ability to receive and rent or sell the Retail Goods in a timely fashion.

141.    In many instances, particularly in the case of "new release" video and game titles, the timing of deliveries is absolutely critical.  In the Debtors' industry, the date that titles will become available to the public for rent or purchase is known as the "street date."  For any given new release, the Debtors typically announce, sometimes with great fanfare, the street date in their stores.  The substantial majority of the Debtors' rental revenues are derived from the rental of new release movies and games.  If the Debtors fail to have new release titles available on the applicable street date, I believe that the Debtors will suffer a loss of credibility with their customers.  I believe, therefore, that it is critical to the Debtors' business that their supply and delivery system continue to function without interruption.

142.    Additionally, because the Debtors operate stores in all 50 states, at any given time the Debtors or their various assets may be subject to a wide variety of lien claims, including, but

not limited to, mechanics liens and materialmans liens (collectively, the "Miscellaneous Lien Claims").

### a.    Description of Shippers' and Warehousemens' Claims

143.    As described above, the Debtors utilize the Shippers and Warehouseman throughout every stage of this distribution process.  The Debtors' ability to timely receive, distribute and return Retail Goods depends on the maintenance of a successful and efficient supply and delivery network, and I believe that any disruption in the delivery of Retail Goods would have an immediate and devastating impact on the Debtors' operations.

144.    It is my understanding that the Debtors pay approximately $25 million annually to the Shippers and Warehousemen.  The Debtors expect that, as of the Commencement Date, the outstanding prepetition invoices of the Shippers and Warehousemen will not exceed $2.5 million (the "Shipping Charges").  However, this balance can fluctuate on a daily basis depending on the timing of large deliveries and invoices.  Absent payment of the Shipping Charges, I believe that the Shippers and the Warehousemen will likely refuse to continue to transport goods and make timely delivery or may seize the goods in their possession as collateral securing their lien.

### b.    Description of Miscellaneous Lien Claims

145.    The Debtors routinely transact business with a number of third parties who have the potential to assert Miscellaneous Lien Claims against the Debtors and their property if the Debtors fail to pay for the goods or services rendered (the "Lien Claimants").  The Lien Claimants may perform various services for the Debtors, including miscellaneous store repair and maintenance services and outsourced video game console repair services.

146.    It is my understanding that the payment of the Shipping Charges are not simply necessary for the continued operations of the Debtors but critical to the survival of the Debtors' business.  The sale and rental of the Retail Goods — especially the new releases, which are the

lifeblood of the Debtors' operations — depend upon the Debtors' ability to receive the Retail Goods in a timely fashion. Moreover, the Debtors believe in their sound business judgment that continuation of their positive relationship with the Shippers and Warehousemen is imperative to their continued operations and greatly increases the likelihood of a successful reorganization.

147.    Furthermore, I also believe that payment of the prepetition Shipping Charges will benefit the Debtors and their creditors by allowing the Debtors to receive the Retail Goods necessary to operate their business, and will not prejudice unsecured creditors since the Debtors will only pay those claimants that they believe in their business judgment to be secured by valid liens, or that they believe are capable of being secured by perfecting liens in the Debtors' property. I believe that payment of the Miscellaneous Lien Claims will save the Debtors the considerable time and expense of having to negotiate or litigate for the return of or right to use property of the estate that may be subject to these lien claims.

148.    I believe that authorizing and directing banks and other financial institutions to receive, process, honor and pay all checks presented for payment and electronic payment requests made by the Debtors related to the prepetition obligations described in the Shippers Motion, whether such checks were presented or electronic payment requests were submitted prior to or after the Commencement Date would be beneficial to the Debtors. It is my understanding that these checks or wire transfer requests are drawn on identifiable payroll and disbursement accounts. Accordingly, I believe checks or wire transfer requests will not be honored inadvertently. Moreover, I believe that if the Court grants the relief requested at the hearing on the First Day Motions, the Debtors will have sufficient cash reserves to promptly pay all prepetition obligations set forth on an ongoing basis and in the ordinary course of their business.

**N.**     **Motion of the Debtors for Entry of Interim and Final Orders Determining Adequate Assurance of Payment for Future Utility Services (the "Utilities Motion")**

149.     While most of the Debtors' stores are leased, the Debtors are responsible for utility expenses at all or nearly all store locations.  Specifically, in the operation of their retail operations, the Debtors incur utility expenses for water, sewer service, electricity, gas, telephone service, internet service, cable service and waste management in the ordinary course of business. These utility services are provided by approximately 3,000 utilities (collectively, the "Utility Providers") through more than 11,000 different accounts, including those listed on Exhibit C attached to the Utilities Motion.  On average, the Debtors spend approximately $4 million each month on utility costs.  It is my understanding that the Debtors believe that they generally were current on utility payments as of the Commencement Date.  Moreover, the Debtors employ an outside vendor, Advantage IQ, Inc. ("Advantage"), to help them generally aggregate and manage the utilities for the approximately 2,466 U.S. store locations.  Uninterrupted utility services are essential to the Debtors' ongoing operations and, therefore, to the success of their reorganization. Indeed, any interruption of utility services, even for a brief period of time, would negatively impact the Debtors' store operations, customer relationships, revenues and profits, seriously jeopardizing the Debtors' reorganization efforts and, ultimately, value and creditor recoveries.  I believe, therefore, it is critical that utility services continue uninterrupted during these chapter 11 cases.

**O.**     **Motion of the Debtors for an Order (A) Authorizing the Debtors to Conduct Store Closing Sales, (B) Approving Procedures with Respect to Store Closing Sales and (C) Authorizing the Debtors to Pay Limited Liquidation and Closure Performance Bonuses in Connection with Store Closing Sales (the "Store Closing Procedures Motion")**

150.     Prior to the Commencement Date, the Debtors conducted an extensive review of their store portfolio with the objective of identifying and closing unprofitable store locations. The Debtors have identified certain stores where closing sales have already been commenced or

56

will commence shortly after the Commencement Date (the "Immediate Store Closing Locations"), and a list of those stores is attached as Exhibit 1 to Exhibit A of the Store Closing Procedures Motion. The Debtors will continue to evaluate stores and will make decisions on whether to close such other stores on a continuing basis throughout these chapter 11 cases.

151.    Historically, the Debtors have closed underperforming or unprofitable store locations in the ordinary course of business. With over 2600 store locations, opening and closing stores is a routine, ordinary course activity for the Debtors. However, out of an abundance of caution, the Debtors now seek authority to conduct, in their sole discretion, store closing sales to effectuate the liquidation of inventory, fixtures and equipment at the Immediate Store Closing Locations and at other store locations that may be closed during these chapter 11 cases (the "Store Closing Sales")

152.    I believe that approval of certain store closing procedures, as set forth on Exhibit 2 annexed to Exhibit A attached to the Store Closing Procedures Motion will ensure that the Store Closing Sales proceed in an orderly and efficient manner without undue interruption to the Debtors' business. I further believe that it is crucial to the Debtors' efforts to successfully reorganize that the Store Closing Sales at the Immediate Store Closing Locations commence as quickly as possible and proceed thereafter without interruption so that the Debtors can timely receive the proceeds of those liquidation sales, which will likely be a crucial element of any plan of reorganization for the Debtors.

153.    Moreover, I believe that to ensure that the Debtors retain sufficient personnel to conduct the Store Closing Sales, the Debtors need the authority, in their sole discretion, to pay limited liquidation and closure performance bonuses to various store-level employees to incentivize them to continue to work during Store Closing Sales (the "Liquidation and Closure Performance Bonuses"). While the Debtors request considerable discretion in determining who

will receive a Liquidation and Closure Performance Bonus and the amount of any Liquidation and Closure Performance Bonus, in no event will a Liquidation and Closure Performance Bonus exceed $0.50 per hour worked per store-level employee for the duration of the Store Closing Sales or $2,400 per store manager for the duration of the Store Closing Sales. The Store Closing Sales are anticipated to last between three and eight weeks, on average. The Liquidation and Closure Performance Bonuses will be paid subsequent to the completion of each Store Closing Sale.

154.    It is my understanding that there are no officers of the Debtors that would be eligible for either the Liquidation or Closure Performance Bonuses.

155.    I believe that any inability to promptly commence and conduct Store Closing Sales would have serious negative consequences for the Debtors. Specifically, interruptions in the sale process would delay the date by which the Debtors are able to vacate and reject the leases for the locations, resulting in potentially significant and unnecessary administrative obligations to landlords, utility providers and other post-petition creditors. In addition, if the Debtors close any significant number of stores at the same time (which the Debtors expect to do during the course of these cases) the Debtors will generally be unable to absorb the excess inventory, fixtures and equipment into the Debtors' remaining store locations. Therefore, the best option for disposing of excess inventory, fixtures and equipment will be to conduct a Store Closing Sale. I believe that Store Closing Sales represent the most profitable means for disposing of the inventory, fixtures and equipment at such store locations.

**P.    Motion of the Debtors for an Order Authorizing the Debtors to Reject Certain Unexpired Leases and Executory Contracts Effective as of the Commencement Date (the "Lease and Contract Rejection Motion")**

156.    Generally, the Debtors do not own the property on which their stores are or were operated.  Instead, the Debtors lease nonresidential real property from numerous lessors and other counterparties.

157.    In considering their options with respect to leases of stores shut down prior to the Commencement Date (the "Rejected Leases"), the Debtors evaluated the possibility of assigning one or more of the leases to third parties.  The Debtors have determined that the transactional costs and prepetition occupancy costs and postpetition occupancy costs associated with marketing a lease of a vacant store likely exceeds any marginal benefit that might be received from potential assignments or subleases.

158.    Furthermore, in addition to their potential obligation to pay rent under the store leases, the Debtors may also be obligated to pay for certain real estate taxes, utilities, insurance and other related charges associated with such leases.  The Debtors have examined the costs associated with their potential obligations to pay rent under the Rejected Leases and estimate that the annual occupancy costs to the Debtors associated with those leases is over $75 million.  I believe that such costs, with the concomitant costs of operating these locations, constitute an unnecessary drain on the Debtors' resources and an overall diminution of the value of the Debtors' estates.  Accordingly, in an effort to reduce postpetition administrative costs and in the exercise of the Debtors' sound business judgment, it is my understanding that the immediate rejection of the Rejected Leases (as set forth on Exhibit 1 annexed to the order attached to the Lease and Contract Rejection Motion) effective as of the Commencement Date is in the best interests of the Debtors, their estates and their creditors.

159.    In addition, to leases of real property, the Debtors are parties to various other executory contracts.  While the Debtors are still in the process of identifying all those executory contracts which no longer provide any benefit to the Debtors, the Debtors have already identified certain executory contracts which they plan to reject immediately.  Accordingly, I believe that the lease rejection procedures attached to the Lease and Contract Rejection Motion are necessary and in the best interests of the Debtors, their estates and their creditors, and that the immediate rejection of the Rejected Leases and other already-identified executory contracts will benefit the Debtors' estates by immediately reducing unnecessary administrative expenses.

**Q.**    **Motion of the Debtors for an Order (A) Authorizing the Debtors to Continue Using their Existing Cash Management System, Bank Accounts and Business Forms, (B) Granting Postpetition Intercompany Claims Administrative Expense Priority and (C) Authorizing Continued Intercompany Arrangements and Historical Practices (the "Cash Management Motion")**

**a.**    **Description of the Debtors' Cash Management System**

160.    In the ordinary course of business, the Debtors utilize an integrated, centralized cash management system under which funds are collected by the Debtors, transferred to various concentration accounts and disbursed, through other accounts, to pay operating expenses (collectively, the "Cash Management System").

161.    In addition to the Cash Management System maintained by the Debtors in the United States, the Debtors' non-Debtor affiliate, Movie Gallery Canada, Inc. ("MG Canada"), maintains a similar cash management system at the Canadian Imperial Bank of Commerce ("CIBC").  MG Canada's cash management system does not overlap with the Cash Management System other than with respect to transfers of cash for intercompany transactions in the ordinary course of business and intercompany loans, debt repayments, dividends and capital contributions that were undertaken before the Commencement Date from time to time outside the ordinary course of business.

162.    The Debtors' Cash Management System is managed primarily by the Debtors'

financial personnel at their support center in Wilsonville, Oregon.   The Cash Management

System enables the Debtors to (a) forecast and report the Debtors' cash position, (b) monitor

collection and disbursement of funds and (c) maintain control over the administration of the

various bank accounts, which is required to effect collection, disbursement and movement of

cash in connection with the operation of the Debtors' approximately 2,600 retail stores located

throughout North America, as well as their three distribution centers and two corporate offices.

163.    The Cash Management System consists of numerous accounts, each of which is

described herein.  The Debtors maintain multiple concentration accounts, payroll disbursement

accounts, accounts payable controlled disbursement accounts (some of which are for payroll

expenses), controlled tax disbursement accounts, stand-alone disbursement accounts, merchant

collection accounts and one stand-alone depository account (collectively, the "Corporate

Accounts").10  The Corporate Accounts are maintained at two separate banks:  Bank of America

("BofA") and Wachovia Bank f/k/a First Union National Bank ("Wachovia").

**b.      The Debtors' Existing Bank Accounts**

164.    As of the Commencement Date, in the ordinary course of business, the Debtors

maintained approximately 400 bank accounts (collectively, the "Bank Accounts") with certain

financial institutions (collectively, the "Banks").  The Debtors' main operating bank accounts are

described herein.  To supplement that description, each of the Bank Accounts maintained by the

Debtors (with the name and contact information of the corresponding Bank) is listed on Exhibit 1

annexed to Exhibit A of the Cash Management Motion.  It is my understanding that some of the

Bank Accounts are located in banks other than those designated as authorized depositories by the

---

10 The Debtors do not utilize any investment accounts.  All funds remain within depository and disbursement bank
   accounts.

U.S. Trustee pursuant to the U.S. Trustee Guidelines.[11] It is also my understanding that the Bank

Accounts located at banks that are not designated as authorized depositories pursuant to the U.S.

Trustee Guidelines, however, hold far less than $100,000 at any given time and, therefore, I do

not believe represent bank accounts with significant deposits for purposes of the Debtors' Cash

Management System.

**c.    The Flow of Funds in the Debtors' Cash Management System**

165.    The Debtors' cash receipts and disbursements flow as follows:

166.    Store Depository Accounts.  Each of the Debtors' stores deposits cash and checks

on a daily basis into a variety of store depository accounts maintained with a multitude of banks

across the United States (each, a "Store Depository Account").   Because the Debtors have

thousands of retail stores across the United States, each Store Depository Account services either

a single retail location or a cluster of retail locations concentrated in a single geographic area.

167.    Merchant Collection Accounts:  The two principal operating Debtors, Hollywood

Entertainment Corporation ("HEC") and Movie Gallery US, LLC ("MGUS") transmit Visa,

MasterCard, American Express and Discover credit card and debit card transactions through a

third party processor (Paymentech for HEC and First Data for MGUS) on a daily basis.  The

respective third party processor wires credit card and debit card payments to a HEC BofA

merchant collection account and a MGUS Wachovia merchant collection account (the "Merchant

Collection Accounts").

168.    Concentration Accounts.  Funds in the MGUS non-Wachovia and the HEC non-

BofA Store Depository Accounts are swept via the Automated Clearing House Network (the

"ACH") — which is a reliable and efficient nationwide batch-orientated electronic funds transfer

---

[11] The Debtors estimate that approximately 25 of their Bank Accounts contain deposits in excess of $100,000.
Pursuant to the U.S. Trustee Guidelines, the Debtors will identify those Bank Accounts for the U.S. Trustee
within 30 days of the date hereof.

— to the MGUS Wachovia concentration account (the "MGUS Concentration Account") and the HEC Wachovia concentration account (the "HEC Wachovia Concentration Account"), respectively, by an anticipatory ACH.[12]  Deposits are reflected in the HEC Wachovia Concentration Account and the MGUS Concentration Account the day after they are made into the Store Depository Accounts.

169.  The HEC BofA Store Depository Accounts and the MGUS Wachovia Store Depository Accounts are also swept into the HEC BofA concentration account (the "HEC Corporate Concentration Account") and the MGUS Concentration Account, respectively, on a daily basis.  The HEC BofA Store Depository Accounts are swept via "Direct Depository Plus" and the MGUS Wachovia Store Depository Accounts are swept via a zero balance account ("ZBA") relationship.[13]  Subsequently, funds within the HEC Corporate Concentration Account are swept via a ZBA relationship to a HEC BofA master concentration account (the "HEC Master Concentration Account").  Finally, most funds in the HEC Master Concentration Account are subsequently transferred via a daily wire to the MGUS Concentration Account and all funds in the MGA Standalone Account are transferred via wire to the MGUS Concentration Account.

170.  Deposit of Credit Card Transactions:  With respect to credit card sales, the Merchant Collection Accounts have a ZBA relationship with the HEC Corporate Concentration Account and the MGUS Concentration Account.  The Merchant Collection Accounts also have a ZBA relationship with the MGUS Concentration Account.  Funds in the Merchant Collection

---

[12] The anticipatory function estimates incoming deposits based on a percentage of prior revenue, rather than waiting for a bank account information file from the bank to confirm account balances.  It is my understanding that this estimation results in faster movement of deposits into the MGUS Concentration Account.  If the ACH is overestimated for any bank balance, that bank's sweep is rejected for the day and a new sweep is initiated the next business day.

[13] A ZBA account is an account used by companies to eliminate excess balances in separate accounts and maintain greater control over disbursements.

Accounts are generally transferred to their respective concentration accounts within 72 hours of the sales transaction. Funds in the HEC Corporate Concentration Account are then transferred via a ZBA relationship with the HEC Master Concentration Account.

171.    Prepetition Deposit of Credit Facility Funds: Before the Commencement Date, in the ordinary course of business, the Debtors made periodic borrowing requests under the Revolving Credit Facility.    These borrowings were deposited into the MGUS Concentration Account.

172.    HEC Disbursement Accounts:  In the ordinary course of business, the Debtors disburse funds to pay, among others, their employees, creditors, suppliers and taxing authorities. The HEC Master Concentration Account disburses funds via a ZBA relationship to a HEC BofA disbursement account (the "HEC Disbursement Account") for payroll purposes only with a deposit into a separate BofA direct deposit payroll account through a manual "book transfer" of funds from the HEC Disbursement Account for employees with direct deposit payroll accounts. Payroll checks are funded daily via the ACH from the HEC Disbursement Account to a BofA check funding account that has a ZBA relationship with a BofA payroll check drawing account. All other disbursements for HEC are made through the HEC Wachovia Concentration Account to a Wachovia accounts payable disbursement account (the "HEC Accounts Payable Disbursement Account") via a ZBA relationship.  As checks clear the HEC Accounts Payable Disbursement Account, these disbursement accounts become negative and are subsequently funded by the HEC Wachovia Concentration Account via a ZBA relationship.  The HEC Wachovia Concentration Account is funded daily via a "book transfer" from the MGUS Concentration Account to fund the outflows in the disbursement accounts. The HEC Wachovia Concentration Account has minimal inflows, so daily transfers are needed to account for

clearings. There is also a HEC Wachovia property tax payable specialty disbursement account with a ZBA relationship with the HEC Wachovia Concentration Account.

173.    MGUS Disbursement Accounts.    MGUS disbursements are transferred to Wachovia accounts payable, payroll, property tax and sales tax specialty accounts that have ZBA relationships with the MGUS Concentration Account.    As noted above, the MGUS Concentration Account also funds the HEC Wachovia Concentration Account to account for daily clearings from the HEC Disbursement Account. In addition, before the Commencement Date, disbursements to the Prepetition Credit Facility borrowings were made from the MGUS Concentration Account.

### d.    Benefits of the Existing Cash Management System

174.    I believe that the Debtors' Cash Management System is similar to those commonly employed by corporate enterprises comparable to the Debtors in economic scope and geographic reach.    Indeed, large, multiple-entity businesses use such systems because of the numerous benefits provided, including the ability to (a) quickly create status reports on the location and amount of funds, allowing management to track and control corporate funds, (b) ensure cash availability and (c) reduce administrative expenses by facilitating the movement of funds.    It is my understanding that these controls are particularly important because approximately $20 million to $40 million flows through the Debtors' integrated Cash Management System on a weekly basis to service the Debtors' retail stores, distribution centers and corporate offices.

### e.    The Debtors' Existing Business Forms and Checks

175.    In the ordinary course of business, the Debtors use a multitude of checks and other business forms.    To minimize expenses to their estates, I believe it is appropriate for the Debtors to continue to use all correspondence and business forms (including, but not limited to,

letterhead, purchase orders and invoices) as such forms were in existence immediately before the

Commencement Date — without reference to the Debtors' status as debtors in possession —

rather than requiring the Debtors to incur the expense and delay of ordering entirely new

business forms. I also believe it will minimize expense to their estates if the Debtors are

permitted to use their existing check stock.

176.   By virtue of the nature and scope of the Debtors' business operations and the

customers and vendors with whom the Debtors deal on a regular basis, I believe that it is

important that the Debtors be permitted to continue to use their existing checks and other

business forms without alteration or change, except as requested herein.

### f.     The Debtors' Intercompany Claims

177.   In the ordinary course of business, the Debtors and MG Canada maintain business

relationships with each other, resulting in intercompany receivables and payables in the ordinary

course of business (the "Intercompany Claims"). Indeed, in connection with the daily operation

of the Cash Management System, funds are disbursed throughout the Cash Management System

and at any given time there may be Intercompany Claims owing by one Debtor to another, or

between a Debtor and MG Canada. The transactions that give rise to Intercompany Claims are

made between and among the Debtors and, to a certain extent MG Canada, in the ordinary course

of the Debtors' business (the "Intercompany Transactions"). The Debtors maintain records of all

fund transfers and can ascertain, trace and account for Intercompany Transactions. At the same

time, though, if the Intercompany Transactions were to be discontinued, it is my understanding

that the Cash Management System and related administrative controls would be disrupted to the

Debtors' detriment.

178.   In the ordinary course of business, HEC purchases game product on behalf of MG

Canada from vendors in the United States and ships the product to MG Canada stores. In

addition, MGUS and HEC transfer excess movie product inventory to MG Canada stores in the ordinary course of business. Lastly, there are cash transfers between MG Canada, MGUS and HEC accounts for funding of general corporate items due to excess liquidity in each of the respective accounts. It is my understanding that all of the foregoing transactions will be accounted for in the respective intercompany accounts of the respective entities. The foregoing are examples of the business relationships between and among the Debtors and MG Canada (together with the Intercompany Transactions, the "Intercompany Arrangements"). The Debtors will continue to maintain records related to the Intercompany Arrangements, so that transactions can be ascertained, traced and accounted for properly on applicable intercompany accounts.

> **g.** **The Continued Use of the Debtors' Cash Management System and Existing Bank Accounts Is Essential to the Debtors' Ongoing Operations and Restructuring Efforts**

179. Given the substantial economical scale and geographic reach of the Debtors' business operations, I believe a successful reorganization of the Debtors' business, as well as the preservation and enhancement of the Debtors' respective values as going concern entities simply cannot be achieved if the Debtors' cash management procedures are substantially disrupted and the Bank Accounts are closed.

180. If the Debtors were required to open separate accounts as debtors in possession and rearrange their Cash Management System, it is my understanding that it would necessitate opening numerous new accounts for collections, cash concentration and disbursements. In fact, the Debtors would need to open hundreds of new bank accounts. It is also my understanding that the Debtors' treasury, accounting and bookkeeping employees would be forced to focus exclusively on opening new accounts immediately, instead of on their daily responsibilities during this critical time. I believe the opening of new accounts would certainly increase operating costs, thereby negatively impacting the Debtors' cash flow. Most importantly, I

believe that delays that would result from opening new accounts, revising cash management procedures and instructing customers to redirect payments would negatively impact the Debtors' ability to operate their businesses while pursuing these arrangements.

### h. Maintaining the Existing Cash Management System Facilitates a Smooth Transition into Chapter 11 and Does Not Harm Parties in Interest

181.    I believe maintaining the Bank Accounts would greatly facilitate the Debtors' transition into operating under chapter 11 by, among other things, avoiding administrative inefficiencies and expenses and minimizing delays in paying debts incurred postpetition. Thus, I believe it would be extremely beneficial to continue to maintain the existing Bank Accounts and, if necessary, to open new accounts and close existing accounts in the ordinary course of business operations.

182.    I believe parties in interest would not be harmed in any way by the Debtors' maintenance of the existing Cash Management System, including their Bank Accounts, because the Debtors have implemented appropriate mechanisms to ensure that payments will not be made on any debts incurred by them before the Commencement Date, other than those authorized by the Court, and to eliminate the risk of other errors or misunderstandings. Specifically, the Debtors have centralized their accounts payable systems and implemented software restrictions that prohibit payments to be issued without prior approval of the Debtors' treasury department. In turn, I believe the Debtors' senior treasury personnel are aware of, and will comply with, the Bankruptcy Code and the U.S. Trustee Guidelines except as modified by order of the Court. I also believe that the Debtors' personnel will consult with the Debtors' advisors and bankruptcy counsel as appropriate in connection with payment approvals.

183.    Under these circumstances, I believe that maintaining the Debtors' Cash Management System is in the best interests of their respective estates and creditors. Indeed, I

believe preserving the "business as usual" atmosphere and avoiding the unnecessary distractions that would inevitably be associated with any substantial disruption in the Cash Management System will facilitate the Debtors' overall reorganization efforts.

### i.    The Debtors Should Be Allowed to Continue Certain Intercompany Arrangements and Intercompany Claims Should Be Afforded Administrative Expense Priority

184.    I believe that continued performance under the Intercompany Arrangements is not only important to the Debtors' successful restructuring, but is also necessary to ensure the Debtors' ability to operate their businesses as debtors in possession.  Were the Debtors required to obtain the services they currently receive under the Intercompany Arrangements by non-affiliated third parties, I believe the significant burdens of identifying appropriate providers and negotiating agreements for these services would divert the Debtors' attention and efforts from ensuring a smooth transition into the chapter 11 process and, ultimately, working towards a successful restructuring.

185.    If the Intercompany Arrangements were discontinued, it is my understanding that a number of services currently provided by the Debtors would be disrupted.  Accordingly, I believe that the continuation of the Intercompany Arrangements is in the best interest of the Debtors' estates and their creditors and, therefore, the Debtors should be permitted to continue such Intercompany Arrangements.

186.    At any given time, there may be balances due and owing between and among the Debtors and MG Canada.  These balances represent extensions of intercompany credit made in the ordinary course of business that I believe are an essential component of the Cash Management System. The Debtors maintain records of these transfers of cash and can ascertain, trace and account for these intercompany transactions.  It is my understanding that the Debtors

will continue to maintain such records, including records of all current intercompany accounts receivable and payable.

### j.     The Debtors Should Be Granted Authority to Use Existing Checks and Business Forms

187.     In the ordinary course of their business, the Debtors use a multitude of checks and other business forms.  To minimize expenses to the estates, the Debtors request authority to continue to use all correspondence and business forms (including, but not limited to, letterhead, purchase orders and invoices) as such forms were in existence immediately prior to the Commencement Date.  The Debtors also request authorization to use their existing check stock without the "debtor in possession" label.  I believe that because the Debtors have approximately 2,600 retail outlets across North America, along with sophisticated purchasing and distribution networks, use of new business forms will greatly increase the Debtors' costs.  Furthermore, the economic scale and geographic reach of the Debtors' business will require a vast amount of resources to implement new business forms for all operations, from correspondences to purchasing orders.

188.     I believe that because parties doing business with the Debtors undoubtedly will be aware of the Debtors' status as a debtor in possession (as a result of the large and highly-publicized nature of these chapter 11 cases), changing business forms is unnecessary and unduly burdensome.  In addition, all known creditor parties will be sent notices of the commencement of these cases and there will be publication notice in large media outlets.

R.    **Motion of the Debtors for Interim and Final Orders Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364(e) and 552 and Fed. R. Bankr. P. 2002, 4001 and 9014 (A) Authorizing the Use of Cash Collateral, (B) Granting Adequate Protection to Certain Pre-Petition Secured Parties, (C) Granting Related Relief, (D) Scheduling an Interim Hearing and (E) Scheduling a Final Hearing (the "Cash Collateral Motion")**

189.    Pursuant to the Cash Collateral Motion, the Debtors seek authority, first on an interim basis and ultimately on a final basis, to use their cash on hand to finance the operation of their businesses during the pendency of these cases.  That cash is collateral for three separate prepetition credit facilities under which the Debtors are either borrowers or guarantors; (a) the Prepetition First Lien Revolving Credit Facility, (b) the Prepetition First Lien Term Credit Facility, and (c) the Prepetition Second Lien Term Credit Agreement.

190.    As set forth in the Cash Collateral Motion, the Prepetition First Lien Revolving Credit Facility and the Prepetition First Lien Term Credit Facility share a joint first lien on substantially all of the assets of the Debtors, including their cash on hand.  However, and as set forth in detail in the Cash Collateral Motion, pursuant to the credit documents governing those two facilities, the Prepetition First Lien Revolving Credit Facility is granted a priority right of repayment over the Prepetition First Lien Term Credit Facility, and is entitled to recover its full outstanding principal balance of $100 million, together with certain fees and expenses, before any repayment is made on account of the outstanding obligations under the Prepetition First Lien Term Credit Facility.

191.    In addition, the credit documents governing these two facilities provide that, following an "Event of Default" under either facility, the lenders under the Prepetition First Lien Revolving Credit Facility are entitled to "sweep" from the Debtors and apply to their outstanding loan obligations all of the Debtors' cash in excess of $15 million.

192.    The terms and conditions of the Prepetition First Lien Revolving Credit Facility and the Prepetition First Lien Term Credit Facility -- including the intercreditor provisions

71

described above -- were expressly approved by the bankruptcy court as part of its Order confirming the Debtors' 2008 Plan.

193.    The current outstanding obligations under the Prepetition First Lien Revolving Credit Facility are approximately $100 million, while the outstanding obligations under the Prepetition First Lien Term Credit Facility are approximately $370 million.  The Debtors believe that the total value of the collateral securing the outstanding obligations under both facilities is more than $100 million, but significantly less than $470 million.  Consequently, the Debtors believe that the First Lien Revolving Credit Facility (which has a repayment priority for the first $100 million of proceeds of collateral) is fully secured, while the Prepetition Secured First Lien Term Facility is significantly undersecured.

194.    Through extensive, arm's-length negotiations with the lender under the First Lien Revolving Credit Facility (the "Revolver Lender"), the Debtors secured the Revolver Lender's consent to the Debtors' use of its cash collateral on terms which the Debtors submit are favorable to the Debtors, and which will provide the Debtors estates with access to adequate cash to fund their ongoing business, including the costs of liquidating a significant number of currently-operating stores.

195.    In return for the Revolver Lender's consent to the Debtors' use of its cash collateral, the Debtor has agreed, inter alia, that the Revolver Lender (a) will be paid cash interest at its contract rate, (b) may sweep the Debtors' cash in excess of $50 million weekly, beginning on the first Monday that is at least 30 days after the Cash Collateral Order is entered, until such time as the Revolver Lender has received and applied to its outstanding obligations a total of $50 million from the Debtors on account of such cash sweeps, and (c) will be granted certain replacement liens and certain superpriority claims against the Debtors.  The Debtors will then be authorized to utilize their cash on hand to fund continuing operations pursuant to an

72

agreed budget approved by the Revolver Lender until the earlier of the termination of the cash collateral order or an event of default under that order.[14]

196.    The Debtors submit that the terms of their agreed use of the Revolver Lender's cash collateral are fair and reasonable to the Debtors, and provide adequate protection to the Revolver Lender, as well as to the lenders under the Prepetition First Lien Term Credit Facility who also have an interest in the same collateral.  Moreover, the Debtors have an absolute and urgent need to access that cash collateral to fund their ongoing business operations.

---

[14] The foregoing discussion merely summarizes certain of the principal terms of the agreed cash collateral order. The complete terms of the agreement between the Debtors and the Revolver Lender with respect to the agreed use of cash collateral are set forth in the form of Cash Collateral Order attached to the Cash Collateral Motion.

I declare under penalty of perjury that the foregoing is true and correct.

By:
Name: Steve Moore
Title:   Chief Restructuring Officer

Sworn to before me on this  2nd day of February, 2010

By:
Notary Public    Comm Exp:  3/31/13

# Movie Gallery Corporate Structure



**Movie Gallery, Inc.**
a Delaware corporation

**Hollywood Entertainment Corporation**
a Virginia corporation

**HEC Real Estate, LLC**
(formally MG Automation)
a Delaware limited
liability company

**Movie Gallery US, LLC**
a Delaware limited
liability company

**Movie Gallery Canada, Inc.**
a New Brunswick corporation

**MG Real Estate, LLC**
(formally MG Realty I, LLC)
a Delaware limited
liability company