John A. Bicks (NY 2032498)
Louis A. Curcio (NY 4016267)
SONNENSCHEIN NATH & ROSENTHAL LLP
1221 Avenue of the Americas
New York, NY 10020-1089
Telephone: (212) 768-6700

Michael A. Condyles (VA 27807)
Peter J. Barrett (VA 46179)
KUTAK ROCK LLP
Bank of America Center
1111 East Main Street, Suite 800
Richmond, Virginia 23219-3500
Telephone: (804) 644-1700

*Attorneys for Debtors and Debtors in Possession*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## RICHMOND DIVISION

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| MOVIE GALLERY, INC., et al.,[1] | ) Case No. 10-30696 (DOT) |
| | ) |
| Debtors. | ) |
| | ) |

## MOTION OF THE DEBTORS FOR ENTRY OF ORDER: (I) APPROVING AGREEMENT WITH GREAT AMERICAN WF, LLC; (II) AUTHORIZING THE SALE OF THE DEBTORS' ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND INTERESTS; (III) APPROVING A BREAK-UP FEE AND EXPENSE REIMBURSEMENT; (IV) APPROVING THE FORM AND MANNER OF THE NOTICE; AND (V) GRANTING RELATED RELIEF

The above-captioned debtors (collectively, the "Debtors"), pursuant to this motion (the "Motion"), hereby move the Court pursuant to sections 105 and 363 of Title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "Bankruptcy Code"), for entry of an order in substantially the form annexed hereto as Exhibit A: (i) approving procedures for the selection by the Debtors of an exclusive agency agreement (such selected agreement, the "Agency Agreement") and the Debtors' execution of and performance under such agreement; (ii) authorizing the sale of certain of the Debtors' assets free and clear of all liens, claims,

---

[1] The Debtors in the cases are Movie Gallery, Inc., Hollywood Entertainment Corporation, Movie Gallery US, LLC, MG Real Estate, LLC, and HEC Real Estate, LLC.

encumbrances and interests pursuant to the Agency Agreement; (iii) approving a break-up fee

and expense reimbursement payable under the Agency Agreement (the "GA Agreement") with

Great American WF, LLC ("Great American") to Great American in the event the Debtors select

a higher and better offer from a competing bidder; (iv) approving the form and manner of the

notice of this Motion; and (v) granting related relief.   In support of this Motion, the Debtors

respectfully state as follows:

## Jurisdiction

1.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and

1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157 (b)(2).

2.     Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3.     The statutory predicates for the relief requested herein are sections 105, 363 and

503 of the Bankruptcy Code and Rule 6004 of the Federal Rules of Bankruptcy Procedure (the

"Bankruptcy Rules").

## Background[2]

*Commencement of the Debtors' Cases*

4.     On February 2, 2010, (the "Commencement Date"), each of the Debtors filed a

petition with the United States Bankruptcy Court for the Eastern District of Virginia, Richmond

Division (the "Bankruptcy Court") under chapter 11 of the Bankruptcy Code.  On February 3,

2010, the Bankruptcy Court entered its Order Directing Joint Administration of the Debtors'

Related Chapter 11 Cases.  (Docket No. 64.)  The Debtors are operating their businesses and

managing their property as debtors in possession pursuant to sections 1107(a) and 1108 of the

Bankruptcy Code.  No request for the appointment of a trustee or examiner has been made in

---

[2] Certain of the facts and circumstances supporting this Motion are set forth in the Affidavit of Steve Moore, Chief
Restructuring Officer of Movie Gallery, Inc. in support of First Day Motions (Docket No. 9; the "First Day
Affidavit").

these chapter 11 cases.  On February 8, 2010, the Official Committee of Unsecured Creditors (the "Committee") was appointed in these cases.

*Events Leading to the Commencement of the Debtors' Cases*

5.      As of the Commencement Date, the Debtors were one of the largest North American home entertainment specialty retailers. As of the Commencement Date, the Debtors operated approximately 2,600 retail stores located throughout North America. The Debtors rent and sell DVDs and video games through three distinct brands -- Movie Gallery, Hollywood Video and Game Crazy.

6.      In 2009, the aggregate annual revenues of the Debtors and their affiliates, including rental revenue and product sales, exceeded $1.4 billion. Of this amount, approximately 52% was attributed to DVD rentals, 21% to the sale of new and used gaming products, 12% to the sale of previously-rented DVDs and video games, 7% to game rentals, 5% to the sale of concessions and other miscellaneous products, and 3% to the sale of movie-related products and merchandise. As of January 28, 2010, the Debtors and their affiliates employed approximately 19,082 employees, including approximately 3,970 full-time employees and 15,112 part-time employees.

7.      Several factors led to the filing of these chapter 11 cases. First, the video rental industry remains highly competitive. The Debtors face direct and increasing competition from competitors such as Blockbuster, Netflix and Redbox and indirect competition from pay-per-view, cable television and big-box retailers who continue to sell DVDs at increasingly lower prices. This direct and indirect competition has reduced traffic into the Debtors' retail stores, put downward pressure on pricing and thus narrowed the Debtors' operating margins across each segment of their business. Moreover, as the Debtors' financial performance deteriorated, a large

and growing number of their store locations began to generate negative cash flows after accounting for payment of rent and other occupancy and operating expenses. Taken together, all of these factors also contributed to the Debtors' inability to comply with various financial covenants under their credit agreements.

*Approval to Conduct Store Closing Sales*

8.    On February 3, 2010, the Debtors filed their Motion of the Debtors for an Order (A) Authorizing the Debtors to Conduct Store Closing Sales, (B) Approving Procedures with Respect to Store Closing Sales (C) Authorizing the Debtors to pay Limited Liquidation and Closure Performance Bonuses, and (D) Authorizing the Debtors to Abandon Certain De Minimis Assets in Connection with Store Closing Sales (Docket No. 20; the "Store Closing Motion").  On February 4, 2010, the Court granted the Debtors' Store Closing Motion (Docket No. 94) and on May 11, 2010 entered its Final Order (A) Authorizing the Debtors to Conduct Store Closing Sales (B) Approving Procedures with Respect to Store Closing Sales, (C) Authorizing the Debtors to Pay Limited Liquidation and Closure Performance Bonuses, and (D) Authorizing the Debtors to Abandon Certain De Minimis Asserts in Connection with Store Closing Sales (Docket No. 1099; the "Store Closing Procedures Order").  The Store Closing Procedures Order, among other things: (i) authorizes the Debtors or its agents to conduct store closing sales ("GOB Sales") notwithstanding provisions in any of the Debtors leases limiting the Debtors' ability to do so (Store Closing Procedures Order at ¶ 8); (ii) permits the sale of inventory and other property in connection with such GOB Sales free and clear of all liens, claims and encumbrances (*id.* at ¶ 9); and (iii) establishes a procedure for the resolution of disputes regarding the application of, and the Debtors' and its agents' compliance with, consumer protection laws governing GOB Sales (*id.* at ¶¶ 20-21).

9.    Since the entry of the Store Closing Procedures Order, the Debtors have closed (or are now in the process of closing) approximately 1,400 stores, and have liquidated the inventory located in such stores pursuant to the Store Closing Procedures Order.  As of the date of this Motion, the Debtors continue to operate 1,296 stores in the U.S. and 181 stores located in Canada.[3]  Of the 1,296 currently-open U.S. Stores, approximately 270 are in the late phases of liquidation sales, and will be closed shortly.  The rest of the currently-open U.S. Stores -- totaling approximately 1,028 -- would be liquidated pursuant to the GA Agreement (the "Remaining Store Locations").

*Use of Cash Collateral*

10.    Also on February 3, 2010, the Debtors filed the Motion of Debtors for Interim and Final Orders Pursuant to 11 U.S.C. §§ 105, 361, 363, 364(e) and 552 and Fed. R. Bankr. P. 2002, 4001 and 9014 (A) Authorizing the Use of Cash Collateral, (B) Granting Adequate Protection to Certain Pre-Petition Secured Parties, (C) Granting Related Relief, (D) Scheduling an Interim Hearing and (E) Scheduling a Final Hearing. (Docket No. 33; the "Cash Collateral Motion".)  In the Cash Collateral Motion, the Debtors described their pre-petition credit facilities and the terms under which they sought to use cash collateral pledged to the Debtors pre-petition secured lenders.

11.    On February 3, 2010, the Court held the Interim Hearing[4] following which the Court entered the Interim Order (Docket No. 68) authorizing the Debtors to use Cash Collateral on an interim basis and scheduling the Final Hearing on the Cash Collateral Motion.   On

---

[3]      On May 7, 2010, the Debtors' affiliate Movie Gallery Canada, Inc. (which operates all of the Movie Gallery and Hollywood Video stores located in Canada) filed a Notice of Intention in the District of Ontario, Toronto Division (Estate No. 31-1357202), commencing voluntary bankruptcy proceedings in Canada.
[4]      Capitalized terms not defined herein shall have the meanings ascribed to such capitalized terms in the Final Order (A) Authorizing the Use of Cash Collateral, (B) Granting Adequate Protection to Certain Pre-Petition Secured Parties, and (C) Granting Related Relief (Docket No. 417; the "Cash Collateral Order").

February 22, 2010, the Court held the Final Hearing and ultimately approved the Debtors' use of

Cash Collateral on a final basis as provided in the Cash Collateral Order.

12.      The Cash Collateral Order contemplates that the Debtors would continue to close

stores and liquidate inventory. Indeed, pursuant to paragraph 15(e)(vi) of the Cash Collateral

Order, it constitutes an Event of Default if the cumulative net proceeds of store liquidations for

any period from the Petition Date through the end of a particular calculation period are less than

the cumulative amount set forth in the Budget (as defined in the Cash Collateral Order) for such

period by more than 10% (the "Liquidation Proceeds Covenant").

13.      Since their respective entry, the Debtors have been in substantial compliance with

both the Interim Order and the Cash Collateral Order.  Recently, however, the Debtors advised

the Prepetition Secured Parties of the occurrence of a breach of the Liquidation Proceeds

Covenant of the Budget.  As a result, an event of default has occurred and is continuing pursuant

to paragraph 15(e)(vi) of the Cash Collateral Order.  The Prepetition Secured Parties have not yet

exercised any remedies with respect to that default, and have forborne from exercising their

rights with respect thereto.

*Termination of Debtors' Business Operations and Plan Support Agreement*

14.      In early April the Debtors, the Prepetition Secured Parties, the Committee and

representatives of the Debtors' major suppliers of movies[5] held a series of all-hands meetings to

discuss the potential reorganization of the Debtors' business around a much smaller footprint of

ongoing stores.  Based upon those meetings, and the parties' review and analysis of the business

plan proposed by the Debtors, all parties concluded that it was in the best interests of the

Debtors, their estates, the Debtors' stakeholders, and the other parties in interest to terminate the

---

[5]      The Debtors' major movie suppliers include: Paramount Home Entertainment Inc., Sony Pictures Home
Entertainment Inc., Universal Studios Home Entertainment LLC, V.P.D. IV, Inc. (d/b/a VPD), Twentieth Century
Fox Home Entertainment and Warner Home Video, a division of Warner Bros. Home Entertainment, Inc.

Debtors' remaining business operations, liquidate the Debtors' remaining assets, and wind-down the Debtors' affairs in an orderly process under chapter 11 of the Bankruptcy Code. Pursuant to the agreement of the Prepetition Secured Parties, that process would also provide some recovery for holders of general unsecured claims against the Debtors, even though the claims of the Prepetition Secured Parties will not be paid in full.

15.    On May 7, 2010, the Debtors, the Prepetition Secured Parties, the Committee, the Studios and Warner Home Video executed and filed a stipulation and related term sheet outlining their agreement as described above. (Docket No. 1093; the "Term Sheet"). The Term Sheet details the agreement among the Debtors' key constituents regarding, among other things: (i) the Debtors' alleged default under the Cash Collateral Order asserted by the Prepetition Secured Parties, (ii) the agreement of the Prepetition Secured Parties to permit $5,000,000 of cash to be made available for holders of general unsecured claims against the Debtors, and to permit their collateral to be used to fund certain payments to the major movie studios in connection with the ongoing liquidation of the Debtors' Movie Inventory, (iii) the agreement of the Studios and Warner Home Video not to challenge the continued liquidation of the Debtors' remaining Movie Inventory subject to the provisions of the Term Sheet, and (iv) the timing for filing of a plan of liquidation consistent with the agreement set forth in the Term Sheet.

*Negotiations Leading to the GA Agreement*

16.    In the midst of the discussions and negotiations leading to the execution of the Term Sheet, the Debtors received an unsolicited bid from Great American to act as the Debtors' exclusive agent to conduct GOB Sales and to sell the Debtors' remaining assets, including the Debtors' inventory of movies in their Remaining Store Locations (collectively, the "Movie Inventory"). Great American is one of the largest liquidators of retail inventory in the United

States, having liquidated the retail inventories of Circuit City, Eaton's, Hancock Fabrics, Jo-Ann

Stores, Linens 'N Things, Kmart, Office Max and Tower Records, among others. Indeed, Great

American previously liquidated $180 million of the Debtors' inventory in stores closed prior to

the Commencement Date. Consistent with their obligations to maximize value for the Debtors'

stakeholders, the Debtors immediately entered into discussions and negotiations with Great

American to explore that proposal further.

17.     During the course of the Debtors' negotiations with Great American, the Debtors

began to receive other unsolicited offers from other liquidators seeking, generally, to either

purchase the Debtors' remaining Movie Inventory outright or offering to act as an agent for the

Debtors in the liquidation of the Movie Inventory (as Great American has agreed). The Debtors

also received requests for access to due diligence materials from still other liquidators, which

requests have been dealt with by the Debtors as promptly as possible under the circumstances.

Based upon all these discussions, the Debtors have determined that engaging a liquidator to act

as the Debtors' exclusive agent charged with selling the Debtors' remaining Movie Inventory

and other assets is the most effective and efficient method to wind up the Debtors' operations,

generate maximum value for stakeholders and bring about an expeditious completion of the

Debtors bankruptcy cases in accordance with the fully-consensual agreement reflected in the

Term Sheet.

18.     The Debtors believe, in the exercise of their business judgment, that Great

American's offer contained in the GA Agreement to act as the Debtors' exclusive agent to sell

the Debtors' Movie Inventory and other assets on the terms and conditions set forth in the GA

Agreement is the highest and best offer that the Debtors have received to date for those assets.

Accordingly, the Debtors executed the GA Agreement on May 13, 2010, subject to the Court's

approval of the terms of the GA Agreement and of the consummation of the transactions described therein. As set forth below, the Debtors request that the Court approve the terms of the GA Agreement (or of a higher and better bid from a competing bidder if one is received at or prior to the hearing on the Motion) as well as the process by which the Debtors seek to complete the liquidation sales described therein, both of which are summarized below.

### Proposed Appointment of an Agent to Sell the Debtors' Assets

19. Subject to the Court's approval, the Debtors have agreed on a definitive form of agreement with Great American to sell substantially all of the Debtors' remaining assets pursuant to the terms of the GA Agreement, which includes the following principal terms:[6]

a. The Debtors have agreed to appoint Great American as their exclusive agent for the limited purpose of selling all of the Debtors' Merchandise located in the Remaining Stores through GOB Sales at all of the Debtors' retail stores, selling all of the Debtors' real property interests, store FF&E and Intellectual Property (subject to the IP Removal Option), all as provided in the GA Agreement (collectively, and as defined in the GA Agreement, the "Subject Assets").[7]

b. Great American has guaranteed that the Debtors will receive $62,300,000 from the sale of the Subject Assets (the "Transaction Consideration"), subject to adjustment only if and to the extent that (i) the actual quantities of Subject Assets exceed, or fall short of, the anticipated quantities as set forth in the GA Agreement in excess of designated thresholds, (ii) a Revenue Share Savings adjustment occurs, or (iii) there is an Excess Revenue Share Adjustment.

c. Great American shall receive as its compensation for services rendered to Debtors a "Base Fee" equal to 3% of the Comprehensive Sale Proceeds, Great American's First Tranche Recovery Amount, if any, and Great American's Second Tranche Recovery Amount, if any. All unsold Merchandise, other than Unsold Revenue Share Merchandise, if any, which remains in the Stores at the Sale Termination Date ("Remaining Merchandise") shall become the

---

[6] This summary of the GA Agreement is provided for the benefit of the Court, other potential purchasers, and other parties in interest. The GA Agreement is attached hereto as Exhibit B and incorporated herein by reference. To the extent of any conflicts between this summary and the GA Agreement, the terms of the GA Agreement shall govern. Capitalized terms used but not otherwise defined in this summary shall have the meanings set forth in the GA Agreement.

[7] The Subject Assets do not include inventory or equipment located at the Debtors' distribution centers. In addition, under the GA Agreement the Debtors have the right to remove the Intellectual Property from the Subject Assets without any resulting reduction in the Transaction Consideration.

property of Great American, free and clear of all liens, claims and encumbrances, and Comprehensive Sale Proceeds generated from the sale of such Remaining Merchandise shall be the property of Great American. All unsold Revenue Share Merchandise, if any, remaining in the Stores at the Sale Termination Date shall remain the property of the Debtors, but shall thereafter be consigned to Agent to sell on the Debtors' behalf.

d.   In connection with the liquidation of the Debtors' new release movie inventory, Great American will honor the Debtors' the "no-sale" windows identified by the Debtors in an exhibit to the GA Agreement, and the GA Agreement shall not serve to limit or impair the Debtors' payment obligations or any of the other provisions of the Debtors' agreements with the Studios and Warner Home Video as set forth in Term Sheet.

e.   If the aggregate amount of Revenue Share Obligations (as defined in the GA Agreement) is less than $10,500,000 the ("Revenue Share Savings Adjustment"), then the Transaction Consideration shall be reduced by an amount equal to 50% of such Revenue Share Savings. If the aggregate Revenue Share Obligations are greater than $10,500,000, then there shall be a Revenue Sharing Adjustment increasing the Transaction Consideration by an amount equal to the lesser of (a) 100% of the excess and (b) $4,500,000 ("Excess Revenue Share Adjustment").

f.   Great American will pay "Comprehensive Sale Expenses" incurred in conducting the GOB Sales or other disposition of the Subject Assets, including, but not limited to: (i) payroll and commissions and certain related expenses, if applicable, for all Retained Employees; (ii) Retention Bonuses for Retained Employees; (iii) advertising and direct mailings relating to the Sale, and Store interior and exterior signage and banners relating to the Sale; (iv) certain real estate related costs (such as rent, CAM charges and other amounts); (v) certain inventory and delivery costs; and (vi) other operating and asset disposition expenses.

g.   The Transaction Consideration will be paid in more than one installment as provided in the GA Agreement. To secure payment of the balance of any unpaid portion of the Transaction Consideration (and the Debtors' reimbursement of Comprehensive Sale Expenses borne by Great American, and any other amounts due from Great American to Debtors), Great American shall deliver to Debtors an irrevocable standby letter of credit in the original face amount equal to five million dollars ($5,000,000), naming Debtors as the beneficiary.

h.   Upon payment of the Initial Transaction Payment, and issuance of the Letter of Credit, Great American shall be granted a security interest in and lien upon: (a) all of the Subject Assets, and (b) all Comprehensive Sale Proceeds, to secure all obligations of Debtors to Great American hereunder; provided however, until the payment of the Transaction Consideration and

Comprehensive Sale Expenses, or other amounts due to Debtors hereunder, in full, the security interest granted to Great American hereunder, shall remain junior to the security interests of the Prepetition Secured Parties and the Prepetition Second Lien Term Parties, to the extent of the unpaid portion of the Transaction Consideration, Comprehensive Sale Expenses or other unpaid amounts.

i.   In the event that the Debtors accept a higher and better offer from a competing bidder, Great American would receive a break-up fee of $1,750,000 (the "Break-Up Fee"), together with reimbursement of its reasonable and documented out-of-pocket expenses for the negotiation and preparation of the GA Agreement, up to a maximum of $100,000 (the "Expense Reimbursement"). In addition, Successful Bidders (as defined below) shall also be required to purchase from and reimburse Great American for its reasonable and documented out-of-pocket expenses incurred in connection with advertising and signage associated with Great American's preparations for the sale of the Subject Assets.

j.   All amounts due to the Debtors under the GA Agreement and the proceeds thereof shall be the perfected collateral of the Prepetition Secured Parties and the Prepetition Second Lien Term Parties and shall be subject to liens and administrative expense claims of the Prepetition Secured Parties and the Prepetition Second Lien Term Parties as provided in, and subject to the priorities set forth in, the Cash Collateral Order without further action by the Prepetition Secured Parties or the Prepetition Second Lien Term Parties.

20.   In connection with the liquidation of the Subject Assets, Great American shall also have the right to direct the Debtors to request Court approval of the assumption and assignment of leases of non-residential real property in accordance with Section 365 of the Bankruptcy Code. Such assumption and assignment will be at Great American's sole cost and expense and all of the non-debtor counter-parties to such leases will be provided with notice and an opportunity to object to any such requested assumption and assignment.

21.   The Debtors believe that the terms of the proposed Transaction are fair, reasonable and equitable and that the Transaction Consideration represents fair value for the right to act as agent with respect to the Subject Assets and, subject to the Debtors' continued discussions with other potential buyers, represent the highest and best value that can be achieved for the Subject Assets.

22.    In particular, the Debtors believe that the agreements of Great American to (i) effectively backstop up to $4.5 million of the Debtor's revenue share liability and (ii) pay costs associated with occupying and operating the Debtors' Remaining Stores are significantly valuable to the estate, and will help realize maximum value for the Debtors' stakeholders from the Subject Assets.

### The Debtors Will Entertain Higher and Better Offers at the Sale Hearing

23.    To date, the Debtors have had discussions and negotiations with several other liquidators concerning the sale of the Debtors' Movie Inventory and other assets, and have considered other transaction structures for the liquidation of those assets. The Debtors believe that all of the proposals received from other interested parties, whether formal or informal, have been inferior to Great American's proposal as embodied in the GA Agreement. Nonetheless, and consistent with the Debtors' ongoing obligations to maximize the value of estate, the Debtors will continue to test the current offer by evaluating any potentially higher and better offers that are brought forward between the date of this Motion and the hearing on this Motion. The Debtors respectfully submit that this process will adequately balance the need for prompt action authorizing the liquidation of the Subject Assets with the Debtors' obligation to reasonably ensure that any transaction approved by the Court will capture maximum value for the estate assets which are being sold.

24.    Specifically, the Debtors have already notified or will shortly notify as many potential bidders as possible of this Motion and of the Debtors' willingness to consider any bids which, at a minimum, both meet the requirements set forth below and are superior to the terms set forth in the GA Agreement. Potential bidders will be informed that for any competing bids to be considered by the Debtors, they must comply with each of the following:

a.    Confidentiality Agreement. Each person desiring to review any due diligence
materials should contact Moelis & Company (the "Debtors' FA") for the
Debtors' standard form confidentiality agreement, which has also been
executed by Great American, and which must be executed without
modification and returned to the Debtors' FA.

b.    Proof of Financial Ability to Perform.  Each person desiring to review due
diligence materials and/or to submit a bid (a "Potential Bidder") must also
submit their most current audited (if available) and latest unaudited financial
statements, or such other form of financial disclosure as Debtors may request,
evidencing the Potential Bidder's ability to close a sale, the sufficiency of
which shall be determined by the Debtors in their sole discretion.   The
Debtors' FA will inform a Potential Bidder as soon as practicable of the
Debtors' determination regarding such Potential Bidder's ability to close a
sale.  Any Potential Bidder that the Debtors determine is able to close a sale
shall be "Qualified Bidder."

c.    Qualifying Bids.   In order to participate   in the bidding process, each
Qualified Bidder must submit a "Qualifying Bid" in writing prior to the
commencement of the hearing on the Motion (the "Sale Hearing"), or if
submitted during the Sale Hearing, an authorized representative of such
Qualified Bidder must represent to the Court, on the record, that such
Qualified Bidder submits a Qualifying Bid and will execute an agency
agreement on terms identical to -- or demonstrably better for the Debtors than
-- the GA Agreement.  For purposes of these procedures, the GA Agreement
is deemed to represent a Qualifying Bid.  To constitute a Qualifying Bid, a bid
must comply with the following conditions:

    i.    Writing.  A bid must be in writing or stated on the record at the Sale
Hearing and it must state that such bidder is prepared to enter into a
legally binding Agency Agreement on terms and conditions that are
identical to or better for the Debtors than the terms of the GA
Agreement.

    ii.    Modified Agency Agreement.  A written bid shall include a clean and
duly executed agency agreement (the "Modified Agency Agreement")
and a black-lined copy reflecting any changes from the GA
Agreement, including, without limitation, those related to the
Transaction Consideration;

    iii.    Minimum Transaction Consideration.  Each bid shall provide for
Transaction Consideration consisting of cash in an amount not less
than $64,350,000 (representing the sum of (i) the Transaction
Consideration provided for in the GA Agreement, (ii) the Break-Up
Fee and maximum Expense Reimbursement which must be paid in
cash, and (iii) the Minimum Overbid) as well as the assumption of at
least the same liabilities that are to be assumed by Great American

under the GA Agreement. In addition, each bid shall also provide that the bidder agrees that, in the event they are the Successful Bidder at the Auction, they will purchase from and reimburse Great American for its reasonable and documented out-of-pocket expenses incurred in connection with advertising and signage associated with Great American's preparations for the sale of the Subject Assets. Each bid must provide for the payment of the Break-Up Fee in cash.

iv.  Compliance with Term Sheet. Each bid shall expressly acknowledge (i) that such bidder will, in liquidating the Debtors' new release movie inventory, honor the applicable "no-sale" windows identified by the Debtors in an exhibit to the Modified Agency Agreement, (ii) that such bidder will honor and abide by the Debtors' obligations to the Studios, Warner Home Video or any other party to the Term Sheet, the Accommodation Agreement and/or the revenue sharing agreements, provided, however, except as expressly otherwise agreed by such bidder, bidder shall not assume Debtors' obligations under the Term Sheet or with respect to the Revenue Share Obligations or Studio Related Agreements and (iii) that the Modified Agency Agreement shall not serve to limit or impair the Debtors' payment obligations or any of the other provisions of the Debtors' agreements with the Studios and Warner Home Video as set forth in Term Sheet.

v.  Contingencies. A bid may not contain any due diligence or financing contingencies of any kind.

vi.  No Fees. A bid may not request or entitle the Qualified Bidder to any break-up fee, termination fee, expense reimbursement or similar type of payment.

vii.  Authorization to Bid. A bid shall include evidence of authorization and approval from the bidder's board of directors (or comparable governing body) with respect to the submission, execution, delivery and closing of the Modified Agency Agreement.

viii.  Identity of Bidders. Each bidder must fully disclose the identity of the party or parties that will be bidding for the right to act as agent with respect to the Subject Assets or otherwise participating in connection with such bid, and the complete terms of any such participation.

ix.  Good Faith Deposit. Each bid must be accompanied by a deposit, in immediately available funds, equal to ten (10%) percent of the Transaction Consideration provided for in connection with the bid.

x.  Other Evidence. Each bid must contain evidence satisfactory to the Debtors that the bidder is reasonably likely to be able to timely

consummate the transaction contemplated by the Agency Agreement if selected as the Successful Bidder (as defined below).

xi.    Each bid must conform to the GA Agreement's provisions regarding liens and administrative claims of the Prepetition Secured Parties and the Prepetition Second Lien Term Parties.

d.    <u>Auction</u>.  In the event that the Debtors receive at least one (1) Qualifying Bid (other than that of Great American), the Debtors shall first ask the Court to approve the Break-Up Fee and Expense Reimbursement, and subsequent to such approval by the Court, shall then ask the Court to conduct an auction (the "<u>Auction</u>") as part of the Sale Hearing, of the right to act as agent with respect to the Subject Assets to determine the highest and otherwise best bid for the right to act as agent with respect to the sale of the Subject Assets.  At the commencement of the hearing on the Motion, the Debtors will announce on the record the highest or otherwise best Qualifying Bid (the "<u>Baseline Bid</u>"). The Auction shall be governed by the following procedures:

i.    Any Qualifying Bidders and Great American shall appear in person at the Auction through a duly authorized representative.

ii.    Each Qualifying Bidder shall be required to confirm that it has not engaged in any collusion with respect to the bidding or the sale.

iii.    Bidding shall commence at the Baseline Bid.

iv.    Qualifying Bidders and Great American may then submit successive bids in increments of at least $500,000 over the previous highest or best bid.  Unless otherwise agreed by the Debtors in their sole discretion with respect to any one or more Qualifying Bids, all additional consideration in excess of the amount set forth in the Baseline Bid must be in cash.

v.    All Qualifying Bidders and Great American shall have the right to submit additional bids, subject to clause (iv) above, and to make additional modifications to the Modified Agency Agreement or GA Agreement, as applicable, at the Auction.

vi.    The Auction shall continue until there is only one offer that the Debtors determine, in consultation with the Prepetition Secured Parties and the Committee and subject to Court approval, is the highest or best offer from among the Qualifying Bidders submitted at the Auction (the "<u>Successful Bid</u>").  In making this decision, the Debtors may consider, without limitation, the amount of the transaction consideration, the form of consideration being offered, the likelihood of the Qualifying Bidder's ability to close a transaction and the timing thereof, the number, type and nature of any changes to the agency agreement requested by each Qualifying Bidder or Great American, the net

benefit to the Debtors' estates, and the views of the Committee and the Prepetition Secured Parties. The party submitting such Successful Bid shall become the "Successful Bidder."

vii.   If a Successful Bid other than one by Great American is approved by the Court, then within three (3) days of approval, the Successful Bidder shall complete and execute all agreements, contracts, instruments or other documents evidencing and containing the terms and conditions upon which the Successful Bid was made and make and pay for all necessary filings with all applicable government or other authorities. Bids made after the close of the Auction shall not be considered by the Debtors.

viii.  In the event the Successful Bidder fails to consummate the Sale as a result of the Successful Bidder's default or breach under the applicable agreement by the closing date contemplated in such agreement, the Debtors shall (i) retain the Successful Bidder's Good Faith Deposit as liquidated damages; and (ii) be free to enter into a new agreement with the next most appropriate Qualified Bidder at the highest price bid by the bidder at the Auction, whose Qualifying Bid shall be deemed open, without the need for an additional hearing before, or order of, the Bankruptcy Court.

e.   Bid Protections.  Recognizing Great American's considerable expenditure of time, energy, and resources in the negotiation and preparation of the GA Agreement, the Debtors have agreed that if Great American is not the Successful Bidder, the Debtors will, in certain circumstances, pay to Great American the Break-Up Fee and Expense Reimbursement. Subject to the Court's approval, the payment of the Break-Up Fee and Expense Reimbursement will be governed by the provisions of the GA Agreement. Under no circumstances will a break-up fee, expense reimbursement or other similar bid protections be provided by the Debtors to any potential bidder or bidder other than Great American.

f.   Return of Good Faith Deposit.  The Good Faith Deposit of the Successful Bidder shall be applied to amounts to be paid in connection with such transaction at closing. The Good Faith Deposits of all other Qualified Bidders shall be returned by no later than the fifth (5th) Business Day following such closing.

g.   Form of Order.   The form of order authorizing consummation of the transaction shall be acceptable to the Prepetition Secured Parties and the Committee in their reasonable discretion and shall provide, *inter alia,* that all amounts due to the debtors under the GA Agreement or any Modified Agency Agreement and the proceeds thereof shall be the perfected collateral of the Prepetition Secured Parties and the Prepetition Second Lien Term Parties and shall be subject to liens and administrative expense claims of the Prepetition

Secured Parties and the Prepetition Second Lien Term Parties as provided in, and subject to the priorities set forth in, the Cash Collateral Order, as amended, without further action by the Prepetition Secured Parties or the Prepetition Second Lien Term Parties.

25.    The proposed procedures outlined above (the "<u>Agent Selection Procedures</u>") carefully balance the Debtors' interests in (i) inducing Great American to commit to consummate the transaction and (ii) preserving the Debtors' ability to attract higher and better offers. Further, the Debtors submit that the Agent Selection Procedures are fair and reasonable under the circumstances of these cases and are reasonably calculated to induce any potentially interested parties to submit competing offers for the right to act as agent with respect to the Subject Assets while at the same time avoiding the expense of a lengthy auction process, thereby ensuring that the maximum value is recovered for the Debtors' estates. Finally, the Debtors submit that the Break-Up Fee and Expense Reimbursement are fair and reasonable in amount and are reasonably related to Great American's risk, effort and expenses associated with its proposed appointment as the Debtors' exclusive agent.

<b><u>Relief Requested</u></b>

26.    Accordingly, the Debtors request (i) the entry of the proposed order substantially in the form attached hereto as <u>Exhibit A</u>, approving the relief requested herein, including specifically the approval of the Debtors' entry into the GA Agreement or the Agency Agreement with the Successful Bidder, the approval of the Break-Up Fee and Expense Reimbursement provisions of the GA Agreement and the Agent Selection Procedures, and authorizing the Debtors to continue selling their assets consistent with the Store Closing Procedures Order, the proposed Store Closing Guidelines and as set forth in this Motion.

A.     **Approval of the Transactions Set Forth in the GA Agreement is Appropriate**

27.     Bankruptcy Code section 363(b)(1) provides: "The trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." A sale of a debtor's assets should be authorized pursuant to Bankruptcy Code section 363(b) if a sound business purpose exists for the sale. *See In re Delaware & Hudson Rwy. Co., 124 B.R. 169, 176 (D. Del. 1991); In re W.A. Mallory Co., Inc., 214 B.R. 834 (Bankr. E.D. Va. 1997); In re WBQ Partnership, 189 B.R. 97, 102 (Bankr. E.D. Va. 1995); see also Stephens Indus., Inc. v. McClung, 789 F.2d 386. 390 (6th Cir. 1986); In re Lionel Corp., 722 F.2d 1063, 1071 (2d Cir. 1983).*

28.     The test of whether a sound business purpose exists is comprised of the following four elements:

    (a)     a sound business reason or emergency justifies the sale;

    (b)     adequate and reasonable notice of the sale was provided to interested parties;

    (c)     the sale has been proposed in good faith; and

    (d)     the purchase price is fair and reasonable.

*See WBQ Partnership,* 189 B.R. at 102 *(citing Delaware & Hudson Rwy. Co.,* 124 B.R. at 176).

29.     The proposed transaction with the Successful Bidder -- whether Great American or another Qualified Bidder -- reflects the exercise of the Debtors' sound business judgment and a proper exercise of their fiduciary duties. A sound business purpose exists for consummating a transaction along the lines set forth in the GA Agreement outside of a plan of reorganization; namely, that the proceeds of such a transaction represent the maximization of the value of the vast majority of the Debtors' remaining assets. Moreover, the Debtors submit that the proposed

notice described above constitutes adequate and proper notice of the Agent Selection Procedures, the proposed transaction and this Motion, reasonably calculated to give parties who are realistically likely to be Qualified Bidders the opportunity to submit competing bids for the right to act as agent with respect to the Subject Assets.  As described above, the key terms of the transaction have been negotiated at arm's length and in good faith, resulting in fair and reasonable consideration to the estates on account of the Subject Assets.  Further, the exposure of the right to act as agent with respect to the Subject Assets to the market prior to the filing of this Motion and through the Agent Selection Procedures set forth above will ensure that the value received for the Subject Assets will represent the best and highest available under the circumstances.  In addition, the Debtors submit that the transaction described in the GA Agreement is consistent with all of the Debtors' prior agreements reached in this case and each of the Court's Orders, including, without limitation, the Store Closing Procedures Order and the Term Sheet.  The GA Agreement (or an Agency Agreement executed with a Successful Bidder) will not only bring in a significant amount of cash to the estates, but will also eliminate a significant amount of administrative expenses (including expenses for store occupancy) which the Debtors would otherwise have to incur if they were to liquidate the Subject Assets on their own.

30.    Accordingly, the Debtors believe that approval of the relief requested in this Motion and the proposed transaction with a Successful Bidder is in the best interests of the Debtors' creditors, estates and other parties in interest and should be approved.

**B.    The Transaction Satisfies the Requirements of Section 363(f)**

31.     Under Bankruptcy Code section 363(f), a debtor-in-possession may sell property

of a debtor's estate free and clear of any lien, claim or interest in such property if, among other

things:

(1)     applicable nonbankruptcy law permits sale of such property free and clear
of such interest;

(2)     such [lienholder] consents;

(3)     such interest is a lien and the price at which such property is sold is greater
than the aggregate value of all liens on such property;

(4)     such interest is in bona fide dispute; or

(5)     such entity could be compelled, in a legal or equitable proceeding, to accept
a money satisfaction of such interest.

11 U.S.C. § 363(f).  Because section 363(f) is drafted in the disjunctive, satisfaction of any one

of its five requirements will suffice to approve the sale of the assets free and clear.  *See* 11

U.S.C. § 363(f); *see also In re Wolverine Radio Co.*, 930 F.2d 1132, 1147 n.24 (6th Cir. 1991);

*In re Elliot*, 94 B.R. 343 (E.D. Pa. 1988).

32.     The Debtors submit that a sale free and clear of all pledges, liens, security

interests, claims, charges, options and interests thereon and there against (collectively, the

"Interests") is appropriate under the circumstances because one or more of the conditions of

section 363(f) will be satisfied.  First, the Prepetition Secured Lenders hold a security interest in

the Subject Assets and have consented to both the execution of the GA Agreement and to the

sale of the Subject Assets on the condition that, subject to the Term Sheet, its Interests attach to

the proceeds of any such sale.  Thus, with respect to the Prepetition Secured Lenders, section

363(f)(2) is satisfied and the Subject Assets (and the right to act as agent with respect to any

sales thereof) may be transferred free and clear of their Interests.  Indeed, the Court has

previously held that, under the circumstances of these cases, it is appropriate that the Debtors' liquidation of their remaining inventory and other store assets be "free and clear of any and all interests, including, without limitation, mortgages, security interests, liens, judgments, encumbrances and claims…" (Docket No. 1099 at ¶ 9.)

33.     With regard to the holders of any other Interests in the Subject Assets which object to the Motion, the Debtors submit that one or more of the other subparagraphs of Section 363(f) would apply and allow the Debtors to execute the GA Agreement (or any similar Agency Agreement) and to sell Subject Assets free and clear of such Interests.

**C.     Section 363(m) Good Faith Protections**

34.     As set forth above, the Debtors believe that the Successful Bidder, whether Great American or another Qualified Bidder, will be entitled to protection under section 363(m) of the Bankruptcy Code and, as such, should be entitled to the protections afforded thereby. Although the Bankruptcy Code does not define the term "good faith purchaser," the traditional equitable definition of "one who purchases the assets for value, in good faith, and without notice of adverse claims" has been adopted by various courts. *See In re Abbotts Dairies of Pennsylvania, Inc.*, 778 F.2d 113 (3d. Cir. 1986); *In re Willemain*, 764 F.2d 1019, 1023 (4th Cir. 1985) (quoting *In re Rock Industries Machinery Corp.*, 572 F.2d 1195, 1197 (7th Cir. 1978)). Here, Great American or any other Successful Bidder will be acting as the Debtors' agent for purposes of the sale of the Subject Assets to third parties, and is entitled to the protections of section 363(m) of the Bankruptcy Code. Under the terms of the GA Agreement, the Debtors will remain the owners of the Subject Assets until those assets are sold by Great American to third parties pursuant to the GA Agreement.

35.      The Successful Bidder will provide substantial value for the Subject Assets and, to the Debtors' knowledge, no adverse claims exist with respect to the right to act as agent with respect to the Subject Assets. Further, because of the market test of the value of the right to act as agent with respect to the Subject Assets through the Agent Selection Procedures, the Debtors submit that the Successful Bidder will not have engaged in any of "the misconduct that would destroy a purchaser's good faith status at a judicial sale [such as] fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders." *Willemain*, 764 F.2d at 1023.

### D.  The Agent Selection Procedures Should Be Approved

36.      The proposed Agent Selection Procedures will assist the Debtors in maximizing the return for their assets by providing for a potentially competitive auction while inducing Great American to enter into the GA Agreement and thereby provide a "floor" for the proposed transaction.

37.      Bid protections such as the proposed Break-Up Fee and Expense Reimbursement are of substantial benefit to the Debtors, their creditors and their estates. *See e.g., In re Integrated Resources. Inc.*, 147 B.R. 650, 660 (S.D.N.Y. 1992); *In re Kmart Corp.*, Case No. 02-02474-SPS (Bankr. N.D. Ill. Aug. 9, 2002) (finding proposed termination fee to be of substantial benefit to the debtor's estate). Bid incentives such as the Break-Up Fee and Expense Reimbursement encourage a potential purchaser to invest the requisite time, money and effort to conduct due diligence and sale negotiations with debtors despite the inherent risks and uncertainties of the chapter 11 process. *See e.g., In re 995 Fifth Ave. Assocs. L.P.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (finding that bidding incentives may be "legitimately necessary to convince a white knight to enter the bidding by providing some form of compensation for the

risks it is undertaking") (citations omitted); *In re Marrose Corp.*, 1992 WL 33848 at *5 (Bankr.

S.D.N.Y. Feb. 15, 1992) (stating that "[a]greements to provide breakup fees or reimbursement of

fees and expenses are meant to compensate the potential acquirer who serves as a catalyst or

'stalking horse' which attracts more favorable offers").

38.    Approval of bid protections such as those contained in the Agent Selection

Procedures, including the Termination Fee, has become an established practice in chapter 11

cases. *See e.g., In re Kmart*, Case No. 02-02474-SPS (Bankr. N.D. Ill. May 10, 2002)

(authorizing a termination fee and overbid protections for potential bidders); *In re Comdisco.*

*Inc.*, Case No. 01-24795-RB (Bankr. N.D. Ill. Aug. 9, 2002) (approving a termination fee as,

*inter alia,* an actual and necessary cost and expense of preserving the debtor's estate, of

substantial benefit to the debtor's estate and a necessary inducement for, and a condition to, the

proposed purchaser's entry into the purchase agreement); *In re Crowthers McCall Pettem. Inc.*,

114 B.R. 877 (Bankr. S.D.N.Y. 1990) (approving an overbid requirement in an amount equal to

the approved break-up fee); *In re Kupp Acquisition Corp.*, Case No. 96-1223-PJW (Bankr. D.

Del. Mar. 3, 1997).  The Break-Up Fee and Expense Reimbursement serves as "an incentive

payment to an unsuccessful bidder who places the estate property in a sales configuration mode

to attract other bidders to the auction." *Integrated Resources*, 147 B.R. at 659 (internal quotation

omitted).  Bid protections take many different forms, including paying the out-of-debt pocket

expenses incurred by a bidder in arranging the deal, including the due diligence expenses, or

compensating a bidder for its lost opportunity costs.  *See In re Hupp Indus. Inc.*, 140 B.R. 191,

194 (Bankr. D. Ohio 1992).  A break-up fee should be "reasonably related to the bidder's efforts

and the transaction's magnitude." *Integrated Resources*, 147 B.R. at 662-63.

39.     In this case, the combined total of the Break-Up Fee and Expense Reimbursement

is, at most, $1,850,000, which is slightly less than 3% of the Transaction Consideration.   Thus

the Debtors submit that the Break-Up Fee and Expense Reimbursement are within the range of

those that have been approved by courts in other cases. *See, e.g., In re Financial News Network.*

*Inc.*, 931 F.2d 217, 219 (2d Cir. 1991) (breakup fee of 2.8% and overbid protection of 9.5%

approved); *In re Colony Hill Assocs.*, 111 F.3d 269, 271 (2nd Cir. 1997) (minimum overbids to

exceed purchaser's initial offer of $7.5 million by at least $650,000 (8.6%)); *In re Tempo Tech.*

*Corp.*, 202 B.R. 363, 368 (D. Del. 1996) (overbid of $1.4 million where initial offer of

"$150,000 in cash, $3 million of [purchaser's] redeemable preferred shares, 10% of the common

stock of [purchaser] and the assumption of the $500,000 of the Debtor's ordinary course

administrative obligations and pre- and post-petition claims of the Debtor's employees who

subsequently become employed by [purchaser]"); *In re Wintex. Inc.*, 158 B.R. 540, 543 (D.

Mass. 1992) (stating that a "debtor may avoid the increased costs and complexity associated with

considering additional bids unless the additional bids are high enough to justify their pursuit" and

a "10% increase requirement is one example of a reasonable litmus test"); *In re O'Brien Envtl.*

*Energy. Inc.*, 181 F.3d 527, 536 (3rd Cir. 1999) (noting that combined break up fee and expense

reimbursement of approximately 4-5% was "within the range of fees approved by some courts");

*In re Fruit of the Loom. Inc.*, Case No. 99-04497-PJW (Bankr. D. Del. Dec. 29, 1999) (allowing

a 3% break-up fee); *In re Ameriserve Food Distribution. Inc.*, 00-00358-PJW (Bankr. D. Del.

Jan. 31, 2000) (allowing a 3.6% breakup fee); *In re HHL Financial Servs. Inc.*, No. 97-398-SLR

(D. Del. Mar. 31,1997) (approving 5.5%-5.9% break-up fees); *In re American White Cross Inc.*,

No. 96-1109-PJW (Bankr. Del., Jan. 21, 1997) (3% fee plus up to $1 million in expenses

approved).   The Debtors believe that these proposed bid protections are appropriate under the

circumstances of these cases, will pose little or no barrier to other seriously interested parties who want to act as agent with respect to the Subject Assets and will create a competitive bidding environment.

40.    The Debtors submit that the Agent Selection Procedures will not chill bidding, are reasonable, and their approval will enable the Debtors to maximize the value of their estates. Thus, the Agent Selection Procedures should be approved.

**E.    The Proposed Store Closing Procedures Should be Approved**

41.    The Store Closing Procedures Order included, at Exhibit 1 thereto, a set of Store Closing Procedures (the "Store Closing Procedures"). By this Motion, the Debtors seek only a single substantive amendment to the Store Closing Procedures. Specifically, paragraph 6 of the Store Closing Procedures authorizes the Debtors' liquidation agent to promote the store closing sales as "store closing," "sale on everything," "everything must go," or similar themed sales. As the Debtors now intend to liquidate all of their remaining stores and wind-down their business completely, the Debtors respectfully submit that paragraph 6 of the Store Closing Procedures should be amended to include authorization for the Debtors' liquidation agent to promote the store closing sales as "going out of business" sales. Except to the extent that modification of the Store Closing Procedures is sought as described above, or as otherwise provided in the Approval Order, the Store Closing Procedures Order would continue to govern the GOB Sales.

**F.    Abrogation of Fourteen-Day Stay**

42.    Bankruptcy Rule 6004(h) provides, "An order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h). The Debtors submit that, given the nature of the proposed transaction and the need to close shortly after its approval, cause

exists for the Court to exercise its discretion and abrogate the 14-day stay provided for by Rule 6004(h).

### Waiver of Memorandum of Points and Authority

43.    The Debtors respectfully request that this Court treat this Motion as a written memorandum of points and authorities or waive any requirement that this Motion be accompanied by a written memorandum of points and authorities as described in Local Bankruptcy Rule 9013-1(G).

### Notice

44.    The Debtors propose to serve this Motion and all of its Exhibits upon: (a) the Core Group (as defined in the Case Management Order); (b) the 2002 List (as defined in the Case Management Order); (c) each Affected Entity (as defined in the Case Management Order); (d) all counter-parties to unexpired leases of nonresidential real property whose leases have not been rejected; and (e) all persons known to the Debtors who have expressed an interest in purchasing the Subject Assets and/or acting as the Debtor's agent with respect to the sale of such the Subject Assets (collectively, the "Notice Parties"). The Debtors further propose to serve only notice of the Motion on all other creditors, excluding current and former employees. The Debtors submit that such notice is sufficient under the circumstances.

WHEREFORE, the Debtors respectfully request that this Court enter an Order, substantially in the form attached hereto as Exhibit A, (i) approving procedures for the selection by the Debtors of an exclusive agent and corresponding agency agreement (such selected agreement, the "Agency Agreement") and the Debtors' execution of and performance under such agreement; (ii) authorizing the sale of the Debtors' assets free and clear of all liens, claims, encumbrances and interests pursuant to such Agency Agreement; (iii) approving the Break-Up

Fee and Expense Reimbursement payable under the GA Agreement to Great American in the

event the Debtors select a higher and better offer from a competing bidder; (iv) approving the

form and manner of the notice of this Motion; and (v) granting the Debtors such other and

further relief as is just and equitable.


Richmond, Virginia                              Respectfully submitted,
Dated: May 13, 2010

                                                **KUTAK ROCK LLP**

                                                By: /s/ Michael A. Condyles

                                                   Michael A. Condyles (VA 27807)
                                                   Peter J. Barrett (VA 46179)
                                                   Bank of America Center
                                                   1111 East Main Street, Suite 800
                                                   Richmond, Virginia  23219-3500
                                                   Telephone:  (804) 644-1700
                                                   Fax:  (804) 783-6192

                                                           and

                                                **SONNENSCHEIN NATH & ROSENTHAL LLP**

                                                   John A. Bicks (NY 2032498)
                                                   Louis A. Curcio (NY 4016267)
                                                   1221 Avenue of the Americas
                                                   New York, NY 10020-1089
                                                   Telephone: (212) 398-4898
                                                   Fax: (212) 768-6800

                                                   *Attorneys for Debtors and Debtors in Possession*

John A. Bicks (NY 2032498)
SONNENSCHEIN NATH & ROSENTHAL LLP
1221 Avenue of the Americas
New York, NY 10020-1089
Telephone: (212) 768-6700

Michael A. Condyles (VA 27807)
Peter J. Barrett (VA 46179)
KUTAK ROCK LLP
Bank of America Center
1111 East Main Street, Suite 800
Richmond, Virginia  23219-3500
Telephone:  (804) 644-1700

*Attorneys for Debtors and Debtors in Possession*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## RICHMOND DIVISION

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| MOVIE GALLERY, INC., et al.,[8] | ) Case No. 10-30696-DOT |
| | ) |
| Debtors. | ) |
| | ) |

## NOTICE OF MOTION OF THE DEBTORS FOR ENTRY OF ORDER: (I) APPROVING AGREEMENT WITH GREAT AMERICAN WF, LLC; (II) AUTHORIZING THE SALE OF THE DEBTORS' ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND INTERESTS; (III) APPROVING A BREAK-UP FEE AND EXPENSE REIMBURSEMENT; (IV) APPROVING THE FORM AND MANNER OF THE NOTICE; AND (V) GRANTING RELATED RELIEF

**PLEASE TAKE NOTICE THAT** the above-captioned debtors (collectively, the "Debtors") have filed with the Court the Motion of the Debtors for Entry of Order: (I) Approving Agreement with Great American WF, LLC; (II) Authorizing the Sale of the Debtors' Assets Free and Clear of All Liens, Claims, Encumbrances and Interests; (III) Approving a Break-Up Fee and Expense Reimbursement; (IV) Approving the Form and Manner of the Notice; and (V) Granting Related Relief (the "Motion").

---

[8]    The Debtors in the cases are Movie Gallery, Inc., Hollywood Entertainment Corporation, Movie Gallery US, LLC, MG Real Estate, LLC, and HEC Real Estate, LLC.

4816-4996-5574. 1

**PLEASE TAKE FURTHER NOTICE THAT <u>your rights may be affected</u>.** You should read these papers carefully and discuss them with your attorney, if you have one in these bankruptcy cases. (If you do not have an attorney, you may wish to consult one.)

**PLEASE TAKE FURTHER NOTICE THAT** in connection with the Debtors' chapter 11 cases, an Order Establishing Certain Notice, Case Management and Administrative Procedures [Docket No. 118] (the "Case Management Order") was entered by the Court on February 8, 2010, which, among other things, prescribes the manner in which objections must be filed and served and when hearings will be conducted. A copy of the Case Management Order may be obtained at no charge at www.kccllc.net/moviegallery or for a fee via PACER at www.vaeb.uscourts.gov/.

**PLEASE TAKE FURTHER NOTICE THAT** if you do not timely file and serve a written objection to the relief requested in the Motion, the Court may deem any opposition waived, treat the Motion as conceded and enter an order granting the relief requested in the Motion without further notice or a hearing.

**PLEASE TAKE FURTHER NOTICE THAT** an epxedited hearing has been requested concurrently with the filing of this Motion. Immediately following a ruling by the Court on the motion to expedite the hearing, a notice of hearing and time for objection will be filed. Any objections must be filed with the Court, at the address shown below, pursuant to any order granting the motion to expedite, Local Bankruptcy Rule 9013-1 and the Case Management Order:

Clerk of the Court
United States Bankruptcy Court
701 East Broad Street
Richmond, Virginia 23219

**PLEASE TAKE FURTHER NOTICE THAT** in accordance with the Case Management Order, you must also serve a copy of your written objection on the Core Group, the 2002 List and the Affected Entities, as such terms are defined in Exhibit 1 to the Case Management Order so that the documents **are received on or before the Objection Deadline**.

**PLEASE TAKE FURTHER NOTICE THAT** you should consult the Case Management Order before filing any written objection to the Motion.

Dated: May 13, 2010
      Richmond, Virginia

Respectfully submitted,

**KUTAK ROCK LLP**

By: /s/ Michael A. Condyles

    Michael A. Condyles (VA 27807)
    Peter J. Barrett (VA 46179)
    Bank of America Center
    1111 East Main Street, Suite 800
    Richmond, Virginia 23219-3500
    Telephone: (804) 644-1700
    Fax: (804) 783-6192
                    and

**SONNENSCHEIN NATH & ROSENTHAL LLP**

    John A. Bicks (NY 2032498)
    1221 Avenue of the Americas
    New York, NY 10020-1089
    Telephone: (212) 768-6700
    Fax: (212) 768-6800

*Attorneys for Debtors and Debtors in Possession*

**EXHIBIT A
(PROPOSED ORDER)**

John A. Bicks (NY 2032498)
Louis A. Curcio (NY 4016267)
SONNENSCHEIN NATH & ROSENTHAL LLP
1221 Avenue of the Americas
New York, NY 10020-1089
Telephone: (212) 768-6700

Michael A. Condyles (VA 27807)
Peter J. Barrett (VA 46179)
KUTAK ROCK LLP
Bank of America Center
1111 East Main Street, Suite 800
Richmond, Virginia  23219-3500
Telephone:  (804) 644-1700

*Attorneys for Debtors and Debtors in Possession*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## RICHMOND DIVISION

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| MOVIE GALLERY, INC., et al.,[1] | ) Case No. 10-30696 (DOT) |
| | ) |
| Debtors. | ) |
| | ) |

## ORDER (I) APPROVING AGREEMENT WITH GREAT AMERICAN WF, LLC; (II) AUTHORIZING THE SALE OF THE DEBTORS' ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND INTERESTS; (III) APPROVING A BREAK-UP FEE AND EXPENSE REIMBURSEMENT; (IV) APPROVING THE FORM AND MANNER OF NOTICE; AND (V) GRANTING <u>RELATED RELIEF</u>

Upon the Motion of the Debtors for Entry of Order: (i) Approving Agreement with Great

American WF, LLC; (ii) Authorizing the Sale of the Debtors' Assets Free and Clear of all Liens,

Claims, Encumbrances and Interests; (iii) Approving a Break-Up Fee and Expense

Reimbursement; (iv) Approving the Form and Manner of Notice; and (v) Granting Related

Relief (the "<u>Motion</u>"); and the Court having jurisdiction to consider the Motion and the relief

requested therein in accordance with 28 U.S.C. §§ 157 and 1334; and consideration of the

Motion and the relief requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b);

and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and

---

[1]     The Debtors in the cases are Movie Gallery, Inc., Hollywood Entertainment Corporation, Movie Gallery US, LLC, MG Real Estate, LLC, and HEC Real Estate, LLC.  The Debtors are also referred to herein as, collectively, the Merchant.

4816-4996-5574. 1

proper notice of the Motion having been provided to (i) the Core Group (as defined in the Order

Establishing Certain Notice, Case Management and Administrative Procedures dated February 8,

2010 (the "Case Management Order")); (ii) the 2002 List (as defined in the Case Management

Order); (iii) each Affected Entity (as defined in the Case Management Order); and (iv) all

persons known to the Debtors who have expressed an interest in purchasing the Subject Assets[2]

and/or acting as the Debtor's agent with respect to the sale of the Subject Assets; and it

appearing that no other or further notice need be provided; and an auction having been held on

May __, 2010 (the "Auction"); and _____ (the "Successful Bidder") having

been identified as the successful bidder at the Auction; and the Debtors and the Successful

Bidder having agreed to the appointment of the Successful Bidder as set forth in the Agency

Agreement pursuant to which the Successful Bidder shall act as the Merchant's exclusive agent

for the limited purpose of (a) selling all of the Merchandise (as hereinafter defined) located in (i)

Merchant's retail store locations listed on Exhibit 1A to the Agency Agreement (each

individually a "Store" or "Closing Location", and collectively the "Stores" or, "Closing

Locations") by means of a "going-out-of-business", "store closing" or similar theme sale (as

further described below, the "GOB Sales"),  (b) disposing of Merchant's furniture, fixtures and

equipment  (the "FF&E") located at (i) the Stores; and (ii) Merchant's corporate offices and

other facilities identified on Exhibit 1C (the "Corporate Offices"); (c) disposing of Merchant's

fee and leasehold interests in non-residential real property for the Closing Locations and the

Corporate Offices, pursuant to Section 16 of the Agency Agreement; and (d) disposing of

Merchant's Intellectual Property, subject to Merchant's IP Removal Option pursuant to Section

17(c) of the Agency Agreement  (all of the assets identified in (a) through (d)), subject to the IP

Removal Option set forth in Paragraph 17(c) of the Agency Agreement, shall be collectively

---

[2] Capitalized terms not defined in this Order shall have the meaning ascribed thereto in the Motion or the Agency Agreement dated __ attached hereto as Schedule A (the "Agency Agreement").

referred to as the "Subject Assets"); and a further hearing having been held on May __, 2010 (the "Hearing") to consider the relief requested in the Motion; and the appearances of all interested parties having been noted in the record of the Hearing; and all of the proceedings had before the Court; and the Court having found and determined that the relief sought in the Motion is in the best interests of the Debtors, their estates and creditors, and all parties in interest and that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefore, it is

FOUND AND DETERMINED THAT:

A.      This Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue of these cases and this Motion in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

B.      The statutory predicates for the relief requested are sections 105, 363 and 503 of the Bankruptcy Code and Rule 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

C.      The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent any of the findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

D.      Notice of the Motion and of the Hearing was given in accordance with the directive of the Court and as otherwise required by applicable law, as evidenced by the affidavits of service on file with the Clerk of the Court.

E.      The notice of the Motion and of the Hearing was adequate and sufficient under the circumstances, and any otherwise applicable requirement for notice is hereby waived and

dispensed with. A reasonable opportunity to object or to be heard with respect to the Motion and the relief requested therein has been afforded to all interested persons and entities.

F. As demonstrated by testimony proffered at the Hearing and representations of counsel to the Debtors and other parties in interest made at the Hearing, the Debtors have conducted the bidding solicitation and auction process fairly, with adequate opportunity for interested parties to submit Qualified Bids.

G. The offer of the Successful Bidder, upon the terms and conditions set forth in the Agency Agreement, including the form and total consideration to be realized by the Debtors pursuant to the Agency Agreement, (i) is the highest and best offer received by the Debtors, (ii) is fair and reasonable; and (iii) is in the best interests of the Debtors' estates.

H. The use by and transfer to the Successful Bidder of personally identifiable information, as defined in section 101(41A) of the Bankruptcy Code ("Personally Identifiable Information") (or assets containing personally identifiable information) in connection with certain components of the transaction is consistent with the Debtors' existing privacy policy; *provided, however,* that the Successful Bidder shall use such Personally Identifiable Information solely to conduct GOB Sales in accordance with the Agency Agreement.

I. The Debtors (i) have full corporate power and authority to execute and deliver the Agency Agreement and all other documents contemplated thereby, and the sale of the Debtors' Merchandise has been duly and validly authorized by all necessary corporate action of the Debtors, (ii) have all of the corporate power and authority necessary to consummate the transactions contemplated by the Agency Agreement and (iii) have taken all corporate action necessary to authorize and approve the Agency Agreement and the consummation of the transactions contemplated thereby. No consents or approvals, other than those expressly

provided for in the Agency Agreement or in this Order or as represented in the Motion or the hearing on this Motion, are required for the Debtors to consummate such transactions.

J.      The Agency Agreement was  negotiated and entered into in good faith, based upon arm's length bargaining, and without collusion or fraud.  Neither the Debtors nor the Successful Bidder has engaged in any conduct that would prevent the application of section 363(m) of the Bankruptcy Code or cause the application of or implicate Section 363(n) of the Bankruptcy Code to the Agency Agreement or to the consummation of the transactions contemplated thereby.

K.      The Debtors were free to deal with any other party interested in liquidating some or all of the Debtors' assets.  The Successful Bidder has not violated section 363(n) of the Bankruptcy Code by any action or inaction.  Specifically, the Successful Bidder has not acted in a collusive manner with any person and was not controlled by any agreement among bidders. The Successful Bidder is not an "insider" as that term is defined in section 101(31) of the Bankruptcy Code.  No common identity of directors or controlling stockholders exists between the Successful Bidder and the Debtors.

L.      The Agent Selection Procedures were negotiated in good faith by the Debtors and Great American. Specifically, the Break-Up Fee and Expense Reimbursement are fair and reasonable in amount and are reasonably related to Great American's risk, effort and expenses associated with their appointment to act as agent with respect to the sale of the Subject Assets. The Break-Up Fee and Expense Reimbursement are the product of extensive, arms-length negotiations between the Debtors and Great American.  Accordingly, payment of the Break-Up Fee and Expense Reimbursement under the circumstances described in the GA Agreement is: (i) an actual and necessary cost and expense of preserving the Debtors' estates within the meaning of sections 503(b)(1) and 507(a)(2) of the Bankruptcy Code; (ii) commensurate to the real and

substantial benefit conferred upon the Debtors' estates by Great American; (iii) reasonable and appropriate, in light of the size and nature of the proposed sale transaction and comparable transactions, the commitments that have been made and the efforts that have been and will be expended by Great American; and (iv) necessary to induce Great American to continue to pursue the sale transaction and to continue to be bound by the GA Agreement.

M.     The Break-Up Fee and Expense Reimbursement also induced Great American to submit a bid that will serve as a minimum floor bid on which the Debtors, their creditors and other bidders may rely. Great American has provided a material benefit to the Debtors and their creditors by increasing the likelihood that the Debtors will receive the best possible price for the Subject Assets. The Break-Up Fee and Expense Reimbursement will not have an adverse impact upon the Debtors, their estates or their creditors. Accordingly, the Agent Selection Procedures, including the Break-Up Fee and Expense Reimbursement, are reasonable and appropriate and represent the best method for maximizing value for the benefit of the Debtors' estates.

Now, therefore, it is hereby

**ORDERED, ADJUDGED AND DECREED THAT:**

1.     The Motion is granted to the extent provided herein. All objections to the Motion that have not been withdrawn, waived, settled, or specifically addressed in this Order, and all reservations of rights included in such objections, are overruled in all respects on the merits and denied.

2.     The Debtors and the Successful Bidder are hereby authorized, pursuant to sections 105(a) and 363(b)(1) of the Bankruptcy Code, to conduct the GOB Sales in accordance with (i) the Agency Agreement, (ii) the Final Order (A) Authorizing the Debtors to Conduct Store Closing Sales (B) Approving Procedures with Respect to Store Closing Sales, (C) Authorizing the Debtors to Pay Limited Liquidation and Closure Performance Bonuses, and (D) Authorizing

the Debtors to Abandon Certain De Minimis Asserts in Connection with Store Closing Sales (Docket No. 1099; the "Store Closing Procedures Order"), and (iii) the terms of this Order and of the Store Closing Procedures attached hereto as Schedule B (the "Store Closing Procedures"), and the Sale Termination Date shall be August 31, 2010, unless the store closing sales are concluded prior to such date in the sole discretion of the Successful Bidder.

3.    The Store Closing Procedures Order shall remain in full force and effect, except as modified by this Order, including the Store Closing Procedures.  The Successful Bidder shall comply with, and shall be entitled to rely upon, the applicable terms of the Store Closing Procedures Order and this Order, including, without limitation the Store Closing Procedures,

4.    The Successful Bidder (i) shall be bound by and shall honor the "no-sale" windows identified by the Debtors in an exhibit to the Agency Agreement, and (ii) shall, as directed by Debtors in writing, honor and abide by Debtors' obligations to the Studios, Warner Home Video and any other party to the Term Sheet (as defined below), the Accommodation Agreement and/or the Revenue Share Agreements (as defined in the Term Sheet), provided, however, that the Successful Bidder shall not assume the Debtors' obligations under the Term Sheet.  The Agency Agreement shall not serve to limit or impair the Debtors' payment obligations or any of the other provisions of the Debtors' agreements with the Studios and Warner Home Video as set forth in the Term Sheet for Joint Plan of Liquidation of Movie Gallery Inc. and its Affiliated Debtors (the "Term Sheet") which Term Sheet was attached to the Stipulation by and Between the Debtors, Lenado Capital Advisors and Affiliates (on Behalf of Certain Prepetition First Lien Revolving Lenders), the Prepetition First Lien Term Agent (on Behalf of the Prepetition First Lien Term Lenders), the Official Committee of Unsecured Creditors and Certain Movie Studios and Suppliers Regarding Final Cash Collateral Order and Plan Term Sheet filed on May 7, 2010 (Docket No. 1093)).    For the avoidance of doubt,

nothing in this Order or the Agency Agreement shall alter the rights and obligations of the respective parties under the Term Sheet.

5.      The Debtors are hereby authorized and empowered to enter into the Agency Agreement, and the Agency Agreement is hereby approved in its entirety and is incorporated herein by reference. All amounts payable to the Successful Bidder under the Agency Agreement shall be payable to the Successful Bidder without the need for any application of the Successful Bidder therefor or a further order of the Court.

6.      Except as otherwise provided in this Order or in the Agency Agreement, pursuant to Section 363(f) of the Bankruptcy Code, the assets being sold pursuant to the Agency Agreement shall be sold free and clear of any and all mortgages, security interests, conditional sales or title retention agreements, pledges, hypothecations, liens, judgments, encumbrances or claims of any kind or nature (including, without limitation, any and all "claims" as defined in section 101(5) of the Bankruptcy Code), including, without limitation, those of the Prepetition Secured Parties, the Prepetition Second Lien Term Parties (as defined in the Cash Collateral Order), the Studios or Warner Home Video (as defined in the Term Sheet), or any other person or entity, whether arising by agreement, any statute or otherwise and whether arising before, on or after the date on which these chapter 11 cases were commenced (collectively, the "Pre-Existing Liens"), with such Pre-Existing Liens to attach to the Transaction Consideration, the Merchant's First Tranche Recovery Amount, if any, and the Merchant's Second Tranche Recovery Amount, if any and any other amounts payable to the Debtors under the Agency Agreement (collectively, the "Transaction Proceeds") with the same validity, force and effect as the same had with respect to the assets at issue, subject to any and all defenses, claims and/or counterclaims or setoffs the Debtors may possess. Without limiting the foregoing, Transaction

Proceeds will be Cash Collateral (as defined in the Cash Collateral Order) and shall be subject to the Cash Collateral Order.

7.        All of the transactions contemplated by the Agency Agreement shall be protected by section 363(m) of the Bankruptcy Code in the event that this Order is reversed or modified on appeal.  The transactions contemplated by the Agency Agreement are not subject to avoidance pursuant to section 363(n) of the Bankruptcy Code.

8.        Unless otherwise ordered by the Court, all newspapers and other advertising media in which the GOB Sales may be advertised and all landlords are directed to accept this Order as binding authority so as to authorize the Debtors and the Successful Bidder to consummate the Agency Agreement and to conduct the GOB Sales at the Stores, including, without limitation, conducting and advertising of the GOB Sales (at the contractual rates charged to the Debtors prior to the Petition Date) in accordance with the Agency Agreement, the Store Closing Procedures, and this Order; and no further approval, license or permits of any governmental authority shall be required.

9.        The Debtors and the Successful Bidder are hereby authorized to take such actions as may be necessary and appropriate to implement the Agency Agreement and to conduct the GOB Sales without necessity of further order of this Court as provided by the Agency Agreement, including, but not limited to, (a) the sale of certain of the Subject Assets by means of a Bulk Sale, and (b) advertising the GOB Sales through the posting of signs (including the use of exterior banners, at (i) non-enclosed mall Stores, and (ii) enclosed mall Stores to the extent the applicable Retail Store entrance does not require entry into the enclosed mall common area, use of signwalkers and street signage, in accordance with the Agency Agreement and as otherwise provided in the Store Closing Procedures.  Notwithstanding anything to the contrary in the Store Closing Procedures Order, this Order or the Store Closing Procedures, the Successful Bidder: (i)

is authorized to conduct, advertise, post signs and otherwise promote the GOB Sales as "going out of business" sales; and (ii) the Successful Bidder shall be deemed to be the "Consultant" as defined in the Store Closing Procedures Order for all purposes related to the conduct and implementation of GOB Sales.

10.     Except as otherwise expressly provided for in the Agency Agreement, title to each Subject Asset shall remain with the applicable Debtor's estate and each Subject Asset shall remain property of the applicable Debtor's estate until the earlier of (i) the sale of such Subject Asset by the Successful Bidder to a third party and (ii) (with respect to Subject Assets that are not subject to revenue share agreements) the occurrence of the Sale Termination Date.

11.     This Court shall retain exclusive jurisdiction to resolve any disputes regarding this Order and the actions authorized hereunder brought by or against any person, including, without limitation, (i) any claim or issue relating to any efforts to prohibit, restrict or in any way limit banner and signwalker advertising, including with respect to any allegations that such advertising is not being conducted in a safe, professional and non-deceptive manner, (ii) any claim of the Debtors, the landlords and/or the Successful Bidder for protection from interference with the GOB Sales and (iii) any other disputes related to the GOB Sales or arising under the Agency Agreement or the implementation thereof.

12.     Throughout the applicable Sale Term, the Successful Bidder shall have the right to use the Stores and all related services, furniture, fixtures, equipment and other assets of Debtors for the purpose of conducting the GOB Sales, in each case solely in accordance with the applicable provisions of the Agency Agreement.

13.     In connection with the IP Designation Rights, the IP Designation Rights Procedures set forth in Section 17(b) of the Agency Agreement and the IP Removal Option set forth in Section 17(c) of the Agency Agreement are approved; *provided however,* any transfer of

Personally Identifiable Information to, or which is to be used by, the Successful Bidder or its designee shall be consistent with the Debtors' privacy policy.

14.    In addition to the IP Designation Rights being granted to the Successful Bidder under the Agency Agreement, until  the applicable Sale Termination Date, the Successful Bidder shall be granted a limited license and right to use the Debtors' trade names, logos and customer lists relating to and used in connection with the operation of the Stores, solely for the purpose of advertising the GOB Sales in accordance with the applicable terms of the Agency Agreement.

15.    Except as expressly provided for in the Agency Agreement, nothing in this Order or the Agency Agreement and none of the Successful Bidder's actions taken in respect of the GOB Sales shall be deemed to constitute an assumption by the Successful Bidder of any of the Debtors' obligations relating to any of the Debtors' employees.  Moreover, the Successful Bidder shall not become liable under any collective bargaining or employment agreement or be deemed a joint or successor employer with respect to such employees.

16.    Except as set forth in the Agency Agreement, the Debtors and/or the Successful Bidder (as the case may be) are authorized and empowered to transfer assets among the Stores and among the Current Stores (but not among the Stores and Current Stores).  The Successful Bidder shall be permitted to include in the GOB Sales as consigned goods the Additional Agent Merchandise in accordance with the terms and provisions of the Agency Agreement.  At all times, title to the Additional Agent Merchandise shall remain with the Successful Bidder and the Additional Agent Merchandise and the proceeds thereof, shall not constitute property of the estate of any one or more of the Debtors.

17.    The Lease Designation Rights and the procedures set forth in the Agency Agreement to be followed in connection therewith are approved, subject to the affected landlord's rights to: (i) receive appropriate notice of and an opportunity to be heard; (ii) payment

of all cure amounts due pursuant to Section 365; (iii) object to the proposed designee's adequate

assurance of further performance; and (iv) assert any enforceable shopping center use restriction.

This Court shall retain jurisdiction over any disputes or objections raised by the affected

landlords with respect to the foregoing.  Notwithstanding anything to the contrary in this Order,

in the event the Successful Bidder elects to require the Debtors to assume and assign a lease to

the Successful Bidder or its designee, the Successful Bidder or its designee shall be obligated to

pay all Pre-Petition Cure Amounts due under the lease to be assumed and the Debtors shall be

obligated to pay all Post-Petition Cure Amounts consistent with the Agency Agreement.

18.      Upon the issuance of the Letter of Credit provided for in the Agency Agreement,

the Debtors shall grant to the Successful Bidder, solely in accordance with the terms of the

Agency Agreement, pursuant to sections 364(d) and 507 of the Bankruptcy Code, a valid and

perfected first priority security interest and superpriority administrative claim (subject to the

subordination provisions set forth below in this paragraph and in the Agency Agreement) in and

lien upon the Subject Assets and the Comprehensive Sale Proceeds to secure all obligations of

Debtors under the Agency Agreement; *provided, however,* that until the payment of: (i) the

Transaction Consideration; (ii) the Merchant's First Tranche Recovery Amount, if any; (iii) the

Merchant's Second Tranche Recovery Amount, if any; (iv) any amounts necessary to reimburse

Merchant for Comprehensive Sale Expenses; and (v) any other amounts to be paid to the Debtors

under the Agency Agreement, the Successful Bidder's security interest shall remain junior and

subordinate in all respects to the liens, security interests and claims of Prepetition Secured

Parties, the Prepetition Second Lien Term Parties, and any holders of Pre-Existing Liens to the

extent of the unpaid portion of the Transaction Consideration, the Recovery Amount and

Expenses.  Upon entry of this Order and payment of the Initial Transaction Payment and the

issuance of the Letter of Credit, the security interest granted to the Successful Bidder shall be deemed properly perfected without the need for further filings or documentation.

19.     The Transaction Proceeds shall be the perfected collateral of the Prepetition Secured Parties and the Prepetition Second Lien Term Parties and shall be subject to liens and administrative expense claims of the Prepetition Secured Parties and the Prepetition Second Lien Term Parties as provided in, and subject to the priorities set forth in, the Cash Collateral Order without further action by the Prepetition Secured Parties or the Prepetition Second Lien Term Parties.

20.     The provisions of this Order, the Agency Agreement, and any actions taken pursuant hereto or thereto shall survive the entry of any order which may be entered confirming or consummating any plan of reorganization of the Debtors or converting the Debtors' cases from chapter 11 to chapter 7, and the terms and provisions of the Agency Agreement, as well as the rights and interests granted pursuant to this Order and the Agency Agreement shall continue in this or any superseding case and shall be binding upon the Debtors, the Successful Bidder and their respective successors and permitted assigns, including any trustee or other fiduciary hereafter appointed as a legal representative of the Debtors under chapter 7 or chapter 11 of the Bankruptcy Code.  Any trustee appointed in these cases shall be and hereby is authorized to operate the business of the Debtors to the fullest extent necessary to permit compliance with the terms of this Order and the Agency Agreement, and the Successful Bidder and the trustee shall be and hereby are authorized to perform under the Agency Agreement upon the appointment of a trustee without the need for further order of this Court.  In the event a chapter 7 trustee determines that it needs further order of this Court in connection with the continued operation of the business, such motion shall be heard on an expedited basis.

21.     To the extent that anything contained in this Order conflicts with a provision in the Agency Agreement or the Store Closing Procedures, this Order shall govern and control. This Court shall retain exclusive jurisdiction with respect to any matters, claims, rights or disputes arising from or related to the implementation of this Order or otherwise arising from or related to the Agency Agreement.

22.     The Successful Bidder shall not be liable for any claims against the Debtors, and the Debtors shall not be liable for any claims against the Successful Bidder, in each case, other than as expressly provided for in the Agency Agreement.  The Successful Bidder shall have no successor liability whatsoever with respect to any Liens or claims of any nature that may exist against the Debtors.

23.     No bulk sale or similar law shall prohibit the Debtors or the Successful Bidder from taking action contemplated by the Agency Agreement.

24.     The Debtors, the Successful Bidder and each of their respective officers, employees and agents are hereby authorized to execute such documents and to do such acts as are necessary or desirable to carry out the GOB Sales and effectuate the Agency Agreement, and the related actions set forth therein.

25.     Notwithstanding Bankruptcy Rules 4001 and 6004, this Order shall be effective and enforceable immediately upon entry and its provisions shall be self-executing.   In the absence of any person or entity obtaining a stay pending appeal, the Debtors and the Successful Bidder are free to perform under the Agency Agreement at any time, subject to the terms of the Agency Agreement.

26.     The Successful Bidder is a party in interest and shall have the ability to appear and be heard on all issues related to or otherwise connected to this Agency Agreement, and the conduct of the GOB Sales.

27.    In the event the Successful Bidder fails to consummate the transaction as a result of the Successful Bidder's default or breach under the applicable purchase agreement by the closing date contemplated in such purchase agreement, the Debtors shall (i) retain the Successful Bidder's Good Faith Deposit as liquidated damages and any other claims for damages; and (ii) be free to enter into a new purchase agreement with the next most appropriate Qualified Bidder at the highest price bid by such bidder at the Auction, whose Qualifying Bid shall be deemed open, without the need for an additional hearing before or order of the Bankruptcy Court.

Dated: May ____, 2009

_____
United States Bankruptcy Judge

We ask for this:

/s/ _____

**KUTAK ROCK LLP**

Michael A. Condyles (VA 27807)
Peter J. Barrett (VA 46179)
Bank of America Center
1111 East Main Street, Suite 800
Richmond, Virginia  23219-3500
Telephone:  (804) 644-1700
Fax:  (804) 783-6192

and

**SONNENSCHEIN NATH & ROSENTHAL LLP**

John A. Bicks (NY 2032498)
1221 Avenue of the Americas
New York, NY 10020-1089
Telephone:  (212) 768-6700
Fax:  (212) 768-6800

*Attorneys for Debtors and Debtors in Possession*

10344914\V-11

15

**SCHEDULE A**
**(Approved Agency Agreement)**
**(See Attached Exhibit B)**

# SCHEDULE B
## (Amended Store Closing Procedures)

The following guidelines and procedures shall apply to GOB Sales:

1.       The Debtors are authorized, on their own or through their Agent, to liquidate inventory, fixtures and equipment by any commercially reasonable means, including, but not limited to, in-store liquidations using either the Debtors' or their Agent's employees or a third-party agent (provided, to the extent applicable, the Debtors' engagement of such an agent has been authorized and approved by the Bankruptcy Court), notwithstanding contrary provisions in any leases restricting such sales, and without further order of the Court.

2.       The Debtors or their Agent are authorized to sell, or in the exercise of their business judgment, to abandon,  certain de minimis personal property, including but not limited to furniture, fixtures, and equipment ("De Minimis Property") as part of the GOB Sales.  The Debtors or their Agent will leave each Store subject to GOB Sales in "broom clean" condition, and the Debtors or their Agent are authorized to abandon on site all unsold De Minimis Property.

3.       The GOB Sales shall be conducted during normal business hours or such hours as otherwise permitted by the lease; provided that the Debtors and their Agent shall abide by any applicable mall guidelines regarding maintenance, security and trash removal.

4.       The  shall be conducted in accordance with applicable state and local "Blue Laws," and thus, where applicable, no Sale shall be conducted on Sunday unless the Debtors had been operating such stores on Sundays prior to the Commencement Date.

5.       The Agent shall have the right to use the stores and all related services, furniture, fixtures, equipment and other assets of Debtors as designated hereunder for the purpose of carrying out its duties under the Agency Agreement, free of any interference from any entity or person subject to compliance with the Store Closing Guidelines and the Order.

6.       The Agent is authorized to conduct, advertise, post signs and otherwise promote the GOB Sales as a "going-out-of-business", "store closing," "sale on everything," "everything

must go," or similar themed sale, subject to compliance with the Store Closing Guidelines and the Order and shall be permitted to use signs and internal and external banners and signwalkers to promote such GOB Sales.

7.      The Agent shall be granted a limited license and right to use the Debtors' trade names, logos and customer lists relating to and used in connection with the operation of the Stores, solely for the purpose of advertising the GOB Sales in accordance with the terms of the Agency Agreement.

8.      All display and hanging signs used by the Debtors and their Agent in connection with GOB Sales shall be professionally lettered and all hanging signs shall be hung in a professional manner.  Nothing contained herein shall be construed to create or impose upon the Debtors any additional restrictions not contained in the applicable lease.  In addition, the Debtors and their Agent shall be permitted to utilize exterior banners and signwalkers.  The Debtors and their Agent also may hang signage indicating the availability of the store's lease for potential assignment.

9.      If sales of Merchandise are to be considered "final," conspicuous signs shall be posted in each of the affected stores to the effect that all sales are "final."

10.      The Debtors and their Agent shall not make any alterations to interior or exterior store lighting.  No property of any landlord of a store shall be removed or sold during the GOB Sales.

11.      The Debtors and their Agent shall keep store premises and surrounding areas clear and orderly consistent with present practices.

12.      The landlords of the stores shall have reasonable access to the store premises upon conclusion of the GOB Sales for the purpose of dressing store windows to minimize the appearance of a dark store.

13.      Counsel for the Debtors, Kutak Rock LLP, 1111 E. Main Street, Suite 800,

Richmond, Virginia 23219, Telephone: (804) 644-1700, Attn: Jeremy Williams, shall be the

designated contact for landlords should an issue arise concerning the conduct of a Store Closing

Sale.

**EXHIBIT B**
**(GA AGREEMENT)**

## AGENCY AGREEMENT

This Agency Agreement (the "Agreement") is made as of this 13th day of May, 2010, by and between GREAT AMERICAN WF, LLC, with a principal place of business located at 21860 Burbank Blvd, Suite South 300, Woodland Hills, CA 91367 (the "Agent") and MOVIE GALLERY, INC. and its affiliated debtors and debtors-in-possession, each with a principal place of business at 9275 SW Payton Lane, Wilsonville, OR 97070 (collectively, the "Merchant").

## RECITALS

WHEREAS, the Merchant desires that the Agent act as the Merchant's exclusive agent for the limited purpose of (a) selling all of the Merchandise (as hereinafter defined) located in (i) Merchant's retail store locations listed on Exhibit 1A attached hereto (each individually a "Store", and collectively the "Stores") by means of a "going-out-of-business", "store closing" or similar theme sale (as further described below, the "Sale"),  (b) disposing of Merchant's furniture, fixtures and equipment located at (i) the Stores, and (ii) Merchant's corporate offices and other facilities identified on Exhibit 1C (the "Corporate Offices") (the "FF&E"); and (c) disposing of Merchant's fee and leasehold interests in non-residential real property for the Stores and the Corporate Offices, pursuant to Section 16 hereof, and (d) disposing of Merchant's Intellectual Property (as hereinafter defined), subject to Merchant's IP Removal Option pursuant to Section 17(c) hereof.   The assets identified in (a) through (d) shall be collectively referred to as the "Subject Assets")

WHEREAS, Agent is willing to serve as Merchant's exclusive agent to conduct the Sale and dispose of the FF&E and Intellectual Property in accordance with the terms and conditions of this Agreement;

NOW THEREFORE, in consideration of the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Agent and Merchant hereby agree as follows:

Section 1.    Defined Terms.    The terms set forth below are defined in the referenced sections of this Agreement:

| Defined Term | Section Reference |
| --- | --- |
| Adjustment Amount | Section 3.3(a) |
| Agency Documents | Section 11.1(b) |
| Agent | Preamble |
| Agent Claim | Section 12.5 |
| Agent Indemnified Parties | Section 13.1 |
| Approval Order | Section 2 |
| Auction | Section 16 |
| Bankruptcy Code | Recitals |
| Bankruptcy Court | Recitals |
| Benefits Cap | Section 4.1 |

| | |
|---|---|
| Central Service Expenses | Section 4.1 |
| Transaction Consideration | Section 3.1(a) |
| Comprehensive Sale Expenses | Section 4.1 |
| Comprehensive Sale Proceeds | Section 7.1 |
| Corporate Offices | Recitals |
| Defective Merchandise | Section 5.2(b) |
| Designated Deposit Accounts | Section 7.2 |
| Display Merchandise | Section 5.2(b) |
| Distribution Centers | Section 4.1 |
| Events of Default | Section 14 |
| Excluded Benefits | Section 4.1 |
| FF&E | Recitals |
| Final Inventory Reconciliation | Section 3.3(a) |
| Final Reconciliation | Section 3.5(a) |
| Gift Cards/Credits/Power Play Points | Section 8.2(b) |
| Gross Rings | Section 6.3 |
| Initial Transaction Payment | Section 3.3(b) |
| Letter of Credit | Section 3.4(a) |
| Merchandise | Section 5.2(a) |
| Merchant | Preamble |
| Near Date Merchandise | Section 5.2(b) |
| Occupancy Expenses | Section 4.1 |
| Outdated Merchandise | Section 5.2(b) |
| Remaining Merchandise | Section 3.2 |
| Retained Employee | Section 9.1 |
| Retention Bonus | Section 9.4 |
| Returned Merchandise | Section 8.5 |
| Sale | Recitals |
| Sale Commencement Date | Section 6.1 |
| Sale Guidelines | Section 8.1(a) |
| Sale Term | Section 6.1 |
| Sale Termination Date | Section 6.1 |
| Sales Taxes | Section 8.3 |
| Secured Creditors | Section 2 |
| Store(s) | Recitals |
| Supplies | Section 8.4 |
| WARN Act | Section 9.1 |

Section 2.    Appointment of Agent; Bankruptcy Court Approval.    The Merchant hereby appoints the Agent, and the Agent hereby agrees to serve, as the Merchant's exclusive agent for the limited purpose of (a) conducting the Sale and disposing of the FF&E at the Stores and Corporate Offices, (b) marketing and selling Merchant's real estate interests for the Stores and the Corporate Offices, and  (c) disposing of the  Intellectual Property, all in accordance with the terms and conditions of this Agreement.  Merchant's and Agent's respective obligations hereunder are subject to approval of the Bankruptcy Court and shall be of no force and effect in the event that they are not so approved.  As soon as practicable after Merchant's execution of this Agreement, Merchant shall apply to the Bankruptcy Court for an order, substantially in the form annexed hereto as Exhibit 2 approving this Agreement in its entirety

(the "Approval Order"). The Approval Order shall provide, in a form satisfactory to Merchant, Agent, and the "Prepetition Secured Parties" as such term is defined in that certain Final Order (A) Authorizing The Use of Cash Collateral, (B) Granting Adequate Protection To Certain Pre-Petition Secured Parties, and (C) Granting Related Relief entered by the United States Bankruptcy Court for the Eastern District of Virginia, Richmond Division (the "Bankruptcy Court"), on February 22, 2010 (as it may hereafter be amended, supplemented, restated or modified pursuant to its terms, the "Cash Collateral Order") (such Prepetition Secured Parties collectively referred to herein as the "Secured Creditors"), that: (i) this Agreement is in the best interests of Merchant, Merchant's estate, creditors and other parties in interest; (ii) this Agreement (and each of the transactions contemplated hereby) is approved in its entirety, including but not limited to the terms of procedures of  (a) the  Leasehold Designation Rights, provided for in Section 16 hereof, and (b) the Bulk Sale Designation Rights provided for in Section 17(a) hereof; and (c) the Intellectual Property Designation Rights provided for in Section 17(b) hereof; (iii) Merchant and Agent shall be authorized to take any and all actions as may be necessary or desirable to implement this Agreement and each of the transactions contemplated hereby; (iv) Agent shall be entitled to sell all Merchandise and FF&E and Intellectual Property (subject to Section 17(b) hereof) hereunder free and clear of all liens, claims or encumbrances thereon; any presently existing liens encumbering all or any portion of the Merchandise, the FF&E, the Intellectual Property, or the Comprehensive Sale Proceeds attaching only to the Transaction Consideration and amounts reimbursed to Merchant on account of Comprehensive Sale Expenses; (v) Agent shall have the right to use the Stores and all related Store services, furniture, fixtures, equipment and other assets of Merchant as designated hereunder for the purpose of conducting the Sale, free of any interference from any entity or person; (vi) Agent, as agent for Merchant, is authorized to conduct, advertise, post signs and banners and otherwise promote the Sale as a "going-out-of-business", "store closing" or similar theme sale without further consent of any person in a manner consistent with the Sale Guidelines attached hereto as Exhibit 8.1; (vii) Agent shall be granted a limited license and right to use until the Sale Termination Date the trade names, logos and customer lists relating to and used in connection with the operation of Stores, solely for the purpose of advertising the Sale in accordance with the terms of the Agreement; (viii) each and every federal, state or local agency, department or governmental authority with regulatory authority over the Sale and all newspapers and other advertising media in which the Sale is advertised shall be directed to accept the Approval Order as binding and to allow Merchant and Agent to consummate the transactions provided for in this Agreement, including, without limitation, the conducting and advertising of the Sale in the manner contemplated by this Agreement, and no further approval, license or permit of any governmental authority shall be required; (ix) all utilities, landlords, creditors and all persons acting for or on their behalf shall not interfere with or otherwise impede the conduct of the Sale, institute any action in any court (other than in the Bankruptcy Court) or before any administrative body which in any way directly or indirectly interferes with or obstructs or impedes the conduct of the Sale; (x) the Bankruptcy Court shall retain jurisdiction over the parties to enforce this Agreement; (xi) subject to the provisions of Section 19 hereof, grant Agent a first priority post-petition lien and security interest under section 364(d) of the Bankruptcy Code in and to (1) the Subject Assets and (2) all Comprehensive Sale Proceeds;  (xii) no bulk sales law or any similar law of any state or other jurisdiction shall apply in any way to the transactions authorized herein and (xiii) sales of the Subject Assets shall be protected by Section 363(m) of the Bankruptcy Code in the event that the Approval Order is reversed or modified on appeal.

Section 3.    Consideration to Merchant and Agent.

3.1    Payments to Merchant.

(a)    Transaction Consideration. As a guaranty of Agent's performance hereunder, Agent guarantees that Merchant shall receive the sum of sixty-two million three hundred thousand dollars ($62,300,000) (the "Transaction Consideration"); provided, however, (i) in the event that the aggregate Unit Count of the Merchandise, by Merchandise category is less than or more than the number of units allocated to such Merchandise category set forth on Exhibit 3.1(a)(i); then the Transaction Consideration shall be adjusted in accordance with Exhibit 3.1(a)(i) hereof (the "Inventory Adjustment"); and/or (ii) the Transaction Consideration shall be subject to adjustment (the "Revenue Share Adjustment") if and to the extent required under Section 3.6 hereof.

(b)    In the event that the aggregate Comprehensive Sale Proceeds exceeds the sum of (i) the Transaction Consideration, as adjusted by any applicable Inventory Adjustment and/or Excess Revenue Sharing Adjustment, but not taking into account any applicable Revenue Share Savings Adjustment; plus (ii) Comprehensive Sale Expenses (the "Sharing Threshold"), such Comprehensive Sale Proceeds in excess of the Sharing Threshold, if any shall be shared as follows: (x) an amount equal to three percent (3%) of aggregate Comprehensive Sale Proceeds, to the extent available, shall be paid to Agent as its base fee hereunder (the "Agent's Fee"); (y) an amount equal to the next two percent (2%) of aggregate Comprehensive Sale Proceeds, shall be shared fifty percent (50%) to Merchant ("Merchant's First Tranche Recovery Amount") and fifty percent (50%) to Agent ("Agent's First Tranche Recovery Amount"); and (z) all remaining Comprehensive Sale Proceeds, if any shall be shared seventy percent (70% ) to Merchant ("Merchant's Second Tranche Recovery Amount") and thirty percent (30%) to Agent ("Agent's Second Tranche Recovery Amount").

(c)    The Transaction Consideration will be calculated based upon the aggregate Unit Count of the Merchandise in the Stores, as of the Sale Commencement Date included in the Sale as determined by Gross Rings and a count of the Remaining Merchandise.

3.2    Payments to Agent. Agent shall, as its compensation for services rendered to Merchant, subject to the terms and conditions of Section 3.1(b), receive, if the Sharing Threshold is exceeded, the Agent's Fee, Agent's First Tranche Recovery Amount, if any, and Agent's Second Tranche Recovery Amount, if any; provided, however, that Merchant shall also receive, by deposit to the Merchant's Account, any payments of Merchant Recovery Amounts due to Merchant on a pro rata basis in accordance with Section 3.1(b) on payment of any Agent's First Tranche Recovery Amount or Agent's Second Tranche Recovery Amount. All unsold Merchandise remaining, if any, in the Stores at the Sale Termination Date that is not Revenue Share Merchandise ("Remaining Merchandise") shall become the property of Agent, free and clear of all liens, claims and encumbrances, and Comprehensive Sale Proceeds generated from the sale of such Remaining Merchandise after the Sale Termination Date shall be the property of Agent. All unsold Revenue Share Merchandise remaining, if any, in the Stores at the Sale Termination Date (the "Unsold Revenue Share Merchandise") shall remain the property of Merchant, but shall be consigned to Agent to sell on Merchant's behalf. Agent's consignment fee for the sale of any item of Unsold Revenue Share Merchandise after the Sale Termination Date shall be equal to 99.9% of the sale proceeds thereof. Merchant shall file UCC-1 financing

statements in the appropriate jurisdictions reflecting the consignment of Unsold Revenue Share Merchandise.

    3.3    <u>Time of Payments</u>.

    (a)    On the first business day following issuance of the Approval Order, Agent shall make an initial payment of the Transaction Consideration to Merchant in the amount of forty-six million five hundred thousand dollars ($46,500,000) (the "<u>Initial Transaction Payment</u>"), which amounts shall be paid by Agent by wire transfer as follows:

    (i)    An amount equal to thirty five percent (35%) of the Transaction Consideration (the "<u>Adjustment Amount Escrow</u>") shall be deposited into an escrow account with an escrow agent (the "<u>Escrow Agent</u>") reasonably acceptable to Merchant, Agent, and the Secured Creditors, which amount shall be held in escrow by the Escrow Agent pursuant to the terms of an escrow agreement reasonably acceptable to Merchant, Agent, and the Secured Creditors; <u>provided</u> <u>however</u>, commencing in the third weekly sale reconciliation under Section 8.7 hereof, and continuing during each subsequent weekly sale reconciliation, Merchant and Agent shall confer in good faith for purposes of evaluating whether, based upon sales of Merchandise to date, all or a portion of the Adjustment Amount Escrow should be released to Merchant's Account, as hereafter defined (each an "<u>Interim Escrow Release</u>"); and

    (ii)    The balance of the Initial Transaction Payment shall be deposited into the account listed on Exhibit 3.3 hereof and shall not, as between Merchant and Agent, be subject to any use restriction hereunder, but upon deposit shall be subject in all respects to the Cash Collateral Order and Plan Term Sheet.

    (iii)    Merchant and Agent shall reconcile the sales of Merchandise by Unit Count as part of the weekly Sale reconciliations provided for under Section 8.7 hereof, and Merchant and Agent shall reasonably cooperate in calculating the appropriate amount of any Interim Escrow Release, and any additional weekly installments of the remaining portion of the Transaction Consideration.

    (b)    The unpaid balance of the Transaction Consideration, if any, shall be paid by Agent to Merchant on the first business day following the issuance of the final reconciliation of the Gross Rings, after verification thereof by Agent and Merchant in consultation with the Secured Creditors (the "<u>Final Inventory Reconciliation</u>") and unless there is an Adjustment Amount due to Agent, Merchant and Agent shall jointly instruct the Escrow Agent to disburse to Merchant, to the extent not theretofore released, all remaining funds in the Adjustment Amount Escrow. Agent and Merchant shall use their reasonable best efforts to issue the Final Inventory Reconciliation within seven (7) days after the conclusion of the Sale Term. In the event that the Final Inventory Reconciliation shows that the Initial Transaction Payment and/or all other amounts funded by Agent on account of the Transaction Consideration or Comprehensive Sale Expenses reimbursed to Agent exceed the Transaction Consideration and amounts due Merchant on account of Comprehensive Sale Expenses (the "<u>Adjustment Amount</u>") then within two (2) business days after the Adjustment Amount is determined, Merchant and Agent shall jointly instruct the Escrow Agent to release the Adjustment Amount to Agent, with any remaining amounts in the Adjustment Amount Escrow to be released to Merchant. To the extent that the Adjustment Escrow Amount is not sufficient to satisfy the Adjustment Amount

due to Agent, then Agent shall make demand for payment of any such unpaid amounts of Merchant and Merchant shall promptly tender payment of the Adjustment Amount to Agent, which amount shall be entitled to treatment as a super-priority administrative expense claim with an administrative priority over other administrative expense and priority claims.

(c) All payments between Merchant and Agent hereunder shall be by wire transfer of immediately available funds, unless otherwise agreed between Merchant and Agent.

3.4    Security.

(a)    To secure payment of the balance of any unpaid portion of the Transaction Consideration and reimbursement of Comprehensive Sale Expenses, and any other amounts due from Agent to Merchant hereunder, Agent shall deliver to Merchant an irrevocable and transferable standby letter of credit (substantially in the form of Exhibit 3.4 (a) annexed hereto) in the original face amount equal to five million dollars ($5,000,000), naming Merchant and its transferees as the beneficiary (the "Letter of Credit").  The Letter of Credit shall be delivered to Merchant one (1) business day following the Sale Commencement Date, and shall be issued by a bank selected by Agent and reasonably acceptable to Merchant and the Secured Creditors.    In the event that Agent  fails to pay to Merchant any amount required to be paid hereunder, or fails to perform any obligation hereunder, the beneficiary shall be entitled to draw on the Letter of Credit to fund such amount or obligation following three (3) days written notice to Agent of the beneficiary's intention to do so.  The Letter of Credit shall expire no earlier than sixty (60) days after the Sale Termination Date, provided, that, in the event that at the scheduled expiration date of the Letter of Credit there remains any unresolved dispute as to the amount of the Transaction Consideration, the beneficiary of the Letter of Credit may, in its discretion, exercise the right to cause Agent to have the expiration date of the Letter of Credit extended for thirty (30) day intervals (or such other longer duration as the beneficiary and Agent may agree) until such time as the subject dispute has been resolved and any additional amounts due hereunder paid to Merchant; provided however, if Agent fails to timely extend the expiration date of the Letter of Credit as requested, the beneficiary shall have the right to draw upon the Letter of Credit in an amount equal to the disputed unpaid amount, upon the earlier of (a) three (3) days written notice of its intention to do so, or (b) two (2) business days prior to the expiration date of the Letter of Credit.  In the event that Agent shall have paid to Merchant all amounts due hereunder prior to such date, Merchant agrees (and any transferee of the Letter of Credit will agree as a condition to the transfer) to surrender the original Letter of Credit to the issuer thereof together with written notification that the Letter of Credit may be terminated.  Merchant and Agent agree that after payment of the unpaid portion of the Transaction Consideration  pursuant to Section 3.3 above, the face amount of the Letter of Credit shall be reduced in an amount(s) to be agreed upon by Merchant and Agent.  Merchant and Agent acknowledge the security interest of the Secured Lenders in the Letter of Credit and the proceeds thereof provided for in the Cash Collateral Order.  Proper drawings under the Letter of Credit shall not, as between Merchant and Agent, be subject to any use restriction hereunder, but upon receipt by the beneficiary shall be subject in all respects to the Cash Collateral Order and Plan Term Sheet

3.5    Final Reconciliation.  (a)    Within thirty (30) days after the Sale Termination Date, Agent and Merchant shall jointly prepare a final reconciliation of the Sale including, without limitation, a summary of Comprehensive Sale Proceeds, Sales Taxes,

Comprehensive Sale Expenses incurred by Merchant, and any other accountings required hereunder (the "Final Reconciliation"). Within five (5) days of completion of the Final Reconciliation, any undisputed and unpaid Comprehensive Sale Expenses incurred by Merchant, shall be paid by Agent. In the absence of an order of the Bankruptcy Court, no such disputed amount(s) shall be paid until the dispute has been resolved by agreement of the parties or as determined in the manner prescribed in Section 3.5(b) hereof. During the Sale Term, and until all of Agent's obligations under this Agreement have been satisfied, Merchant, Agent and the Secured Creditors and their respective representatives shall have reasonable access to Merchant's and Agent's records with respect to the Merchandise, transfers of Merchandise (that occur prior to and during the Sale), Comprehensive Sale Proceeds, taxes and Comprehensive Sale Expenses incurred by Merchant to review and audit such records.

(b)     In the event that there is any dispute with respect to the Final Reconciliation such dispute shall be promptly (and in no event later than the third business day following the request by either Merchant or Agent) submitted to the Bankruptcy Court for resolution.

3.6     Revenue Sharing Adjustment. (a) Merchant has identified the Merchandise included in the Sales that is subject to so-called revenue sharing arrangements, subject to and limited to the titles and unit quantities set forth on Exhibit 3.6 annexed hereto (the "Revenue Share Merchandise") with the vendors thereof (the "Revenue Share Agreements"). As part of the weekly sale reconciliations pursuant to Section 8.7 hereof, Merchant and Agent shall jointly monitor the sale of Revenue Share Merchandise, and Merchant and Agent shall cooperate with each other in the preparation of weekly sale reports (which will be shared with the Secured Creditors) showing the sales of the Revenue Share Merchandise and the sale price therefor. Merchant shall, in consultation with Agent, calculate the amount of any payments due to vendors under the applicable Revenue Share Agreements with respect to the titles listed on Exhibit 3.6 annexed hereto (the "Revenue Share Obligations") and Merchant shall promptly pay such obligations when they are due.

(b)     If, and to the extent, the aggregate amount of Revenue Share Obligations is less than $10,500,000 the ("Revenue Share Savings"), then the Transaction Consideration shall be reduced by an amount equal to 50% of such Revenue Share Savings. If the aggregate Revenue Share Obligations are greater than $10,500,000, then there shall be a Revenue Sharing Adjustment increasing the Transaction Consideration by an amount equal to the lesser of (a) 100% of the excess and (b) $4,500,000 ("Excess Revenue Share Adjustment").

(c)     Nothing in this Agency Agreement shall serve to limit or impair Merchant's payment obligations under, or any of the other provisions of, Merchant's agreements with the Studios and Warner Home Video as set forth in the Term Sheet for Joint Plan of Liquidation of Movie Gallery Inc. and its Affiliated Debtors (the "Term Sheet") which Term Sheet was attached to the Stipulation by and Between the Debtors, Lenado Capital Advisors and Affiliates (on Behalf of Certain Prepetition First Lien Revolving Lenders), the Prepetition First Lien Term Agent (on Behalf of the Prepetition First Lien Term Lenders), the Official Committee of Unsecured Creditors and Certain Movie Studios and Suppliers Regarding Final Cash Collateral Order and Plan Term Sheet filed on May 7, 2010 (Docket No. 1093)). Agent shall, as directed by Merchant in writing, honor and abide by Merchant's obligations to the Studios, Warner Home Video or any other party to the Term Sheet, the Accommodation

Agreements, and/or the Revenue Share Agreements (collectively, the "Studio Related Agreements"). Agent shall not, except as expressly provided for in section (c)(i) below, assume Merchant's obligations under the Term Sheet and Agent's liability with respect to the Revenue Share Obligations and/or Studio Related Agreements shall be limited to Agent's obligation to pay the Excess Revenue Share Adjustment, if any as provided for in Section 3.6(a) above.

(i)    Agent shall be bound by and shall honor any "no-sale" windows identified by Merchant on Exhibit 3.6; provided however between the date hereof and the Auction, Merchant, Agent, the Studios and Warner Home Video shall work together to identify additional provisions of the Studio Related Agreements that are within the control of Agent, if any, to which Agent will agree to be bound (the "Agent's Studio Agreement Obligations") so as to obtain the Studios' and Warner Home Video's consent to the Sale. Absent an agreement between Merchant, Agent, the Studios and Warner Home Video, nothing contained in the Agency Agreement shall be deemed to modify, limit or waive the Studios' or Warner Home Video's right to object to the Sale.

(ii)    Upon receiving advice of any sale of Unsold Revenue Share Merchandise by Agent after the conclusion of the Sale Term, Merchant shall promptly make payment of any amounts due under the applicable Revenue Share Agreement.

Section 4.    Comprehensive Sale Expenses of the Sale.

4.1    Comprehensive Sale Expenses.    Agent shall be responsible for all Comprehensive Sale Expenses incurred in conducting the Sale. As used herein, "Comprehensive Sale Expenses" shall mean Store-level operating expenses of the Sale which arise during or are related to the Sale Term at the Stores limited to the following:

(a)    all payroll and commissions, if applicable, for all Retained Employees (as defined in this Agency Agreement) used in conducting the Sale for actual days/hours worked during the Sale Term as well as payroll, to the extent retained by Agent for the Sale, for any of Merchant's former employees or temporary labor;

(b)    actual amounts payable by Merchant for benefits for Retained Employees (including FICA, unemployment taxes, workers' compensation and healthcare insurance, and vacation, sick or similar benefits that accrue during the Sale Term, but excluding Excluded Benefits) for Retained Employees used in the Sale, in an amount not to exceed 10% of the aggregate base payroll for all Retained Employees in the Stores (the "Benefits Cap");

(c)    Retention Bonuses for Retained Employees, as provided for in Section 9.4 hereof;

(d)    advertising and direct mailings relating to the Sale, and Store interior and exterior signage and banners relating to the Sale;

(e)    credit card fees, chargebacks and discounts with respect to Merchandise sold in the Sale;

(f)      bank service charges (for Store and corporate accounts), check guarantee fees, and bad check expenses to the extent attributable to the Sale;

(g)      costs for additional Supplies used at the Stores;

(h)      all fees and charges required to comply with applicable general laws in connection with the Sale;

(i)      Store cash theft and other store cash shortfalls in the registers;

(j)      any and all costs relating to the processing, transfer and consolidation of Merchandise between and among the Stores, at Agent's direction, including delivery and freight costs;

(k)      Store trash and snow removal;

(l)      on-site supervision of the Stores or at the Corporate Offices, including base fees and bonuses of Agent's field personnel, travel to and from the Stores and/or the Corporate Office and incidental out-of-pocket and commercially reasonable travel expenses relating thereto (including reasonable and documented corporate travel to monitor and manage the Sale);

(m)      postage, courier and overnight mail charges to and from or among the Stores and central office to the extent relating to the Sale;

(n)      actual Occupancy Expenses for the Stores on a per location and per diem basis in an amount not to exceed the per Store per diem amount set forth on Exhibit 4.1 annexed hereto;

(o)      Agent's actual cost of capital (including Letter of Credit fees and other financing fees, charges and expenses incurred by Agent) and insurance;

(p)      Central Services Expenses in an amount equal to $10,000 per week of the Sale Term.

(q)      third party payroll processing;

(r)      Agent's reasonable out-of-pocket costs and expenses, including but not limited to, corporate travel, legal fees and expenses, incurred in connection with the review of data, preparation, negotiation and execution of this Agreement, the Approval Order and any ancillary documents, and/or in connection with Agent's conduct of the sale and enforcement of its rights under this Agreement and/or the Approval Order;

(s)      Bulk Sale Disposition Expenses;

(t)      Intellectual Property Disposition Expenses;

(u)      Real Estate Disposition Expenses; and

(v)     Store FF&E Disposition Expenses.

Notwithstanding anything herein to the contrary, to the extent that any Expense listed in Section 4.1 is also included on Occupancy Expense Exhibit, then the Occupancy Expense Exhibit shall control, and such Expenses shall not be double counted.

"Comprehensive Sale Expenses" shall not include: (i) Excluded Benefits; (ii) Central Service Expenses, except as provided in Section 4.1(p) above ; (iii) Occupancy Expenses, except as provided in Occupancy Expense Exhibit; (iv) all expenses associated with the operation of Merchant's distribution center facilities (collectively, the "Distribution Centers"). and (v) any other costs, expenses or liabilities payable by Merchant not provided for herein.

As used herein, the following terms have the following respective meanings:

"Central Service Expenses" means costs and expenses for Merchant's central administrative services necessary for the Sale, including, but not limited to, MIS services, payroll processing, cash reconciliation, inventory processing and handling, and data processing and reporting.

"Excluded Benefits" means any employee benefits in excess of the Benefits Cap.

"Occupancy Expenses" means base rent, cost or expense under any real property lease, or real estate agreement (including any expired or month to month lease under which Merchant continues to operate), HVAC, utilities, base telephone charges, leased line charges, snow removal, CAM, real estate and use taxes, Merchant's association dues and expenses, liability and casualty insurance (exclusive of any deductible, which shall be paid by Merchant), cash register maintenance, building maintenance, landscaping, and building insurance relating to the Stores (exclusive of any deductible, which shall be paid by Merchant).

4.2     Payment of Comprehensive Sale Expenses.

(a)     All Comprehensive Sale Expenses incurred during each week of the Sale (i.e. Sunday through Saturday) shall be paid by Agent to or on behalf of Merchant, or offset from Comprehensive Proceeds held by Merchant, immediately following the weekly Sale reconciliation by Merchant and Agent pursuant to Section 8.7 below, based upon invoices and other documentation reasonably satisfactory to Agent.

Section 5.     Inventory Valuation; Merchandise.

5.1     Determination of Aggregate Unit Count of Merchandise.

(a)     With respect to Merchandise in the Stores as of the Sale Commencement Date, during the Sale Term, Agent and Merchant shall jointly keep (i) a strict count of gross register receipts less applicable Sales Taxes ("Gross Rings"), and (ii) cash reports of sales within such Stores.  Register receipts and records shall show for each item sold the "TIKEY" attributable to such item of Merchandise (the "Unit Count").  All such records and reports shall be made available to Agent and Merchant during regular business hours upon reasonable notice.

Upon completion of the Final Inventory Reconciliation, the Transaction Consideration attributable to the Merchandise shall be adjusted in accordance with and consistent with Section 3.1(a).

      5.2    <u>Merchandise Subject to this Agreement</u>.

      (a)    For purposes of this Agreement, "<u>Merchandise</u>" shall mean (subject to the express exclusions set forth herein) all finished goods inventory owned by Merchant and located at the Stores on the Sale Commencement Date that is salable in the ordinary course of Merchant's business, including (A) Merchandise subject to Gross Rings, (B) White Sleeve Merchandise; and (C) Revenue Share Merchandise.   Notwithstanding the foregoing, "Merchandise" shall not include:  (1) Defective Merchandise, (2) Display Merchandise (3) Outdated Merchandise, (4) Near Dated Merchandise, (5) goods which belong to sublessees, licensees or concessionaires of Merchant, unless otherwise agreed by Merchant, Agent and such third party sublessees, licensees or concessionaires prior to the Sale Commencement Date, (6) goods held by Merchant on memo, on consignment, or as bailee or licensee, unless otherwise agreed by Merchant, Agent and such third party consignor, bailor licensor, prior to the Sale Commencement Date, (7) FF&E (as defined below), (8) goods designated by the Merchant for return to vendors; (9) Distribution Center Merchandise and/or In Transit/On Order Merchandise that is not received in the Stores on the Sale Commencement Date; and (10) any goods that are currently, or were previously offered for sale at any of Merchant's retail store locations that are or were subject to the store closing sale being conducted by Merchant and/or Gordon Brothers Retail Partners, LLC (the "<u>Gordon Brothers Stores</u>") (collectively, other than FF&E, the "<u>Excluded Goods</u>").

      (b)    As used in this Agreement the following terms have the respective meanings set forth below:

      "<u>Defective Merchandise</u>" means any item of Merchandise that is defective or otherwise not saleable in the ordinary course because it is Outdated Merchandise, Near Dated Merchandise, scratched, chipped, broken,  mismatched, not in its "clam shell" (except to the extent it constitutes White Sleeve Merchandise) or affected by other similar defects rendering it not first quality.   Display Merchandise shall not per se be deemed to be Defective Merchandise.

      "<u>Display Merchandise</u>" means any item of Merchandise which is installed, affixed or modified for purposes of a sample, display or of demonstrating its function or design.

      "<u>In-Transit/On Order Merchandise</u>" means (a) any Merchandise in-transit between Stores and/or the Distribution Center and Stores on the Sale Commencement Date and (b) any goods on order as of the Sale Commencement Date but not yet delivered from any third party vendor to the Stores and/or Distribution Center.

      "<u>Near Dated Merchandise</u>" means Merchandise that has an expiration date that occurs within the first 30 days during the Sale Term.

      "<u>Merchant Consignment Goods</u>" shall have the meaning assigned to such

term in Section 5.4 below.

"Outdated Merchandise" means all items of Merchandise where the expiration date is on or prior to the Sale Commencement Date.

"White Sleeve Merchandise" means those item of Merchandise, not to exceed 25,000 units, that are in white sleeves and not in their "claim shell" that are not otherwise Defective Merchandise.

    5.3    [Intentionally Left Blank]

    5.4    Excluded Goods. Merchant shall retain all rights and responsibility for any Excluded Goods. At Merchant's election, to be exercised on or before the Sale Commencement Date, Agent shall accept the Excluded Goods for sale as "Agent Commission Sale Goods" at prices established by the Agent. Agent shall retain twenty percent (20%) of the sale price for all sales of Agent Commission Sale Goods, and Merchant shall receive eighty percent (80%) of the receipts in respect of such sales; provided however, Agent shall have the exclusive right to determine the sale prices for any Excluded Goods that Merchant has elected to be treated as Agent Commission Sale Goods. Any unsold Agent Commission Sale Goods at the end of the Sale shall be returned to Merchant. If Merchant does not elect to have Agent sell Excluded Goods as Agent Commission Sale Goods, then all such items will be removed by Merchant from the Stores at its expense as soon as practicable after the Sale Commencement Date. Except as expressly provided in this Section 5.4, Agent shall have no cost, expense or responsibility in connection with any Excluded Goods.

    Section 6.    Sale Term.

    6.1    Sale Term. Subject to the prior issuance of the Approval Order, the Sale shall commence at the Stores on the first day after entry of the Approval Order, but in no event later than May 21, 2010 (the "Sale Commencement Date") and Agent shall complete the Sale at each Store, and, subject to Agent's Leasehold Designation Rights provided for in Section 16 hereof, Agent shall vacate each Store on or before August 31, 2010 (the "Sale Termination Date"). The period from the Sale Commencement Date to the Sale Termination Date shall be referred to herein as the "Sale Term." The Agent may, in its discretion, terminate the Sale at any Store at any time within the Sale Term (i) upon the occurrence of an Event of Default by Merchant, or (ii) upon not less than five (5) days' prior written notice to Merchant.

    6.2    Vacating the Stores. Subject to Agent's FF&E disposition rights provided for in Section 15, and Agent's Leasehold Designation Rights provided for in Section 16, on the Sale Termination Date, Agent shall vacate the Stores and leave the Stores in "broom clean" condition (ordinary wear and tear excepted) subject to Agent's rights under Section 15 hereof (the "Vacate Date"). Agent's obligation to pay, as a Comprehensive Sale Expense, Occupancy Expenses for a Store shall continue until such Store's applicable Vacate Date. Notwithstanding the foregoing, Agent shall have a period of eight weeks from the date that Merchant provides Agent with written notice of its intention to vacate the respective Corporate Offices (as the case may be, the "FF&E Vacate Date"), for the sale and removal of the Corporate Office FF&E. All assets of Merchant used by Agent in the conduct of the Sale (e.g. unsold FF&E, supplies, etc.)

shall be returned by Agent to Merchant or left at the Store on the FF&E Vacate Date to the extent the same have not been used in the conduct of the Sale or have not been otherwise disposed of by Agent.

Section 7.      Comprehensive Sale Proceeds.

7.1    Comprehensive Sale Proceeds.    For purposes of this Agreement, "Comprehensive Sale Proceeds" shall mean the aggregate of: (a) the total amount (in dollars) of all sales of Merchandise made under this Agreement (including any amounts recovered under the Bulk Sale Designation Election), exclusive of (i) Sales Taxes, (ii) credit card and bankcard fees and chargebacks, and (iii) returns, allowances and customer credits; (b) all proceeds generated from the disposition of the Store FF&E, and (c) all proceeds generated from the Leasehold Disposition Rights; and (d) all proceeds generated from the sale of the  Intellectual Property Inventory pursuant to Section 17(b) hereof;  in each case exclusive of (i) Sales Taxes, (ii) credit card and bankcard fees and chargebacks, and (iii) returns, allowances and customer credits, (e) all rental revenue and/or revenue from additional days rentals that is collected during the Sale Term exclusive of (i) Sales Taxes, (ii) credit card and bankcard fees and chargebacks, and (iii) customer credits, and (f) all proceeds of Merchant's insurance for loss or damage to Merchandise or loss of cash arising from events occurring during the Sale Term.

7.2    Deposit of Proceeds.    During the Sale Term, all Comprehensive Sale Proceeds (including credit card proceeds), shall be collected by Agent and deposited on a daily basis into depository accounts designated by Merchant for the Stores, which accounts shall be designated solely for the deposit of Comprehensive Sale Proceeds (including credit card proceeds), and the disbursement of amounts payable by Agent hereunder (the "Designated Deposit Accounts"). Commencing on the first business day following the Payment Date and on each business day thereafter, Merchant shall promptly pay to Agent by wire funds transfer all collected funds constituting Comprehensive Sale Proceeds deposited into the Designated Deposit Accounts.

7.3    Credit Card Proceeds.    During the Sale Term Agent shall have the right (but not the obligation) to use Merchant's credit card facilities, including Merchant's credit card terminals and processor(s), credit card processor coding, Merchant identification number(s) and the Designated Deposit Accounts.  In the event that Agent elects so to use Merchant's credit card facilities, Merchant shall process credit card transactions on behalf of Agent and for Agent's account, applying customary practices and procedures.  Without limiting the foregoing, Merchant shall cooperate with Agent to down-load data from all credit card terminals each day during the Sale Term and to effect settlement with Merchant's credit card processor(s), and shall take such other actions necessary to process credit card transactions on behalf of Agent under Merchant's Merchant identification number(s).  All credit card Comprehensive Sale Proceeds will constitute the property of the Agent and to the extent deposited into the Designated Deposit Accounts shall be held by Merchant in trust for Agent.    Merchant shall not be responsible for and Agent shall pay as a Comprehensive Sale Expense hereunder, all credit card fees, charges, and chargebacks related to the Sale, whether received during or after the Sale Term.

7.4    Petty Cash.    In addition to the Transaction Consideration, Agent shall purchase all cash in the Stores on and as of the start of business on the Sale Commencement Date and shall reimburse Merchant on a dollar for dollar basis therefor.

Section 8.          Conduct of the Sale

8.1      Rights of Agent.     Subject to the Approval Order, the Agent shall be permitted to conduct the Sale as a "going-out-of-business", "store closing" or similar theme sale throughout the Sale Term.  The Agent shall conduct the Sale in the name of and on behalf of the Merchant in a commercially reasonable manner and in compliance with the terms of this Agreement and the Approval Order.  In addition to any other rights granted to Agent hereunder, in conducting the Sale the Agent, in the exercise of its sole discretion, shall have the right:

(a)      to establish and implement advertising, signage, and promotion programs (whether by in-store or media advertising or promotional materials) consistent with the "going-out-of-business", "store closing" or similar theme (including, without limitation, by means of media advertising, interior and exterior banners, sign walkers,  A-frame signage, and similar signage), and consistent with the sale guidelines annexed hereto as Exhibit 8.1(a) (the "Sale Guidelines");

(b)      to establish Sale prices and Store hours which are consistent with local laws or regulations, including, without limitation, Sunday closing laws;

(c)      to use without charge during the Sale Term all FF&E, advertising materials, bank accounts, Store-level customer lists and mailing lists (provided, however, subject to Agent's rights under Section 17(b) hereof, such access shall be provided solely through Merchant or Merchant's outside advertisement services, and the Agent shall not have direct access to any personally identifiable information contained therein) computer hardware and software, Supplies, intangible assets (including Merchant's name, logo and tax identification numbers), Store keys, case keys, security codes, and safe and lock combinations required to gain access to and operate the Store, and any other assets of Merchant located at the Stores (whether owned, leased, or licensed).

(d)      to use, without charge (except as provided in Section 4.1(p) hereof), Merchant's Corporate Offices, central administrative services, including but not limited to services incidental thereto, to administer and deal with submission and reconciliation of rebates and/or vendor allowances, and personnel to process payroll, perform MIS and provide other central office services necessary for the Sale, at no cost to Agent;

(e)      to transfer Merchandise between Stores; and

(f)      subject to Section 3.6 hereof, to sell all titles of Merchandise commencing on the Sale Commencement Date without any restriction under any revenue sharing agreements Merchant may have had with a third party; and

(g)      to rent any and all titles to customers during the Sale Term.

8.2      Terms of Sales to Customers.

(a)      All sales of Merchandise will be "final sales" and "as is," and all advertisements and sales receipts will reflect the same.  Agent shall not warrant the Merchandise

in any manner, but will, to the extent legally permissible, pass on all manufacturer's warranties to customers. All sales will be made only for cash, and by bank credit cards currently accepted by Merchant, but excluding Merchant's private label charge account (if any).

(b)    During the first thirty (30) days of the Sale Term, Agent shall accept Merchant's Gift Cards and  store credits, which were issued by Merchant prior to the Sale Commencement Date, and  Power Play points earned by Merchant's customers on a dollar for dollar basis, which points can be used for purchases or rentals items of Merchandise (collectively, the "Gift Cards/Credits/Power Play Points"), provided, however, Agent shall be reimbursed in cash for the actual face amount, on a dollar for dollar basis for the Gift Cards/Credits/Power Play Points accepted/honored by Agent, as part of the weekly sales reconciliation provided for in Section 8.7 hereof.   Agent shall not honor rain checks or due bills issued by Merchant prior to the Sale Commencement Date.   During the Sale Term, Agent shall not honor any of Merchant's customer discounts or other promotions whereby customers would be entitled to an additional discount, except with respect to the Power Play points described above.

8.3    Sales Taxes.  During the Sale Term, all sales, excise, gross receipts and other taxes attributable to sales of Merchandise (other than taxes on income) payable to any taxing authority having jurisdiction (collectively, "Sales Taxes") shall be added to the sales price of Merchandise and collected by Agent at the time of sale. The Agent shall draw checks on the Designated Deposit Accounts payable to the applicable taxing authorities in the amount so collected, which shall be delivered together with accompanying schedules to Merchant on a timely basis for payment of Sales Taxes when due. Merchant shall promptly pay all Sales Taxes and file all applicable reports and documents required by the applicable taxing authorities. Merchant will be given access to the computation of gross receipts for verification of all such tax collections.  Provided Agent performs its responsibilities in accordance with this Section 8.3, Merchant shall indemnify and hold harmless Agent from and against any and all costs, including, but not limited to, reasonable attorneys' fees, assessments, fines or penalties which Agent sustains or incurs as a result or consequence of the failure by Merchant to promptly pay such taxes to the proper taxing authorities and/or the failure by Merchant to promptly file with such taxing authorities all reports and other documents required, by applicable law, to be filed with or delivered to such taxing authorities.

8.4    Supplies.  Agent shall have the right to use, without charge, all existing supplies located at the Stores, the Distribution Centers and/or Corporate Offices, including, without limitation, boxes, bags, paper, twine and similar sales, packaging and shipping materials (collectively, "Supplies").  In the event that additional Supplies are required in any of the Stores during the Sale, Merchant agrees to promptly provide the same to Agent, if available, for which Agent shall reimburse Merchant at Merchant's cost therefor. Since April 1, 2010,  Supplies have not been, and shall not be prior to the Sale Commencement Date, transferred by Merchant between or among the Stores, the Distribution Centers and/or the Gordon Brothers Stores, so as to alter the mix or quantity of Supplies at the Stores from that existing on such date, other than in the ordinary course of business.

8.5    Returns of Merchandise.  During the first fourteen (14) days of the Sale Term Agent shall accept returns of merchandise sold prior to the Sale Commencement Date, consistent with Merchant's return policy in effect at the time such merchandise was purchased

(the "Pre-Sale Returned Merchandise"). To the extent that any item of Pre-Sale Returned Merchandise is saleable as first-quality finished merchandise, it shall be included as Merchandise in the Sale. Any increase in payment on account of the Transaction Consideration as a result of Pre-Sale Returned Merchandise shall be paid by Agent as part of the weekly sale reconciliation as part of the Gross Rings reconciliation. Agent shall not accept returns of merchandise where the customer contemplates repurchasing the same item so as to take advantage of the sale price being offered by Agent. Agent shall reimburse customers for Pre-Sale Returned Merchandise in the same tender as such item was purchased (the "Pre-Sale Refund"). Merchant shall promptly reimburse Agent in cash for any Pre-Sale Refunds Agent is required to issue to customers in respect of any Pre-Sale Returned Merchandise as part of the weekly reconciliation process. To the extent that Merchant is required to reimburse Agent for refunds to customers in respect of any Pre-Sale Returned Merchandise, such amounts shall not reduce Proceeds under this Agreement. Any Pre-Sale Returned Merchandise not included in Merchandise shall be disposed of by Agent in accordance with instructions received from Merchant or, in the absence of such instructions, returned to Merchant at the end of the Sale Term.

      8.6     [Intentionally Left Blank]

      8.7     Sale Reconciliation. On each Thursday during the Sale Term (and with respect to any Unsold Revenue Share Merchandise, for so long after the Sale Term as Agent continues to sell Unsold Revenue Share Merchandise), commencing on the second Thursday after the Sale Commencement Date, Agent and Merchant shall cooperate to reconcile Comprehensive Sale Expenses, Gift Cards/Credits/Power Play Points accepted at the Stores, Gross Rings, and such other Sale-related items as either party shall reasonably request, in each case for the prior week or partial week (i.e. Sunday through Saturday), all pursuant to procedures agreed upon by Merchant and Agent.

      8.8     Force Majeure. If any casualty, act of terrorism, act of war or act of God prevents or substantially inhibits the conduct of business in the ordinary course at any Store, such Store and the Merchandise located at such Store shall, in Agent's discretion, be eliminated from the Sale and considered to be deleted from this Agreement as of the date of such event, and Agent and Merchant shall have no further rights or obligations hereunder with respect thereto; provided, however, that (i) the Comprehensive Sale Proceeds of any insurance attributable to such Merchandise shall constitute Proceeds hereunder, and (ii) the Transaction Consideration shall be reduced to account for any Merchandise eliminated from the Sale which is not the subject of insurance proceeds, and Merchant shall reimburse Agent for the amount the Transaction Consideration is so reduced prior to the end of the Sale Term.

      Section 9.     Employee Matters.

      9.1     Merchant's Employees. Agent may utilize Merchant's employees in the conduct of the Sale to the extent Agent in its sole discretion deems expedient, and Agent may select and schedule the number and type of Merchant's employees required for the Sale. Agent shall identify any such employees to be used in connection with the Sale (each such employee, a "Retained Employee") as soon as practicable after the Sale Commencement Date. Retained Employees shall at all times remain employees of Merchant, and shall not be considered or deemed to be employees of Agent. Merchant and Agent agree that except to the extent that wages and benefits of Retained Employees constitute Comprehensive Sale Expenses hereunder,

nothing contained in this Agreement and none of Agent's actions taken in respect of the Sale shall be deemed to constitute an assumption by Agent of any of Merchant's obligations relating to any of Merchant's employees including, without limitation, Excluded Benefits, Worker Adjustment Retraining Notification Act ("WARN Act") claims and other termination type claims and obligations, or any other amounts required to be paid by statute or law; nor shall Agent become liable under any collective bargaining or employment agreement or be deemed a joint or successor employer with respect to such employees. Merchant shall not, without Agent's prior written consent, raise the salary or wages or increase the benefits for, or pay any bonuses or make any other extraordinary payments to, any of its employees prior to the Sale Termination Date. To the extent that Merchant determines that it has an obligation under the WARN Act, Merchant shall notify Agent at least two (2) business days in advance of Merchant's decision to provide notice under the WARN Act to any of its employees, including the Retained Employees.

9.2     Termination of Employees. Agent may in its discretion stop using any Retained Employee at any time during the Sale. In the event of termination of any Retained Employee, Agent will use all reasonable efforts to notify Merchant at least five (5) days prior thereto, except for termination "for cause" (such as dishonesty, fraud or breach of employee duties), in which event no prior notice to Merchant shall be required, provided Agent shall notify Merchant as soon as practicable after such termination. From and after the date of this Agreement and until the Sale Termination Date, Merchant shall not transfer or dismiss employees of the Stores except "for cause" without Agent's prior consent. In the event that Agent exercises its Leasehold Designation Rights, provided for in Section 16 hereof, and if the respective Designee elects to seek to retain the services of a Retained Employee at the subject Stores, Merchant shall cooperate with such Designee to assist in such Designee's efforts to retain the services of such Retained Employee after the termination of the Sale at the subject Stores.

9.3     Payroll Matters. During the Sale Term Merchant shall process the base payroll for all Retained Employees and temporary employees brought to the Sale. Each Wednesday during the Sale Term the Agent shall transfer from the Designated Deposit Accounts to Merchant's payroll accounts an amount equal to the base payroll for Retained Employees plus related payroll taxes, worker's compensation and benefits for such week which constitute Comprehensive Sale Expenses hereunder.

9.4     Employee Retention Bonuses. Agent may, at its option, fund and pay, as a Comprehensive Sale Expense, retention bonuses ("Retention Bonuses") in an aggregate amount of up to ten percent (10%) of the aggregate Store payroll (which amount is inclusive of payroll taxes and as to which no benefits shall be payable) to Retained Employees who do not voluntarily leave employment and are not terminated "for cause." Such Retention Bonuses shall be payable within 30 days after the Sale Termination Date, and shall be processed through Merchant's payroll system.

Section 10.     Conditions Precedent. The willingness of Agent and Merchant to enter into the transactions contemplated under this Agreement are directly conditioned upon the satisfaction of the following conditions at the time or during the time periods indicated, unless specifically waived in writing by the applicable party:

(a)     The Approval Order (including any modifications consented to by Merchant, Agent and the Secured Creditors): (i) shall have been entered by the Bankruptcy Court

on or before May 20, 2010, (ii) shall not have been appealed or be subject to any pending appeal, and (iii) no stay with respect thereto shall be in effect as of the Sale Commencement Date.

(b)    All representations and warranties of Merchant and Agent hereunder shall be true and correct in all material respects and no Event of Default has then occurred and no event then exists which solely with the passage of time or giving of notice or both would constitute an Event of Default at and as of the date hereof and as of the Sale Commencement Date.

(c)    Merchant shall have provided Agent reasonable access to all pricing and cost files, computer hardware, software and data files, inter-Store transfer logs, markdown schedules, invoices, style runs, all other documents relative to the price, mix and quantities of inventory located at the Stores, all real estate documents relating to the Stores, and all documents and files relating to the Intellectual Property.

Section 11.    Representations, Warranties and Covenants.

11.1    Merchant Representations, Warranties and Covenants.    Merchant hereby represents, warrants and covenants in favor of Agent as follows:

(a)    Each entity comprising Merchant: (i) is a corporation or limited liability company, as the case may be, duly organized, validly existing and in good standing under the laws of the state of its organization; (ii) has all requisite entity power and authority to own, lease and operate its assets and properties and to carry on its business as presently conducted; and (iii) is and during the Sale Term will continue to be, duly authorized and qualified as a foreign business to do business and in good standing in each jurisdiction where the nature of its business or properties requires such qualification, including all jurisdictions in which the Stores are located (except where the failure to be so qualified would not have a material adverse effect on the Sales or Merchant's ability to perform its obligations under this Agency Agreement).

(b)    Subject to the issuance of the Approval Order: (i) the Merchant has the right, power and authority to execute and deliver this Agreement and each other document and agreement contemplated hereby (collectively, together with this Agreement, the "Agency Documents") and to perform fully its obligations thereunder; (ii) Merchant has taken all necessary actions required to authorize the execution, delivery and performance of the Agency Documents, and no further consent or approval is required for Merchant to enter into and deliver the Agency Documents, to perform its obligations thereunder, and to consummate the Sale; (iii) each of the Agency Documents has been duly executed and delivered by Merchant and constitutes the legal, valid and binding obligation of Merchant enforceable in accordance with its terms; (iv) no court order or decree of any federal, state or local governmental authority or regulatory body is in effect that would prevent or impair, or is required for the Merchant's consummation of, the transactions contemplated by this Agreement, and no consent of any third party which has not been obtained is required therefor; and (v) no contract or other agreement to which the Merchant is a party or by which the Merchant is otherwise bound will prevent or impair the consummation of the Sale and the other transactions contemplated by this Agreement.

(c)    Except as affected by the filing for Chapter 11 protection, since April 1, 2010, Merchant has operated the Stores in the ordinary course of business and from the date of

this agreement through the Sale Commencement Date, Merchant shall continue to operate the Stores in the ordinary course of business.

(d)    Subject to entry of the Approval Order, Merchant owns and will own at all times during the Sale Term, good and marketable title to all of the Subject Assets free and clear of all liens, claims and encumbrances of any nature except for (1) liens of the Secured Creditors identified in the Cash Collateral Order and other presently existing liens identified in Exhibit 11.1(d)(i) annexed hereto, and (2) the rights of vendors under revenue sharing arrangements identified to Agent (collectively (1) and (2), the "Pre-Existing Liens").  The Pre-Existing Liens shall attach only to the Transaction Consideration, the Merchant's First Tranche Recovery Amount, if any, and the Merchant's Second Tranche Recovery Amount, if any and any other amounts payable to Merchant under this Agency Agreement (collectively, the "Transaction Proceeds") in the same order and priority as existed on the Sale Commencement Date.

(e)    Since April 1, 2010 and through the Sale Commencement Date, no tickets or price files have been or will be changed or marked up, or prices otherwise raised outside of the ordinary course of business and Merchant has not removed or altered, and will not remove or alter, any tickets or any indicia of clearance merchandise, except in the ordinary course of business. Merchant has maintained its pricing files in the ordinary course of business, and prices charged to the public for goods (whether in-Store, by advertisement or otherwise) are the same in all material respects as set forth in such pricing files for the periods indicated therein.

(f)    As of the Sale Commencement Date, all normal course permanent markdowns on inventory located at the Stores will have been taken on a basis consistent with Merchant's historical practices.

(g)    Merchant shall ticket or mark all items of inventory received at the Stores prior to the Sale Commencement Date, in a manner consistent with Merchandise presently located at the Stores and in accordance with Merchant's historic practices and policies relative to pricing and marking inventory, to the extent such item of inventory was historically ticketed or marked by Merchant or otherwise required by applicable law to be ticketed or marked.

(h)    Merchant has not and shall not purchase or transfer to or from the Stores any merchandise or goods outside the ordinary course in anticipation of the Sale and Merchant has not and shall not transfer into the Stores any merchandise or goods that had previously been offered for sale in the Gordon Brothers Stores.  Any transfers of merchandise from the Distribution Centers to the Stores after May 10, 2010 through the Sale Commencement Date shall be mutually agreed to by Merchant and Agent.

(i)    No action, arbitration, suit, notice, or legal, administrative or other proceeding before any court or governmental body has been instituted by or against the Merchant, or has been settled or resolved, or to Merchant's knowledge, is threatened against or affects Merchant, relative to Merchant's business or properties, or which questions the validity of this Agreement, and that if adversely determined, would adversely affect the conduct of the Sale.

(j)    To the best of Merchant's knowledge, all Merchandise is in compliance in all material respects with all applicable federal, state or local product health, safety and pricing laws, rules and standards.

(k)     Subject to the Approval Order, throughout the Sale Term, the Agent shall have the right to the unencumbered use and occupancy of, and peaceful and quiet possession of, each of the Store, the assets currently located at the Store, and the utilities and other services provided at the Store. Merchant shall throughout the Sale Term maintain in good working order, condition and repair, at its sole expense, all cash registers, heating systems, air conditioning systems, elevators, escalators, Store alarm systems, and all other mechanical devices used in the ordinary course of operation of the Stores.

(l)     Merchant has not taken and shall not throughout the Sale Term take any actions with the intended result of materially increasing the cost of operating the Sale, including, without limitation, increasing salaries or other amounts payable to Retained Employees.

(m)     Merchant is not a party to any collective bargaining agreements. To the best of Merchant's knowledge, there are currently no strikes, work stoppages or other labor disturbances affecting the Merchant, the Stores, or any of Merchant's other properties.

(n)     As of the date of this Agreement, Merchant is current in the payment of all post-petition telephone, utilities, taxes, insurance and advertising liabilities. Merchant agrees that in the event that Agent receives notice that any such post-petition liability is overdue or unpaid, or Agent is unable to advertise the Sale with any newspapers, magazines, radio or television stations or other media providers which target or serve the market areas of the Stores or is unable to obtain Merchant's contract rate with any such provider as a result of the Merchant's failure to pay its outstanding post-petition balances with such providers, Merchant shall immediately pay such applicable balances in full.

(o)     Merchant represents that as of the Sale Commencement Date the Merchandise included in the Sale shall not be materially different than the levels, mix and categories of the Merchandise as set forth on Exhibit 3.1(a)(i) annexed hereto and that Merchant has not and shall not through the Sale Commencement Date transfer Merchandise between and among the Stores and/or the Distributions Centers so as to alter the levels, mix and categories of Merchandise from the levels, mix and categories set forth on Exhibit 3.1(a)(i).

(p)     Other than as provided Section 3.6, Agent shall not be bound or restricted in terms of its ability to sell any items of Merchandise, including but not limited to by (i) the Revenue Share Agreements, (ii) the Term Sheet; and/or (iii) any other agreements entered into by Merchant. The Revenue Share Obligations calculated under Section 3.6(a) hereof shall be calculated in a manner consistent with the data and calculations provided to Agent by Merchant or its representatives in the course of Agent's due diligence in connection with the negotiation of this Agreement.

(q)     As of April 1, 2010, although Merchant continued to receive certain items of merchandise replenishment, Merchant discontinued replenishment of merchandise (including new releases) in the ordinary course of business;

(r)     To the best of Merchant's knowledge, formed after a reasonable and due inquiry, each of the Subject Leases is legal, valid, binding enforceable and in full force and effect, and subject to the entry of the Approval Order, no event of default currently exists

thereunder that after the giving of notice and the passage of any applicable cure period would constitute an event of default, and Merchant has neither delivered nor received any notice from the other party to any such lease of the termination thereof (excluding in each case defaults to be cured by Bankruptcy Court order).

(s)    Subject to the entry of the Approval Order, each of the Subject Leases may be freely assigned (without third party consent) by Merchant to Agent or Agent's designee.

(t)    There is no pending, or to the best of Merchant's knowledge, threatened condemnation proceedings against any of the Subject Leases.

(u)    There is not pending, or to the best of Merchant's knowledge, any proposed special assessment affecting or which may affect the Subject Leases.

(v)    Within ten (10) days after the date of this Agreement, Merchant shall deliver to Agent the following items to the extent same, or the information from which same can be prepared, are in the possession of Merchant: (i) true, complete and accurate copies of all Leases, including, without limitation, all amendments to and assignments thereof, and all notices delivered with respect thereto; and (ii) a true, complete and accurate listing of all amounts due under the Subject Leases that would be required to be cured in order to assume and assign such leases pursuant to Section 365 of the Bankruptcy Code.

(w)    <u>Intellectual Property</u>

(i)    <u>Exhibit 11.1(w)(i)</u> constitutes a true, correct and complete list of all Trademarks which Merchant owns, or which are exclusively licensed to Merchant, worldwide, common law or otherwise, including without limitation all Trademarks for which Merchant has obtained a registration or has filed an application for registration. Exhibit 11.1(w)(i) indicates which Trademarks owned by Merchant have been registered and all assignments of registered Trademarks have been recorded, except where indicated, with the United States Patent and Trademark Office or the applicable foreign trademark office. Merchant is currently in substantial compliance with all formal legal requirements for maintaining such registrations, including the timely filing of all required post-registration filings such as affidavits of use and incontestability and renewal applications, and all such Trademarks owned by Merchant are valid and enforceable. Except as set forth on <u>Exhibit 11.1(w)(i)</u>, Merchant has the exclusive right to use the Trademarks in the United States in connection with business of the sort conducted at the Stores and on websites maintained by Merchant. None of the Trademarks owned by Merchant infringes on the rights of any third party. No opposition, invalidation, infringement or cancellation proceeding is pending or has been commenced or decided against Merchant during the past five years; and to Merchant's knowledge no such action is threatened with respect to any of such Trademarks owned by Merchant. Merchant has registered the domain names listed on Exhibit 11.1(w)(i). Merchant has paid all fees required to maintain those domain names to date.

(ii)    There is no pending, or, to Merchant's knowledge, threatened claim or litigation against Merchant (i) contesting its right to use the Trademarks listed on <u>Exhibit 11.1(w)(i)</u> (ii) questioning the ownership of any Intellectual Property owned by Merchant, (iii) asserting the misuse thereof or (iv) asserting the infringement or violation of any intellectual property right of any third party.

(iii)    Except as set forth on Exhibit 11.1(w)(iii), (i) Merchant has no knowledge of any infringing use of any Intellectual Property owned by Merchant  by any person or entity; (ii) no action or proceeding is pending alleging that any person or entity is infringing upon or otherwise violating any Intellectual Property owned by Merchant; and (iii) no such claims have been asserted by Merchant against any person or entity.

(iv)    To Merchant's knowledge, there is no  unauthorized use, disclosure, infringement or misappropriation of the Merchant's Intellectual Property by any current or former employee, licensee, distributor or consultant of Merchant or by any other third party.

(v)    There are no agreements, documents, orders, judgments or other writings which would restrict or materially adversely affect Agent's right to use, license or exploit any Intellectual Property used in the operation of the Merchant's business as currently conducted.

(x)    Annexed hereto as Exhibit 11.1(x) is a true and correct list of all promotional prices and circulars issued and/or offered by Merchant during the period of April __, 2010 through and including the Sale Commencement Date ("Merchant's Pending Promotions").

11.2    Agent Representations and Warranties.    The Agent hereby represents, warrants and covenants in favor of the Merchant as follows:

(a)    Agent:  (i) is an entity duly organized, validly existing and in good standing under the laws of its state of  organization; (ii) has all requisite entity power and authority to consummate the transactions contemplated hereby; and (iii) is and during the Sale Term will continue to be, duly authorized and qualified as a foreign business to do business and in good standing in each jurisdiction where the nature of its business or properties requires such qualification.

(b)    The Agent has the right, power and authority to execute and deliver each of the Agency Documents to which it is a party and to perform fully its obligations thereunder.  Agent has taken all necessary actions required to authorize the execution, delivery, and performance of the Agency Documents, and no further consent or approval is required on the part of the Agent for Agent to enter into and deliver the Agency Documents and to perform its obligations thereunder.  Each of the Agency Documents has been duly executed and delivered by the Agent and constitutes the legal, valid and binding obligation of the Agent enforceable in accordance with its terms.  No court order or decree of any federal, state or local governmental authority or regulatory body is in effect that would prevent or impair or is required for the Agent's consummation of the transactions contemplated by this Agreement, and no consent of any third party which has not been obtained is required therefor.  No contract or other agreement to which the Agent is a party or by which the Agent is otherwise bound will prevent or impair the consummation of the transactions contemplated by this Agreement.

(c)    No action, arbitration, suit, notice, or legal, administrative or other proceeding before any court or governmental body has been instituted by or against the Agent, or

has been settled or resolved, or to Agent's knowledge, has been threatened against or affects Agent, which questions the validity of this Agreement or any action taken or to be taken by the Agent in connection with this Agreement, or which if adversely determined, would have a material adverse effect upon the Agent's ability to perform its obligations under this Agreement.

      11.3    Acknowledgments.    Agent acknowledges that Merchant has not guaranteed that Agent shall be paid the Agent's Fee, the Agent's First Tranche Recovery Amount, or the Agent's Second Tranche Recovery Amount and that the payment of any such fees and amounts shall be subject to, among other things provided for in this Agreement, the Comprehensive Sale Proceeds exceeding the Sharing Threshold.  Merchant acknowledges that Agent has not guaranteed that Merchant shall be paid the Merchant's First Tranche Recovery Amount, or the Merchant's Second Tranche Recovery Amount and that the payment of any such amounts shall be subject to, among other things provided for in this Agreement, the Comprehensive Sale Proceeds exceeding the Sharing Threshold.

      Section 12.    Insurance.

      12.1    Merchant's Liability Insurance.  Merchant shall continue at its cost and expense until the Sale Termination Date, in such amounts as it currently has in effect, all of its liability insurance policies including, but not limited to, products liability, comprehensive public liability, auto liability and umbrella liability insurance, covering injuries to persons and property in, or in connection with Merchant's operation of the Stores (collectively, "Merchant's Existing Liability Coverage"), and shall cause Agent to be named an additional named insured with respect to all such policies.  Exhibit 12.1 attached hereto contains a description of all such policies.  Prior to the Sale Commencement Date, Merchant shall deliver to Agent certificates evidencing such insurance setting forth the duration thereof and naming Agent as an additional named insured, in form reasonably satisfactory to Agent.  All such policies shall require at least thirty (30) days prior notice to Agent of cancellation, non-renewal or material change.  In the event of a claim under any such policies Merchant shall be responsible for the payment of all deductibles, retentions or self-insured amounts thereunder, unless it is determined that liability arose by reason of the wrongful, willful or intentional acts or omissions, breach of this Agreement by Agent, or negligence of Agent, or Agent's employees, independent contractors or agents (other than Merchant's employees.)  To the extent that any of  Merchant's Existing Liability Coverage has a scheduled expiration or termination date that occurs during the Sale Term, Merchant shall be responsible to renew or replace Merchant's Existing Liability Coverage, at Merchant's cost; provided however, in the event that Merchant fails to renew or replace Merchant's Existing Liability Coverage, then Agent may, at its election procure replacement insurance coverage, provided further however, the incremental cost of which above the costs of Merchant's Existing Liability Coverage shall be, at Agent's option (a) reimbursed by Merchant to Agent and/or (b) offset by Agent against amounts owed by Agent to Merchant under this Agreement.

      12.2    Merchant's Casualty Insurance.  Merchant will provide throughout the Sale Term, at Agent's cost (as a Comprehensive Sale Expense hereunder), fire, flood, theft and extended coverage casualty insurance covering the Merchandise in a total amount equal to no less than the retail value thereof (collectively, "Merchant's Existing Casualty Coverage"). Exhibit 12.2 attached hereto contains a description of all such policies.  From and after the date of this Agreement until the Sale Termination Date, all such policies will name Agent as loss

payee.  In the event of a loss to the Merchandise on or after the date of this Agreement, the Comprehensive Sale Proceeds of such insurance attributable to the Merchandise shall constitute Proceeds hereunder and shall be paid to Agent.  In the event of such a loss Agent shall have the sole right to adjust the loss with the insurer.  Prior to the Sale Commencement Date, Merchant shall deliver to Agent certificates evidencing such insurance setting forth the duration thereof and naming the Agent as loss payee, in form and substance reasonably satisfactory to Agent.  All such policies shall require at least thirty (30) days prior notice to the Agent of cancellation, non-renewal or material change.  Merchant shall not make any change in the amount of any deductibles or self insurance amounts prior to the Sale Termination Date without Agent's prior written consent.  To the extent that any of  Merchant's Existing Casualty  Coverage has a scheduled expiration or termination date that occurs during the Sale Term, Merchant shall be responsible to renew or replace Merchant's Existing Casualty Coverage, at Merchant's cost, subject to Agent's obligations under Section 4.1(j); provided however, in the event that Merchant fails to renew or replace Merchant's Existing Casualty Coverage, then Agent may, at its election procure replacement insurance coverage, provided further , however, the incremental cost of which above the costs of Merchant's Existing Casualty Coverage shall be, at Agent's option (a) reimbursed by Merchant to Agent and/or (b) offset by Agent against amounts owed by Agent to Merchant under this Agreement.

12.3    Agent's Insurance.    Agent shall maintain at Agent's cost (and as a Comprehensive Expense of the Sale), throughout the Sale Term, in such amounts as it currently has in effect, comprehensive public liability and automobile liability insurance policies covering injuries to persons and property in or in connection with Agent's agency at the Stores, and shall cause Merchant to be named an additional insured with respect to such policies.  Exhibit 12.3 attached hereto contains a description of all such policies.  Prior to the Sale Commencement Date, Agent shall deliver to Merchant certificates evidencing such insurance policies setting forth the duration thereof and naming Merchant as an additional insured, in form and substance reasonably satisfactory to Merchant.  In the event of a claim under any such policies Agent shall be responsible for the payment of all deductibles, retentions or self-insured amounts thereunder, unless it is determined that liability arose by reason of the wrongful, willful or intentional acts, omissions, breach of this Agreement by Merchant, or negligence of Merchant or Merchant's employees, independent contractors or agents (other than Agent or Agent's employees, agents or independent contractors).

12.4    Worker's Compensation Insurance.  Merchant shall at all times during the Sale Term maintain in full force and effect worker's compensation insurance (including employer liability insurance) covering all Retained Employees in compliance with all statutory requirements.  Prior to the Sale Commencement Date, Merchant shall deliver to Agent a certificate of Merchant's insurance broker or carrier evidencing such insurance.

12.5    Risk of Loss.    Without limiting any other provision of this Agreement, Merchant acknowledges that Agent is conducting the Sale on behalf of Merchant solely in the capacity of an agent, and that in such capacity (i) Agent shall not be deemed to be in possession or control of the Store or the assets located therein or associated therewith, or of Merchant's employees located at the Store, and (ii) except as expressly provided in this Agreement, Agent does not assume any of Merchant's obligations or liabilities with respect to any of the foregoing. Agent shall not be deemed to be a successor employer. Merchant and Agent agree that, subject to the terms of this Agreement,   Merchant shall bear all responsibility for liability claims of

customers, employees and other persons arising from events occurring at the Store during and after the Sale Term, except to the extent any such claim arises directly from the wrongful, willful or intentional acts or omissions, or breach of this Agreement by Agent or its supervisors, agents, independent contractors, or employees located at the Store (an "Agent Claim"). In the event of any liability claim other than an Agent Claim, Merchant shall administer such claim and shall present such claim to Merchant's liability insurance carrier in accordance with Merchant's policies and procedures existing immediately prior to the Sale Commencement Date, and shall provide a copy of the initial documentation relating to such claim to Agent at the address listed in this Agreement. To the extent that Merchant and Agent agree that a claim constitutes an Agent Claim, Agent shall administer such claim and shall present such claim to its liability insurance carrier, and shall provide copies of the initial documentation relating to such claim to Merchant. In the event that Merchant and Agent cannot agree whether a claim constitutes an Agent Claim, each party shall present the claim to its own liability insurance carrier, and a copy of the initial claim documentation shall be delivered to the other party.

Section 13.    Indemnification

13.1    Merchant Indemnification. Merchant shall indemnify and hold Agent and its officers, directors, employees, agents and independent contractors (collectively, "Agent Indemnified Parties") harmless from and against all claims, demands, penalties, losses, liability or damage, including, without limitation, reasonable attorneys' fees and expenses, directly or indirectly asserted against, resulting from, or related to:

(a)    Merchant's material breach of or failure to comply with any of its agreements, covenants, representations or warranties contained in any Agency Document;

(b)    subject to Agent's performance and compliance with its obligations pursuant to Sections 4.1(a), 4.1(b) and 4.1(c) and Section 9 hereof, any failure of Merchant to pay to its employees any wages, salaries or benefits due to such employees during the Sale Term or other claims asserted against Agent by Merchant's employees resulting from Merchant's (and not Agent's) treatment of its employees;

(c)    subject to Agent's compliance with its obligations under Section 8.3 hereof, any failure by Merchant to pay any Sales Taxes to the proper taxing authorities or to properly file with any taxing authorities any reports or documents required by applicable law to be filed in respect thereof;

(d)    any consumer warranty or products liability claims except to the extent such claims arise from representations made by the Agent relating to the Merchandise;

(e)    without limiting any of the foregoing, the negligence (to the extent not covered by insurance) gross negligence or willful misconduct of Merchant, its affiliates or any of their respective officers, directors, employees agents or representatives.

13.2    Agent Indemnification. Agent shall indemnify and hold Merchant and its officers, directors, employees, agents and representatives harmless from and against all claims, demands, penalties, losses, liability or damage, including, without limitation, reasonable attorneys' fees and expenses, directly or indirectly asserted against, resulting from, or related to:

(a)     Agent's material breach of or failure to comply with any of its agreements, covenants, representations or warranties contained in any Agency Document;

(b)     except to the extent compliance is waived in the Approval Order, Agent's failure to comply with applicable state or local law, rules or regulations, including, but not limited to, Agent's obligations to comply with applicable law, ordinances, rules or regulations, in connection with the sale of cigarettes, other tobacco products, beer and wine and liquor;

(c)     any harassment or any other unlawful, tortious or otherwise actionable treatment of any customers, employees or agents of Merchant by Agent or any of its personnel, agents or representatives;

(d)     any claims by any party engaged by Agent as an employee or independent contractor arising out of such employment;

(e)     any Agent Claims; and

(f)     without limiting any of the foregoing, the negligence (to the extent not covered by insurance) gross negligence or willful misconduct of Agent, its affiliates or any of their respective officers, directors, employees agents or representatives.

Section 14.   Defaults.   The following shall constitute "Events of Default" hereunder:   Merchant's or Agent's failure to perform any of their respective material obligations hereunder, which failure shall continue uncured five (5) days after written notice thereof to the defaulting party; or

(a)     Any representation or warranty made by Merchant or Agent proves untrue in any material respect as of the date made; or

(b)     The Sale is terminated at a Store for any reason other than (i) an Event of Default by Agent, or (ii) any other breach or action by Agent not authorized hereunder, or (iii) an event administered pursuant to Section 8.8 above.

In the event of an Event of Default, any party's damages or entitlement to equitable relief shall be determined by the Bankruptcy Court.

Section 15   Sale of FF&E. (a) During the period from the Sale Commencement Date through the applicable Vacate Date, Agent shall have the exclusive right to sell or otherwise dispose of all FF&E located in the Stores, and the Corporate Headquarters. Agent shall have the right to abandon, in place, any unsold FF&E, at the Stores, and the Corporate Headquarters. Merchant shall be responsible for all occupancy expenses and carrying costs at the Distribution Centers and the Corporate Offices from the Sale Commencement Date through the FF&E Vacation Date.

(b)                     Agent shall be responsible for, and shall pay as a Comprehensive Sale Expense, all of the expenses incurred by Agent in connection with the disposition of the FF&E at the Stores (the "Store FF&E Disposition Expenses") . Agent shall be

entitled to retain all Proceeds from the sale of the FF&E from the Stores.

(c)    Agent shall act as Merchant's agent in connection with the disposition of the FF&E at the Stores and the Corporate Office. Merchant shall be responsible for, and shall pay, all of the expenses incurred in connection with the disposition of the FF&E in the Corporate Offices (the "Office FF&E Disposition Expenses"), which expenses shall be subject to a budget to be mutually agreed upon by Merchant and Agent.   In consideration of Agent's services, Agent shall receive a commission of twenty percent of the gross proceeds from the sale of the Office FF&E (net only of Sales Taxes).  Merchant shall retain all proceeds from the sale of the Office FF&E, net of the Office FF&E Disposition Expense and Agent's FF&E commission.

Section 16.    Leasehold Disposition Rights.

(a)    For the period commencing on the Sale Commencement Date through the later of (i) in the case of any Store where Merchant occupies same under the terms of an unexpired lease or other occupancy agreement (each a "Subject Lease" and collectively, the "Subject Leases"), August 31, 2010 and (ii) entry of an Order by the Bankruptcy Court confirming a liquidating plan of reorganization with respect to the Merchant (such longer period, the "Marketing Period"), Agent shall have the exclusive right to market Merchant's non-residential real property interests in and to each Store and the Corporate Headquarters (the "Real Property Leasehold Interests", and collectively, the Subject Leases, and the Corporate Headquarters, the "Leased Real Property Locations).

(b)    From  the applicable Vacate Date for the Stores and continuing through the earlier of (x) the expiration of the Marketing Period, (y) the date that is seven days after the date that Agent provides Merchant with a Dropout Notice (as defined below), or (z) the effective date of any assumption and assignment of the respective Subject Leases (the "Marketing Termination Date"), Agent shall be responsible for the costs and expenses, including, but not limited to, occupancy expenses for the Stores, limited to the amounts and categories set forth on Exhibit 4.1 annexed hereto, marketing and advertising costs and expenses that arise under or are otherwise incurred in connection with the disposition of such Stores (the "Real Estate Disposition Expenses").

(c)    Agent shall be entitled to retain all proceeds received in connection with the sale, transfer, conveyance, assumption and assignment of any Subject Lease(s), as the case may be, to the respective Designees (as defined below).

(d)    At any time prior to the expiration of the Marketing Period for each Store, Agent shall have the right, which right may be exercised at any time and from time to time in Agent's sole and absolute discretion, to provide notice (each such notice, a "Lease Assumption Notice") to Merchant of Agent's election to require Merchant to assume the Subject Lease(s) identified in the subject Lease Assumption Notice(s) and assign same to either Agent or a designee thereof (each a "Designee").  Within fifteen (15) days following the date upon which Agent delivers a Lease Assumption Notice to Merchant, Merchant shall, at no additional cost or expense to Agent (other than the payment by Agent of required cure amounts for the period prior to the petition date necessary to comply with Section 365 of the Bankruptcy Code, if any (the "Pre-Petition Cure Amounts"), take all requisite actions (including, without limitation, actions required under sections 363 and/or 365 of the Bankruptcy Code) to sell, transfer, convey, assume

and assign, as applicable, the subject Lease interest to Agent (or in the case of a Designee identified by Agent under such Notice(s), to the Designee).  Within five (5) business days after the entry of an order of the Bankruptcy Court approving the sale, transfer, conveyance, assumption and assigned, as and where applicable for the subject Lease (in each case, the "Real Property Closing Date"), Merchant shall execute the necessary documentation to effectuate such assumption and assignment.  In the event Agent elects to require Merchant to assume and thereupon assign a Subject Lease(s) to Agent or to a Designee, Agent or the Designee shall be obligated to pay all Pre-Petition Cure Amounts due under the respective Subject Lease that is the subject of the Subject Lease Assumption Notice(s) and Merchant shall be obligated to pay all remaining cure amounts (the "Post-Petition Cure Amounts").

(e)          At any time prior to the expiration of the Marketing Period, Agent shall have the right, which right may be exercised at any time and from time to time in Agent's sole and absolute discretion, to provide notice to Merchant (each such notice, a "Dropout Notice") of Agent's election to discontinue its efforts to market and attempt to sell any Subject Lease(s).  Upon the applicable Marketing Termination Date, Agent shall have no further obligation or liability with respect to the subject Store covered by a Dropout Notice (including any obligation to continue to pay any expenses with respect thereto), and Merchant shall thereafter be solely responsible for all amounts payable or other obligations or liabilities that may be owed in connection with such Store(s) (including, without limitation, any damages resulting from the rejection of any affected lease(s) under section 365 of the Bankruptcy Code or otherwise); provided, however, nothing contained herein shall be intended to relieve Agent from any obligation it may have to pay or reimburse any Expense under Section 4.1(a) hereof.

(f)          Without limiting the generality of the foregoing, upon receipt of a Lease Assumption Notice, Merchant shall use its best efforts to obtain the entry of an order of the Bankruptcy Court approving the assumption of the Subject Lease(s) identified in such Lease Assumption Notice(s) and the assignment of such lease(s) to the specified Designee.  As used herein, the term "best efforts" shall require Merchant to pay Post-Petition Cure Amounts (but not any Pre-Petition Cure Amounts which shall be payable by Agent or the its Designee).  The Lease Assumption Notice from Agent shall be accompanied by written documentation establishing adequate assurance of future performance of the specified Designee for any Subject Lease.  Agent and the respective Designee shall cooperate with the Merchant in providing such additional information as may be reasonably requested by the respective landlord(s) in connection with establishing adequate assurance of such Designee's future performance.

Section 17    Bulk Sale /Intellectual Property Designation Rights.

(a)    Bulk Sale of Merchandise and FF&E.  (i) During the Sale Term (the "Bulk Sale Option Period"), Agent shall have the right , in Agent's sole and absolute discretion, to provide notice (each such notice, a "Bulk Sale Designation Notice") to Merchant of Agent's election to sell, transfer and convey, in bulk, certain Merchandise and FF&E (the "Designated Bulk Sale Assets"), as designated by Agent in its sole discretion (the "Bulk Sale Designation") to  a designee (the "Bulk Sale Designee") as identified by Agent in the Bulk Sale Designation Notice (the "Bulk Sale Designation").  Within five (5) business days after Merchant's receipt of a Bulk Sale Designation Notice (the "Bulk Sale Transfer Date"),  Merchant shall sell, transfer and execute such documents as may be reasonably requested by Agent and the Bulk Sale Designee in order to sell, transfer and convey the Designated Bulk Sale Assets to the respective Bulk Sale

Designee.   The sale of the Designated Bulk Sale Assets shall be free and clear of all liens, claims and encumbrances, with Pre-Existing liens to attach to the Transaction Proceeds in the same order and priority as existed on the Sale Commencement Date.

           (ii)      From the Sale Commencement Date through the Bulk Sale Transfer Date (if any), Agent  shall have the right to conduct the Sale at the Stores, consistent with this Agreement.

           (iii)     The Comprehensive Sale Proceeds generated from the transfer of the Designated Bulk Sale Assets to the Bulk Sale Designee shall constitute Comprehensive Sale Proceeds under this Agreement and shall be retained by Agent.   Agent shall be responsible for, as a Comprehensive Sale Expense, all expenses incurred by Agent in connection with the disposition of Designated Bulk Sale Assets ("Bulk Sale Disposition Expenses".

           (b)      Sale of Intellectual Property.   Subject to Merchant's IP Removal Option set forth in Section 17(c) below:

           (i)      during the period of twelve months after the Sale Commencement Date (the "Intellectual Property Marketing Period"), Agent shall have the exclusive right to market and attempt to sell, transfer, or convey some or all of the Intellectual Property (as defined below).   At any time during the Intellectual Property Marketing Period, Agent may provide notice (each such notice, an "Intellectual Property Designation Notice") to Merchant of Agent's designation for Merchant to sell, transfer and convey some or all of the Intellectual Property as designated by Agent (the "Designated Intellectual Property") to a designee (the "Intellectual Property Designee") identified by Agent in the Intellectual Property Designation Notice (the "Intellectual Property Designation"), provided that such Intellectual Property Designee has the requisite federal, state and local licenses and permits to engage in the business of owning and/or selling such Intellectual Property.   Within five (5) of Merchant's receipt of the Intellectual Property Designation Notice (the "Intellectual Property Transfer Date"),   Merchant shall sell, transfer and convert the Designated Intellectual Property to the respective Intellectual Property Designee, and shall execute such documents as may be reasonably requested by Agent  and the Intellectual Property Designee, or otherwise required by applicable federal, state and local law, rules and regulations, in order to effectuate the sale, transfer and conveyance of  the Designated Intellectual Property to such Intellectual Property Designee.   The sale of the Designated Intellectual Property shall be free and clear of all liens, claims and encumbrances (except that the Intellectual Property Designee will grant to Merchant a license to use the Intellectual Property to the extent necessary to wind up Merchant's business activities which activities will include, without limitation, the continuation of any GOB Sales at any of the Stores or other locations of Merchant or its subsidiaries that are not "Stores" as defined in this Agreement and a license (or assignment of the Merchant's license) to the Secured Creditors in order to permit the exercise of any of the Secured Creditors' rights or remedies**, **), with Pre-Existing Liens to attach to the Intellectual Property Guaranteed Amount and other Transaction Proceeds, in the same order and priority as existed on the Sale Commencement Date.

           (ii)                For purposes of this Agreement, "Intellectual Property" shall mean the Trademarks (which means registered and unregistered trademarks, trade names, logos and service marks throughout the world), internet domain names

and corporate names, together with all translations, adaptations, derivations and combinations thereof and including all goodwill associated therewith, and all applications (including without limitation intent-to-use applications), registrations and renewals in connection therewith listed on Exhibit 11.1(w)(i) and Merchant's customer lists and copies and tangible embodiments of any of the foregoing in whatever form or medium.

(iii)    Agent shall be responsible for (as a Comprehensive Sale Expense) all of the marketing and advertising costs and/or other  expense incurred by Agent during the Intellectual Property Marketing Period in connection with the marketing and sale of the Intellectual Property (the "Intellectual Property Marketing Expenses",). All proceeds paid by the Intellectual Property Designee(s) shall constitute Comprehensive Sale Proceeds and shall be retained by Agent.   Agent shall be responsible for, as a Comprehensive Sale Expense, all expenses incurred by Agent in connection with the disposition of the Intellectual Property (collectively, the "Intellectual Property Disposition Expenses").

(iv)    During the Intellectual Property Marketing Period, Merchant shall cooperate with Agent in Agent's efforts to market and dispose of the Intellectual Property, including but not limited to Agent's and the prospective Intellectual Property Designee's efforts to conduct a physical inventory and other due diligence of the Intellectual Property.

(v)    From and after the Sale Commencement Date, Merchant shall not use any of the Intellectual Property owned by Merchant or any derivative thereof in connection with the sale of any goods or services or for any other commercial purposes, anywhere in the United States, except in connection with Merchant's disposition of its on hand inventory at the Gordon Brothers Stores.

(c)    Merchant shall have the right, at any time following the conclusion of the Auction, but  prior to the entry of the Approval Order, to in its sole and absolute discretion remove the Intellectual Property from the Subject Assets and this Agreement (subject to Agent's continued right to use such Intellectual Property in connection with the Sale as provided for herein) (the "IP Removal Option"), without adjustment to the Transaction Consideration and without giving rise to any other payment obligation or other obligation to Agent (including those obligations set forth in Section 17(b) hereof); provided however, notwithstanding the existence of the IP Removal Option (whether or not exercised), Merchant shall take all steps necessary to provide such adequate notice as may be required, and to the extent necessary seek appointment of an ombudsman, so as to be in a position to include the designation rights for the Intellectual Property as a Subject Asset at the Auction and to obtain approval of the Sale of such asset in the Approval Order, should the Merchant elect not to exercise the IP Removal Option.   The Transaction Consideration does not include any consideration on account of the Intellectual Property, which consideration will be the subject of further negotiations.  For the avoidance of doubt, the IP Removal Option will be deemed to be exercised unless a mutually satisfactory agreement is reached by the Merchant and Agent (with the consent of the Secured Creditors) concerning such additional consideration.

Section 18.    Bidding Procedures.  In consideration of Agent conducting its due diligence and entering into this Agreement, which serves as a base by which other offers may be measured, in the event this Agreement is subject to higher and better offers by way of  bidding at

an auction to be conducted by Merchant or other hearing as provided by the Bankruptcy Court (the "Auction"): (i) all bidders must agree to be bound by all of the terms and conditions of this Agreement with appropriate modifications for the identity of the successful bidder and the increased price; (ii) all bidders must provide adequate assurance of their ability to perform their obligations under this Agreement reasonably acceptable to Merchant; (iii) the initial bid must be for an increase in the Transaction Consideration of at least $2,050,000, with successive bids thereafter for an increase of at least $200,000 over the previous bid; (iv) all bidders must agree that, in the event that they are the successful bidder at the Auction, they will purchase from and reimburse Agent for Agent's reasonable and documented out-of-pocket expenses incurred in connection with advertising and signage associated with the Sale; (v) competing bids shall not be conditioned on the outcome of unperformed due diligence by the bidder; and (vi) Agent shall be permitted to bid and submit a higher offer. In the event that Agent is not the ultimate successful bidder, Merchant shall pay Agent a break-up fee of $1,750,000 (the "Break-Up Fee"), plus reimbursement of reasonable and documented expenses up to $100,000 (the "Expense Reimbursement"); and Merchant shall, with the support of the Secured Creditors and the creditors committee obtain approval of the Break-Up Fee and Expense Reimbursement prior to entertaining competing bids at the Auction.

   Section 19. Security Interest. (a) Upon payment of the Initial Transaction Payment, and issuance of the Letter of Credit, Merchant hereby grants to Agent a first priority security interest in and lien upon (i) all of the Subject Assets, and (ii) all Comprehensive Sale Proceeds, to secure all obligations of Merchant to Agent hereunder; provided however, until the payment of the Transaction Consideration and Comprehensive Sale Expenses, or other amounts due to Merchant hereunder, in full, the security interest granted to Agent hereunder, shall remain junior to the security interest of the Secured Creditors, to the extent of the unpaid portion of the Transaction Consideration, Comprehensive Sale Expenses or other unpaid amounts. Upon entry of the Approval Order and payment of the Initial Transaction Payment and the issuance of the Letter of Credit, the security interest granted to Agent hereunder shall be deemed properly perfected without the need for further filings or documentation.

  (b) All Transaction Proceeds shall be the perfected collateral of the Secured Creditors and shall be subject to liens and administrative expense claims of the Secured Creditors as provided in, and subject to the priorities set forth in, the Cash Collateral Order.

   Section 20. Miscellaneous.

  20.1 Notices. All notices and communications provided for pursuant to this Agreement shall be in writing, and sent by hand, by facsimile, or by Federal Express or other recognized overnight delivery service, as follows:

   If to the Agent:

       GREAT AMERICAN WF, LLC
       9  Parkway North
       Suite 300
       Deerfield, IL 60015
       Attn:  Mark P. Naughton
       Senior Vice President/General Counsel
       Tel:  847 444 1400

|  | Email:  mnaughton@greatamerican.com |
|---|---|
| With copies to: | EPSTEIN BECKER & GREEN P.C.<br>250 Park Avenue – 11th Floor<br>New York, New York  1007<br>Attn:   Paul Traub<br>　　　　Maura I. Russell<br>Tel:    212/351-3770 (Traub)<br>　　　　212/351-3758 (Russell)<br>Email: ptraub@ebglaw.com<br>　　　　mrussell@ebglaw.com |
| If to the Merchant: | MOVIE GALLERY, INC.<br>9275 SW Payton Lane<br>Wilsonville, OR 97070<br>Attn:   Chief Restructuring Officer<br>Tel:<br>Email: |
| with copies to: | SONNENSCHEIN NATH & ROSENTHAL LLP<br>1221 Avenue of the Americas<br>New York, NY 10020<br>Attn:   John A. Bicks<br>　　　　Richard L. Sadowsky<br>Tel:    (212) 398-4898 (Bicks)<br>　　　　(212) 398-7611 (Sadowsky)<br>Email: jbicks@sonnenschein.com<br>　　　　rsadowsky@sonnenschein.com |
| with copies to counsel to<br>　the Secured Creditors: | BROWN RUDNICK LLP<br>One Financial Center<br>Boston, MA 02111<br>Attn: Jeff Jonas<br>Tel: 617-856-8577<br>Email: JJonas@brownrudnick.com<br><br>O'MELVENY & MYERS LLP<br>400 South Hope Street<br>Los Angeles, CA 90071<br>Attn: Steve Warren<br>Tel: (213) 430-6000<br>Email: SWarren@OMM.com |

　　　20.2　Governing Law.  This Agreement shall be governed and construed in accordance with the laws of the State of Virginia without regard to conflicts of laws principles thereof, except where governed by the Bankruptcy Code.

10344914\V-11

20.3    Termination.  This Agreement shall remain in full force and effect until the first to occur of: (i) receipt by Merchant of written notice from Agent that any of the conditions specified in Section 10 hereof have not been satisfied; or (ii) the expiration of the Sale Term and completion and certification by Merchant and Agent of the final Sale reconciliation pursuant to Section 8.7 above.    Notwithstanding the foregoing, the representations and warranties of Merchant and Agent contained herein and the provisions of Section 13 above shall survive the termination of this Agreement pursuant to this Section 20.3.

20.4    Entire Agreement.  This Agreement contains the entire agreement between the parties hereto with respect to the transactions contemplated hereby and supersedes and cancels all prior agreements, including, but not limited to, all proposals, letters of intent or representations, written or oral, with respect thereto.

20.5    Amendments.  This Agreement may not be modified except in a written instrument executed by each of the parties hereto.

20.6    No Waiver.  No consent or waiver by any party, express or implied, to or of any breach or default by the other in the performance of its obligations hereunder shall be deemed or construed to be a consent or waiver to or of any other breach or default in the performance by such other party of the same or any other obligation of such party.  Failure on the part of any party to complain of any act or failure to act by the other party or to declare the other party in default, irrespective of how long such failure continues, shall not constitute a waiver by such party of its rights hereunder.

20.7    Successors and Assigns.  This Agreement shall inure to the benefit of and be binding upon Agent and Merchant, and their respective successors and assigns; provided, however, that this Agreement may not be assigned by Merchant or Agent to any party without the prior written consent of the other.

20.8    Execution in Counterparts.  This Agreement may be executed in two or more counterparts, each of which shall be deemed an original but all of which together shall constitute but one agreement.  This Agreement may be executed by facsimile, and such facsimile signature shall be treated as an original signature hereunder.

20.9    Section Headings.  The headings of sections of this Agreement are inserted for convenience only and shall not be considered for the purpose of determining the meaning or legal effect of any provisions hereof.

20.10  Survival.  All representations, warranties, covenants and agreements made by the parties hereto shall be considered to have been relied upon by the parties and shall survive the execution, delivery and performance of this Agreement.

[Remainder of Page Intentionally Left Blank]

IN WITNESS WHEREOF, the Agent and Merchant hereby execute this Agreement by their duly authorized representatives as a sealed instrument as of the day and year first written above.

MOVIE GALLERY, INC.


By: /s/ Wesley D. Sand
Print Name and Title:
Wesley D. Sand, President and COO

HOLLYWOOD ENTERTAINMENT CORP.


By: /s/ Wesley D. Sand
Print Name and Title:
Wesley D. Sand, President and COO


MOVIE GALLERY US LLC


By: /s/ Wesley D. Sand
Print Name and Title:
Wesley D. Sand, President and COO


MG REAL ESTATE, LLC


By: /s/ Wesley D. Sand
Print Name and Title:
Wesley D. Sand, President and COO



HEC REAL ESTATE, LLC


By:/s/ Wesley D. Sand
Print Name and Title:
Wesley D. Sand, President and COO

GREAT AMERICAN WF, LLC

By: /s/ Scott K. Carpenter
Print Name and Title:
Scott K. Carpenter, Executive Vice President

Consented to with respect
to Section 3.3(a) and Section 19

Lenado Capital Advisors and affiliates and other entities under common control on behalf of
funds and accounts that are lenders party to the Prepetition First Lien Revolver Credit Agreement

By:      O'Melveny & Myers LLP

_____
     Stephen Warren

Wilmington Trust Company, as Agent

By:      Brown Rudnick LLP

_____

_____
On Behalf of Itself and as Authorized
Representative for the Term Secured Creditors

By: _____
Print Name and Title:

**EXHIBIT 3.1(a)(i)**

**UNIT COUNT ADJUSTMENT SCHEDULE**

**EXHIBIT 4.1**

**OCCUPANCY EXPENSE**

**MOVIE GALLERY US, LLC**
**Per Diem Occupany Expenses**
**Exhibit 4.1**
*Trailing 12-Months (Feb09-Jan10) from file "income_statements.xlsx"*

| Store # | Banner | Address | City | ST | Rent And Related | Repairs | Utilities | Taxes / Insurance | Security Services | Total |
|---------|--------|---------|------|-----|-----------------|---------|-----------|-------------------|-------------------|-------|
| 001500 | GCHV | 1304 Woodward Ave | Muscle Shoals | AL | 338 | 27 | 55 | 8 | 1 | 428 |
| 001504 | HLYW | 924 Beltline Rd | Decatur | AL | 331 | 42 | 48 | 3 | 1 | 425 |
| 001712 | HLYW | 398 Hughes Rd | Madison | AL | 331 | 40 | 43 | 5 | 1 | 419 |
| 003398 | HLYW | 23706 S Power Road Ste 104 | Queen Creek | AZ | 219 | 0 | 32 | 1 | 1 | 253 |
| 003420 | HLYW | 1280 S Watson Rd Ste 104 | Buckeye | AZ | 401 | 10 | 66 | 5 | 1 | 482 |
| 003920 | HLYW | 1555 S Ave B Ste C | Yuma | AZ | 347 | 10 | 81 | 3 | 1 | 441 |
| 003928 | GCHV | 4705 S Hwy 95 | Fort Mohave | AZ | 231 | 32 | 58 | 4 | 0 | 325 |
| 003948 | HLYW | 7584 E Hwy 69 Ste A | Prescott Valley | AZ | 357 | 17 | 42 | 3 | 1 | 419 |
| 003957 | HLYW | 1958 E Brown Rd | Mesa | AZ | 309 | 20 | 46 | 1 | 1 | 377 |
| 003963 | GCHV | 1250 N Alma School Rd | Chandler | AZ | 177 | 15 | 41 | 2 | 1 | 236 |
| 003978 | GCHV | 1430 E Rte 66 | Flagstaff | AZ | 464 | 16 | 44 | 2 | 1 | 526 |
| 005320 | GCHV | 40790 California Oaks Rd | Murrieta | CA | 397 | 26 | 84 | 8 | 1 | 515 |
| 005400 | GCHV | 2340 N Blackstone Ave | Fresno | CA | 419 | 14 | 72 | 7 | 1 | 514 |
| 005412 | HLYW | 12263 Highland Ave. Suite 120 | Rancho Cucamonga | CA | 532 | 18 | 62 | 9 | 1 | 621 |
| 005421 | HLYW | 12873 Mountain Avenue | Chino | CA | 285 | 13 | 34 | 5 | 1 | 338 |
| 005428 | HLYW | 826 B St. | Marysville | CA | 474 | 9 | 72 | 8 | 1 | 563 |
| 005429 | HLYW | 29910 S Murrieta Hot Springs Rd | Murrieta | CA | 540 | 27 | 53 | 5 | 1 | 626 |
| 005491 | HLYW | 1318 W Foothill Blvd | Rialto | CA | 261 | 7 | 75 | 10 | 11 | 363 |
| 005497 | HLYW | 6415 Platt Ave | West Hills | CA | 361 | 11 | 54 | 8 | 1 | 435 |
| 005501 | GCHV | 1846 N Broadway | Santa Maria | CA | 475 | 11 | 59 | 8 | 2 | 555 |
| 005514 | GCHV | 900 N Norma St | Ridgecrest | CA | 329 | 6 | 82 | 3 | 1 | 420 |
| 005526 | HLYW | 711 Stony Point Rd. Ste. 1 | Santa Rosa | CA | 489 | 5 | 70 | 8 | 1 | 574 |
| 005542 | GCHV | 2147 W Cleveland Ave | Madera | CA | 351 | 8 | 61 | 4 | 2 | 426 |
| 005547 | GCHV | 440 N 11Th Ave | Hanford | CA | 474 | 18 | 84 | 4 | 2 | 581 |
| 005551 | HLYW | 1791 Hillsdale Ave | San Jose | CA | 432 | 7 | 94 | 3 | 1 | 537 |
| 005582 | HLYW | 1051 N Imperial Ave | El Centro | CA | 344 | 5 | 55 | 11 | 1 | 415 |
| 005584 | GCHV | 511 N Second St | El Cajon | CA | 446 | 32 | 39 | 4 | 0 | 521 |
| 005586 | HLYW | 1395 W Henderson Ave | Porterville | CA | 286 | 14 | 47 | 5 | 1 | 352 |
| 005641 | HLYW | 8610 Firestone Blvd | Downey | CA | 476 | 11 | 65 | 5 | 2 | 559 |
| 005650 | HLYW | 8012 Limonite Ave | Riverside | CA | 462 | 9 | 67 | 9 | 7 | 554 |
| 005677 | HLYW | 1290 W Redondo Beach Blvd | Gardena | CA | 399 | 3 | 63 | 4 | 1 | 470 |
| 005723 | HLYW | 621 W Central Ste. A | Lompoc | CA | 268 | 6 | 56 | 7 | 1 | 338 |
| 005724 | GCHV | 900 Rancho Pky | Arroyo Grande | CA | 376 | 15 | 57 | 11 | 1 | 458 |
| 005726 | HLYW | 789 E Monte Vista Ave | Vacaville | CA | 310 | 9 | 47 | 3 | 1 | 369 |
| 005728 | GCHV | 4952 E Kings Canyon Rd | Fresno | CA | 307 | 16 | 65 | 10 | 2 | 401 |
| 005742 | HLYW | 415 W Felicita Ave | Escondido | CA | 311 | 19 | 56 | 3 | 2 | 391 |
| 005750 | GCHV | 12252 Perris Blvd | Moreno Valley | CA | 346 | 4 | 32 | 9 | 8 | 399 |
| 005763 | HLYW | 1105 W Main St | Merced | CA | 236 | 7 | 10 | 5 | 1 | 260 |
| 005789 | GCHV | 15152 Bear Valley Rd | Victorville | CA | 368 | 16 | 79 | 8 | 3 | 475 |
| 005791 | GCHV | 3454  Palmer Dr | Cameron Park | CA | 449 | 9 | 83 | 8 | 1 | 549 |
| 005814 | GCHV | 4871 White Ln | Bakersfield | CA | 444 | 7 | 72 | 4 | 2 | 529 |
| 005816 | GCHV | 81850 Hwy 111 | Indio | CA | 518 | 9 | 107 | 12 | 1 | 647 |
| 005821 | HLYW | 2515 Western Ave Ste 2 A | San Pedro | CA | 441 | 17 | 49 | 10 | 1 | 517 |
| 005825 | GCHV | 58132 Twenty Nine Palms Hwy | Yucca Valley | CA | 453 | 19 | 76 | 7 | 1 | 556 |
| 005836 | GCHV | 370 N Capital Ave | San Jose | CA | 570 | 7 | 78 | 6 | 11 | 671 |
| 005841 | HLYW | 678 N Wilson Wy Ste 20 | Stockton | CA | 328 | 24 | 96 | 8 | 1 | 457 |
| 005892 | HLYW | 3970 Missouri Flat Rd Ste B1 | Placerville | CA | 231 | 6 | 54 | 6 | 1 | 299 |
| 005917 | HLYW | 1920 W Eleventh St | Tracy | CA | 314 | 7 | 68 | 10 | 1 | 399 |
| 005919 | HLYW | 8195 El Camino Real | Atascadero | CA | 316 | 6 | 64 | 4 | 1 | 389 |
| 005928 | HLYW | 73680 Buena Vista Dr | Twentynine Palms | CA | 344 | 10 | 77 | 4 | 1 | 436 |
| 005936 | HLYW | 1060 N Lemoore Ave Ste 101 | Lemoore | CA | 160 | 9 | 48 | 2 | 1 | 220 |
| 005948 | HLYW | 194 Niblick Rd | Paso Robles | CA | 424 | 27 | 69 | 4 | 2 | 526 |
| 005966 | HLYW | 1462 S Mercy Springs Rd | Los Banos | CA | 309 | 8 | 71 | 4 | 1 | 393 |
| 006666 | GCHV | 6750 Camden Blvd | Fountain | CO | 320 | 46 | 47 | 5 | 1 | 418 |
| 006671 | GCHV | 1425 W Hwy 50 | Pueblo | CO | 324 | 34 | 43 | 4 | 1 | 405 |
| 006683 | GCHV | 3205  I-70 Business Loop | Clifton | CO | 264 | 32 | 35 | 4 | 1 | 336 |
| 006698 | HLYW | 9205 Washington St | Thornton | CO | 126 | 19 | 39 | 2 | 1 | 187 |
| 006717 | HLYW | 1006 Bonforte Blvd. | Pueblo | CO | 289 | 29 | 41 | 6 | 1 | 365 |
| 009627 | HLYW | 4220 Nw 16Th Blvd | Gainesville | FL | 416 | 12 | 70 | 6 | 1 | 505 |
| 009695 | HLYW | 2640 Blanding Blvd Ste 211 | Middleburg | FL | 323 | 10 | 64 | 5 | 1 | 402 |
| 012101 | HLYW | 1233 Parkway Drive | Blackfoot | ID | 306 | 13 | 38 | 16 | 0 | 374 |
| 012102 | GCHV | 2110 Nez Perce Grade | Lewiston | ID | 346 | 7 | 54 | 9 | 1 | 416 |
| 012103 | GCHV | 624 N Yellowstone Ave | Pocatello | ID | 385 | 22 | 43 | 18 | 1 | 467 |
| 012105 | HLYW | 725 Blue Lakes Blvd N | Twin Falls | ID | 235 | 30 | 34 | 5 | 1 | 306 |
| 012109 | GCHV | 66 Second St S Ste D | Nampa | ID | 348 | 6 | 28 | 8 | 0 | 388 |
| 012115 | HLYW | 350 S Eagle Rd | Eagle | ID | 303 | 4 | 25 | 5 | 1 | 338 |
| 012119 | HLYW | 189 E Maine Street | Nampa | ID | 338 | 17 | 46 | 9 | 1 | 410 |

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 012120 | HLYW | 382 N Overland Ave | Burley | ID | 325 | 12 | 26 | 5 | 1 | | 368 |
| 012121 | HLYW | 4809 Yellowstone Ave | Chubbuck | ID | 347 | 8 | 42 | 15 | 1 | | 412 |
| 013837 | GCHV | 3125 N University St | Peoria | IL | 363 | 5 | 53 | - | 1 | | 420 |
| 013871 | HLYW | 3010 Perryville Road | Rockford | IL | 380 | 13 | 42 | 0 | 1 | | 435 |
| 013908 | GCHV | 1350 S Alpine Rd | Rockford | IL | 435 | 23 | 43 | 0 | 1 | | 502 |
| 013935 | HLYW | 9128 N Lindbergh Dr | Peoria | IL | 401 | 10 | 43 | - | 1 | | 455 |
| 014881 | HLYW | 353 N Grandstaff | Auburn | IN | 259 | 1 | 28 | 11 | 1 | | 300 |
| 014885 | HLYW | 326  Hwy 930 W | New Haven | IN | 186 | 8 | 44 | 11 | 1 | | 249 |
| 014950 | GCHV | 6091 Broadway | Merrillville | IN | 309 | 5 | 60 | 10 | 2 | | 386 |
| 014951 | GCHV | 6129 Us Hwy 6 | Portage | IN | 420 | 19 | 57 | 20 | 2 | | 518 |
| 015489 | HLYW | 3505 Gordon Dr | Sioux City | IA | 326 | 12 | 36 | - | 1 | | 375 |
| 016829 | HLYW | 133 E 47Th St S | Wichita | KS | 408 | 42 | 46 | 2 | 1 | | 499 |
| 017745 | HLYW | 1897 Bypass Rd | Winchester | KY | 444 | 90 | 55 | 3 | 1 | | 593 |
| 018482 | HLYW | 9018 Mansfield Rd | Shreveport | LA | 362 | 14 | 34 | 23 | 1 | | 434 |
| 018509 | HLYW | 1405 Beglis Pkwy | Sulphur | LA | 304 | 13 | 30 | 9 | 1 | | 357 |
| 018514 | HLYW | 2130 Airline Dr | Bossier City | LA | 321 | 36 | 37 | 9 | 1 | | 403 |
| 020808 | GCHV | 1003 W Patrick St | Frederick | MD | 515 | 18 | 56 | 3 | 2 | | 594 |
| 020880 | GCHV | 1580 Wesel Blvd | Hagerstown | MD | 261 | 6 | 57 | 18 | 1 | | 342 |
| 021101 | HLYW | 5 State Rd | Dartmouth | MA | 406 | 18 | 117 | 1 | 1 | | 544 |
| 021108 | GCHV | 933 Pleasant St | Fall River | MA | 392 | 6 | 57 | 1 | 1 | | 458 |
| 021133 | HLYW | 250 E Central St | Franklin | MA | 151 | 2 | 56 | 1 | 1 | | 210 |
| 022255 | HLYW | 49125 Van Dyke | Shelby Township | MI | 230 | 9 | 37 | 3 | 1 | | 279 |
| 022270 | GCHV | 2015 Niles Rd | St. Joseph | MI | 379 | 6 | 35 | 4 | 1 | | 424 |
| 022271 | GCHV | 1424 S Main St | Adrian | MI | 243 | 52 | 44 | 5 | 1 | | 345 |
| 022279 | HLYW | 2360 W Stadium Blvd | Ann Arbor | MI | 484 | 13 | 67 | 7 | 3 | | 575 |
| 022281 | HLYW | 1190 N West Ave | Jackson | MI | 307 | 30 | 9 | 5 | 1 | | 351 |
| 022282 | HLYW | 3140 E Michigan Ave | Jackson | MI | 176 | 6 | 48 | 3 | 1 | | 234 |
| 022293 | HLYW | 6767 Cascade Rd Se | Grand Rapids | MI | 237 | 11 | 46 | 3 | 1 | | 299 |
| 022296 | GCHV | 1047 E Main St | Owosso | MI | 195 | 4 | 53 | 5 | 1 | | 257 |
| 022474 | HLYW | 335 S Telegraph Road | Monroe | MI | 218 | 6 | 48 | 7 | 1 | | 279 |
| 023792 | HLYW | 412 Crossroads Dr | Rochester | MN | 364 | 4 | 45 | 0 | 1 | | 414 |
| 023793 | HLYW | 2521 8Th St S | Moorhead | MN | 139 | 10 | 26 | 0 | 1 | | 176 |
| 024510 | HLYW | 1496 Old Aberdeen Rd | Columbus | MS | 247 | 4 | 48 | 9 | 1 | | 308 |
| 025872 | HLYW | 1210 N Westwood | Poplar Bluff | MO | 313 | 32 | 48 | 4 | 1 | | 398 |
| 025897 | GCHV | 10887 W Florissant | Ferguson | MO | 576 | 42 | 73 | 12 | 1 | | 703 |
| 025944 | GCHV | 2703 East Broadway Ste 236 | Columbia | MO | 361 | 29 | 61 | 9 | 1 | | 461 |
| 026776 | HLYW | 633 N 46Th St | Omaha | NE | 252 | 10 | 40 | 1 | 1 | | 304 |
| 028403 | HLYW | 3300 E Flamingo Rd Ste 26 | Las Vegas | NV | 266 | 28 | 79 | 5 | 1 | | 379 |
| 028409 | HLYW | 1030 Nevada Way | Boulder City | NV | 279 | 7 | 29 | 3 | 1 | | 318 |
| 028414 | GCHV | 240 S Hwy 160 | Pahrump | NV | 395 | 21 | 50 | 2 | 1 | | 469 |
| 028909 | HLYW | 7375 S Durango Dr Ste 101 | Las Vegas | NV | 491 | 21 | 72 | 6 | 1 | | 590 |
| 030114 | GCHV | 2465 S Broad St Ste E 1 | Hamilton | NJ | 437 | 18 | 63 | 0 | 1 | | 518 |
| 030120 | GCHV | 875 Mantua Pike | Woodbury | NJ | 224 | 2 | 77 | - | 1 | | 304 |
| 030151 | HLYW | 801 Tilton Rd | Northfield | NJ | 177 | 9 | 65 | 1 | 1 | | 253 |
| 031903 | HLYW | 106 Girard Blvd Se | Albuquerque | NM | 248 | 59 | 53 | 1 | 2 | | 362 |
| 031904 | HLYW | 1965 Bataan Memorial West Unit 1 | Las Cruces | NM | 305 | 26 | 48 | 1 | 1 | | 381 |
| 031905 | HLYW | 3538 Zafarano Dr Bldg A | Santa Fe | NM | 495 | 8 | 45 | 1 | 1 | | 551 |
| 031909 | HLYW | 4017 N Prince St Ste B1 | Clovis | NM | 266 | 9 | 31 | 1 | 1 | | 308 |
| 031917 | HLYW | 1600-A Valley Drive | Las Cruces | NM | 292 | 14 | 49 | 3 | 1 | | 358 |
| 032305 | HLYW | 46 S Washington St Ste 1 | Binghamton | NY | 412 | 11 | 36 | 0 | 1 | | 460 |
| 032307 | HLYW | 1410 Altamont Ave | Schenectady | NY | 336 | 11 | 63 | 0 | 1 | | 411 |
| 032309 | HLYW | 134 Vestal Pky W | Vestal | NY | 345 | 14 | 46 | 0 | 1 | | 406 |
| 032621 | GCHV | 216 Quaker Rd Ste 1 | Queensbury | NY | 370 | 11 | 65 | - | 1 | | 447 |
| 032778 | HLYW | 11 Saratoga Rd | Glenville | NY | 342 | 5 | 45 | - | 1 | | 393 |
| 032781 | HLYW | 279 Main St | Binghamton | NY | 290 | 10 | 39 | 0 | 1 | | 340 |
| 032786 | HLYW | 350 Fairview Ave | Hudson | NY | 167 | 6 | 46 | - | 1 | | 220 |
| 032789 | HLYW | 4908 State Hwy 30 | Amsterdam | NY | 201 | 7 | 47 | - | 1 | | 256 |
| 032839 | HLYW | 380 Route 9 W | Glenmont | NY | 295 | 5 | 66 | 0 | 1 | | 367 |
| 032842 | HLYW | 279 Troy Road Bldg A Unit 6 | Rensselaer | NY | 384 | 7 | 49 | - | 1 | | 441 |
| 033105 | HLYW | 7621 S. Raeford Rd. | Fayetteville | NC | 340 | 28 | 58 | 4 | 1 | | 430 |
| 033948 | GCHV | 1590 Skibo Road | Fayetteville | NC | 270 | 16 | 36 | 5 | 0 | | 327 |
| 033959 | HLYW | 1515 S Cannon Blvd Ste A | Kannapolis | NC | 348 | 7 | 31 | 3 | 1 | | 390 |
| 033962 | GCHV | 102 Stanford Rd | Lincolnton | NC | 248 | 6 | 33 | 7 | 1 | | 294 |
| 033999 | HLYW | 3460 Dr. M L King Jr Blvd | New Bern | NC | 358 | 29 | 57 | 3 | 1 | | 447 |
| 034100 | GCHV | 1700 S Broadway | Minot | ND | 377 | 40 | 38 | 0 | 1 | | 456 |
| 034101 | HLYW | 1844 S Washington St | Grand Forks | ND | 273 | 14 | 34 | 0 | 1 | | 321 |
| 035796 | GCHV | 3773 S High St | Columbus | OH | 310 | 9 | 49 | (0) | 1 | | 369 |
| 035800 | GCHV | 7867 Plains Rd | Mentor On The Lake | OH | 274 | 10 | 55 | 0 | 1 | | 340 |
| 035804 | GCHV | 340 Mill Ave Se | New Philadelphia | OH | 394 | 45 | 46 | 0 | 1 | | 486 |
| 035820 | GCHV | 175 W Milltown Rd | Wooster | OH | 329 | 50 | 57 | (0) | 1 | | 437 |
| 035847 | GCHV | 950 N Bridge St | Chillicothe | OH | 421 | 8 | 56 | 0 | 1 | | 486 |
| 035887 | GCHV | 5225 Mahoning Ave | Austintown | OH | 252 | 11 | 48 | (0) | 1 | | 311 |
| 035905 | HLYW | 1210 State Route 125 | Amelia | OH | 329 | 20 | 56 | 0 | 1 | | 406 |
| 036796 | HLYW | 2802 N Kickapoo Ave | Shawnee | OK | 237 | 2 | 33 | 4 | 1 | | 277 |
| 036852 | GCHV | 2112 Nw Cache Rd | Lawton | OK | 309 | 46 | 40 | 20 | 1 | | 414 |

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 036859 | HLYW | 1930 S Muskogee Ave | Tahlequah | OK | 296 | 27 | 42 | 5 | 1 | | 371 |
| 036871 | GCHV | 7418 E Admiral Pl | Tulsa | OK | 251 | 19 | 34 | 7 | 1 | | 312 |
| 036878 | GCHV | 9101 S Pennsylvania Ave | Oklahoma City | OK | 343 | 32 | 45 | 12 | 1 | | 433 |
| 037102 | GCHV | 29756 Sw Town Ctr Lp W Ste F | Wilsonville | OR | 365 | 21 | 37 | 7 | 1 | | 430 |
| 037112 | GCHV | 15660 Sw Pacific Hwy Ste 100 | Tigard | OR | 492 | 7 | 58 | 14 | 2 | | 573 |
| 037114 | HLYW | 7461 Sw Barbur Blvd | Portland | OR | 263 | 11 | 48 | 11 | 1 | | 334 |
| 037125 | HLYW | 1443 Ne 181St | Portland | OR | 286 | 7 | 34 | 7 | 1 | | 335 |
| 037145 | GCHV | 335 Nw 4Th St | Corvallis | OR | 287 | 24 | 47 | 10 | 1 | | 370 |
| 037183 | GCHV | 1176 Nw Garden Valley Blvd | Roseburg | OR | 368 | 9 | 34 | 12 | 1 | | 424 |
| 037186 | GCHV | 1120 Se 3Rd St Ste 100 | Bend | OR | 458 | 11 | 34 | 7 | 1 | | 511 |
| 037194 | HLYW | 2225 Sw Court Pl | Pendleton | OR | 274 | 22 | 46 | 6 | 1 | | 348 |
| 037197 | HLYW | 3455 Lancaster Dr Ne | Salem | OR | 324 | 23 | 48 | 5 | 1 | | 402 |
| 037198 | HLYW | 1671 N 18Th St | Springfield | OR | 337 | 4 | 35 | 7 | 1 | | 384 |
| 037206 | GCHV | 2866 Willamette St Ste A | Eugene | OR | 293 | 7 | 40 | 7 | 1 | | 348 |
| 037207 | HLYW | 1604 S Hwy 97 | Redmond | OR | 207 | 5 | 32 | 6 | 1 | | 251 |
| 037208 | GCHV | 1432 Molalla Ave | Oregon City | OR | 340 | 15 | 58 | 6 | 1 | | 420 |
| 037211 | HLYW | 400 Mt Hood St | The Dalles | OR | 286 | 8 | 43 | 7 | 1 | | 344 |
| 037212 | HLYW | 507 S Roosevelt Dr Ste 1 | Seaside | OR | 171 | 5 | 30 | 4 | 1 | | 211 |
| 037214 | HLYW | 903 N First Ave | Stayton | OR | 239 | 9 | 36 | 4 | 1 | | 289 |
| 037215 | HLYW | 8505 Sw Tualatin Sherwood Rd | Tualatin | OR | 471 | 11 | 47 | 13 | 1 | | 543 |
| 037225 | HLYW | 3515 Ne 15Th Ave | Portland | OR | 268 | 3 | 21 | 5 | 1 | | 299 |
| 037230 | HLYW | 5518 S 6Th St | Klamath Falls | OR | 272 | 11 | 31 | 3 | 1 | | 317 |
| 037231 | HLYW | 45 Nw Plum St | Madras | OR | 188 | 13 | 30 | 5 | 1 | | 237 |
| 037240 | GCHV | 115 E Highland Ave | Hermiston | OR | 169 | 12 | 24 | 7 | 0 | | 211 |
| 037243 | HLYW | 4600 Se Woodstock | Portland | OR | 381 | 9 | 64 | 6 | 1 | | 461 |
| 037244 | HLYW | 5278 Sw Philomath Blvd | Corvallis | OR | 278 | 1 | 33 | 4 | 1 | | 317 |
| 037459 | HLYW | 1495 Monmouth Street | Independence | OR | 277 | 11 | 41 | 7 | 1 | | 336 |
| 037461 | HLYW | 1495 Ivy Street | Junction City | OR | 221 | 3 | 32 | 5 | 1 | | 262 |
| 038315 | HLYW | 1640 Main St | Dickson City | PA | 295 | 4 | 46 | 2 | 1 | | 347 |
| 038325 | HLYW | 2489 Aramingo Ave | Philadelphia | PA | 501 | 10 | 78 | 0 | 1 | 13 | 603 |
| 038352 | HLYW | 224 Memorial Blvd. | Connellsville | PA | 278 | 12 | 48 | 2 | 1 | | 341 |
| 038386 | HLYW | 102 Milford Landing Dr Suite 9 | Matamoras | PA | 267 | 2 | 108 | - | 1 | | 378 |
| 038891 | HLYW | 855 E Main St | Dallastown | PA | 278 | 6 | 52 | 2 | 1 | | 337 |
| 038986 | HLYW | 635 Fayette Plz | Uniontown | PA | 293 | 4 | 49 | 1 | 1 | | 347 |
| 038989 | HLYW | 1800 Hoffman Blvd | West Mifflin | PA | 163 | 7 | 39 | 7 | 1 | | 217 |
| 039100 | GCHV | 1400 Park Ave | Woonsocket | RI | 383 | 7 | 73 | 36 | 1 | | 498 |
| 039101 | GCHV | 244 Atwood Ave | Cranston | RI | 348 | 11 | 52 | 15 | 1 | | 426 |
| 039102 | GCHV | 320 Warwick Ave | Warwick | RI | - | - | - | - | - | | - |
| 039109 | HLYW | 760 Tiogue Ave | Coventry | RI | 249 | 12 | 57 | 3 | 1 | | 323 |
| 040895 | HLYW | 506 Bypass 72 Nw | Greenwood | SC | 365 | 27 | 49 | 3 | 1 | | 444 |
| 041101 | HLYW | 2505 S Minnesota Ave | Sioux Falls | SD | 295 | 7 | 32 | 0 | 1 | | 335 |
| 042440 | HLYW | 2660 Memorial Blvd | Springfield | TN | 364 | 19 | 50 | 5 | 1 | | 439 |
| 042940 | GCHV | 2139 Lowes Dr | Clarksville | TN | 431 | 40 | 69 | 14 | 1 | | 554 |
| 042945 | HLYW | 2503 Old Fort Pky | Murfreesboro | TN | 426 | 18 | 52 | 8 | 1 | | 505 |
| 042961 | GCHV | 250 S Hall Rd | Alcoa | TN | 327 | 33 | 60 | 11 | 1 | | 432 |
| 042962 | GCHV | 670 S Jefferson Ave | Cookeville | TN | 398 | 29 | 55 | 10 | 1 | | 494 |
| 042963 | GCHV | 3409 Gallatin Pike | Nashville | TN | 441 | 67 | 72 | 11 | 1 | | 591 |
| 042978 | HLYW | 3541 Riverdale Rd | Memphis | TN | 440 | 12 | 49 | 5 | 1 | | 507 |
| 042990 | GCHV | 611 S Cumberland St | Lebanon | TN | 365 | 32 | 48 | 15 | 1 | | 460 |
| 043310 | HLYW | 4200 S Alameda St | Corpus Christi | TX | 327 | 17 | 61 | 7 | 2 | | 413 |
| 043324 | GCHV | 3150 S 31St St | Temple | TX | 269 | 19 | 53 | 15 | 2 | | 358 |
| 043331 | GCHV | 509 S Expressway 83 | Harlingen | TX | 335 | 26 | 72 | 16 | 1 | | 448 |
| 043341 | GCHV | 900 W Central Tx Expy | Killeen | TX | 441 | 28 | 75 | 18 | 1 | | 563 |
| 043352 | HLYW | 3225 50Th St | Lubbock | TX | 118 | 3 | 40 | 7 | 1 | | 168 |
| 043362 | HLYW | 3102 N Lee Trevino Dr | El Paso | TX | 396 | 24 | 75 | 7 | 1 | | 503 |
| 043364 | GCHV | 6045 Montana Ave | El Paso | TX | 435 | 21 | 64 | 11 | 1 | | 532 |
| 043370 | GCHV | 606 S Walnut Ave Ste A | New Braunfels | TX | 335 | 23 | 49 | 12 | 1 | | 419 |
| 043380 | GCHV | 203 Hewitt Dr | Woodway | TX | 410 | 14 | 60 | 17 | 5 | | 506 |
| 043389 | HLYW | 2531 82Nd St | Lubbock | TX | 464 | 26 | 45 | 8 | 1 | | 544 |
| 043395 | GCHV | 2109 Us Expy 83 | Weslaco | TX | 347 | 34 | 76 | 20 | 1 | | 479 |
| 043561 | GCHV | 7610 Fm Hwy. 78 | San Antonio | TX | 344 | 32 | 40 | 16 | 1 | | 434 |
| 043572 | GCHV | 2726 Hwy 190 | Copperas Cove | TX | 441 | 28 | 69 | 16 | 1 | | 555 |
| 043574 | GCHV | 701 Indian Trail | Harker Heights | TX | 330 | 45 | 73 | 19 | 1 | | 468 |
| 043583 | GCHV | 9155 Dyer St Ste B85 | El Paso | TX | 313 | 33 | 63 | 12 | 1 | | 423 |
| 043605 | HLYW | 7933 N Mesa St Ste A | El Paso | TX | 454 | 19 | 54 | 8 | 1 | | 535 |
| 043606 | GCHV | 1860 N. Zaragosa Rd. | El Paso | TX | 345 | 42 | 75 | 12 | 1 | | 476 |
| 043616 | GCHV | 4202 Ayers Dr. | Corpus Christi | TX | 370 | 7 | 66 | 17 | 1 | | 461 |
| 043640 | HLYW | 1634 Central Blvd | Brownsville | TX | 233 | 1 | 47 | 17 | 1 | | 299 |
| 043642 | HLYW | 4650 Woodrow Bean Transmountain Dr | El Paso | TX | 237 | 7 | 36 | 6 | 1 | | 287 |
| 043689 | GCHV | 20851 Fm 1485 Ste A | New Caney | TX | 308 | 20 | 45 | 17 | 1 | | 390 |
| 043691 | HLYW | 17400 Spring Cypress Rd | Cypress | TX | 502 | 6 | 62 | 11 | 1 | | 582 |
| 043694 | GCHV | 902 Kitty Hawk Ste 110 | Universal City | TX | 478 | 13 | 45 | 23 | 1 | | 559 |
| 043701 | GCHV | 6056 Fm 2920 | Spring | TX | 361 | 20 | 52 | 16 | 1 | | 451 |
| 043713 | GCHV | 300 S Bibb Ave Ste G | Eagle Pass | TX | 249 | 9 | 72 | 15 | - | | 346 |
| 044600 | GCHV | 4335 S. Harrison Blvd. | Ogden | UT | 413 | 7 | 51 | 9 | 1 | | 480 |

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 044615 | GCHV | 566 S. Main | Cedar City | UT | 344 | 13 | 36 | 5 | 1 | | **398** |
| 044618 | HLYW | 8093 W. 3500 S. | Magna | UT | 327 | 13 | 32 | 5 | 1 | | **378** |
| 044620 | GCHV | 12664 S. Redwood Rd. | Riverton | UT | 357 | 11 | 35 | 5 | 1 | | **409** |
| 044644 | HLYW | 888 S Main St | Brigham City | UT | 162 | 46 | 15 | 3 | 1 | | **228** |
| 044651 | HLYW | 880 S Main St | Logan | UT | 245 | 10 | 39 | 4 | 1 | | **300** |
| 046731 | HLYW | 2121 Colonial Ave Sw | Roanoke | VA | 499 | 9 | 39 | 5 | 1 | | **553** |
| 046734 | HLYW | 2008 Wards Rd. | Lynchburg | VA | 468 | 14 | 41 | 6 | 1 | | **529** |
| 046741 | HLYW | 10350 Courthouse Road | Spotsylvania | VA | 390 | 30 | 49 | 6 | 1 | | **475** |
| 046743 | HLYW | 4050 Brambleton Ave | Roanoke | VA | 360 | 17 | 33 | 5 | 1 | | **416** |
| 046754 | HLYW | 2818 Linkhorne Dr Ste A | Lynchburg | VA | 213 | 7 | 38 | 4 | 1 | | **263** |
| 046758 | HLYW | 7365 Peppers Ferry Blvd | Radford | VA | 300 | 3 | 38 | 12 | 1 | | **353** |
| 047201 | GCHV | 7604 Ne 5Th Ave, Suite #100 A | Vancouver | WA | 585 | 3 | 34 | 8 | 1 | | **631** |
| 047203 | GCHV | 1111 Johnson Rd | Centralia | WA | 292 | 7 | 45 | 6 | 1 | | **351** |
| 047206 | GCHV | 3475 Bethel Rd Se | Port Orchard | WA | 324 | 25 | 39 | 5 | 0 | | **394** |
| 047235 | GCHV | 2500 Sw Barton St | Seattle | WA | 479 | 10 | 33 | 15 | 1 | | **537** |
| 047257 | HLYW | 813 Sr 9 Ne | Lake Stevens | WA | 462 | 15 | 38 | 7 | 1 | | **523** |
| 047260 | GCHV | 719 Sleater Kinney Rd Se Ste 162 | Lacey | WA | 549 | 9 | 70 | 15 | 2 | | **644** |
| 047263 | GCHV | 4008 Summitview | Yakima | WA | 483 | 5 | 43 | 8 | 1 | | **540** |
| 047264 | GCHV | 17615 108Th Ave Se | Renton | WA | 451 | 14 | 43 | 6 | 1 | | **514** |
| 047271 | GCHV | 19835 10Th Ave W | Poulsbo | WA | 308 | 17 | 47 | 8 | 2 | | **382** |
| 047277 | GCHV | 1040 S. Burlington Blvd. Ste. A | Burlington | WA | 352 | 7 | 43 | 6 | 1 | | **408** |
| 047284 | HLYW | 409 S. Main Ste. 1 | Ellensburg | WA | 267 | 14 | 25 | 6 | 1 | | **312** |
| 047286 | GCHV | 6713 N.E. 63Rd St. Ste. 101 | Vancouver | WA | 367 | 13 | 27 | 7 | 1 | | **415** |
| 047291 | HLYW | 2312 W Main St Ste 101 | Battle Ground | WA | 288 | 2 | 25 | 5 | 1 | | **321** |
| 047293 | GCHV | 1242 State Ave Ste A | Marysville | WA | 257 | 12 | 30 | 6 | 1 | | **306** |
| 047298 | HLYW | 474 228Th Ave. N.E. | Sammamish | WA | 374 | 6 | 20 | 5 | 1 | | **407** |
| 047304 | GCHV | 1329 Auburn Way N | Auburn | WA | 261 | 7 | 44 | 7 | 1 | | **320** |
| 047305 | HLYW | 755 W Washington Ave Ste D | Sequim | WA | 270 | 6 | 21 | 5 | 1 | | **302** |
| 047311 | HLYW | 1401 72Nd St E | Tacoma | WA | 312 | 18 | 39 | 13 | 1 | | **383** |
| 047320 | HLYW | 3307 Evergreen Blvd Ste 301 | Washougal | WA | 381 | 13 | 22 | 7 | 1 | | **423** |
| 047322 | HLYW | 17528 Meridian E | Puyallup | WA | 381 | 6 | 29 | 8 | 1 | | **425** |
| 047459 | HLYW | 595 Grant Rd Ste 1 | East Wenatchee | WA | 319 | 11 | 11 | 6 | 1 | | **348** |
| 047471 | GCHV | 1602 E Washington Street | Union Gap | WA | 392 | 15 | 39 | 8 | 1 | | **454** |
| 047473 | HLYW | 1873 Main Street Suite A | Ferndale | WA | 303 | 6 | 38 | 7 | 1 | | **354** |
| 047475 | HLYW | 11012 Canyon Road E Suite 14 | Puyallup | WA | 216 | 3 | 33 | 7 | 1 | | **260** |
| 050634 | HLYW | 704 Limekiln Rd. | Green Bay | WI | 291 | 10 | 61 | 5 | 1 | | **368** |
| 050652 | GCHV | 3415 80Th St. | Kenosha | WI | 438 | 14 | 60 | 7 | 1 | | **520** |
| 051103 | HLYW | 1900 Converse Ave | Cheyenne | WY | 145 | 15 | 38 | 3 | 1 | | **202** |
| 051106 | HLYW | 3510 E 2Nd Street, Units 1-5 | Casper | WY | 315 | 17 | 36 | 4 | 1 | | **374** |
| 114,882 | GCZY | 2106 E Boulevard Street | Kokomo | IN | 9 | 0 | 3 | 0 | 0 | | **12** |
| 115,497 | GCZY | 1511 E San Marnan Dr | Waterloo | IA | 6 | - | 2 | - | 0 | | **7** |
| 125,909 | GCZY | 6662 Delmar | St Louis | MO | 13 | 1 | 3 | 0 | 0 | | **17** |
| 132,612 | GCZY | 4934 Transit Rd | Depew | NY | 5 | - | 1 | - | 0 | | **6** |
| 138,151 | GCZY | 4403 Southmont Way | Easton | PA | 11 | 3 | 4 | - | 0 | | **18** |
| 138,384 | GCZY | 415 Eisenhower Drive | Hanover | PA | 7 | - | 2 | - | 0 | | **9** |
| 200006 | MGUSA | 6510 Caroline Street | Milton | FL | 173 | 3 | 35 | 7 | 1 | | **218** |
| 200010 | MGUSA | 1408 Maple Ave | Geneva | AL | 37 | 4 | 34 | 1 | 1 | | **76** |
| 200012 | MGUSA | 2109 Ross Clark Circle Suite | Dothan | AL | 183 | 4 | 42 | 5 | 1 | | **235** |
| 200015 | MGUSA | 300 S Willey Avenue | Donalsonville | GA | 39 | 2 | 40 | 4 | 1 | | **85** |
| 200016 | MGUSA | 2421 Thomas Drive | Panama City Beach | FL | 102 | 3 | 31 | 3 | 1 | | **139** |
| 200017 | MGUSA | 300 W 23Rd Street | Panama City | FL | 233 | 11 | 52 | 5 | 1 | | **303** |
| 200018 | MGUSA | 120 S Tyndall Pkwy | Panama City | FL | 256 | 3 | 41 | 5 | 1 | | **305** |
| 200019 | MGUSA | 1023 Douglas Avenue | Brewton | AL | 99 | 13 | 51 | 3 | 1 | | **167** |
| 200021 | MGUSA | 1604 S Main St | Atmore | AL | 97 | 7 | 35 | 5 | 1 | | **145** |
| 200022 | MGUSA | 1133 N Bypass | Andalusia | AL | 162 | 9 | 41 | 7 | 1 | | **219** |
| 200029 | MGUSA | 1043 South Eufaula Avenue | Eufaula | AL | 124 | 6 | 12 | 3 | 1 | | **146** |
| 200031 | MGUSA | 1445 South Alabama Ave | Monroeville | AL | 137 | 7 | 32 | 6 | 1 | | **182** |
| 200032 | MGUSA | 1310 Highway 331 South | Defuniak Springs | FL | 228 | 7 | 36 | 5 | 1 | | **277** |
| 200034 | MGUSA | 1812 Highway 77 South | Lynn Haven | FL | 171 | 6 | 40 | 5 | 1 | | **222** |
| 200040 | MGUSA | 4356 Us Highway 231 | Wetumpka | AL | 223 | 4 | 36 | 3 | 1 | | **268** |
| 200055 | MGUSA | 3813 North Monroe St | Tallahassee | FL | 207 | 6 | 19 | 2 | 1 | | **235** |
| 200058 | MGUSA | 1351 East Boone St | Kingsland | GA | 170 | 1 | 28 | 4 | 1 | | **204** |
| 200061 | MGUSA | 301 South Scott Street | Bainbridge | GA | 136 | 8 | 43 | 4 | 1 | | **192** |
| 200065 | MGUSA | 704 West 4Th Street | Adel | GA | 79 | 11 | 29 | 3 | 1 | | **123** |
| 200074 | MGUSA | 613 Mcmeans Ave | Bay Minette | AL | 90 | 4 | 30 | 11 | 1 | | **135** |
| 200076 | MGUSA | 20059 Nw Central Ave W | Blountstown | FL | 133 | 15 | 47 | 8 | 1 | | **204** |
| 200082 | MGUSA | 621 East 1St Street | Vidalia | GA | 150 | 5 | 35 | 3 | 1 | | **194** |
| 200083 | MGUSA | 12246 Columbia Street | Blakely | GA | 87 | 6 | 26 | 3 | 1 | | **124** |
| 200091 | MGUSA | 2407 Us Hwy 431 | Anniston | AL | 185 | 11 | 39 | 3 | 1 | | **239** |
| 200094 | MGUSA | 468 Gilmer Ave | Tallassee | AL | 80 | 6 | 43 | 2 | 1 | | **132** |
| 200096 | MGUSA | 879 Market Place | Alexander City | AL | 192 | 20 | 41 | 4 | 1 | | **258** |
| 200100 | MGUSA | 1031 Us Hwy 19 North | Thomaston | GA | 220 | 13 | 43 | 5 | 1 | | **281** |
| 200106 | MGUSA | 579 N 1St St | Jesup | GA | 175 | 12 | 38 | 7 | 1 | | **232** |
| 200109 | MGUSA | 8020 Highway 72 West | Madison | AL | 150 | 3 | 33 | 6 | 1 | | **193** |
| 200110 | MGUSA | 1032 Boll Weevil Circle | Enterprise | AL | 42 | 16 | 34 | 3 | 1 | | **95** |

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 200116 | MGUSA | 322 Main Street | Trussville | AL | 175 | 3 | 38 | 5 | 1 | 220 |
| 200121 | MGUSA | 15046 Highway 43 | Russellville | AL | 142 | 10 | 33 | 5 | 1 | 191 |
| 200124 | MGUSA | 117 Us Highway 31 North | Athens | AL | 131 | 10 | 31 | 3 | 1 | 176 |
| 200129 | MGUSA | 10861 Commerce Street | Summerville | GA | 142 | 5 | 36 | 3 | 1 | 187 |
| 200132 | MGUSA | 809 N 2Nd Street | Booneville | MS | 158 | 3 | 34 | 9 | 1 | 205 |
| 200133 | MGUSA | 907 East Alabama | Columbus | MS | 133 | 2 | 31 | 7 | 1 | 174 |
| 200138 | MGUSA | 216 W Bankhead Street | New Albany | MS | 132 | 11 | 32 | 6 | 1 | 182 |
| 200139 | MGUSA | 234 Highway 15 North | Pontotoc | MS | 99 | 13 | 33 | 7 | 1 | 152 |
| 200140 | MGUSA | 132 Highway 12 West | Starkville | MS | 252 | 15 | 34 | 7 | 1 | 308 |
| 200144 | MGUSA | 2130 N Frontage Road | Meridian | MS | 125 | 12 | 27 | 7 | 1 | 172 |
| 200146 | MGUSA | 205 Davis Blvd | Bremen | GA | 169 | 3 | 29 | 4 | 1 | 205 |
| 200152 | MGUSA | 21951H State Hwy 59 | Robertsdale | AL | 127 | 7 | 36 | 17 | 1 | 188 |
| 200161 | MGUSA | 2010 Hillsboro Blvd | Manchester | TN | 175 | 1 | 34 | 5 | 1 | 216 |
| 200163 | MGUSA | 1216A Huntsville Hwy | Fayetteville | TN | 147 | 10 | 32 | 4 | 1 | 194 |
| 200166 | MGUSA | 634 Madison St | Shelbyville | TN | 147 | 8 | 30 | 3 | 1 | 189 |
| 200182 | MGUSA | 3107 Highway 90 | Gautier | MS | 179 | 8 | 25 | 7 | 1 | 219 |
| 200185 | MGUSA | 6729 Spanish Fort Blvd | Spanish Fort | AL | 108 | 12 | 28 | 9 | 1 | 158 |
| 200189 | MGUSA | 814 South Hill Street | Griffin | GA | 196 | 9 | 42 | 6 | 1 | 254 |
| 200201 | MGUSA | E 828 Main St | Prattville | AL | 206 | 15 | 44 | 3 | 1 | 269 |
| 200203 | MGUSA | 3621 Highway 14 | Millbrook | AL | 179 | 8 | 38 | 5 | 1 | 232 |
| 200204 | MGUSA | 2250 Us Highway 43 | Winfield | AL | 82 | 6 | 38 | 3 | 1 | 129 |
| 200205 | MGUSA | 313 Cane Creek Road | Warrior | AL | 153 | 9 | 52 | 7 | 1 | 222 |
| 200216 | MGUSA | 760 Martin Street South | Pell City | AL | 173 | 10 | 39 | 3 | 1 | 225 |
| 200220 | MGUSA | 11809 Alabama Hwy 157 | Moulton | AL | 72 | 3 | 27 | 5 | 1 | 107 |
| 200224 | MGUSA | 9260 Highway 119 | Alabaster | AL | 171 | 6 | 67 | 4 | 1 | 250 |
| 200228 | MGUSA | 208 West College Street | Columbiana | AL | 103 | 10 | 39 | 4 | 1 | 156 |
| 200230 | MGUSA | 11038 Highway 25 P O Box 1224 | Calera | AL | 41 | 8 | 31 | 4 | 1 | 85 |
| 200236 | MGUSA | 24571 Us Highway 31 | Jemison | AL | 63 | 12 | 29 | 5 | 1 | 110 |
| 200238 | MGUSA | 674 Clanton Market Place | Clanton | AL | 116 | 8 | 28 | 4 | 1 | 157 |
| 200241 | MGUSA | 2555 Highway 78 East | Jasper | AL | 146 | 5 | 37 | 56 | 1 | 244 |
| 200247 | MGUSA | 28861 Highway 5 | Woodstock | AL | 49 | 6 | 29 | 3 | 1 | 87 |
| 200255 | MGUSA | 557 North Main Street | Cedartown | GA | 164 | 4 | 40 | 7 | 1 | 216 |
| 200257 | MGUSA | 604 Highway 278 East | Amory | MS | - | 15 | 29 | 24 | 1 | 68 |
| 200259 | MGUSA | 609 East College St | Lineville | AL | 26 | 2 | 28 | 3 | 1 | 60 |
| 200261 | MGUSA | 207 James Payton Boulevard | Sylacauga | AL | 93 | 11 | 37 | 4 | 1 | 145 |
| 200262 | MGUSA | 4209 E University Blvd | Tuscaloosa | AL | 191 | 12 | 45 | 4 | 1 | 252 |
| 200289 | MGUSA | 1850 Route C Unit B | Jefferson City | MO | 136 | 9 | 23 | 4 | 1 | 173 |
| 200329 | MGUSA | 333 Hwy 12 East | Kosciusko | MS | 79 | 7 | 22 | 4 | 1 | 113 |
| 200346 | MGUSA | 831 West Main Street | Spindale | NC | 175 | 8 | 36 | 2 | 1 | 222 |
| 200354 | MGUSA | 217 N Waukesha St | Bonifay | FL | 64 | 11 | 36 | 4 | 1 | 116 |
| 200383 | MGUSA | 403 Furys Ferry Rd | Martinez | GA | 208 | 8 | 33 | 4 | 1 | 253 |
| 200386 | MGUSA | 1202 North Pine Street | Florence | AL | 115 | 12 | 30 | 5 | 1 | 161 |
| 200388 | MGUSA | 305 W Belmont Dr | Calhoun | GA | 124 | 3 | 50 | 5 | 1 | 183 |
| 200394 | MGUSA | 613 Bear Creek Rd | Tuscaloosa | AL | 204 | 6 | 42 | 5 | 1 | 257 |
| 200406 | MGUSA | 186 Cannon Bridge | Cornelia | GA | 210 | 5 | 43 | 3 | 1 | 261 |
| 200407 | MGUSA | 777 Us Highway 431 | Boaz | AL | 164 | 12 | 53 | 6 | 1 | 235 |
| 200434 | MGUSA | 200 N 15Th | Corsicana | TX | 72 | 6 | 43 | 5 | 1 | 128 |
| 200436 | MGUSA | 406 East Main St | Atlanta | TX | 41 | 2 | 26 | 4 | 1 | 74 |
| 200438 | MGUSA | Hwy 79 Buffalo Shopping Cntr | Buffalo | TX | 16 | 8 | 24 | 5 | 1 | 53 |
| 200439 | MGUSA | 1409 West Panola Street | Carthage | TX | 167 | 14 | 27 | 5 | 1 | 213 |
| 200441 | MGUSA | 905 E Broadway | Gladewater | TX | 160 | 10 | 23 | 6 | 1 | 200 |
| 200442 | MGUSA | 370 S Covington | Hillsboro | TX | 119 | 9 | 47 | 6 | 1 | 183 |
| 200445 | MGUSA | 6450 S State Hwy 37 | Mineola | TX | 127 | 7 | 26 | 4 | 1 | 165 |
| 200446 | MGUSA | 121 West Main Street | Gun Barrel City | TX | 169 | 13 | 46 | 8 | 1 | 236 |
| 200449 | MGUSA | 1220 S Colorado | Lockhart | TX | 129 | 8 | 40 | 7 | 1 | 184 |
| 200453 | MGUSA | 609 East Hondo Street | Devine | TX | 98 | 15 | 32 | 7 | 1 | 153 |
| 200454 | MGUSA | 935 10Th Street | Floresville | TX | 127 | 15 | 34 | 8 | 1 | 185 |
| 200461 | MGUSA | 308 Hwy 35 Bypass | Port Lavaca | TX | 99 | 24 | 59 | 5 | 1 | 187 |
| 200475 | MGUSA | 1703 19Th Street | Hondo | TX | 115 | 12 | 30 | 5 | 1 | 162 |
| 200489 | MGUSA | Nw 3435 Pine Ave Ste 101 | Ocala | FL | 205 | 4 | 44 | 2 | 1 | 255 |
| 200504 | MGUSA | 3400 Calumet Avenue | Valparaiso | IN | 351 | 45 | 42 | 3 | 1 | 442 |
| 200511 | MGUSA | 1671 Morthland Drive | Valparaiso | IN | 91 | 3 | 22 | 3 | 1 | 119 |
| 200517 | MGUSA | 1621 S Woodland Ave | Michigan City | IN | 91 | 16 | 58 | 3 | 1 | 169 |
| 200533 | MGUSA | 1545 Us 19 South | Leesburg | GA | 120 | 5 | 31 | 3 | 1 | 159 |
| 200534 | MGUSA | 760 Brindlee Mountain Pkwy | Arab | AL | 104 | 14 | 50 | 5 | 1 | 174 |
| 200543 | MGUSA | 2098 East Main Street | Duncan | SC | 155 | 4 | 25 | 3 | 1 | 188 |
| 200553 | MGUSA | 220 Cook St | Abingdon | VA | 192 | 15 | 37 | 5 | 1 | 250 |
| 200554 | MGUSA | 4033 College Ave | Bluefield | VA | 189 | 36 | 35 | 8 | 1 | 270 |
| 200558 | MGUSA | 1139 Plaza Drive | Grundy | VA | 58 | 2 | 25 | 6 | 1 | 91 |
| 200562 | MGUSA | 665 East Main St | Lebanon | VA | 132 | 2 | 25 | 9 | 1 | 169 |
| 200564 | MGUSA | 2510 S Front St | Richlands | VA | 182 | 8 | 39 | 7 | 1 | 236 |
| 200567 | MGUSA | 1207 Highland Ave | Carrollton | KY | 112 | 6 | 24 | 3 | 1 | 146 |
| 200568 | MGUSA | 118 S Main St | Dry Ridge | KY | 178 | 6 | 68 | 4 | 1 | 256 |
| 200602 | MGUSA | 36 North Lewis Street | Metter | GA | 57 | 4 | 38 | 4 | 1 | 104 |
| 200605 | MGUSA | 611 W Poplar St | Elizabethtown | KY | 203 | 12 | 38 | 2 | 1 | 257 |

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 200609 | MGUSA | 1985 Brownsboro Rd | Louisville | KY | 124 | 10 | 31 | 2 | 1 | 168 |
| 200610 | MGUSA | 1761 Elizabethtown Road | Leitchfield | KY | 116 | 7 | 27 | 3 | 1 | 153 |
| 200611 | MGUSA | 187 Boone Station Rd | Shelbyville | KY | 195 | 6 | 31 | 6 | 1 | 239 |
| 200617 | MGUSA | 159 Marketplace Dr | North Augusta | SC | 142 | 11 | 29 | 1 | 1 | 183 |
| 200625 | MGUSA | 2220 South Ferdon Blvd | Crestview | FL | 230 | 10 | 48 | 5 | 1 | 295 |
| 200634 | MGUSA | 611 W Hill Street | Ellisville | MS | 77 | 5 | 29 | 6 | 1 | 118 |
| 200636 | MGUSA | 17960 Us 431 | Headland | AL | 44 | 8 | 37 | 4 | 1 | 94 |
| 200637 | MGUSA | 123 Walter Payton Dr | Columbia | MS | 138 | 3 | 34 | 8 | 1 | 184 |
| 200642 | MGUSA | 3358 Cloverdale Road | Florence | AL | 132 | 5 | 29 | 4 | 1 | 171 |
| 200643 | MGUSA | 1911 Boone Village Center | Boonville | MO | 64 | 9 | 30 | 0 | 1 | 104 |
| 200644 | MGUSA | 1021 West Buchanan | California | MO | 36 | 12 | 33 | 3 | 1 | 86 |
| 200647 | MGUSA | 1404 Odell Street | Marshall | MO | 129 | 7 | 28 | 4 | 1 | 169 |
| 200648 | MGUSA | 801 E South St | Richmond | MO | 103 | 8 | 25 | 6 | 1 | 141 |
| 200650 | MGUSA | 707 E Broadway | Sedalia | MO | 90 | (1) | 24 | 3 | 1 | 117 |
| 200654 | MGUSA | 3920 S Suncoast Blvd | Homosassa | FL | 131 | 8 | 34 | 9 | 1 | 183 |
| 200655 | MGUSA | 729 S Battlefield Blvd | Chesapeake | VA | 211 | 1 | 35 | 6 | 1 | 253 |
| 200657 | MGUSA | 12290 Us Hwy 231431 N | Meridianville | AL | 161 | 14 | 27 | 4 | 1 | 207 |
| 200658 | MGUSA | 3953 Us Hwy 80 East | Phenix City | AL | 181 | 5 | 38 | 8 | 1 | 233 |
| 200663 | MGUSA | 170 Delco Plaza | Winchester | VA | 194 | 3 | 24 | 6 | 1 | 228 |
| 200666 | MGUSA | 4131 Plank Road | Fredericksburg | VA | 305 | 19 | 36 | 2 | 1 | 364 |
| 200679 | MGUSA | 5298 Oaklawn Blvd | Hopewell | VA | 214 | 10 | 37 | 6 | 1 | 268 |
| 200693 | MGUSA | Highway 190 West | Onalaska | TX | 72 | 6 | 29 | 4 | 1 | 111 |
| 200698 | MGUSA | 2301 N Main Street | Liberty | TX | 162 | 2 | 26 | 7 | 1 | 198 |
| 200699 | MGUSA | 1934 Hwy 190 West | Livingston | TX | 83 | 3 | 23 | 4 | 1 | 113 |
| 200700 | MGUSA | 519 Hwy 69 North | Huntington | TX | 53 | 3 | 28 | 6 | 1 | 91 |
| 200703 | MGUSA | 1313 N Main St | Rusk | TX | 67 | 9 | 43 | 6 | 1 | 125 |
| 200705 | MGUSA | 601 Highway 110 N Ste G | Whitehouse | TX | 186 | 1 | 58 | 6 | 1 | 252 |
| 200706 | MGUSA | 502 East Goode Suite D P O | Quitman | TX | 39 | 6 | 26 | 4 | 1 | 76 |
| 200710 | MGUSA | 602 S Washington | Livingston | TX | 124 | 1 | 33 | 7 | 1 | 165 |
| 200729 | MGUSA | 287 North Ron Mcnair Blvd | Lake City | SC | 117 | 3 | 32 | 6 | 1 | 159 |
| 200730 | MGUSA | 120 15401 Bypass East Suite | Bennettsville | SC | 143 | 3 | 29 | 3 | 1 | 178 |
| 200757 | MGUSA | 4030 W Main Street | Dothan | AL | 239 | 7 | 50 | 7 | 1 | 304 |
| 200762 | MGUSA | 757 Michigan St | Waterville | OH | 99 | 2 | 29 | (0) | 1 | 131 |
| 200765 | MGUSA | 1602 East Forsyth St | Americus | GA | 137 | 2 | 36 | 5 | 1 | 181 |
| 200767 | MGUSA | 504  G l Maddox Pkwy | Chatsworth | GA | 120 | 3 | 37 | 3 | 1 | 164 |
| 200768 | MGUSA | 2240 West Us Highway 90 | Lake City | FL | 262 | 10 | 38 | 5 | 1 | 315 |
| 200770 | MGUSA | 4104 Windsor Spring Rd | Hephzibah | GA | 161 | 6 | 38 | 3 | 1 | 208 |
| 200775 | MGUSA | 11312 Highway 49 | Gulfport | MS | 152 | 17 | 59 | 11 | 1 | 240 |
| 200794 | MGUSA | 2803 Wrightsboro Rd | Augusta | GA | 139 | 3 | 35 | 3 | 1 | 181 |
| 200802 | MGUSA | 403 South Columbia Avenue | Rincon | GA | 223 | 9 | 63 | 8 | 1 | 304 |
| 200808 | MGUSA | 280 S Locust Ave | Oxford | OH | 169 | 4 | 37 | (0) | 1 | 210 |
| 200810 | MGUSA | 13474 Benns Church Blvd | Smithfield | VA | 244 | 3 | 26 | 15 | 1 | 289 |
| 200826 | MGUSA | 16258 West Main | Cut Off | LA | 89 | 3 | 30 | 11 | 1 | 133 |
| 200829 | MGUSA | 6402 Hwy 182 East | Morgan City | LA | 179 | 17 | 31 | 8 | 1 | 236 |
| 200835 | MGUSA | 935 Fairystone Park Hwy | Stanleytown | VA | 83 | 7 | 29 | 3 | 1 | 123 |
| 200839 | MGUSA | P O Box 8035 | Clarksville | VA | 87 | 6 | 30 | 2 | 1 | 125 |
| 200843 | MGUSA | 51 S Airport Drive | Highland Springs | VA | 247 | 28 | 41 | 1 | 1 | 318 |
| 200865 | MGUSA | 46 Bangor Street | Augusta | ME | 180 | 5 | 10 | 5 | 1 | 201 |
| 200871 | MGUSA | 101 Main Street | Winthrop | ME | 128 | 4 | 38 | 3 | 1 | 174 |
| 200872 | MGUSA | 35 Scammon Street | Saco | ME | 284 | 18 | 60 | 4 | 1 | 366 |
| 200881 | MGUSA | 15F Starret Drive | Belfast | ME | 215 | 5 | 33 | 3 | 1 | 257 |
| 200888 | MGUSA | 148 Main Street | South Paris | ME | 86 | 3 | 38 | 6 | 1 | 134 |
| 200894 | MGUSA | 482 Stillwater Ave | Old Town | ME | 198 | 9 | 67 | 9 | 1 | 283 |
| 200896 | MGUSA | 139 High Street | Ellsworth | ME | 261 | 12 | 72 | 11 | 1 | 357 |
| 200897 | MGUSA | 733 Main Street | Presque Isle | ME | 170 | 1 | 36 | 5 | 1 | 213 |
| 200916 | MGUSA | 7415 Goodman Rd | Olive Branch | MS | 222 | 20 | 28 | 6 | 1 | 277 |
| 200917 | MGUSA | 1525 Cleveland Highway | Dalton | GA | 150 | 3 | 33 | 5 | 1 | 191 |
| 200926 | MGUSA | 520 Highway 76 | White House | TN | 196 | 4 | 28 | 4 | 1 | 233 |
| 200927 | MGUSA | 615 10Th Street | Dewitt | IA | 71 | 7 | 23 | 0 | 1 | 102 |
| 200931 | MGUSA | 305 East Highway 151 | Platteville | WI | 118 | 4 | 25 | 4 | 1 | 153 |
| 200937 | MGUSA | 100 West 8Th Street | Monroe | WI | 172 | 6 | 35 | 5 | 1 | 220 |
| 200946 | MGUSA | 906 Us Highway 12 Suite 104 | Baraboo | WI | 154 | 4 | 24 | 5 | 1 | 188 |
| 200954 | MGUSA | 825 Lexington Blvd | Fort Atkinson | WI | 172 | 6 | 32 | 4 | 1 | 214 |
| 200959 | MGUSA | 224 W Mccoy Blvd | Tomah | WI | 144 | 7 | 29 | 5 | 1 | 186 |
| 200962 | MGUSA | 425 Southtowne Dr | Belvidere | IL | 204 | 10 | 35 | 0 | 1 | 250 |
| 200974 | MGUSA | 1338 Winchester Rd | Huntsville | AL | 99 | 9 | 26 | 7 | 1 | 142 |
| 200983 | MGUSA | 4446 W 7Th St | Texarkana | TX | 144 | 8 | 24 | 5 | 1 | 181 |
| 200990 | MGUSA | 2202 N Young Blvd | Chiefland | FL | 150 | 9 | 43 | 4 | 1 | 207 |
| 200992 | MGUSA | E 511 Highway 199 | Springtown | TX | 201 | 15 | 51 | 9 | 1 | 277 |
| 201004 | MGUSA | 251 Highway 51 North | Brookhaven | MS | 161 | 5 | 37 | 5 | 1 | 209 |
| 201005 | MGUSA | 19850 Alberta Avenue | Oneida | TN | 86 | 8 | 23 | 3 | 1 | 120 |
| 201007 | MGUSA | 1415 Tahoka Rd | Brownfield | TX | 68 | 4 | 33 | 5 | 1 | 111 |
| 201011 | MGUSA | 1550 North Bridge Street | Elkin | NC | 136 | 3 | 26 | 2 | 1 | 169 |
| 201012 | MGUSA | 8940 Ohio River Rd | Wheelersburg | OH | 135 | 3 | 22 | (0) | 1 | 161 |
| 201013 | MGUSA | 1104 Highway 16 South | Graham | TX | 93 | 4 | 51 | 5 | 1 | 155 |

| 201019 | MGUSA | 307 2Nd Street | Pleasanton | TX | 107 | 18 | 54 | 6 | 1 | 187 |
| 201020 | MGUSA | 304 S Broadway Suite E | Portland | TN | 134 | 5 | 40 | 4 | 1 | 183 |
| 201023 | MGUSA | 404 Highway 42 | Petal | MS | 130 | 6 | 35 | 8 | 1 | 180 |
| 201025 | MGUSA | 1048 South Main Street | Ellijay | GA | 72 | 13 | 41 | 2 | 1 | 129 |
| 201034 | MGUSA | 6707 U S Highway 431 | Owens Cross Roads | AL | 178 | 14 | 46 | 6 | 1 | 244 |
| 201035 | MGUSA | 1742 First Street | Kennett | MO | 118 | 4 | 24 | 6 | 1 | 152 |
| 201036 | MGUSA | 1063 Us Hwy 271 N | Gilmer | TX | 71 | 3 | 20 | 5 | 1 | 100 |
| 201041 | MGUSA | 126 Cedar Grove Road | Ruckersville | VA | 160 | 12 | 43 | 3 | 1 | 219 |
| 201042 | MGUSA | 828 S Jefferson St | Perry | FL | 185 | 12 | 40 | 6 | 1 | 245 |
| 201043 | MGUSA | 706 South Pennsylvania Avenue | Wellston | OH | 98 | 3 | 31 | 0 | 1 | 133 |
| 201046 | MGUSA | 1117 Sextonville Road | Richland Center | WI | 140 | 5 | 32 | 4 | 1 | 182 |
| 201050 | MGUSA | 102 Northwest Plaza Ste 1 | Senatobia | MS | 136 | 1 | 29 | 7 | 1 | 174 |
| 201051 | MGUSA | 60 Forest Park Plaza | Brazil | IN | 135 | 7 | 29 | 4 | 1 | 177 |
| 201052 | MGUSA | 715 South Davis St | Nashville | GA | 100 | 6 | 32 | 4 | 1 | 143 |
| 201055 | MGUSA | 11150 N Williams Street | Dunnellon | FL | 213 | 5 | 37 | 5 | 1 | 261 |
| 201057 | MGUSA | 61 Bell Boulevard | Lehigh Acres | FL | 167 | 10 | 33 | 5 | 1 | 216 |
| 201060 | MGUSA | 234 Hwy 6 West | Batesville | MS | 47 | 6 | 43 | 5 | 1 | 102 |
| 201065 | MGUSA | 10394 Diberville Blvd | D'Lberville | MS | 178 | 5 | 40 | 5 | 1 | 229 |
| 201067 | MGUSA | 2239 Fairview Blvd West | Fairview | TN | 152 | 12 | 32 | 3 | 1 | 200 |
| 201071 | MGUSA | 929 Ohio Avenue | Live Oak | FL | 176 | 3 | 36 | 6 | 1 | 222 |
| 201072 | MGUSA | 1305 N Washington Street | Chillicothe | MO | 136 | 6 | 28 | 6 | 1 | 177 |
| 201073 | MGUSA | 1103 Highway 72 | Killen | AL | 121 | 9 | 33 | 3 | 1 | 167 |
| 201074 | MGUSA | 1313 N Walnut St | Cameron | MO | 132 | 8 | 26 | 2 | 1 | 169 |
| 201077 | MGUSA | 1855 South Springfield Road | Bolivar | MO | 133 | 13 | 23 | 4 | 1 | 173 |
| 201078 | MGUSA | 311 Westside Drive | Durant | OK | 152 | 6 | 32 | 6 | 1 | 196 |
| 201083 | MGUSA | 208 Red River Expressway Nort | Burkburnett | TX | 103 | 5 | 27 | 4 | 1 | 139 |
| 201084 | MGUSA | 100 Chelsea Corners Way | Chelsea | AL | 108 | 7 | 31 | 4 | 1 | 151 |
| 201085 | MGUSA | 3326 Front Street | Winnsboro | LA | 115 | 21 | 29 | 5 | 1 | 170 |
| 201087 | MGUSA | 1701 Prospect Drive | Macon | MO | 147 | 7 | 19 | 4 | 1 | 177 |
| 201088 | MGUSA | 1313 S Adams Street | Fulton | MS | 153 | 4 | 30 | 6 | 1 | 194 |
| 201095 | MGUSA | 1898 Declaration Drive | Independence | KY | 144 | 5 | 30 | 4 | 1 | 183 |
| 201096 | MGUSA | 802 S Elliott | Aurora | MO | 144 | 11 | 33 | 6 | 1 | 194 |
| 201101 | MGUSA | 519 South Main Street | Swainsboro | GA | 142 | 3 | 29 | 4 | 1 | 178 |
| 201102 | MGUSA | Po Box 639 125 West Brazel | Reidsville | NC | 123 | 11 | 34 | 4 | 1 | 172 |
| 201103 | MGUSA | 199 Main St | Lancaster | NH | 112 | 3 | 25 | - | 1 | 142 |
| 201109 | MGUSA | 2015 Jefferson St | Perryville | MO | 145 | 17 | 34 | 4 | 1 | 200 |
| 201111 | MGUSA | 139 North Street | Houlton | ME | 113 | 5 | 30 | 6 | 1 | 155 |
| 201114 | MGUSA | 11 Shapleigh Road | Kittery | ME | 104 | 3 | 31 | 8 | 1 | 147 |
| 201115 | MGUSA | 214 Duval Street | Claxton | GA | 113 | 5 | 30 | 4 | 1 | 153 |
| 201116 | MGUSA | 3621 Lecanto Highway | Beverly Hills | FL | 134 | 6 | 34 | 9 | 1 | 184 |
| 201117 | MGUSA | 928 Furman Drive | Waupaca | WI | 179 | 6 | 28 | 5 | 1 | 219 |
| 201118 | MGUSA | 2020 16Th Avenue | Haleyville | AL | 97 | 17 | 30 | 3 | 1 | 148 |
| 201120 | MGUSA | 48 John Stark Highway | Newport | NH | 105 | 6 | 38 | - | 1 | 150 |
| 201125 | MGUSA | 10592 Dunbarton Blvd | Barnwell | SC | 122 | 10 | 31 | 2 | 1 | 166 |
| 201126 | MGUSA | 26453 Main Street | Ardmore | TN | 60 | 3 | 35 | 3 | 1 | 101 |
| 201130 | MGUSA | 209 Florence Road | Savannah | TN | 154 | 13 | 33 | 4 | 1 | 206 |
| 201131 | MGUSA | 790 Highway 51 N | Ripley | TN | 114 | 17 | 33 | 2 | 1 | 167 |
| 201135 | MGUSA | 700 11Th Street Southwest | Spencer | IA | 196 | 5 | 23 | 0 | 1 | 225 |
| 201141 | MGUSA | 3374 Railroad Avenue | Bamberg | SC | 92 | 6 | 26 | 4 | 1 | 129 |
| 201142 | MGUSA | 590 Hwy 60 East | Republic | MO | 145 | 6 | 31 | 5 | 1 | 188 |
| 201144 | MGUSA | 1003 Sidney E Manning Blvd | Flomaton | AL | 99 | 13 | 38 | 5 | 1 | 155 |
| 201153 | MGUSA | 1029 West Highway 80 | Pooler | GA | 138 | 8 | 32 | 4 | 1 | 182 |
| 201160 | MGUSA | 1627 S 4Th Street | Chickasha | OK | 165 | 7 | 21 | 4 | 1 | 197 |
| 201161 | MGUSA | 919 Hillcrest Drive | Vernon | TX | 136 | 5 | 39 | 9 | 1 | 190 |
| 201162 | MGUSA | 5189 Murfreesboro Road | La Vergne | TN | 165 | 10 | 32 | 4 | 1 | 212 |
| 201167 | MGUSA | 2713 Se Highway #70 | Arcadia | FL | 236 | 3 | 37 | 7 | 1 | 284 |
| 201169 | MGUSA | 61 South Lee Street | Labelle | FL | 201 | 11 | 48 | 6 | 1 | 266 |
| 201172 | MGUSA | 1751 Ne Pine Island Road Su | Cape Coral | FL | 267 | 6 | 30 | 4 | 1 | 307 |
| 201181 | MGUSA | 137 Federal Street | Greenfield | MA | 262 | 5 | 53 | 1 | 1 | 321 |
| 201188 | MGUSA | 729 Bethel Street | Clover | SC | 129 | 5 | 24 | 3 | 1 | 162 |
| 201192 | MGUSA | 116 North Main St | Glennville | GA | 126 | 8 | 37 | 4 | 1 | 175 |
| 201195 | MGUSA | 316 16Th Ave East | Cordele | GA | 130 | 4 | 26 | 5 | 1 | 165 |
| 201196 | MGUSA | 932 Indian Mound Drive | Mount Sterling | KY | 179 | 6 | 23 | 3 | 1 | 214 |
| 201197 | MGUSA | 1783 E Hwy 163 | Clinton | IN | 101 | 7 | 27 | 1 | 1 | 137 |
| 201199 | MGUSA | 906 E Washington St | Idabel | OK | 165 | 10 | 20 | 5 | 1 | 200 |
| 201200 | MGUSA | 7423 Adairsville Highway | Adairsville | GA | 160 | 9 | 32 | 3 | 1 | 205 |
| 201201 | MGUSA | 1223 Northway Us Hwy 17 North | Darien | GA | 70 | 12 | 29 | 3 | 1 | 115 |
| 201205 | MGUSA | 1053 Franklin St | Royston | GA | 100 | 7 | 32 | 3 | 1 | 142 |
| 201206 | MGUSA | 4464 Lafayette Street | Marianna | FL | 127 | 10 | 57 | 4 | 1 | 200 |
| 201207 | MGUSA | 12284 Augusta Road | Lavonia | GA | 59 | 7 | 33 | 3 | 1 | 103 |
| 201210 | MGUSA | 628 S Big A Road | Toccoa | GA | 178 | 5 | 55 | 5 | 1 | 244 |
| 201217 | MGUSA | 1361 Washington Street | Jefferson | GA | 85 | 6 | 28 | 3 | 1 | 124 |
| 201218 | MGUSA | 505 Ne Dykes Street | Cochran | GA | 82 | 7 | 41 | 4 | 1 | 134 |
| 201221 | MGUSA | 417 South Washington Avenue | Mansfield | LA | 156 | 9 | 22 | 6 | 1 | 194 |
| 201223 | MGUSA | 1505 Santa Fe Avenue | Chanute | KS | 56 | 25 | 30 | 1 | 1 | 113 |

| 201228 | MGUSA | 481 Main St | Rainsville | AL | 84 | 11 | 33 | 4 | 1 | 133 |
| 201239 | MGUSA | 704D Canton Road Nw | Carrollton | OH | 137 | 1 | 27 | (0) | 1 | 165 |
| 201243 | MGUSA | 5060 Wrightsboro Road | Grovetown | GA | 159 | 5 | 36 | 4 | 1 | 203 |
| 201246 | MGUSA | 855 Highway 60 | Monett | MO | 131 | 8 | 28 | 5 | 1 | 173 |
| 201247 | MGUSA | 808 Rogers Street | Clarksville | AR | 154 | 19 | 34 | 1 | 1 | 208 |
| 201252 | MGUSA | 407 E Main Street | Weatherford | OK | 144 | 7 | 29 | 4 | 1 | 185 |
| 201255 | MGUSA | 207 East King Street | Kings Mountain | NC | 137 | 10 | 33 | 2 | 1 | 183 |
| 201258 | MGUSA | 254 South Service Road East | Sullivan | MO | 143 | 5 | 29 | 5 | 1 | 183 |
| 201259 | MGUSA | 1402 West Grant Avenue Ste A | Pauls Valley | OK | 171 | 12 | 33 | 5 | 1 | 221 |
| 201262 | MGUSA | 2525 Mill Phillips Avenue | Seminole | OK | 172 | 1 | 32 | 5 | 1 | 212 |
| 201270 | MGUSA | 1225 South Main Street | Poplarville | MS | 68 | 6 | 26 | 7 | 1 | 108 |
| 201276 | MGUSA | 1031 West Second Street | Portales | NM | 142 | 2 | 24 | 2 | 1 | 172 |
| 201277 | MGUSA | 1451 Gibson Avenue | West Plains | MO | 149 | 6 | 25 | 7 | 1 | 187 |
| 201278 | MGUSA | 901 Business Highway 60 West | Dexter | MO | 127 | 10 | 27 | 4 | 1 | 168 |
| 201279 | MGUSA | 1010 West North Ave | Flora | IL | 82 | 9 | 28 | - | 1 | 120 |
| 201282 | MGUSA | 915 W Washington | Marshfield | MO | 139 | 11 | 25 | 1 | 1 | 177 |
| 201285 | MGUSA | 15551 Nw Us Highway 441 | Alachua | FL | 75 | 2 | 26 | 3 | 1 | 106 |
| 201287 | MGUSA | 796 Meadow Street | Littleton | NH | 138 | 3 | 34 | - | 1 | 176 |
| 201289 | MGUSA | 1315 Sunset Avenue | Clinton | NC | 203 | 7 | 29 | 3 | 1 | 243 |
| 201292 | MGUSA | 609 North Main Street | Andrews | TX | 174 | 15 | 41 | 5 | 1 | 236 |
| 201294 | MGUSA | 128 Hwy 641 | Camden | TN | 89 | 4 | 33 | 2 | 1 | 129 |
| 201298 | MGUSA | 19 West Avenue D | Lovington | NM | 155 | 8 | 24 | 3 | 1 | 190 |
| 201299 | MGUSA | 621 Hwy 87 South | Dalhart | TX | 122 | 7 | 26 | 5 | 1 | 161 |
| 201303 | MGUSA | 503 Collin Ray Drive | De Queen | AR | 138 | 13 | 24 | 1 | 1 | 177 |
| 201312 | MGUSA | 1912 North Main Street | Miami | OK | 174 | 11 | 30 | 7 | 1 | 223 |
| 201313 | MGUSA | 1520 S W First Street | Wagoner | OK | 155 | 11 | 33 | 4 | 1 | 203 |
| 201316 | MGUSA | 1512 Hwy 67 South | Pocahontas | AR | 135 | 2 | 31 | 2 | 1 | 171 |
| 201317 | MGUSA | 111 Whitley Avenue | Henderson | TN | 150 | 10 | 32 | 3 | 1 | 196 |
| 201318 | MGUSA | 2023 Rock Road Plaza | Desoto | MO | 154 | 5 | 22 | 8 | 1 | 189 |
| 201323 | MGUSA | 1625 North Morley Street | Moberly | MO | 163 | 5 | 28 | 6 | 1 | 202 |
| 201327 | MGUSA | 3608 West Main St | Erin | TN | 128 | 7 | 36 | 3 | 1 | 175 |
| 201331 | MGUSA | 3504 Hwy 84 | Blackshear | GA | 160 | 7 | 32 | 4 | 1 | 203 |
| 201332 | MGUSA | 803 South Pierce Street | Alma | GA | 90 | 6 | 32 | 5 | 1 | 134 |
| 201335 | MGUSA | 813 2Nd Street | Folkston | GA | 39 | 8 | 30 | 4 | 1 | 82 |
| 201338 | MGUSA | 1026 Wall Street | Summersville | WV | 123 | 6 | 24 | 3 | 1 | 155 |
| 201342 | MGUSA | N 13620 43 Hwy Ste 2 | Northport | AL | 145 | 12 | 40 | 3 | 1 | 201 |
| 201343 | MGUSA | 2703 Vine Street | Hays | KS | 217 | 7 | 23 | 1 | 1 | 249 |
| 201344 | MGUSA | 1100 N Hwy 25 | Heber Springs | AR | 156 | 2 | 27 | 1 | 1 | 187 |
| 201345 | MGUSA | 2120 North Broadway | Poteau | OK | 163 | 5 | 33 | 6 | 1 | 208 |
| 201347 | MGUSA | 11 Pleasant Street | Berlin | NH | 193 | 8 | 45 | - | 1 | 247 |
| 201348 | MGUSA | 103 W Gibson Street | Jasper | TX | 159 | 12 | 31 | 5 | 1 | 207 |
| 201349 | MGUSA | 651 North Union Street | Mauston | WI | 123 | 4 | 21 | 5 | 1 | 155 |
| 201356 | MGUSA | 608 W Delaware Street | Fairfield | IL | 48 | 20 | 39 | 1 | 1 | 108 |
| 201357 | MGUSA | 1340 Illinois Hwy 1 Suite D | Carmi | IL | 166 | 23 | 47 | 1 | 1 | 238 |
| 201358 | MGUSA | S 12 Commercial Street | Harrisburg | IL | 92 | 22 | 59 | 1 | 1 | 175 |
| 201359 | MGUSA | 216 West Main Street | West Frankfort | IL | 104 | 36 | 48 | 1 | 1 | 189 |
| 201361 | MGUSA | 1361 North Market Street | Sparta | IL | 162 | 15 | 42 | 1 | 1 | 220 |
| 201362 | MGUSA | 340 Campbellsville Bypass | Campbellsville | KY | 126 | 3 | 28 | 1 | 1 | 159 |
| 201365 | MGUSA | 500 Hwy 463 North | Trumann | AR | 130 | 4 | 28 | 1 | 1 | 163 |
| 201366 | MGUSA | 512 West Marion Avenue | Crystal Springs | MS | 133 | 1 | 30 | 5 | 1 | 170 |
| 201367 | MGUSA | 314 West 4Th Street | Dequincy | LA | 99 | 2 | 30 | 5 | 1 | 137 |
| 201370 | MGUSA | 1600 North Falls Blvd | Wynne | AR | 134 | 14 | 30 | 3 | 1 | 182 |
| 201380 | MGUSA | 1322 E Milam St | Mexia | TX | 162 | 15 | 32 | 5 | 1 | 214 |
| 201387 | MGUSA | 724 N Jeffery Blvd | Walterboro | SC | 153 | 5 | 32 | 3 | 1 | 194 |
| 201388 | MGUSA | 413 South 10Th St | Atchison | KS | 175 | 7 | 21 | 1 | 1 | 205 |
| 201393 | MGUSA | 591 West Church St | Lexington | TN | 123 | 9 | 29 | 3 | 1 | 164 |
| 201395 | MGUSA | 902 E West Pierce | Carlsbad | NM | 188 | 1 | 16 | 2 | 1 | 207 |
| 201398 | MGUSA | 1414 West Broadway | Princeton | IN | 137 | 15 | 45 | 4 | 1 | 201 |
| 201399 | MGUSA | 1207 W Chicago Blvd | Tecumseh | MI | 193 | 4 | 27 | 7 | 1 | 231 |
| 201409 | MGUSA | 14241 Airport Highway #1 | Swanton | OH | 122 | 14 | 38 | (0) | 1 | 174 |
| 201416 | MGUSA | 1240 North Shoop Ave | Wauseon | OH | 135 | 16 | 37 | (0) | 1 | 188 |
| 201421 | MGUSA | 1505 West Main St | Artesia | NM | 190 | 5 | 28 | 3 | 1 | 227 |
| 201424 | MGUSA | 5404 Highway 136 | Trenton | GA | 138 | 20 | 63 | 3 | 1 | 224 |
| 201432 | MGUSA | 1479 Fox Run Pkwy | Opelika | AL | 189 | 17 | 44 | 21 | 1 | 271 |
| 201433 | MGUSA | 1499 South College St | Auburn | AL | 234 | 4 | 40 | 20 | 1 | 298 |
| 201435 | MGUSA | 641 South Main Street | Cleveland | GA | 151 | 5 | 28 | 4 | 1 | 190 |
| 201440 | MGUSA | 352 Old Gallatin Road | Scottsville | KY | 121 | 3 | 29 | 3 | 1 | 157 |
| 201442 | MGUSA | 3004 Williams Avenue | Woodward | OK | 133 | 9 | 33 | 4 | 1 | 180 |
| 201444 | MGUSA | 1206 S Neosha Blvd | Neosho | MO | 135 | 20 | 29 | 7 | 1 | 193 |
| 201446 | MGUSA | 60 Plaza Drive | Sainte Genevieve | MO | 92 | 5 | 23 | 6 | 1 | 126 |
| 201447 | MGUSA | 1019 South Cedar Street | Pecos | TX | 94 | 20 | 42 | 8 | 1 | 164 |
| 201457 | MGUSA | 628 Sudderth | Ruidoso | NM | 136 | 5 | 32 | 3 | 1 | 175 |
| 201459 | MGUSA | 628A North Riverside | Espanola | NM | 206 | 15 | 26 | 2 | 1 | 250 |
| 201460 | MGUSA | 2041 Hwy 45 South | Trenton | TN | 124 | 20 | 44 | 2 | 1 | 191 |
| 201462 | MGUSA | 1745 Southgate Parkway | Cambridge | OH | 95 | 3 | 24 | (0) | 1 | 122 |

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 201471 | MGUSA | 6961 Us Hwy 431 | Albertville | AL | 164 | 4 | 34 | 6 | 1 | | 209 |
| 201474 | MGUSA | 112 Cyril Circle | Lebanon | KY | 186 | 9 | 43 | 2 | 1 | | 241 |
| 201476 | MGUSA | 1244 Anderson Crossing Drive | Lawrenceburg | KY | 185 | 5 | 36 | 5 | 1 | | 232 |
| 201477 | MGUSA | 779 South Main St | Morgantown | KY | 105 | 6 | 54 | 3 | 1 | | 168 |
| 201478 | MGUSA | 640 River Ridge Plaza | Brandenburg | KY | 182 | 4 | 27 | 4 | 1 | | 218 |
| 201479 | MGUSA | 517 Old Highway 60 | Hardinsburg | KY | 85 | 9 | 33 | 2 | 1 | | 129 |
| 201480 | MGUSA | 805 South Main Street | Salem | IN | 171 | 8 | 48 | 2 | 1 | | 230 |
| 201482 | MGUSA | 998 Chambers Blvd | Bardstown | KY | 127 | 9 | 32 | 4 | 1 | | 173 |
| 201483 | MGUSA | 948 West Main St | Boonville | IN | 101 | 56 | 42 | 5 | 1 | | 204 |
| 201484 | MGUSA | 35 East State Road 66 | Tell City | IN | 119 | 18 | 54 | 4 | 1 | | 195 |
| 201487 | MGUSA | 503 Memorial Drive | Waycross | GA | 164 | 12 | 48 | 6 | 1 | | 230 |
| 201489 | MGUSA | 75 Poplar Springs Road | Ringgold | GA | 127 | 3 | 24 | 3 | 1 | | 158 |
| 201492 | MGUSA | 534 E Main Street | Jackson | OH | 110 | 3 | 28 | (0) | 1 | | 142 |
| 201501 | MGUSA | 701 Us Highway 60 E | Morganfield | KY | 117 | 11 | 54 | 7 | 1 | | 191 |
| 201508 | MGUSA | 802 West Rogers | Skiatook | OK | 111 | 4 | 21 | 3 | 1 | | 140 |
| 201517 | MGUSA | 370 East Broad Street | Pataskala | OH | 155 | 12 | 30 | (0) | 1 | | 197 |
| 201518 | MGUSA | 515 South Centerville Road | Sturgis | MI | 130 | 5 | 33 | 8 | 1 | | 176 |
| 201519 | MGUSA | 12906 St Rt 664 South | Logan | OH | 104 | 8 | 25 | (0) | 1 | | 137 |
| 201523 | MGUSA | 601 Dewey St, Ste 3 | North Platte | NE | 121 | 11 | 29 | 0 | 2 | | 163 |
| 201525 | MGUSA | 326 W 27Th St Ste A | Scottsbluff | NE | 123 | 2 | 25 | 1 | 1 | | 151 |
| 201533 | MGUSA | 1006 W Main St | Walnut Ridge | AR | 80 | 12 | 33 | 1 | 1 | | 127 |
| 201534 | MGUSA | 8420 Dollarway Road | White Hall | AR | 144 | 13 | 28 | 1 | 1 | | 187 |
| 201536 | MGUSA | 2609 Crawfordville Highway | Crawfordville | FL | 124 | 7 | 35 | 5 | 1 | | 172 |
| 201537 | MGUSA | 342 Blue Ridge Street | Blairsville | GA | 112 | 4 | 39 | 2 | 1 | | 158 |
| 201538 | MGUSA | 122 Nick Savas Avenue | Logan | WV | 166 | 5 | 24 | 14 | 1 | | 209 |
| 201554 | MGUSA | 4915F Rich Tapp Highway | Aylett | VA | 108 | 2 | 18 | 7 | - | | 136 |
| 201555 | MGUSA | 17495 Jefferson Davis Highway | Ruther Glen | VA | 103 | 9 | 25 | 6 | 1 | | 143 |
| 201557 | MGUSA | 8145 Kings Highway | King George | VA | 113 | 9 | 34 | 1 | 1 | | 158 |
| 201573 | MGUSA | 769 Carroll Street | New Lexington | OH | 125 | 1 | 22 | (0) | 1 | | 149 |
| 201574 | MGUSA | 4043 Central Ave | Hot Springs | AR | 164 | 3 | 31 | 1 | 1 | | 201 |
| 201575 | MGUSA | 100 Walmart Drive | Morrilton | AR | 132 | 11 | 24 | 2 | 1 | | 169 |
| 201578 | MGUSA | 230 W 10Th Avenue | Milan | IL | 125 | 11 | 29 | - | 1 | | 166 |
| 201585 | MGUSA | 109 Plaza Road | Cabot | AR | 99 | 14 | 37 | 3 | 1 | | 153 |
| 201587 | MGUSA | 114 S Broadview | Greenbrier | AR | 72 | 4 | 23 | 2 | 1 | | 102 |
| 201588 | MGUSA | 1739 Airport Road | Hot Springs | AR | 66 | 17 | 28 | 1 | 1 | | 113 |
| 201589 | MGUSA | 1607 Albert Pike Road | Hot Springs | AR | 218 | 7 | 27 | 2 | 1 | | 255 |
| 201591 | MGUSA | 821 Hogan Road | Conway | AR | 178 | 9 | 29 | 2 | 1 | | 219 |
| 201595 | MGUSA | 319 S Main Suite 1 | Rogersville | MO | 52 | 5 | 14 | 1 | 1 | | 73 |
| 201600 | MGUSA | 698 North 6Th Street | Blytheville | AR | 131 | 12 | 29 | 4 | 1 | | 176 |
| 201604 | MGUSA | 826 North State Highway 5 | Camdenton | MO | 87 | 15 | 24 | 3 | 1 | | 131 |
| 201606 | MGUSA | N 100 4Th Street | Cabot | AR | 136 | 4 | 33 | 4 | 1 | | 177 |
| 201609 | MGUSA | 108 Highway 71 North | Alma | AR | 148 | 1 | 21 | 1 | 1 | | 172 |
| 201611 | MGUSA | 1313A Highway 6265 North | Harrison | AR | 158 | 3 | 35 | 1 | 1 | | 198 |
| 201614 | MGUSA | 903 Dewitt Henry Drive | Beebe | AR | 122 | 6 | 35 | 3 | 1 | | 166 |
| 201620 | MGUSA | 102104 17Th Street | Ozark | AR | 24 | 2 | 17 | 1 | 1 | | 43 |
| 201622 | MGUSA | 2207 W 7Th Street | Joplin | MO | 124 | 17 | 23 | 4 | 1 | | 169 |
| 201623 | MGUSA | 1460 South Madison | Webb City | MO | 143 | 8 | 26 | 7 | 1 | | 185 |
| 201624 | MGUSA | 904 West Montgomery | Willis | TX | 177 | 16 | 24 | 7 | 1 | | 224 |
| 201625 | MGUSA | 1419 State Hwy J | Ozark | MO | 154 | 10 | 22 | 4 | 1 | | 191 |
| 201627 | MGUSA | 106 East 17Th St | Mountain Grove | MO | 97 | 7 | 29 | 3 | 1 | | 136 |
| 201660 | MGUSA | 2409 W Beebe Street | Searcy | AR | 84 | 7 | 30 | 2 | 1 | | 123 |
| 201663 | MGUSA | 990 N Hwy 89 #A Po Box 31 | Chino Valley | AZ | 140 | 9 | 31 | 3 | 1 | | 184 |
| 201665 | MGUSA | 1447 7Th Street South | Clanton | AL | 102 | 8 | 29 | 4 | 1 | | 145 |
| 201675 | MGUSA | 76 Madison Ave | Madison | VA | 134 | 14 | 26 | 5 | 1 | | 179 |
| 201676 | MGUSA | 7380 Sr 100 Suite # 18 | Keystone Heights | FL | 136 | 2 | 27 | 2 | 1 | | 168 |
| 201682 | MGUSA | 4683 W Richland Plaza | Bloomington | IN | 98 | 3 | 29 | 3 | 1 | | 133 |
| 201683 | MGUSA | 661 W Morgan St | Spencer | IN | 67 | 8 | 29 | 4 | 2 | | 109 |
| 201684 | MGUSA | 1259 A Street Ne | Linton | IN | 95 | 2 | 27 | 4 | 1 | | 129 |
| 202004 | MGUSA | 1798 Market Drive | Stillwater | MN | (81) | 62 | 71 | 54 | 1 | | 107 |
| 202008 | MGUSA | 3303 East Sunshine | Springfield | MO | 187 | 6 | 36 | 5 | 1 | | 234 |
| 202010 | MGUSA | 201 North Massey Boulevard | Nixa | MO | 219 | 44 | 33 | 6 | 1 | | 303 |
| 202037 | MGUSA | 14039 Edgewood Drive | Baxter | MN | 164 | 5 | 29 | 1 | 1 | | 200 |
| 202080 | MGUSA | 1565 Nw Louisiana | Chehalis | WA | 211 | 3 | 18 | 4 | 1 | | 237 |
| 202084 | MGUSA | 15 North Highway 101 | Warrenton | OR | 128 | 22 | 14 | 3 | 1 | | 167 |
| 202111 | MGUSA | 1202 Hillcrest Parkway | Dublin | GA | 208 | 10 | 55 | 9 | 1 | | 281 |
| 202116 | MGUSA | 2457 33Rd Avenue | Columbus | NE | 93 | 6 | 22 | 0 | 1 | | 123 |
| 202120 | MGUSA | 6050 Rawsonville Road | Belleville | MI | 240 | 13 | 34 | 5 | 1 | | 293 |
| 202129 | MGUSA | 1500 Paul Bunyan Drive Nw | Bemidji | MN | 208 | 13 | 25 | 0 | 1 | | 247 |
| 202142 | MGUSA | 204 S Wilmington Highway | Jacksonville | NC | 257 | 4 | 52 | 4 | 1 | | 318 |
| 202143 | MGUSA | 1000 Henderson Drive | Jacksonville | NC | 254 | 11 | 37 | 4 | 1 | | 307 |
| 202148 | MGUSA | 401 N Main Street | Marion | NC | 214 | 25 | 39 | 3 | 1 | | 282 |
| 202158 | MGUSA | 4433 Mahoning Nw | Warren | OH | 85 | 5 | 33 | (0) | 1 | | 124 |
| 202160 | MGUSA | 8015 State Street | Garrettsville | OH | 95 | 7 | 41 | (0) | 1 | | 143 |
| 202165 | MGUSA | 15765 State Route 170 | Calcutta | OH | 129 | 11 | 30 | (0) | 1 | | 171 |
| 202169 | MGUSA | 700 Greene Street | Marietta | OH | 258 | 9 | 74 | (0) | 1 | | 342 |

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 202183 | MGUSA | 11 Pelzer Avenue | Williamston | SC | 140 | 9 | 28 | 2 | 1 | 180 |
| 202193 | MGUSA | 1004 6Th Street | Brookings | SD | 139 | 16 | 28 | - | 1 | 184 |
| 202194 | MGUSA | 1100 Broadway | Yankton | SD | 105 | 3 | 23 | - | 1 | 133 |
| 202237 | MGUSA | 1059 Ironton Hills Drive | Ironton | OH | 215 | 20 | 66 | (0) | 1 | 302 |
| 202240 | MGUSA | 3860 W Chestnut Expressway | Springfield | MO | 125 | 8 | 21 | 4 | 1 | 159 |
| 202244 | MGUSA | 3099 Breckenridge Lane | Louisville | KY | 162 | 7 | 42 | 2 | 1 | 214 |
| 202255 | MGUSA | 210 South Main St | Rushville | IN | 134 | 16 | 51 | 3 | 1 | 206 |
| 202257 | MGUSA | 709 Highlander Point Drive | Floyds Knobs | IN | 139 | 11 | 30 | 1 | 1 | 182 |
| 202260 | MGUSA | 1012 West Main Street Ste A | Dover Foxcroft | ME | 155 | 5 | 38 | 3 | 1 | 202 |
| 202262 | MGUSA | 2200 S Main Street | Perryton | TX | 129 | 9 | 22 | 5 | 1 | 165 |
| 202271 | MGUSA | 910 West Center Street | Greenwood | AR | 169 | 16 | 18 | 1 | 1 | 206 |
| 202272 | MGUSA | 1025 North 6Th Street | Beatrice | NE | 136 | 6 | 28 | 1 | 1 | 171 |
| 202273 | MGUSA | 410 2Nd Avenue E | Oneonta | AL | 226 | 5 | 37 | 6 | 1 | 276 |
| 202274 | MGUSA | 127 Northpoint Drive | Mount Orab | OH | 145 | 2 | 25 | (0) | 1 | 173 |
| 202275 | MGUSA | West 919 State Street | Trenton | OH | 129 | 5 | 25 | (0) | 1 | 160 |
| 202283 | MGUSA | 2551 Jefferson Davis Highway | Warrenville | SC | 135 | 3 | 28 | 2 | 1 | 168 |
| 202285 | MGUSA | 3330 Clark Street | Alamosa | CO | 179 | 1 | 24 | 2 | 1 | 207 |
| 202286 | MGUSA | 1000A Leigh Drive | Anna | IL | 123 | 8 | 23 | - | 1 | 154 |
| 202805 | MGUSA | 101 Cattlemen Drive | Lexington | NE | 107 | 11 | 21 | 1 | 1 | 140 |
| 202814 | MGUSA | 410 West Third Street | Pembroke | NC | 123 | 5 | 28 | 3 | 1 | 160 |
| 202815 | MGUSA | 151 West Us Hwy 98 | Port Saint Joe | FL | 118 | 6 | 28 | 4 | 1 | 157 |
| 202816 | MGUSA | 1028 W Main Street | Princeton | KY | 137 | 9 | 31 | 2 | 1 | 180 |
| 202820 | MGUSA | 841 S Walnut Street | Starke | FL | 213 | 3 | 43 | 8 | 1 | 268 |
| 202821 | MGUSA | 630 W Main Street | Tilton | NH | 174 | 15 | 43 | - | 1 | 233 |
| 202822 | MGUSA | 1205 Us Highway 231 South | Troy | AL | - | 7 | 62 | 19 | 1 | 89 |
| 202829 | MGUSA | 1105 Gary Blvd | Clinton | OK | 112 | 5 | 17 | 2 | 1 | 137 |
| 202831 | MGUSA | 642 East State Street | Georgetown | OH | 150 | 5 | 39 | (0) | 1 | 195 |
| 202832 | MGUSA | 691 West Plane Street | Bethel | OH | 73 | 9 | 37 | (0) | 1 | 120 |
| 202838 | MGUSA | 34 Southtowne Shopping Center | Duquoin | IL | 159 | 17 | 35 | 1 | 1 | 213 |
| 202839 | MGUSA | 235 South Burlington | Hastings | NE | 124 | 5 | 19 | 0 | 1 | 149 |
| 202840 | MGUSA | 1560 North Main Street | Beaver Dam | KY | 122 | 11 | 27 | 2 | 1 | 163 |
| 202841 | MGUSA | 2 West Piedmont Street | Keyser | WV | 172 | 3 | 27 | 13 | 1 | 215 |
| 202842 | MGUSA | 304 North Key Ave | Lampasas | TX | 137 | 4 | 33 | 6 | 1 | 181 |
| 202846 | MGUSA | 563 North Main Street | Hiawassee | GA | 126 | 2 | 26 | 2 | 1 | 157 |
| 202847 | MGUSA | 2110 Highway 180 East | Silver City | NM | 159 | 6 | 29 | 2 | 1 | 196 |
| 202851 | MGUSA | 1393 Boardman Canfield Road | Boardman | OH | 122 | 8 | 25 | (0) | 1 | 155 |
| 202857 | MGUSA | 490 Union Street | Pringle | PA | 149 | 2 | 36 | 2 | 1 | 189 |
| 202861 | MGUSA | Rte 590 | Hamlin | PA | 136 | 9 | 33 | 0 | 1 | 178 |
| 202862 | MGUSA | 2062 Lycoming Creek Road | Williamsport | PA | 102 | 4 | 23 | 1 | 1 | 130 |
| 202864 | MGUSA | 300 W Walnut Street | Shamokin | PA | 150 | 40 | 34 | 2 | 1 | 226 |
| 202868 | MGUSA | Route 309 Crestwood Plaza | Mountain Top | PA | 133 | 11 | 40 | - | 1 | 184 |
| 202870 | MGUSA | Route 309 | Dallas | PA | 183 | 7 | 38 | - | 1 | 228 |
| 202877 | MGUSA | 1511 South 4Th Street | Nashville | AR | 117 | 22 | 30 | 1 | 1 | 171 |
| 202880 | MGUSA | 10102 U South Main Street | Archdale | NC | 144 | 5 | 23 | 2 | 1 | 174 |
| 202885 | MGUSA | 575 Morgantown Street | Uniontown | PA | 174 | 7 | 36 | 0 | 1 | 218 |
| 202886 | MGUSA | 2014 Hwy 45 North | Meridian | MS | 66 | 3 | 24 | 8 | 1 | 101 |
| 202888 | MGUSA | 542 Archusa | Quitman | MS | 27 | 3 | 17 | 3 | 1 | 51 |
| 202891 | MGUSA | 665 South Main St | Sparta | NC | 64 | 5 | 22 | 2 | 1 | 93 |
| 202894 | MGUSA | 701 E Parrish Drive | Benson | NC | 96 | 18 | 48 | 6 | 1 | 170 |
| 202895 | MGUSA | 1121 West Broad Street | Dunn | NC | 96 | 27 | 32 | 2 | 1 | 157 |
| 202906 | MGUSA | 124 Route 1 | Bucksport | ME | 153 | 5 | 29 | 3 | 1 | 191 |
| 202908 | MGUSA | 2380 West 8Th Avenue | Plattsmouth | NE | 65 | 2 | 22 | 1 | 1 | 91 |
| 202909 | MGUSA | 340 28Th St | Bellaire | OH | 100 | 1 | 23 | (0) | 1 | 124 |
| 202911 | MGUSA | 102 Blossom Center Blvd | Willard | OH | 71 | 3 | 26 | (0) | 1 | 101 |
| 202917 | MGUSA | 225 North State Road 2 | New Martinsville | WV | 90 | 4 | 37 | 7 | 1 | 139 |
| 202918 | MGUSA | 1261 E Canal St | Nelsonville | OH | 53 | 6 | 24 | (0) | 1 | 84 |
| 202921 | MGUSA | 520 South Hill Street | Globe | AZ | 172 | 12 | 31 | 4 | 1 | 219 |
| 202924 | MGUSA | 633 South Park Plaza | Broken Bow | OK | 137 | 16 | 20 | 5 | 1 | 179 |
| 202931 | MGUSA | 370B Bridge Street | Clarkston | WA | 148 | 2 | 28 | 5 | 1 | 185 |
| 202936 | MGUSA | E 8566 Washington Street | Chagrin Falls | OH | 198 | 5 | 32 | (0) | 1 | 236 |
| 202943 | MGUSA | 130 Stone Street | Morehead | KY | 142 | 8 | 22 | 3 | 1 | 176 |
| 202946 | MGUSA | 6056 S State Route 48 | Maineville | OH | 170 | 11 | 32 | (0) | 1 | 213 |
| 202952 | MGUSA | 1149 Ashville Hwy | Inman | SC | 156 | 14 | 23 | 2 | 1 | 195 |
| 202967 | MGUSA | 514 South Alabama Avenue | Chesnee | SC | 224 | 5 | 24 | 4 | 1 | 257 |
| 202968 | MGUSA | 305 North Main Street | Woodruff | SC | 159 | 13 | 27 | 5 | 1 | 204 |
| 202970 | MGUSA | 451 N White Mountain Road | Show Low | AZ | 175 | 16 | 40 | 2 | 1 | 233 |
| 202972 | MGUSA | 119 Veterans Drive North | Huntingdon | TN | 151 | 8 | 27 | 2 | 1 | 190 |
| 202975 | MGUSA | 116117 Geneva Square | Lake Geneva | WI | 149 | 10 | 25 | 4 | 1 | 189 |
| 202982 | MGUSA | 812 "A" Avenue West | Oskaloosa | IA | 220 | 40 | 31 | 0 | 1 | 291 |
| 202986 | MGUSA | 1739 West Cherry Lane | Meridian | ID | 150 | 11 | 17 | 4 | 1 | 182 |
| 202987 | MGUSA | 1404 S Blaine Street | Moscow | ID | 153 | 8 | 29 | 6 | 1 | 197 |
| 202998 | MGUSA | 2640 East 32Nd Street | Joplin | MO | 110 | 7 | 26 | 4 | 1 | 148 |
| 203002 | MGUSA | 1440 Highway 95A North | Fernley | NV | 199 | 2 | 28 | 2 | 1 | 232 |
| 203003 | MGUSA | 228 West Murrell Street | Lakeland | GA | - | 21 | 29 | 10 | 1 | 61 |
| 203013 | MGUSA | 4760 Eastern Valley Road | Mccalla | AL | 139 | 5 | 30 | 7 | 1 | 182 |

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 203015 | MGUSA | 60 North Bridge Street | Chillicothe | OH | 143 | 1 | 23 | (0) | 1 | | 169 |
| 203016 | MGUSA | 920 West American Boulevard | Muleshoe | TX | - | 13 | 18 | 15 | 1 | | 46 |
| 203018 | MGUSA | 545 South State Street | Sparta | MI | 181 | 8 | 28 | 5 | 1 | | 223 |
| 203020 | MGUSA | 932 West Trimble Ave | Berryville | AR | 160 | 2 | 22 | 2 | 1 | | 188 |
| 203021 | MGUSA | 1725 Reed Road | Leland | NC | 93 | 9 | 26 | 2 | 1 | | 130 |
| 203023 | MGUSA | 6101 Castle Hayne Road Ste 7 | Castle Hayne | NC | 91 | 4 | 27 | 1 | 1 | | 124 |
| 203025 | MGUSA | 151 South Main Street | Cedar Springs | MI | 178 | 7 | 32 | 5 | 1 | | 223 |
| 203027 | MGUSA | 907 Mississippi Drive | Waynesboro | MS | - | 10 | 28 | 20 | 1 | | 58 |
| 203028 | MGUSA | 1701 Us Highway 412 West | Siloam Springs | AR | 179 | 7 | 25 | 4 | 1 | | 214 |
| 203034 | MGUSA | 100 Country Center Drive | Pagosa Springs | CO | 167 | 10 | 20 | 1 | 1 | | 199 |
| 203037 | MGUSA | 3231 Martha Berry Highway | Rome | GA | 105 | 2 | 32 | 4 | 1 | | 144 |
| 203039 | MGUSA | 1685 American Legion Blvd | Mountain Home | ID | 158 | 13 | 20 | 8 | 1 | | 200 |
| 203040 | MGUSA | 755 Highway 96 South | Silsbee | TX | 129 | 4 | 20 | 3 | 1 | | 157 |
| 203042 | MGUSA | 4924 West Us 10 | Ludington | MI | 117 | 3 | 24 | 4 | 1 | | 148 |
| 203044 | MGUSA | 690 Cash Road Sw | Camden | AR | 137 | 7 | 31 | 1 | 1 | | 176 |
| 203046 | MGUSA | 4165 Bemiss Road | Valdosta | GA | 133 | 6 | 25 | 5 | 1 | | 170 |
| 203048 | MGUSA | 1136 West Randall Road | Coopersville | MI | 145 | 2 | 27 | 5 | 1 | | 180 |
| 203056 | MGUSA | 11231 A Highway 63 South | Lucedale | MS | 129 | 9 | 32 | 12 | 1 | | 182 |
| 203057 | MGUSA | West 1965 Main Street | Lowell | MI | 216 | 6 | 36 | 4 | 1 | | 263 |
| 203059 | MGUSA | 1381 Leesburg Avenue | Washington Court Hou | OH | 171 | 4 | 24 | (0) | 1 | | 200 |
| 203060 | MGUSA | Highway 45 | Milan | TN | 146 | 6 | 23 | 3 | 1 | | 180 |
| 203062 | MGUSA | 661 North Main Street | Russellville | KY | 137 | 8 | 29 | 2 | 1 | | 177 |
| 203069 | MGUSA | 101 North Sherman Street | Allegan | MI | 204 | 5 | 22 | 6 | 1 | | 238 |
| 203075 | MGUSA | 200 A West 92 Highway | Kearney | MO | 123 | 4 | 38 | 2 | 1 | | 167 |
| 203081 | MGUSA | 385 S 16Th Street | Payette | ID | 147 | 8 | 17 | 9 | 1 | | 181 |
| 203082 | MGUSA | 340 West Church Street | Jasper | GA | 171 | 0 | 44 | 4 | 1 | | 220 |
| 203083 | MGUSA | 5480 E Memorial Blvd | Saint George | SC | - | 8 | 28 | 15 | 1 | | 53 |
| 203087 | MGUSA | 400 North Church Street | Swansea | SC | - | 4 | 34 | 12 | 1 | | 50 |
| 203090 | MGUSA | 43 Morgan Square | Berkeley Springs | WV | 143 | 4 | 32 | 5 | 1 | | 185 |
| 203091 | MGUSA | 160 E Dallas Rd | Stanley | NC | 135 | 9 | 21 | 3 | 1 | | 169 |
| 203097 | MGUSA | 610 North 5Th Avenue | Sandpoint | ID | 118 | 50 | 37 | 6 | 1 | | 212 |
| 203102 | MGUSA | 8410 South Main Street | Cottonwood | AZ | 186 | 5 | 28 | 2 | 1 | | 221 |
| 203103 | MGUSA | 2370 West Hwy 89 A | Sedona | AZ | 185 | 4 | 25 | 1 | 1 | | 217 |
| 203110 | MGUSA | 118 North 2Nd Avenue | Sheldon | IA | 61 | 5 | 16 | 0 | 1 | | 83 |
| 203114 | MGUSA | 507 East Wise Street | Bowie | TX | 157 | 5 | 35 | 6 | 1 | | 203 |
| 203115 | MGUSA | 427 Edwardsville Road | Troy | IL | 104 | 6 | 21 | - | 1 | | 132 |
| 203116 | MGUSA | 684 N Bisbee Avenue | Willcox | AZ | 176 | 10 | 35 | 3 | 1 | | 224 |
| 203117 | MGUSA | 261 Navajo Blvd | Holbrook | AZ | 156 | 2 | 34 | 2 | 1 | | 195 |
| 203121 | MGUSA | 100 West Arizona | Ruston | LA | 151 | 3 | 28 | 4 | 1 | | 186 |
| 203123 | MGUSA | 1045A Frontage Drive East | Wiggins | MS | 129 | 7 | 31 | 11 | 1 | | 179 |
| 203138 | MGUSA | 27 East Main Street | Tremonton | UT | 198 | 15 | 23 | 4 | 1 | | 240 |
| 203139 | MGUSA | 166 Front Street | Evanston | WY | 106 | 14 | 22 | 2 | 1 | | 145 |
| 203143 | MGUSA | 595 Main Street | Billings | MT | 253 | 10 | 40 | 1 | 1 | | 305 |
| 203145 | MGUSA | 312 West Madison Avenue | Belgrade | MT | 166 | 2 | 24 | 1 | 1 | | 194 |
| 203146 | MGUSA | 1520 3Rd Street Nw | Great Falls | MT | 197 | 16 | 25 | 1 | 1 | | 240 |
| 203147 | MGUSA | 305 1St Avenue South | Laurel | MT | 156 | 8 | 33 | 1 | 1 | | 199 |
| 203154 | MGUSA | 1106 West Park | Livingston | MT | 128 | 5 | 30 | 1 | 1 | | 165 |
| 203161 | MGUSA | 2116 Freedom Road | Trinidad | CO | 108 | 9 | 32 | 1 | 1 | | 149 |
| 203165 | MGUSA | 1111 West Victory Way | Craig | CO | 172 | 15 | 35 | 1 | 1 | | 224 |
| 203166 | MGUSA | 1100 W Main | Sterling | CO | 140 | 5 | 9 | 4 | 1 | | 158 |
| 203177 | MGUSA | 1118 Highway 11 W Ste F | Church Hill | TN | 116 | 4 | 29 | 1 | 1 | | 150 |
| 203181 | MGUSA | Route 22 And Fourth Street | Huntingdon | PA | 153 | 3 | 27 | 0 | 1 | | 184 |
| 203183 | MGUSA | 712 North Main P O Box 183 | Taylor | AZ | 127 | 12 | 36 | 1 | 1 | | 175 |
| 203185 | MGUSA | 514 Lincoln Road | Monroe | LA | - | 38 | 28 | 23 | 1 | | 90 |
| 203190 | MGUSA | 726 West Main Street | Fremont | MI | 158 | 3 | 24 | 6 | 1 | | 192 |
| 203192 | MGUSA | 231 North Walton Blvd | Bentonville | AR | 194 | 6 | 26 | 4 | 1 | | 231 |
| 203193 | MGUSA | 211 1St Ave Ne | Cambridge | MN | 173 | 7 | 31 | 0 | 1 | | 211 |
| 203197 | MGUSA | 453 Lake Park Road | Lake Park | GA | 98 | 5 | 31 | 4 | 1 | | 138 |
| 203202 | MGUSA | 200 South Gardner | Scottsburg | IN | 184 | 9 | 24 | 5 | 1 | | 223 |
| 203205 | MGUSA | 229 Apple Square Plaza | Edgefield | SC | 57 | 8 | 36 | 1 | 1 | | 103 |
| 203212 | MGUSA | 3901 B Cleveland Highway | Varnell | GA | 133 | 4 | 32 | 3 | 1 | | 172 |
| 203213 | MGUSA | 3200 Greenwich Road | Norton | OH | 138 | 2 | 29 | (0) | 1 | | 170 |
| 203215 | MGUSA | 266 West Main Street | Malone | NY | 185 | 2 | 39 | 0 | 1 | | 228 |
| 203218 | MGUSA | 254 Foothills Center Drive | West Union | SC | 227 | 8 | 31 | 4 | 1 | | 272 |
| 203220 | MGUSA | 1821 Louisa Street | Rayville | LA | - | 15 | 34 | 17 | 1 | | 66 |
| 203226 | MGUSA | 538 Island Ford Road | Madisonville | KY | 121 | 7 | 20 | 2 | 1 | | 152 |
| 203234 | MGUSA | 59 Central Avenue | Ilion | NY | 181 | 12 | 19 | - | 1 | | 214 |
| 203237 | MGUSA | 1008 West B Street | Mccook | NE | 88 | 5 | 22 | 1 | 1 | | 117 |
| 203240 | MGUSA | 1812 East Madison | Bastrop | LA | 145 | 6 | 28 | 13 | 1 | | 192 |
| 203241 | MGUSA | 235 Old Capital Plaza Nw Suit | Corydon | IN | 142 | 2 | 32 | 1 | 1 | | 177 |
| 203243 | MGUSA | 2602 Harry Nichols Drive | Madison | IN | 178 | 5 | 28 | 4 | 1 | | 216 |
| 203247 | MGUSA | 174180 East Main Street | Gouverneur | NY | 112 | 32 | 37 | 0 | 1 | | 182 |
| 203257 | MGUSA | 100 Commerce Drive | Maumelle | AR | 186 | 10 | 28 | 2 | 1 | | 228 |
| 203258 | MGUSA | 717 E Atlantic Street | South Hill | VA | 159 | 8 | 24 | 3 | 1 | | 194 |
| 203261 | MGUSA | 3390 Old Hakeakala Hwy | Pukalani | HI | 235 | 7 | 47 | 0 | 1 | | 290 |

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 203275 | MGUSA | 1032 West Kern St | Taft | CA | 268 | 8 | 46 | 1 | 1 | 324 |
| 203290 | MGUSA | 332 South Main Street | Belton | SC | 143 | 4 | 30 | 5 | 1 | 183 |
| 203291 | MGUSA | 2235 West Everly Brothers Boul | Powderly | KY | 133 | 6 | 25 | 3 | 1 | 167 |
| 203292 | MGUSA | 7713 State Road 21 And 73 | Wautoma | WI | 93 | 7 | 28 | 3 | 1 | 132 |
| 203294 | MGUSA | 2740 Pine Street | Arkadelphia | AR | 149 | 11 | 23 | 3 | 1 | 186 |
| 203297 | MGUSA | 9 Charleston Street | Wellsboro | PA | 150 | 3 | 21 | 0 | 1 | 176 |
| 203308 | MGUSA | 1017 Paris Road | Mayfield | KY | 124 | 4 | 32 | 3 | 1 | 164 |
| 203322 | MGUSA | 1409 Pacific Avenue | Woodland | WA | 122 | 2 | 19 | 4 | 1 | 147 |
| 203327 | MGUSA | 40 Sokokis Trail | East Waterboro | ME | 155 | 4 | 24 | 4 | 1 | 188 |
| 203329 | MGUSA | 1025 Ninth Street West | Columbia Falls | MT | 210 | 2 | 17 | 2 | 2 | 233 |
| 203332 | MGUSA | 921 N Dupont Highway | Milford | DE | 98 | 12 | 27 | 0 | 1 | 139 |
| 203341 | MGUSA | 116 E Glenwood Avenue | Smyrna | DE | 259 | 2 | 48 | 0 | 1 | 310 |
| 203345 | MGUSA | 711 Washington Avenue | Chestertown | MD | 158 | 4 | 29 | 2 | 1 | 195 |
| 203354 | MGUSA | 500A South 12Th Street | Murray | KY | 150 | 7 | 27 | 3 | 1 | 187 |
| 203359 | MGUSA | 113 E Water Street | Muncy | PA | 97 | 4 | 23 | | 1 | 124 |
| 203365 | MGUSA | 175 North Miriam Street | Nappanee | IN | 165 | 8 | 29 | . | 1 | 205 |
| 203370 | MGUSA | 108 North Mill Street | Pryor | OK | 145 | 5 | 28 | 6 | 1 | 184 |
| 203373 | MGUSA | 115 North Granite Avenue | Granite Falls | WA | 110 | 18 | 25 | 4 | 1 | 157 |
| 203376 | MGUSA | 150 Sam Walton Drive | Sparta | TN | 147 | 8 | 29 | 3 | 1 | 188 |
| 203393 | MGUSA | 130 Amicks Ferry Road | Chapin | SC | 153 | 7 | 29 | 4 | 1 | 194 |
| 203413 | MGUSA | 124 6Th Avenue Ne | Devils Lake | ND | 174 | 6 | 22 | 0 | 1 | 204 |
| 203416 | MGUSA | 266 3Rd Avenue West | Dickinson | ND | 151 | 2 | 18 | 0 | 1 | 172 |
| 203419 | MGUSA | 610 W Main St | Rockwell | NC | 138 | 6 | 25 | 2 | 1 | 172 |
| 203428 | MGUSA | 746 E White Mountain Blvd | Pinetop | AZ | 219 | 5 | 22 | 2 | 1 | 249 |
| 203430 | MGUSA | 109 N Hervey Street | Hope | AR | 162 | 10 | 30 | 1 | 1 | 204 |
| 203433 | MGUSA | 425 South Elm Suite 3 | Toppenish | WA | 169 | 4 | 16 | 5 | 1 | 195 |
| 203434 | MGUSA | 2013 North Hwy 7 | Pleasant Hill | MO | 142 | 13 | 34 | 6 | 1 | 195 |
| 203436 | MGUSA | 2736 Fairground Road | Goochland | VA | 141 | 2 | 26 | 5 | 1 | 175 |
| 203440 | MGUSA | 1600 East 1St Street | Pratt | KS | 233 | 4 | 40 | 3 | 1 | 280 |
| 203442 | MGUSA | 702 South Main Street | Moab | UT | 112 | 4 | 19 | 4 | 1 | 140 |
| 203443 | MGUSA | 21 South Spring Street | Buckhannon | WV | 147 | 3 | 27 | 4 | 1 | 182 |
| 203445 | MGUSA | 917 South State St | Yadkinville | NC | 86 | 3 | 20 | 2 | 1 | 112 |
| 203446 | MGUSA | 796 Valley Road | Mocksville | NC | 90 | 2 | 19 | 1 | 1 | 112 |
| 203454 | MGUSA | 5273 Us Hwy 158 | Advance | NC | 138 | 0 | 20 | 1 | 1 | 161 |
| 203459 | MGUSA | 1925 N Street Suite C | Newman | CA | 184 | 15 | 32 | 3 | 1 | 235 |
| 203460 | MGUSA | 907 Rain Forest Parkway | Columbia | MO | 162 | 6 | 22 | 4 | 1 | 195 |
| 203463 | MGUSA | 1310 E Pine | Deming | NM | 125 | 4 | 27 | 2 | 1 | 160 |
| 203464 | MGUSA | 220 South Main | Sikeston | MO | 96 | 3 | 20 | 2 | 1 | 122 |
| 203467 | MGUSA | S 1313 Main Street | Weaverville | CA | 161 | 9 | 25 | 2 | 1 | 198 |
| 203470 | MGUSA | W 1516 Broadway | Bloomfield | NM | 147 | 4 | 28 | 3 | 1 | 183 |
| 203471 | MGUSA | 14260 A Horizon | Horizon City | TX | 161 | 3 | 35 | 7 | 1 | 207 |
| 203475 | MGUSA | 704 Hovey Street | Bridgeport | TX | 146 | 7 | 39 | 6 | 1 | 199 |
| 203479 | MGUSA | 300 North Main St | Bristow | OK | 67 | 9 | 31 | 4 | 1 | 112 |
| 203485 | MGUSA | 115 East Main St | Stigler | OK | 38 | 11 | 8 | 4 | 1 | 61 |
| 203487 | MGUSA | 715 9Th Avenue Se | Watertown | SD | 138 | 4 | 17 | 0 | 1 | 159 |
| 203491 | MGUSA | 813 East Main Street | Cobleskill | NY | 149 | 9 | 33 | - | 1 | 192 |
| 203494 | MGUSA | 300 East Sunflower | Cleveland | MS | 155 | 5 | 31 | 10 | 1 | 202 |
| 203506 | MGUSA | North 295 Western Drive | Pacific | MO | 152 | 9 | 23 | 7 | 1 | 191 |
| 203508 | MGUSA | 600 W Dickinson Street | Fort Stockton | TX | - | 4 | 38 | 15 | 1 | 58 |
| 203509 | MGUSA | 2009 East Jackson Blvd | Jackson | MO | 105 | 8 | 29 | 6 | 1 | 148 |
| 203526 | MGUSA | 402 West Lincoln Avenue | Fergus Falls | MN | 155 | 5 | 21 | 0 | 1 | 181 |
| 203528 | MGUSA | 11092 Highway 51 North | Atoka | TN | 145 | 8 | 28 | 2 | 1 | 185 |
| 203529 | MGUSA | 245 W Broadway | Saranac Lake | NY | 118 | 9 | 42 | - | 1 | 169 |
| 203532 | MGUSA | 524 East Cedar Avenue | Gladwin | Mi | 75 | 7 | 31 | 5 | 1 | 120 |
| 203535 | MGUSA | 1110 Visalia Road Ste 100 | Exeter | CA | 301 | 4 | 34 | 3 | 1 | 343 |
| 203537 | MGUSA | 363 Versailles Road | Frankfort | KY | 130 | 9 | 29 | 2 | 1 | 171 |
| 203539 | MGUSA | 409 South 200 East | Roosevelt | UT | 181 | 1 | 30 | 5 | 1 | 218 |
| 203543 | MGUSA | 2419 Murphy Mill Road | Dothan | AL | 190 | 8 | 33 | 4 | 1 | 236 |
| 203545 | MGUSA | 2990 Highway 28 East | Pineville | LA | 153 | 3 | 29 | 8 | 1 | 195 |
| 203547 | MGUSA | 1940 Old Highway 66 | Edgewood | NM | 171 | 5 | 31 | 2 | 1 | 210 |
| 203552 | MGUSA | 1045 West Jefferson Street | Greenfield | OH | 161 | 4 | 29 | (0) | 1 | 194 |
| 203555 | MGUSA | 140 Columbia Center | Columbia | IL | 127 | 8 | 24 | 0 | 1 | 160 |
| 203570 | MGUSA | 720 South Ash Street | Buffalo | MO | 116 | 5 | 25 | 4 | 1 | 151 |
| 203572 | MGUSA | 2785 A Highway 15 South | Bay Springs | MS | 27 | 1 | 20 | 5 | 1 | 54 |
| 203574 | MGUSA | 2943 Ft Campell Blvd | Hopkinsville | KY | 165 | 5 | 27 | 2 | 1 | 200 |
| 203578 | MGUSA | 735 Kalamazoo Avenue | Paw Paw | MI | 386 | 5 | 18 | 7 | 1 | 417 |
| 203581 | MGUSA | 420 West Main Street | Carson City | MI | 99 | 7 | 11 | 5 | 1 | 123 |
| 203584 | MGUSA | 1050 West Main | Locust | NC | 116 | 6 | 22 | 2 | 1 | 147 |
| 203585 | MGUSA | 1732 South Main Street | Saint Martinville | LA | - | 11 | 26 | 12 | 1 | 49 |
| 203601 | MGUSA | 1743142Nd | Dorr | MI | 61 | 2 | 22 | 2 | 1 | 88 |
| 203605 | MGUSA | 101 East Bow St | Cherokee | IA | 102 | 6 | 18 | 0 | 1 | 127 |
| 203607 | MGUSA | 527 Marion Road Ste E | Mount Gilead | OH | 126 | 2 | 24 | (0) | 1 | 153 |
| 203609 | MGUSA | 165 Wal Mart Way | Maysville | KY | 175 | 4 | 25 | 4 | 1 | 209 |
| 203610 | MGUSA | 300 South Poplar Street Po | Elizabethtown | NC | 147 | 2 | 40 | 3 | 1 | 192 |
| 203611 | MGUSA | 500 Hwy 40 | Odessa | MO | 130 | 10 | 33 | 2 | 1 | 175 |

| 203618 | MGUSA | 200 North Madera Avenue | Kerman | CA | 185 | 4 | 31 | 3 | 1 | 223 |
| 203620 | MGUSA | 1655 Hwy 10 West | Detroit Lakes | MN | 141 | 9 | 28 | 0 | 1 | 179 |
| 203622 | MGUSA | 5520 Platt Springs Road | Lexington | SC | 152 | 8 | 31 | 4 | 1 | 197 |
| 203623 | MGUSA | 1428 Remington Ave | Thomasville | GA | 176 | 4 | 27 | 4 | 1 | 211 |
| 203628 | MGUSA | 1533 N Linden Road | Kuna | ID | 157 | 8 | 18 | 6 | 1 | 191 |
| 203641 | MGUSA | 102 West Main St | Louisville | OH | 90 | 3 | 20 | (0) | 1 | 114 |
| 203644 | MGUSA | 2815 Cleveland Avenue South | Canton | OH | 126 | 20 | 39 | (0) | 1 | 186 |
| 203647 | MGUSA | 919 State Rt 46 | Columbiana | OH | 76 | 2 | 22 | (0) | 1 | 101 |
| 203649 | MGUSA | 1410 Valley View Drive | Delta | CO | 227 | 6 | 27 | 2 | 1 | 263 |
| 203651 | MGUSA | 9321 Cherry Valley Ave | Caledonia | MI | 162 | 1 | 23 | 6 | 1 | 193 |
| 203654 | MGUSA | 311 2Nd Avenue Nw | Cullman | AL | 153 | 1 | 31 | 4 | 1 | 191 |
| 203655 | MGUSA | 5408 Summerville Road | Phenix City | AL | 170 | 8 | 40 | 28 | 1 | 247 |
| 203658 | MGUSA | 2823 10Th Street | Great Bend | KS | 148 | 14 | 20 | 3 | 1 | 186 |
| 203660 | MGUSA | 909 4Th Ave South | Denison | IA | 131 | 3 | 17 | 0 | 1 | 152 |
| 203661 | MGUSA | 535 South Jefferson | Lebonan | MO | 133 | 4 | 25 | 4 | 1 | 166 |
| 203662 | MGUSA | 416 East 4Th Street | Eldon | MO | 118 | 11 | 23 | 2 | 1 | 156 |
| 203663 | MGUSA | 200 1St Avenue Se Ste #1 | Oelwein | IA | 171 | 3 | 30 | 0 | 1 | 205 |
| 203664 | MGUSA | 720 Business 61 South | Bowling Green | MO | 117 | 6 | 29 | 4 | 1 | 155 |
| 203667 | MGUSA | 129 Fowler Street Ste A | Gentry | AR | 73 | 4 | 24 | 3 | 1 | 104 |
| 203675 | MGUSA | 120 W George B Mowad Hwy | Oakdale | LA | 116 | 14 | 27 | 8 | 1 | 166 |
| 203677 | MGUSA | 8751 Lincoln Hwy | Bedford | PA | 131 | 9 | 21 | 0 | 1 | 161 |
| 203678 | MGUSA | 443 South Broadway | Joshua | TX | 194 | 4 | 48 | 15 | 1 | 261 |
| 203679 | MGUSA | 409 N Buckeye Avenue | Abilene | KS | 115 | 3 | 35 | 2 | 1 | 155 |
| 203682 | MGUSA | 1505 Benzie Hwy Suite 101 | Benzonia | MI | 116 | 2 | 24 | 6 | 1 | 148 |
| 203694 | MGUSA | 704 Broadway | Paintsville | KY | 43 | 9 | 28 | 2 | 1 | 83 |
| 203700 | MGUSA | 150 South Curtis | Pea Ridge | AR | 84 | 16 | 26 | 3 | 1 | 130 |
| 203701 | MGUSA | 412 Broadwater Street | Malden | MO | 129 | 10 | 26 | 6 | 1 | 171 |
| 203707 | MGUSA | 602 West State Street | Hastings | MI | 134 | 12 | 64 | 6 | 1 | 217 |
| 203715 | MGUSA | 1294 E Downing Ste 4 | Tahlequah | OK | 157 | 3 | 29 | 4 | 1 | 194 |
| 203717 | MGUSA | 1210 W Kings Hwy | Paragould | AR | 131 | 5 | 28 | 2 | 1 | 167 |
| 203721 | MGUSA | 613 West Emmitt Avenue | Waverly | OH | 113 | 4 | 28 | (0) | 1 | 146 |
| 203726 | MGUSA | 6279 Sissonville Road | Charleston | WV | 124 | 5 | 30 | 5 | 1 | 165 |
| 203729 | MGUSA | 41 Williams Drive | Spencer | WV | 124 | 1 | 27 | 9 | 1 | 162 |
| 203736 | MGUSA | 1110 E St Peters Street | New Iberia | LA | 179 | 9 | 30 | 8 | 1 | 227 |
| 203769 | MGUSA | 1320 W 3Rd | Alliance | NE | 114 | 4 | 17 | 1 | 1 | 137 |
| 203774 | MGUSA | 611 Valley Drive Unit A | Wayne | NE | 102 | 13 | 28 | 2 | 1 | 146 |
| 203778 | MGUSA | 909 Commerce Drive | Ligonier | IN | 186 | 11 | 38 | 5 | 1 | 241 |
| 203782 | MGUSA | 1601 Jackson Street | Jacksonville | TX | 156 | 10 | 44 | 8 | 1 | 218 |
| 203794 | MGUSA | 806 State Road 114 W | North Manchester | IN | 182 | 11 | 42 | 4 | 1 | 240 |
| 203799 | MGUSA | 4186 Highway 64 Suite B | Kirtland | NM | 136 | 3 | 22 | 2 | 1 | 163 |
| 203803 | MGUSA | 900 South St Marys Road | St. Mary'S | PA | 127 | 10 | 21 | 0 | 1 | 159 |
| 203808 | MGUSA | 9003 Richlands Hwy | Richlands | NC | 90 | 7 | 29 | 1 | 1 | 129 |
| 203812 | MGUSA | 10650 State Route 21 | Hillsboro | MO | 113 | 7 | 19 | 5 | 1 | 145 |
| 203813 | MGUSA | 580 Us Highway 18 West | Clear Lake | IA | 135 | 6 | 24 | 0 | 1 | 165 |
| 203816 | MGUSA | 813 Superior St | Webster City | IA | 155 | 5 | 36 | 0 | 1 | 197 |
| 203817 | MGUSA | 1020 East Main Suite A | Union | MO | 148 | 15 | 27 | 7 | 1 | 198 |
| 203818 | MGUSA | 514 Park Center | Rainelle | WV | 88 | 7 | 21 | 7 | 1 | 124 |
| 203820 | MGUSA | 13180 Garrett Hwy | Oakland | MD | 151 | 2 | 40 | 3 | 1 | 197 |
| 203821 | MGUSA | 902 East Atkins Street | Dobson | NC | 143 | 3 | 38 | 2 | 1 | 187 |
| 203822 | MGUSA | 452 Finnie Flat Road Ste A | Camp Verde | AZ | 160 | 2 | 29 | 1 | 1 | 192 |
| 203837 | MGUSA | 14100 Ranch Road 12 Ste 100 | Wimberley | TX | 145 | 5 | 26 | 2 | 1 | 179 |
| 203840 | MGUSA | 701 Us Hwy 29 Bypass | China Grove | NC | 134 | 3 | 21 | 2 | 1 | 161 |
| 203844 | MGUSA | 14 West Brimmer Avenue | Watsontown | PA | 140 | 4 | 39 | - | 1 | 184 |
| 203845 | MGUSA | 1166 South Mccrary Street | Woodbury | TN | - | 17 | 20 | 8 | 1 | 46 |
| 203850 | MGUSA | 196 W River Valley Drive | Newaygo | MI | 235 | 10 | 29 | 6 | 1 | 282 |
| 203853 | MGUSA | 1887 Holton Road | North Muskegon | MI | 195 | 2 | 24 | 4 | 1 | 227 |
| 203854 | MGUSA | 358 Reno Drive | Wayland | MI | 165 | 9 | 21 | 6 | 1 | 202 |
| 203860 | MGUSA | 1631 Bruce Smith Pkwy | West Plains | MO | 168 | 3 | 20 | 7 | 1 | 199 |
| 203861 | MGUSA | 623 East Main St | Maiden | NC | 117 | 5 | 23 | 2 | 1 | 147 |
| 203864 | MGUSA | 300 West Clinton St | Gray | GA | 180 | (2) | 28 | 4 | 1 | 211 |
| 203870 | MGUSA | 101 Mbl Bank Drive | Minden | LA | 175 | 13 | 38 | 6 | 1 | 233 |
| 203873 | MGUSA | 3165 East Roane Avenue | Eupora | MS | - | 19 | 29 | 10 | 1 | 59 |
| 203880 | MGUSA | 281 Hwy 701 North | Loris | SC | 124 | 4 | 18 | 3 | 1 | 151 |
| 203885 | MGUSA | 257 Johnstown Center Drive Un | Johnstown | CO | 133 | 4 | 21 | 3 | 1 | 161 |
| 203886 | MGUSA | 2491 Tongass Avenue | Ketchikan | AK | 218 | 6 | 72 | 4 | 1 | 302 |
| 203891 | MGUSA | 3110 Tower Avenue Space 1 | Superior | WI | 148 | 1 | 24 | 4 | 1 | 178 |
| 203894 | MGUSA | 555 Depot Street | Franklin | NC | 128 | 6 | 37 | 2 | 1 | 174 |
| 203895 | MGUSA | 118 W Main St | Hartford | MI | 117 | 8 | 24 | 6 | 1 | 156 |
| 203899 | MGUSA | 1084 Campbell St | Baker City | OR | 124 | 4 | 18 | 5 | 1 | 151 |
| 203900 | MGUSA | 1051 W State Road | Belding | MI | 184 | 3 | 24 | 7 | 1 | 220 |
| 203903 | MGUSA | 1001 W Michigan Avenue | Three Rivers | MI | 197 | 9 | 27 | 10 | 1 | 244 |
| 203906 | MGUSA | 597 Whitman Street | Orangeburg | SC | 246 | 6 | 31 | 6 | 1 | 290 |
| 203913 | MGUSA | 807 North Broadway | Cleveland | OK | - | 24 | 22 | 8 | 1 | 55 |
| 203916 | MGUSA | 9371 Cedar St | Monticello | MN | 187 | 3 | 37 | 0 | 1 | 228 |
| 203919 | MGUSA | 124 E Prairie St | Vicksburg | MI | 114 | 3 | 23 | 4 | 1 | 144 |

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 203920 | MGUSA | 1515 N Broadway Street | Red Oak | IA | 117 | 4 | 26 | 0 | 1 | 148 |
| 203921 | MGUSA | 1606 Kowaliga Road | Eclectic | AL | - | 13 | 27 | 6 | 0 | 46 |
| 203922 | MGUSA | 530 4Th Ave Se | Red Bay | AL | - | 42 | 21 | 4 | 1 | 68 |
| 203923 | MGUSA | 1592 Hwy 100 | Centerville | TN | - | 7 | 25 | 7 | 1 | 40 |
| 203924 | MGUSA | 2537 East Lyon Station Road | Creedmoor | NC | 170 | 7 | 30 | 2 | 1 | 210 |
| 203925 | MGUSA | 6613 W Commercial Park Avenue | Rathdrum | ID | 158 | 1 | 18 | 5 | 1 | 182 |
| 203928 | MGUSA | 908 Rees St | Breaux Bridge | LA | 115 | 10 | 43 | 7 | 1 | 176 |
| 203940 | MGUSA | 10 Crosswinds Drive | Cloverdale | IN | 120 | 2 | 21 | 2 | 1 | 146 |
| 203947 | MGUSA | 307 East Veterans | Calhoun City | MS | - | 10 | 21 | 9 | 1 | 40 |
| 203949 | MGUSA | 917 Henderson Street | Palacios | TX | - | 12 | 30 | 20 | 1 | 62 |
| 203950 | MGUSA | 1311 Woodmount Drive | Tuscumbia | AL | - | 6 | 21 | 12 | 1 | 41 |
| 203961 | MGUSA | 230 East Idaho | Kalispell | MT | 84 | 6 | 24 | 1 | 1 | 115 |
| 203962 | MGUSA | 2141 Hwy 2 East | Evergreen | MT | 171 | 5 | 22 | 2 | 1 | 200 |
| 203982 | MGUSA | 801 Short Street | Decorah | IA | 130 | 4 | 25 | 0 | 1 | 160 |
| 203983 | MGUSA | 1870 Commercial | Warsaw | MO | 117 | 4 | 24 | 4 | 1 | 150 |
| 203986 | MGUSA | 420 W Hwy #22 | Centralia | MO | 135 | 5 | 26 | 5 | 1 | 171 |
| 203987 | MGUSA | #10 Wildcat Drive Ste A | Wright City | MO | 148 | 8 | 19 | 5 | 1 | 180 |
| 203988 | MGUSA | 762 South Broadway | Geneva | OH | 137 | 3 | 31 | (0) | 1 | 172 |
| 203990 | MGUSA | 1114 Commercial Avenue | Coleman | TX | - | 8 | 34 | 16 | 1 | 59 |
| 203991 | MGUSA | 2608 N Main Ste E | Belton | TX | 194 | 2 | 36 | 7 | 1 | 241 |
| 203993 | MGUSA | 52530 Main Street | Mattawan | MI | 135 | 6 | 27 | 4 | 1 | 174 |
| 203994 | MGUSA | 500 North 8Th Street | Haskell | TX | - | 39 | 28 | 16 | 1 | 84 |
| 203998 | MGUSA | 333 South Main St | Marysville | OH | 254 | 5 | 39 | (0) | 1 | 299 |
| 204004 | MGUSA | 397 Hyde Park Road Suite 100 | Leechburg | PA | 131 | 8 | 22 | 0 | 1 | 162 |
| 204009 | MGUSA | 6005 East Us Route 60 | Barboursville | WV | 131 | 10 | 22 | 7 | 1 | 170 |
| 204014 | MGUSA | 1201 South Ward Street Ste | Stockton | MO | 94 | 6 | 29 | 3 | 1 | 133 |
| 204015 | MGUSA | 1060 Spillway Circle | Brandon | MS | 192 | 3 | 30 | 5 | 1 | 230 |
| 204019 | MGUSA | 330 West Washington St | Bath | NY | 109 | 8 | 29 | 0 | 1 | 147 |
| 204023 | MGUSA | 100 Kingsbury Blvd | Fredericktown | MO | 127 | 28 | 27 | 7 | 1 | 190 |
| 204024 | MGUSA | 634 Main Street | Lander | WY | 139 | 12 | 21 | 3 | 1 | 176 |
| 204026 | MGUSA | 503 S Henry Clay Blvd | Ashland | MO | 168 | 6 | 23 | 4 | 1 | 202 |
| 204029 | MGUSA | 708 North 5Th Street | Montevideo | MN | 136 | 1 | 25 | 0 | 1 | 162 |
| 204031 | MGUSA | S 1100 Louise Street | Salem | MO | 135 | 3 | 27 | 7 | 1 | 172 |
| 204034 | MGUSA | 518 North Jefferson Street Su | Lewisburg | WV | 150 | 2 | 26 | 5 | 1 | 184 |
| 204038 | MGUSA | 100 Bolivar Road | Wellsville | NY | 139 | 5 | 22 | - | 1 | 167 |
| 204048 | MGUSA | 2832 Pike Street Ste 1 | Parkersburg | WV | 141 | 6 | 22 | 6 | 1 | 177 |
| 204053 | MGUSA | 1005 South Lincoln Ave | Jerome | ID | 93 | 5 | 21 | 3 | 1 | 122 |
| 204054 | MGUSA | 800 S Greeley Hwy Unit A | Cheyenne | WY | 163 | 5 | 20 | 3 | 1 | 191 |
| 204060 | MGUSA | 30185 Triangle Drive | Mechanicsville | MD | 208 | 11 | 52 | 3 | 1 | 275 |
| 204070 | MGUSA | 101 Cottonwood Mill Road | Tunnel Hill | GA | 140 | 2 | 34 | 2 | 1 | 179 |
| 204075 | MGUSA | 107 West Ray Fine Blvd Unit | Roland | OK | 151 | 2 | 29 | 4 | 1 | 187 |
| 204076 | MGUSA | 366 W Travis Street | La Grange | TX | 154 | 2 | 30 | 4 | 1 | 190 |
| 204077 | MGUSA | 4130 9Th Ave West | Hibbing | MN | 202 | 4 | 29 | 0 | 1 | 235 |
| 204079 | MGUSA | 419 South Broadway Avenue | Buhl | ID | 112 | 2 | 22 | 9 | 1 | 146 |
| 204093 | MGUSA | Bldg 129 Gold Vault Road | Fort Knox | KY | 3 | 3 | 8 | 1 | 1 | 17 |
| 204096 | MGUSA | 234 South State Street Ste B | Rigby | ID | 102 | 7 | 24 | 10 | 1 | 144 |
| 204100 | MGUSA | 41 North Morey Road | Lake City | MI | 105 | 4 | 26 | 3 | 1 | 139 |
| 204102 | MGUSA | 304 West Evergreen Ave | Palmer | AK | 288 | 12 | 30 | 0 | 1 | 330 |
| 204103 | MGUSA | 110 East Saint Peter Street | Carencro | LA | 28 | 6 | 19 | 2 | 1 | 57 |
| 204115 | MGUSA | 928 S Hwy 377 Ste 200 | Aubrey | TX | 123 | 2 | 28 | 4 | 1 | 158 |
| 204137 | MGUSA | 1104 Hutchings Avenue | Ballinger | TX | - | 5 | 28 | 15 | 1 | 49 |
| 204143 | MGUSA | 1008 North Main St | Williston | ND | 156 | 1 | 18 | 0 | 1 | 176 |
| 204147 | MGUSA | 423 North Main St | Crookston | MN | 131 | 4 | 22 | 0 | 1 | 158 |
| 204154 | MGUSA | 1650 Starlite Drive Ste L | Owensboro | KY | 159 | 2 | 39 | 2 | 1 | 202 |
| 204157 | MGUSA | 1009 West Wisconsin Ave | Sparta | WI | 139 | 9 | 26 | 1 | 1 | 175 |
| 204169 | MGUSA | 1100 West Church Road Ste 121 | Southaven | MS | 147 | 4 | 26 | 8 | 1 | 187 |
| 204171 | MGUSA | 318 S Main St | Lindale | TX | 138 | 5 | 40 | 8 | 1 | 192 |
| 204218 | MGUSA | 334 E Mt Vernon Blvd | Mt. Vernon | MO | 141 | 4 | 23 | 7 | 1 | 176 |
| 204229 | MGUSA | 1407 E 7Th Street | Atlantic | IA | 157 | 3 | 26 | 0 | 1 | 187 |
| TOTAL | | | | | 190,939 | 10,123 | 36,418 | 4,817 | 808 | 243,105 |