

RICHMOND DIVISION

F I L E D

AUG 3 2010

F I L E D

CLERK
U.S. BANKRUPTCY COURT

**July 27, 2010**
**Request by:  Y & B Holdings, LLC**
**90 F Glenda Trace #348, Newnan GA 30265 (landlord)**

**Request for Allowance of Administrative Claim**
**Property ID 0115**
**Property Location:  1445 Forestdale Blvd, Birmingham AL
35214**
**Bankruptcy case number 10-30696-DOT**

Clerk of Court
United States Bankruptcy Court
701 East Broad Street
Richmond VA 23219

Lease Agreement by and between MD Midwest Inc, d/b/a Movie Gallery as tenant
Lease dated January 1, 2003 and later modified on December 31, 2009
Y & B Holdings, LLC as landlord

Unpaid charges related to store #0115:

Sign removal-2: $1260 (Estimate)
Furniture and fixture removal (shelves, cameras, counter tops, safe, display cases: $4100
Rekey premises: $125
Fix outside water leak problem left behind by tenant: $750
Past due water bill due to leak:  $388
Pressure wash header after sign removal:  $375 (Estimate)
Inspect A/C units and service:  $275
Service indoor plumbing leak left behind and clean odor:  $173
Past due rent and CAM through March 13th (post bankruptcy):  $5590

Sub total:  $13,036
Credit amount already paid, post bankruptcy:  $4103.66

**Amount Due Per Request of Administrative Claim Allowance:
$8932.24**

Ahmad (Matt) Yammout
Y & B Holdings, LLC

**REAL ESTATE LEASE**

by and between

**SHOPS AT FORESTDALE, LLC,**
**an Alabama limited liability company**

**(Landlord)**

and

**M.G. MIDWEST, INC.,**
**a Delaware corporation**

**(Tenant)**

for the Leased Premises located at:
The Shops at Forestdale
Highway 78
Birmingham, AL 35214

# REAL ESTATE LEASE

A.   Landlord:

| | |
|---|---|
| Name: | Shops at Forestdale, LLC, an Alabama limited liability company |
| Address: | 200 Union Hill Dr., Suite 301 |
| City/State/Zip: | Birmingham, AL 35209 |
| Phone #: | 205-868-4575 |
| Fax #: | 205-868-4582 |
| Contact: | Sid Aultman |
| Email Address: | saultman @ brighamwilliams.com |

B.   Tenant:

| | |
|---|---|
| Name: | M.G. Midwest, Inc., a Delaware corporation |
| Address: | 900 West Main Street |
| City/State/Zip: | Dothan, AL 36301 |
| Phone #: | 334-677-2108 |
| Fax #: | 334-794-5923 |
| Contact: | Real Estate Department |

C.   Leased Premises:

| | |
|---|---|
| Center Name: | The Shops at Forestdale |
| Address: | Highway 78 |
| City/State/Zip: | Birmingham, AL 35214 |
| County: | Jefferson |

D.   Lease Date: _1-3-2003_ *[Date Lease is executed by the last to sign (Tenant).]*

E.   Leased Premises Size: 4,000 s.f.    Dimensions: 66.67' W x 60' D
Gross Leasable Area of Center: 6,400 s.f.

F.   Term: Seven (7) years    *(see Paragraph 3 of the Lease)*

G.   Rent Commencement Date: 60 days after Turn Over Date *(see Paragraph 4 of the Lease)*

H.   Lease Commencement Date: 60 days after Turn Over Date *(see Paragraph 4 of the Lease)*

I.   Turn Over Date: ~~June 1, 2003~~ 8-2-03
*[Landlord Construction commences: 60 days from Lease Date (see Paragraph 5 of the Lease)]*

J.   Base Rent:

| | |
|---|---|
| Lease Year 1: | $4,000.00 per month ($12.00 p.s.f.) |
| Lease Year 2: | $4,000.00 per month ($12.00 p.s.f.) |
| Lease Year 3: | $4,000.00 per month ($12.00 p.s.f.) |
| Lease Year 4: | $4,166.67 per month ($12.50 p.s.f.) |
| Lease Year 5: | $4,166.67 per month ($12.50 p.s.f.) |
| Lease Year 6: | $4,166.67 per month ($12.50 p.s.f.) |
| Lease Year 7: | $4,333.33 per month ($13.00 p.s.f.) |

K.   Options: 1st for three (3) years at $13.50 p.s.f.
                 2nd for three (3) years at $14.00 p.s.f.
  Notice:   90 days

L.   Estimated first year pass through costs: CAM: $1.00 p.s.f.

M.   Facade: Sign:   Yes, 36 (height in inches) Cloud *(see Paragraph 34A of the Lease)*
          Awning:   No   *(see Paragraph 34B of the Lease)*

N.   Pylon Sign:   Locate on Landlord's Pylon? No *(see Paragraph 35 A of the Lease)*
               Tenant installs own Pylon?   Yes *(see Paragraph 35 B of the Lease)*

O.   Early Termination:   48 months after Lease Commencement Date
  Termination Penalty: $50,000.00
  Notice: 90 days

P.   [Intentionally Left Blank]

Q.   [Intentionally Left Blank]

FORESTDALE, AL                                         PAGE 1
(9020FORM 6.2002)

THIS REAL ESTATE LEASE ("Lease") is made and entered into by and between the Landlord shown on Page 1 Item A, (hereinafter called "Landlord"), and Tenant shown on Page 1 Item B, (hereinafter called "Tenant").

**WITNESSETH:**

For and in consideration of the rents hereinafter reserved and of the covenants and consideration contained herein, the parties hereto agree as follows:

1. **Leased Premises.** Landlord, representing and warranting to Tenant its right and authority to do so, hereby leases to Tenant and Tenant hereby leases from Landlord, those certain premises whose address and location are set forth on Page 1 Item C of this Lease (the "Leased Premises"), which are more particularly described on Exhibit "A" attached hereto and incorporated herein by reference, together with all appurtenances thereto including, but not limited to, driveways and parking areas (the "Center"). The Landlord and Tenant herein establish the Lease Date stated on Page 1 Item D of this Lease. Page 1 Item E of this Lease sets forth the size and dimensions of the Leased Premises.

2. **Possession and Use of Leased Premises.** Tenant shall be entitled to possession of the Leased Premises on the Turn Over Date and shall yield possession to Landlord on the last day of the term of this Lease, unless otherwise provided by law. Tenant shall operate its business in the Leased Premises for the purpose of retail rental and/or sales of video cassette tapes, digital video discs ("DVDs"), and video games, audio books, laser discs, video hardware and software, video cassette recorders and players, video game players and DVD players; sales of related items such as magazines and concessions, including popcorn, theater candy, sodas and snacks; and other incidental uses provided any such use does not violate an exclusive of any other tenant(s) of which Tenant has received prior written notice.

3. **Term.** The Term of this Lease shall be for the number of years set forth on Page 1 Item F. For purposes of this Lease, the first Lease Year shall be deemed to begin on the Lease Commencement Date and to end twelve (12) months thereafter; provided, if said first twelve (12) month period does not end on the last day of a calendar month, the first Lease Year shall be extended to the end of said month, and each succeeding twelve (12) month period thereafter shall be deemed a Lease Year. Any partial month shall be pro-rated on a thirty (30) day calendar month.

4. **Commencement Dates.** Tenant's rent obligation shall commence as set forth on Page 1 Item G, or when Tenant opens for business, whichever shall first occur. The Term of this Lease shall commence as set forth on Page 1 Item H of this Lease; but if new construction, in no event shall the

Term of this Lease begin prior to the opening for business of the largest anchor tenant in the Center in which the Leased Premises are located. Landlord or Tenant shall submit to the other a letter confirming the Commencement Dates at such time as the dates become final so that Tenant may establish the account for payment.

   5. **Construction and Turn Over Date.** In the event the Leased Premises are to be constructed or renovated, such construction or renovation shall be performed according to the terms stated in Exhibit "B" attached hereto and incorporated herein. As an inducement for Tenant to enter into this Lease with Landlord, Landlord represents and warrants that it shall begin and diligently pursue construction/renovation of the Leased Premises and/or Center within sixty (60) days of the Lease Date set forth on Page 1. If Landlord fails to begin such construction within such period to the reasonable satisfaction of Tenant, and has not obtained either (a) Tenant's written consent for an extension or (b) a written waiver of such delay; then Tenant shall have the right to terminate this Lease upon (10) days written notice to Landlord.

   Landlord is expected to turn over the premises the date shown on Page 1 Item I (the "Turn Over Date"). In the event that the Leased Premises is not ready fifteen (15) days after the Turn Over Date, then Tenant will be entitled to one day free rent for each day of delay until Leased Premises are actually turned over to Tenant. In the event the Leased Premises have not been completed and turned over to Tenant within forty-five (45) days after the Turn Over Date, Tenant may elect to terminate this Lease with no penalty or further responsibility of the Tenant. If Tenant elects not to so terminate this Lease after each forty-five (45) day delay, then the free rent shall continue to accrue until such time as Landlord turns over the Leased Premises to Tenant in compliance with the terms of this Lease.

   Landlord may, one time only, adjust the Turn Over Date by providing Tenant with written notice at least sixty (60) days prior to the Turn Over Date and Landlord shall coordinate the adjusted Turn Over Date with Tenant to the reasonable satisfaction of Tenant (as such adjustment involves an amendment of the Lease). Landlord hereby acknowledges that Tenant orders the fixtures and equipment for the store, and schedules the various departments involved in Tenant's opening for business, during the sixty (60) days prior to the Turn Over Date. Landlord further acknowledges that Landlord's failure to meet the original Turn Over Date, or to seek an adjustment to such date in a timely manner, causes Tenant actual and consequential damages. To that end, if Landlord and Tenant execute this Lease and Landlord does not build the Center and/or the Leased Premises; does not commence and

diligently work to complete Landlord's work for any reason whatsoever; or fails to turn over the Leased Premises to Tenant pursuant to this Lease; then Landlord shall pay to Tenant $15,000.00 as liquidated damages for the costs incidental to site selection; lease preparation and negotiation; and the time and expense incidental to the scheduling changes of the various departments so affected. Landlord further acknowledges that Tenant shall not be unreasonable to refuse to accept an adjusted Turn Over Date during Tenant's peak sales seasons including, but not limited to, a holiday season or a holiday weekend ("Holiday Blackout") and/or Tenant's turn over date schedule for other properties already on Tenant's schedule ("Blackout").

6. **Exclusivity.** During the Term of this Lease and any extension or holdover terms, Landlord grants to Tenant exclusive video specialty store rights (including, but not limited to, the primary rental and/or sales of video cassette tapes, DVDs, and video games), in the Center in which the Leased Premises are located, including out parcels thereof. In the event that this exclusivity is violated, the Tenant may exercise its remedies available under law or in equity and/or the provisions of Paragraph 17 of this Lease.

7. **Rent.** Tenant agrees to pay monthly rental payment set forth on Page 1 Item J of this Lease during the term of this Lease ("Base Rent"). Base Rent shall be paid by Tenant to Landlord by U.S. Mail, in advance, due on the first (1st) day of each month and payable by the tenth (10th) day of each month during the Term and any extension or holdover term of this Lease. In the event that Landlord has not received the rent payment by the tenth (10th) day of the month, then Landlord shall enforce the provisions in accordance with Paragraph 17 of the Lease.

8. **Option to Extend.** So long as Tenant is not in default under this Lease beyond any applicable cure period, Tenant shall have the option to extend the Term of this Lease for the successive term(s) and at such rents as set forth on Page 1 Item K of this Lease. Tenant shall exercise the option to extend by giving Landlord written notice in accordance with the number of days set forth on Page 1, Item K of this Lease. Any such extension term shall begin upon the expiration of the immediately preceding term. Except as otherwise provided in this paragraph, all of the terms and conditions of this Lease shall apply during the extension term. Any subsequent changes shall be enforceable only by mutual consent in writing.

In order to prevent the inadvertent failure of Tenant to exercise any of the aforesaid options within the time specified above, it is agreed that Landlord may not terminate this Lease until and unless Landlord notifies Tenant in writing and points out that the option to extend or to further extend, as the

case may be, has not been exercised. Tenant's option to extend, in each instance, shall continue for a period of ten (10) days after receipt of such notice from Landlord; but if Tenant does not send written notice of the exercise of such option to Landlord within said ten (10) day period, Tenant's option to extend shall thereafter terminate. If Landlord fails to give Tenant such notice prior to the expiration of the original term or of any extension term, as the case may be, and if Tenant shall remain in possession of the Leased Premises after the expiration of the then current term, then Tenant shall remain in possession as a tenant from month to month, subject to the provisions of this Lease insofar as the same may be made applicable to a tenant from month to month. If Landlord then gives Tenant such notice and Tenant exercises its option to extend, then the effective date of such exercise shall be retroactive to the expiration date of the Term or of the extension term, whichever is appropriate.

9. **Use, Operation and Maintenance of Common Areas.** The use and occupation by Tenant of the Leased Premises shall include the use (in common with others tenants entitled thereto) of the common areas, employees' parking area, service roads, loading facilities, landscaping, sidewalks and customer car parking areas of the Center, and such facilities as may be designated from time to time by Landlord, subject, however, to the terms and conditions of this Lease. Landlord shall operate and maintain the common areas and common facilities of the Center at its sole expense, it being acknowledged by the parties that Tenant's pro rata share of the common area maintenance charges are to be reimbursed by Tenant as additional rent. Common area maintenance ("CAM") charges shall be the actual amount (without profit or "mark up" by Landlord or any affiliate of Landlord) of all necessary components and reasonable costs and expenses actually incurred by Landlord in operating and maintaining the common areas of the Center in an appropriate manner commensurate with good business practice; including, but not limited to the following items:

I. The costs of maintenance and repair of:

(a) driveways, sidewalks, parking areas and any other paved areas (including patching, sealing, and line painting);

(b) building maintenance including repair to roofs, gutters, downspouts, canopies, storefronts, electrical and plumbing system, and exterior painting and sealing;

(c) water and septic system repairs and maintenance;

(d) landscaping (including replacement of plant materials);

(e) parking lot, exterior wall mounted and canopy light fixtures (including replacement of bulbs, ballasts and poles/fixtures); and

(f) Center signage;

(g) pest and weed control;

(h) security, if provided;

(i) fire protection (sprinkler system), if provided;

(j) utilities for the common areas and the water and septic systems;

(k) snow removal;

(l) trash, garbage, and refuse removal, if provided;

(m) power washing; and

(n) window cleaning.

II. Notwithstanding anything to the contrary herein, the following items and costs shall be excluded from Tenant's pro-rata share of CAM:

(a) Costs attributable to improvements or work which were part of original plans and specifications for which building permits were issued, ie planting parking lot lighting, striping, roads, and other such items of capital improvement.

(b) Leasing costs of any type, be it procuring tenants or re-leasing; as well as retaining existing tenants.

(c) Costs incurred due to Landlord violations of any of the terms and conditions of any leases with any tenant(s) in the Center.

(d) Costs attributable to enforcing leases against any tenants in the Center, such as attorney's fees, court costs, adverse judgments and similar expenses.

(e) Depreciation and amortization of all, except the depreciation and amortization of capital improvements. If the costs of any repairs, alterations, changes, replacements or other items which would otherwise be included in are required and/or are of the type which should be capitalized under the Internal Revenue Code, then except as given below, then such costs shall not be included in full in CAM costs, but rather the CAM shall only include for each fiscal year the annual portion of such costs derived by amortizing the same over the useful life thereof.

(f) Interest on any mortgages of the Landlord and rental under any ground or underlying lease.

(g) Advertising and promotional expenditures which are not a part of a specific marketing plan agreed upon by the tenant.

(h) Repairs and other work occasioned by fire, or other casualty that the Landlord is reimbursed by insurance that was required to be carried under the Lease.

(i) Any costs, fines or penalties, incurred due to violations by Landlord of any governmental rule or authority and the defense of same.

(j) Expenses for vacant or vacated space, including utility costs, securing and renovating.

(k) Repairs and maintenance performed in a tenant exclusive space and not in the common area.

(l) Any costs incurred in connection with the removal or abatement of asbestos, environmental condition, and/or other hazardous materials or substances from, within, on, or beneath the Center.

(m) Any expense for which Landlord receives reimbursement by insurance proceeds or condemnation awards.

(n) Any and all payroll or other benefits, perks, or expenses for employees of Landlord; provided, however, that Landlord shall be permitted to pass through reasonable charges relating to third party contractors performing routine maintenance for the Center, such as mowing the grass, etc.

The parties acknowledge and agree that the distinction between items which are a CAM type item, items which are an expense of which the Landlord has an IRS business expense deduction available, and items which are and/or should be capitalized; depend upon both the type of the item and the extent to which the item is repaired and/or replaced. As an example of such distinction, the parties acknowledge the following IRS Code explanation regarding the treatment of improvements:

The cost of making improvements to a business asset are capital expenses if the improvements add to the value of the asset, appreciably lengthen the time you can use it, or adapt it to a different use. You can deduct repairs that keep your property in a normal

efficient operating condition as a business expense. Improvements include new electric wiring, a new roof, a new floor, new plumbing, bricking up windows to strengthen a wall, and lighting improvements. [However, one would] capitalize the costs of reconditioning, improving, or altering your property as part of a plan of a general restoration plan to make it suitable for your business: This applies even if some of the work would by itself be classified as repairs (ie a Restoration).    [As to Replacements] You cannot deduct the cost of a replacement that stops deterioration and adds to the life of your property: Capitalize that costs and depreciate it. [For example] Treat as repairs amounts paid to replace parts of a machine that only keep it in a normal operating condition. However, if your equipment has a major overhaul, capitalize and depreciate the expense.

Tenant's proportionate share of such applicable CAM charges shall be determined using a fraction, the numerator of which is the gross leasable area in the Leased Premises and the denominator of which is the total gross leasable area of the Center. Tenant shall pay said amount on a monthly basis based on one-twelfth (1/12th) the estimated annual amount as estimated by Landlord, and Tenant shall pay said cost with monthly Base Rent.

The initial estimate of CAM charges is set forth on Page 1 Item L of this Lease. At the end of each year, Landlord shall notify Tenant of the actual amount of such charges and any overage or deficiency between the actual cost and the estimated costs shall be paid by the appropriate party within fifteen (15) days from the date of notice; provided, however that if Landlord does not reconcile such charges within six (6) months of the end of the lease year, then Landlord shall be deemed to have waived such adjustment for the remainder of that lease year and all prior years. Furthermore, Landlord and Tenant agree that during the initial Term of this Lease, CAM charges shall not increase more than five percent (5%) per annum (including any and all exercised option periods).

16.    Taxes and Insurance.  Tenant shall annually reimburse Landlord, as additional rent, its proportionate share of real estate taxes, special taxes and assessments (Landlord represents that it has notified Tenant of any assessment of which Landlord knows or should have known and which Tenant would be subject to pursuant to terms of this Lease) ("Taxes") and all insurance for the Center (excluding any tenants separately taxed or separately charged for insurance). Insurance provided by Landlord shall include fire insurance, extended coverage and all other perils coverage, plus all endorsements and other coverages deemed reasonable and necessary by Landlord for the building and for the exterior or Common Areas of the Center ("Insurance").

Landlord shall, along with Landlord's written notice to Tenant for the payment of Taxes and Insurance, provide to Tenant copies of the actual paid receipts for Taxes and Insurance. Tenant agrees to pay its share of Taxes and Insurance within thirty (30) days of its receipt of the annual bill from Landlord; provided, however that if Landlord does not request such amounts within six (6) months of

the end of the lease year, then Landlord shall be deemed to have waived such amounts for Taxes and Insurance for that Lease year. Furthermore, Landlord and Tenant agree that during the Term of this Lease, increases in Taxes and Insurance charges shall not increase more than five percent (5%) per annum (including any and all exercised option periods).

Landlord, at Landlord's option, may obtain separate taxable status for the Leased Premises and in such event Tenant shall pay its taxes directly to the taxing authority. In such event, Landlord may reasonably request from Tenant evidence of such payment by Tenant. Tenant shall be responsible for all personal property taxes on its personal property located at the Leased Premises.

11. **Audit of CAM, Taxes and Insurance.** Tenant shall be provided, upon request, an accounting (such as copies of bills or invoices) of all ad valorem taxes on the Leased Premises, insurance expenses, and common area maintenance expenses for each year of the Lease Term provided Tenant is required to pay any portion of such expenses by the terms of this Lease.

12. **Mutual Waiver of Subrogation.** Notwithstanding anything set forth in this Lease to the contrary, Landlord and Tenant each expressly, knowingly, and voluntarily waive and release any and all right of recovery, claim, action, or cause of action against the other and its respective agents, officers and employees, for any damage to its properties and loss of business (specifically including loss of rent by Landlord and business interruption by Tenant) as a result of the acts or omissions of the other party, or the other party's agents, officers and employees (specifically including the negligence of either party or its agents, officers and employees and the intentional misconduct of the agents, officers and employees of either party), which claims are covered by the insurance required to be maintained by the parties pursuant to the terms of this Lease or other insurance as either party may carry at the time of an occurrence. In addition, all insurance policies carried by either party covering the Center, the Leased Premises, or the property in the Leased Premises (including, but not limited to: contents, fire, and casualty insurance) shall expressly waive any right on the part of the insured against the other party for damage to its properties and loss of business as a result of the acts or omissions of the other party or the other party's agents, officers and employees; or in the alternative, Landlord and Tenant shall each, on or before the Turn Over Date obtain and keep in full force and effect at all times thereafter a waiver of subrogation from its insurer concerning the property, rent loss, and business interruption insurance maintained by it for the Center, the Leased Premises, and the property located in the Leased Premises; provided, however, that the foregoing shall not apply to claims for personal injury or wrongful death.

FORESTDALE, AL                                                                                                    PAGE 8
(9020FORM 6.2002)

**13. Repairs.** In addition to Landlord's obligation to maintain the common areas, Landlord shall (at its expense except to the extent such expense is a permitted CAM item pursuant to Paragraph 9 of the Lease) make all repairs as shall be necessary to the roof (and repair any damage caused as a result of leakage), exterior walls, exterior painting, foundations, below floor plumbing, sidewalk, parking lot, landscape, exterior lighting, storefront, sprinkler systems (if present), exterior façade, Landlord installed canopies (if any), structural components of the Leased Premises, so as to keep all free of leaks and in good condition and repair. Notwithstanding anything contained herein to the contrary, all equipment (including, but not limited to, heating and air conditioning ("HVAC") system, wiring, lights, plumbing, etc.) will be in good working order as of the Turn Over Date. Landlord will be responsible for any latent defects (defects that occur during construction but do not become obvious until sometime during the Term of this Lease) as Landlord is the correct party to pursue such claim against its contractor. Landlord shall have all light fixtures and bulbs operational in the Leased Premises as of the Turn Over Date and shall provide a warranty on all light fixtures, excluding bulbs, for a period of one (1) year. Tenant shall notify Landlord in writing of any required repairs that are the responsibility of Landlord in accordance with Paragraph 17 of this Lease. Enforcement of this provision by Tenant shall be in accordance with Paragraph 17 of this Lease.

Except as hereinafter provided, Tenant, during the Term of this Lease or any extension or holdover terms of this Lease, shall, at its expense, make all internal repairs as shall be reasonably necessary to keep said Leased Premises in good condition and repair, including interior painting and above floor plumbing, reasonable wear and tear excepted. Tenant agrees that all damage or injury by Tenant (other than reasonable wear and tear and/or except as caused by Landlord, its agents, servants and employees) shall be repaired by Tenant at its expense, unless covered by insurance maintained by Landlord. Upon inspection, should Landlord find needed repairs that are the responsibility of Tenant, Landlord shall notify Tenant in writing of the needed repairs pursuant to Paragraph 17 of this Lease. Enforcement of this provision by Landlord shall be in accordance with Paragraph 17 of this Lease.

Landlord agrees that the HVAC system for the Leased Premises shall meet the requirements of Exhibit B. If the HVAC system is new, Landlord agrees to pass through all warranties to Tenant (one-year minimum). Landlord further agrees to provide Tenant with written notice listing all applicable warranty information and/or warranty-required vendor information (for the HVAC or the Leased Premises) on or before the Turn Over Date. In addition, Landlord shall warrant HVAC system equipment for one year from opening date (excluding regular maintenance costs). Tenant will repair

and maintain, but not replace, HVAC of the Leased Premises in order to adequately maintain the Leased Premises at customer comfortable heating and cooling levels at all times during operations therein. After the expiration of the warranty period or if the HVAC is not new as of the Turn Over Date, a cap of $250.00 per occurrence and $500.00 per year shall apply to all HVAC repairs by Tenant. Tenant agrees to maintain a maintenance contract on the HVAC in the Leased Premises, and Landlord may (upon written request to Tenant) obtain additional information upon Tenant's opening for business.

In the event of an emergency, Landlord and Tenant agree that (i) either party may make such immediate and reasonable repairs as is necessary to (a) cure an emergency (including, but not limited to an HVAC system situation) and/or (b) prevent injury to persons or property in the Leased Premises, and (ii) the party responsible for such repair, maintenance, or cure under the terms of this Lease shall reimburse the other party for such reasonable emergency expenditures within thirty (30) days of its receipt of an itemized invoice of same. Landlord and Tenant agree, if reasonably possible, to provide the other party a twenty-four (24) hour notice by phone and/or facsimile, and thus an opportunity to begin and diligently pursue the cure of the emergency prior to performing such emergency repair. Any such emergency repair shall have a cap of $1,000.00 per occurrence, for purposes of the reimbursement.

Tenant agrees that the expiration of this Lease, or upon the earlier termination hereof, to quit and surrender said Leased Premises in good broom clean condition and repair, reasonable wear and damage by act of God or fire or other cause beyond the control of Tenant excepted. Tenant agrees to return the keys to the Leased Premises to Landlord upon such surrender of the Leased Premises; or to reimburse the Landlord the reasonable cost of re-keying the Leased Premises.

14. **Assignment and Subletting.** Tenant may not assign this Lease or sublet the Leased Premises without the written consent of Landlord, said consent not to be unreasonably withheld.

15. **Insolvency.** If any proceedings in bankruptcy or insolvency are filed against Tenant; or if any writ of attachment or writ of execution be levied upon Tenant's interest herein, and such proceedings or levy shall not be released, bonded or dismissed within thirty (30) days thereafter; or if any sale of the leasehold interest hereby created or any part thereof should be made under any execution or other judicial process; or if Tenant shall make any assignment for benefit of creditors or shall voluntarily institute bankruptcy or insolvency proceedings; Landlord, at Landlord's election, may re-enter and take possession of said Leased Premises and remove all persons therefrom and may, at

FORESTDALE, AL
(9020FORM 6.2002)                                                                PAGE 10

Landlord's option, terminate this Lease. Landlord shall provide Tenant with written notice of its intent to exercise its remedies set forth in this provision and Tenant shall have thirty (30) days from the date of such notice to remove its personal property from the Leased Premises.

16. **Attorney's fees.** In the event of any litigation between the parties hereto arising out of this Lease, or in connection with the Leased Premises, the prevailing party shall be allowed all reasonable attorney's fees, all court costs, and incidental expenses incurred or expended in such litigation, to be recovered as a part of the costs therein.

17. **Default, Cure Period, and Remedies.** Except as otherwise set forth in this Lease:

A. **Tenant Default, Notice to Tenant, Tenant's Cure Period, Landlord's Remedies.** This Lease is made upon the express condition that if:

(i) Tenant fails to pay the rental reserved hereunder or any part thereof after the same shall become due and payable, and such failure or neglect shall continue for a period of thirty (30) days after written notice thereof from Landlord to Tenant; then Landlord at any time thereafter by written notice to Tenant, may lawfully: (a) assess a late charge in an amount of Fifty and No/100 Dollars ($50.00) per occurrence to offset Landlord's resulting administrative expenses; or (b) declare the termination hereof and re-enter said Leased Premises or any part thereof, and by due process of law, expel, remove and put out Tenant or any person or persons occupying said Leased Premises and may remove all personal property therefrom without prejudice to any remedies which might otherwise be used for the collection of arrears of rent or for any breach of covenants or conditions; or (c) pursue any of its remedies at law or in equity; and/or

(ii) Tenant fails or neglects to perform, meet, or observe any of Tenant's other non-monetary obligations hereunder, and such failure or neglect shall continue for a period of thirty (30) days after written notice thereof from Landlord to Tenant; then Landlord at any time thereafter, by written notice to Tenant, may lawfully: (a) cure the default and bill Tenant for the reasonable costs of such cure, and if Tenant has not paid such amount within thirty (30) days of its receipt of the bill, then Landlord may terminate the lease in accordance with the terms of this provision as set forth below; and/or (b) declare the termination hereof and re-enter said Leased Premises or any part thereof, and by due process of law, expel, remove and put out Tenant or any person or persons occupying said Leased Premises and may remove all personal property therefrom without prejudice to any remedies which might otherwise be used for the collection of arrears of rent or for any breach of covenants or conditions; or (c) pursue any

FORESTDALE, AL                                                                                           PAGE 11
(9020FORM 6.2002)

of its remedies at law or in equity.  Notwithstanding anything to the contrary, the Landlord shall have a duty to mitigate damages.

B.  Landlord Default, Notice to Landlord, Landlord's Cure Period, Tenant's Remedies.  In the event Landlord fails or neglects to perform, meet, or observe any of Landlord's obligations under this Lease, and such failure or neglect shall continue for a period of thirty (30) days after written notice from Tenant, then Tenant, at any time thereafter by written notice to Landlord, shall have the right to either terminate the Lease; withhold rent, pending Landlord's cure of the default; cure the default and deduct the expense or cost from the rent amount due Landlord under the terms of this Lease; or pursue ant of its remedies at law or in equity.  Notwithstanding anything to the contrary, the Tenant shall have a duty to mitigate damages.

**18.  Nonwaiver of Default.**  The subsequent acceptance of rent hereunder by Landlord shall not be deemed a waiver of any preceding breach of any obligation hereunder by Tenant other than the failure to pay the particular rental so accepted, and waiver of any breach of agreement or condition by either party shall not constitute a waiver of any breach of such other default regardless of knowledge thereof.

**19.  Limit of Liability.**  In the event of default of this Lease beyond any applicable cure period, the liability of either party of this Lease to the other party is hereby limited to $500,000.00. the foregoing provision is not intended to relieve Landlord or Tenant from the performance of any obligation under this Lease, but only to limit the personal liability of such party in the case of recovery of a judgment against said defaulting party.  The parties further agree that the provisions of this Paragraph shall neither limit the coverage and/or the indemnification for liability provision, provided pursuant to Paragraphs 12, 20 and 41 of the Lease, respectively; nor shall the foregoing be deemed to limit Landlord or Tenant's rights to obtain injunctive relief or specific performance or to avail itself of any other right or remedy which maybe awarded Tenant by law or under this Lease as permitted by the terms of the Lease.

**20.  Insurance and Mutual Indemnity.**

Tenant agrees to obtain and maintain with a reputable insurance company, at its sole cost and expense, public liability insurance against property damage or personal injury growing out of the use of, or occurring on, or about, the Leased Premises, including personal injury coverage with liability limits of $1,000,000.00 and fire and casualty insurance on the contents in a commercially adequate amount.  Landlord shall be named as an additional insured on all such policies provided by Tenant, except for Tenant's personal property insurance coverage, and shall be entitled upon Landlord's

reasonable request, to a certificate of the insurer showing said coverage to be in effect. (Landlord's insurance obligation is set forth in Paragraph 10 of this Lease.)

Tenant hereby agrees to indemnify Landlord against, and to hold Landlord harmless from, any and all claims or demands, including attorney's fees and court costs incurred in defending same, for loss of or damage to property or for injury or death to any person from any cause whatsoever while in, upon, or about said Leased Premises during the term of this Lease or any extension or holdover terms hereof. Landlord shall indemnify and hold Tenant harmless from any and all claims or demands, including attorney's fees and court costs incurred in defending same, for loss of or damage to property or for injury or death to any person from any cause whatsoever in the Center; or the common areas; excluding the Leased Premises; during the Term of this Lease, any exercised option period, or any extension or holdover terms hereof.

21. **Utilities and Services.** During the Term of this Lease, including any exercised option period, or any extension or holdover terms, all utility costs for service on the Leased Premises will be borne and paid by Tenant, including telephone, electricity, water, janitorial services, sewage and garbage collection, and pest control within the Leased Premises. Tenant prefers to pay such utilities and services through direct billing, but if that is not available then Tenant will reimburse Landlord for such reasonable utilities and/or services through CAM. Landlord shall be responsible for maintaining adequate pest control in the common areas if such becomes necessary in Tenant's reasonable business judgment. Notwithstanding anything to the contrary herein, Landlord shall be responsible for obtaining any necessary termite inspections and/or maintaining termite control for the Leased Premises and the Center.

22. **Entry and Inspection.** Tenant shall permit Landlord and Landlord's agents to enter the Leased Premises at all reasonable times during Tenant's business hours for any of the following purposes: to inspect the Leased Premises; to maintain the building in which the Leased Premises are located; to make such repairs to the Leased Premises as Landlord is obligated or may elect to make; and to post notices of nonresponsibility for alterations or additions or repairs. Landlord shall have such right of entry and the right to fulfill the purpose thereof without any rebate of rent to the Tenant for any loss of occupancy or quiet enjoyment of the Leased Premises thereby occasioned; provided (a) the purpose of such entry is reasonable and commensurate with good business practices; (b) Landlord or its agents enter and perform such repair(s) in or about the Leased Premises in compliance with all applicable laws, using good equipment and products, and such work is performed in a prompt and

professional manner; and (c) Landlord does not unreasonably restrict or impair visibility of, access to, parking for, or the operation of, Tenant's business in the Leased Premises.

23. **Destruction of Leased Premises.**  In the event of a total or partial destruction of the Leased Premises during the term of the Lease from any cause, Landlord shall forthwith repair the same, provided such repairs can be made within 120 days under the laws and regulations of state, federal, county or municipal authorities; but such partial destruction shall in no way annul or void this Lease, except that the rent reserved to be paid hereunder shall be equitably adjusted according to the amount and value of the undamaged space.  If such repairs cannot be made within 120 days (as reasonably determined by the parties no later than sixty (60) days from the date of destruction), this Lease may be terminated at the option of either party.

24. **Alterations.**  Tenant shall be permitted to make any non-structural alterations to the interior/exterior of the Leased Premises as it wishes.  Requests to make structural alterations to the Leased Premises shall require Landlord's consent which shall not be unreasonably withheld.  Any additions to, or alterations of, the real property shall become a part of the realty and belong to Landlord.  However, Landlord hereby grants Tenant the right to install any of Tenant's personal property, including, but not limited to, signs, marketing materials, banners, etc. on the interior of the Leased Premises without Landlord's prior consent.  Tenant shall keep the Leased Premises free from any and all liens arising out of any work performed, materials furnished, or obligations incurred by Tenant.  Tenant agrees to permit Landlord to post a notice of non-responsibility.

25. **Condemnation.**  If the whole of the Leased Premises shall be taken or condemned by any competent authority for any public use or purpose, then the Term hereby granted shall cease on the day prior to the taking of possession by such authority or on the day prior to the vesting of title in such authority, whichever first occurs, and rent hereunder shall be paid to and adjusted as of that day.

If a portion of said Leased Premises shall be condemned or taken and, as a result thereof, there shall be such a major change in the character of the Leased Premises as to prevent Tenant from using the same in substantially the same manner as theretofore used, then and in that event, Tenant may terminate this Lease, as of the date when the part of the Leased Premises so taken or condemned shall be required for such public purpose, or said Tenant may continue to occupy the remaining portion; provided, however, that Tenant shall give written notice to Landlord, within fifteen (15) days after the date of any taking or vesting of title, of its election.  In the event Tenant shall remain in possession and occupation of the remaining portion, all terms and conditions of this Lease shall remain in full force

FORESTDALE, AL
(9020FORM 6.2002)

PAGE 14

and effect with respect to such remaining portion, except that the rent reserved to be paid hereunder shall be equitably adjusted according to the amount and value of such remaining space; provided further that Landlord shall, at Landlord's own expense, promptly and with all reasonable diligence (subject to Force Majeure per Paragraph 38K of the Lease) do such work as to make a complete architectural unit of the remainder of the building on the Leased Premises and this Lease shall continue for the balance of its Term, subject to the terms and conditions herein stated.

The entire award of damages or compensation for the Leased Premises taken, or the amount paid pursuant to private purchase in lieu thereof, whether such condemnation or sale be total or partial, shall belong to and be the property of Landlord, and Tenant hereby assigns to Landlord any and all such award or purchase price. Nothing herein contained shall be deemed or construed to prevent Tenant from interposing and prosecuting in any condemnation proceeding a claim for the value of any trade fixtures installed in the Leased Premises by Tenant, and in the case of a partial condemnation of the Leased Premises, the cost, loss, or damages sustained by Tenant as the result of any alterations, modifications, or repairs which may be reasonably required of Tenant in order to place the remaining portion of the Leased Premises not so condemned in a suitable condition for Tenant's further occupancy.

26. **Laws and Regulations.** Tenant, at its own cost and expense and in accordance with the terms of this Lease, shall comply promptly with all laws, rules, and orders of all federal, state, and municipal governments, or departments, that may be applicable to the Leased Premises, and shall likewise promptly comply with the requirements of the Board of Fire Underwriters concerning the Leased Premises. Landlord, at its own cost and expense and in accordance with the terms of this Lease, shall comply promptly with all laws, rules, and orders of all federal, state, and municipal governments, or departments, that may be applicable to the Center, and shall likewise promptly comply with the requirements of the Board of Fire Underwriters concerning the Center.

27. **Notices.** All notices to be given to Tenant or Landlord shall be in writing, deposited in the United States mail, certified or registered return receipt requested, with postage prepaid or by a regular nationally recognized overnight delivery service (i.e., Federal Express) and addressed as set forth on Page 1 Item A or B of this Lease (as appropriate). Notices shall be deemed delivered when deposited in the United States mail, as provided above, or accepted by an overnight delivery service. A change of address by either party must be by notice given to the other in the manner specified above.

FORESTDALE, AL                                                                                    PAGE 15
(9020FORM 6.2002)

28. **Holding Over.** Any holding over after the expiration of the Term or any exercised option period, without the consent of the Landlord, shall be construed as a tenancy from month to month and shall be on the terms and conditions herein specified.

29. **Quiet Enjoyment.** Upon payment by Tenant of the rent herein provided, and upon the observance by Tenant of the terms and conditions on Tenant's part to be observed and performed, Tenant shall peaceably and quietly hold and enjoy the premises for the term of this Lease without hindrance or interruption by Landlord or any other person or persons lawfully or equitably claiming by, through, or under Landlord, subject, nevertheless, to each and every of the terms, provisions, covenants, agreements, undertakings and conditions of this Lease.

30. **Renewal.** Landlord and Tenant by mutual written agreement may elect to renew this Lease (the "extension") for additional periods beyond the options set out in this Lease, under the same or similar terms, with the rent for any such additional periods to be paid monthly, in advance, equal to the amounts agreed upon in writing by the parties hereto.

31. **Liens and Encumbrances.** This Lease shall be subordinate to any existing or subsequent mortgage, lien, or encumbrance.

32. **Relationship of Parties.** It is understood and agreed that the relationship of the parties hereto is strictly that of Landlord and Tenant and that this Lease shall not be construed as a joint venture or partnership. Tenant is not and shall not be deemed to be an agent or a representative of Landlord. Landlord is not and shall not be deemed to be an agent or a representative of Tenant.

33. **Personal Property.** Landlord acknowledges that Landlord has no interest in any personal property, equipment, or furniture and fixtures (except for Landlord's statutory Landlord Lien rights, if applicable) which may be installed by Tenant upon the Leased Premises. Tenant shall have the right to remove said items at the termination of this Lease, and shall be permitted twenty (20) days after the effective date of termination of the Term or any exercised option period or holdover term, whichever is applicable, within which to accomplish the removal and Tenant shall pay pro-rata rent for the number of days it takes in removing its property (rent rate shall be the rent last in effect under the terms of the Lease). Tenant shall be responsible for all ad valorem property taxes for its personal property located at the Leased Premises (as stated in Paragraph 10 of this Lease).

34. **Facade.**

A.    *Sign.* If "Yes" is listed on Page 1 Item M of the Lease; then Tenant shall be permitted to install, at Tenant's expense, its typical "Movie Gallery" sign on the facade of the Leased Premises. If

such signage is allowed pursuant to Page 1, Tenant must have (i) the installation permit for the signage; (ii) the signage must conform to all local codes; (iii) the cost of the signage, its installation and maintenance, shall be paid for by the Tenant; and (iv) upon termination of this Lease, the Tenant shall remove the sign and reasonably repair damage to the façade caused by such removal, reasonable wear and tear excepted. If such is allowed pursuant to Page 1 Item M, then the specifications of said item is attached as Exhibit C. If "No" is indicated on Page 1 Item M, then Tenant is not granted the right, and shall not, install any signage on the façade of the Leased Premises.

B. *Awning.* If "Yes" is indicated on Page 1 Item M of this Lease, then Tenant shall be permitted to install, at Tenant's expense, its typical "Movie Gallery" awning(s) on the Leased Premises. If such awning(s) is/are allowed pursuant to Page 1, then (i) Tenant must have installation permit for the awning(s); (ii) the awning(s) must conform to all local codes; (iii) the cost of the awning, its installation and maintenance, shall be paid for by the Tenant; and (iv) upon the termination of this Lease, the Tenant shall remove the awning(s) and reasonably repair damage to the façade caused by such removal, reasonable wear and tear excepted. If such is allowed pursuant to Page 1 Item M, the specifications of said item(s) is/are attached as Exhibit C. If "No" is indicated on Page 1 Item M, then Tenant is not granted the right, and shall not, install any awning(s) on the Leased Premises.

**35. Pylon Signs.**

A. *Landlord's Pylon.* If "Yes" is indicated on Page 1 Item N, then Tenant shall have the right to place its typical "Movie Gallery" pylon panel sign on Landlord's existing pylon sign. Landlord also hereby grants to Tenant the right, but not the obligation, to include its pylon panel on any future Landlord pylon in the Center and to that end agrees to provide Tenant with written notice of the availability of such and the specifications of the proposed Landlord pylon sign. The cost of Tenant's pylon panel will be paid for by Tenant and Tenant shall pay its pro-rata share of Landlord's pylon sign maintenance and utility charges for any pylon sign of which Tenant has agreed to be included. The specifications of said item (as referenced on Page 1) is attached as Exhibit C and the approximate location of which is noted on Exhibit D (see Paragraph 39 of the Lease). If "No" is indicated on Page 1 Item N, then Tenant is not granted the right, and shall not, install its pylon panel on the Landlord's pylon as of the execution of this Lease; provided, however, that Tenant retains its right to install its pylon panel on any future Landlord pylon in the Center.

B. *Tenant's Pylon.* If "Yes" is indicated as set forth on Page 1 Item N, then Landlord grants Tenant the right to place its typical "Movie Gallery" pylon sign in the Center. If Tenant is allowed its

D.  Governing Law.  This Lease shall be construed and enforced in accordance with the law of the state in which the Leased Premises are located.

E.  Authorized Signatures.  Landlord and Tenant represent that the undersigned is duly authorized to execute this Lease and bind Landlord or Tenant, respectively.  Any addenda or amendments to this Lease, including but not limited to the letter amendment confirming the Commencement dates for the Term of this Lease, may be signed by only one officer so approved by the board of directors of the Tenant and an authorized officer or agent for Landlord.

F.  Partial invalidity.  If any term, covenant, condition or provision of this Lease, or the application to any person or circumstance thereof, shall, to any extent, be invalid or unenforceable, then the remainder of the Lease, or the application of such term or provision to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby; and each term, covenant, condition and provision of this Lease shall be valid and be enforced to the fullest extent permitted by law.

G.  Waiver.  The failure of either party to address any violation of, or to insist upon strict performance of any term, covenant or condition contained in this Lease shall not prevent a similar subsequent act from constituting a default under this Lease.

H.  Broker.  Landlord and Tenant acknowledge and agree that Landlord utilized the services of Robert Jolly with Eason, Graham & Sanders whose address is 2101 Highland Avenue in Birmingham, Alabama 35205 (the "Broker").  Landlord agrees that Landlord is solely responsible for the payment of any commission or other fees of Broker relating to the negotiation and/or execution of this Lease and any extensions or holdover thereof.  Landlord and Tenant agree to hold each other harmless against any and all claims by any person for brokerage commissions arising out of any conversation, negotiations or other dealings held by the other party with any broker regarding this Lease.

I.  Definition of Term.  Whenever a general reference is made to the "term" or "Term" of this Lease, it shall be understood that such reference includes the initial Term (specifically defined as set forth on Page 1) and, if applicable, any exercised option periods, holdover terms or any other extensions beyond the original termination date as contemplated by this Lease.

J.  Entire Agreement.  This instrument contains the entire and only agreement between the parties, and no oral statements, representations, or written matter not contained in this instrument shall have force or effect.  This Lease shall not be amended or modified in any way except by a writing executed by a duly authorized representative of both parties.

FORESTDALE, AL                                                                                                    PAGE 19
(9020FORM 6.2002)

K.  Force Majeure.  In the event that either party hereto shall be delayed or hindered in or prevented from the performance of any act required under this Lease by reason of materially adverse weather conditions (defined as a catastrophic event and/or such severe adverse weather as not reasonably foreseeable to the performing party), strikes, lockouts, labor troubles, failure of power, restrictive governmental laws or regulations, riots, insurrections, acts of war, or other reasons of a like nature not the fault of the party delayed in performing works or doing acts required under the terms of this Lease, then performance of such act shall be extended for a period equivalent to the period of such delay, except as otherwise specifically provided herein to the contrary.  The provisions of this Section shall not (a) be applicable to delays resulting from the inability of a party to obtain financing or to proceed with its obligations under this Lease because of a lack of funds; (b) delay or postpone any of the rights specifically granted to Tenant to terminate this Lease; or (c) be applicable to either party's performance of its respective financial obligation pursuant to the terms of the Lease.

L.  Landlord's Approval.  Whenever this Lease requires Tenant to obtain the permission, approval and consent of Landlord, Landlord, in its permission, approval or consent shall not be unreasonably withheld, conditioned, or delayed. Landlord further agrees that when exercising its discretionary rights under this Lease, Landlord will at all times act reasonably, and will use commercially reasonable efforts to minimize any interference with the visibility of, access to, parking for, or the operation of, Tenant's business in the Leased Premises.

M.  Survival of Provisions.  The representations and warranties of the respective parties regarding the performance of a party's respective obligations under the terms of this Lease shall be deemed material and shall survive the expiration or termination of the Lease indefinitely, in so far as such provision(s) should be applicable after the expiration or termination of this Lease.

39.  Site Plan.  Landlord hereby leases to Tenant, and Tenant hereby leases from Landlord, those certain premises highlighted on the Site Plan attached hereto and incorporated herein as Exhibit "D" (the "Site Plan").

40.  Additional Provisions.

A.  Notwithstanding anything contained herein to the contrary, Tenant may, after the number of months from commencement date as set forth on Page 1 Item O, terminate this Lease without further obligation by providing Landlord with the number of days notice set forth on Page 1 Item O of this Lease.

B.  [Intentionally Left Blank]

C.  Notwithstanding anything contained herein to the contrary, Tenant may, upon thirty (30) days written notice to Landlord, permanently close its store (cease operations, or otherwise remove its property from the Leased Premises) provided that all terms and conditions of this Lease will remain in full force and effect, including the payment of all rentals due hereunder.  In the event Tenant exercises this right, Landlord shall have the right to terminate the Lease upon ten (10) days written notice.

D.  [Intentionally Left Blank]

E.  Landlord shall not lease to any health club, bar, lounge, news stand, bingo hall, video arcade, or any "sit down" restaurant (with seating for fifty (50) or more persons or gross sales of alcohol over 50%) if the nearest door of such establishment is closer than one hundred (100) feet to the nearest door of the Leased Premises.

F.  Landlord also agrees that it will not sell or enter into a lease with respect to any property in which it, or an officer, member or owner of Landlord, has an interest within a three (3) mile radius of the Leased Premises to any entity that intends to use the property for a video rental/sales business.

**41.  Environmental Representation and General Indemnification:**

**A.  TENANT'S ENVIRONMENTAL REPRESENTATIONS & INDEMNIFICATION:**

Tenant hereby agrees that its use and alterations of the Leased Premises shall comply with all applicable laws, rule, ordinances, and regulations, including permits, during its possession; and Tenant will not store, release, or dispose (or knowingly permit the storage, release, or disposal of) an environmental hazard or condition, hazardous materials, or toxic waste (as defined by federal and state law and regulation) on the Leased Premises.  Tenant does hereby agree to indemnify and hold Landlord harmless of, from, and against, all claims, actions, liens, demands, costs, expenses, fines and judgments (including reasonable legal fees and costs) resulting from, or arising out of, Tenant's violation of this provision.

**B.  LANDLORD'S ENVIRONMENTAL REPRESENTATIONS & INDEMNIFICATION:**

Landlord, represents and warrants that the Leased Premises, and any Landlord properties connecting to or adjacent to Leased Premises, is currently, and shall remain for the duration of this Lease, free from any Hazardous Substance.  Landlord acknowledges and agrees that this representation and subsequent agreement to indemnify Tenant for breaches of this provision, served as an inducement to Tenant to enter into this Lease with Landlord for the Leased Premises.

Notwithstanding anything to the contrary in the Lease, Landlord does hereby agree to indemnify and hold Tenant harmless of, from, and against, all claims, actions, liens, demands, costs, expenses,

fines and judgments, claims, losses (including, but not limited to, loss of revenue and business), damages, causes of actions, suits, investigations, administrative hearings, or other claims (including reasonable legal fees and costs) resulting from, arising out of, or relating to any known or unknown Hazardous Substance above, on, and/or below the surface of the Leased Premises or Center, or any Landlord properties connecting to, or adjacent to, the Leased Premises or Center, and/or resulting from, arising out of, or relating to Landlord's breach or violation of this provision.

Upon notice, Landlord shall have two (2) Monday through Friday business days to respond to Tenant's notice of any breach or violation of this provision. Landlord shall use its reasonable best efforts to begin and diligently pursue the cure of such violation of this provision within five (5) Monday through Friday business days of such notice; and the parties acknowledge and agree that such "cure commencement" will likely include, but is not limited to, contacting third party experts. If Landlord shall fail to adequately respond within this time (as determined by Tenant), then Tenant shall have the right, but not the obligation, to contact the necessary expert assistance, immediately cure said breach or violation, and Landlord's expense; if the breach or violation cannot be immediately cured; then Tenant shall terminate the lease as it discretion and end all of Tenant obligations under the Lease; or Tenant may evacuate the building temporarily suspending all Tenant obligations under the Lease, with Landlord being responsible for all of investigation costs, expert fees and costs, reasonable attorney fees, and other Tenant costs, including but not limited to loss of revenue and business suffered by Tenant during this evacuation, and any and all costs associated with the cure of such breach or violation of this provision.

C. **Definition of Hazardous Substance:** The parties acknowledge and agree that the for purposes of this provision and the Lease, (a) the term "Hazardous Substance(s)" shall mean and include any substance which is or contains: (i) any "Hazardous Substance" as now or hereafter defined in the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as now or hereafter amended (42 U.S.C. Section 9601 et seq.) ("CERCLA") or any regulations now or hereafter promulgated under CERCLA; (ii) any "Hazardous Waste" as now or hereafter defined in the Resource Conservation and Recovery Act of 1976, as now or hereafter amended (42 U.S.C. Section 6901 et seq.) ("RCRA") or any regulations now or hereafter promulgated under RCRA; (iii) any substance now or hereafter regulated by the Toxic Substances Control Act, as now or hereinafter amended (15 U.S.C. Section 2601 et seq.) ("TSCA"), or any regulations now or hereafter promulgated under TSCA; (iv) gasoline, diesel fuel, oil or other petroleum products or derivatives or fractions thereof; (v) asbestos or

FORESTDALE, AL                                                                    PAGE 22
(9020FORM 6.2002)

asbestos-containing materials in any form, whether friable or non-friable; (vi) polychlorinated biphenyls; (vii) radon gas; or (viii) any other substances, materials or wastes which are now or hereafter regulated or classified or considered to be mutagenic, carcinogenic, radioactive, hazardous or toxic under any existing or future federal, state or local law, statute, court decision, common law, code, ordinance, order, rule or regulation relating to hazardous or toxic substances, materials or wastes or the protection of the environment or human health, including without limitation any substance the presence of which on, in, under or in the vicinity of the Center and/or Leased Premises (A) requires reporting, investigation or remediation, (B) causes or threatens to cause a nuisance on or to the Leased Premises, the Center, or to any other property in the vicinity thereof, or poses or threatens to pose a hazard to the health or safety of persons on or in the vicinity of the Leased Premises and/or Center; or (C) which, if released, emanated or migrated from the non-Leased Premises area of the Center, could constitute a trespass; and (b) the term "Environmental Laws" shall mean and include CERCLA, RCRA, TSCA and all other federal, state and local laws, statutes, court decisions, common law codes, ordinances, orders, rules and regulations relating to hazardous substances or the protection of the environment or human health, as same now exist and as hereafter made, promulgated and amended.

42.    (Intentionally Left Blank)

43.    Proof of Title.  Landlord hereby represents and warrants to Tenant that Landlord is either the owner of, or is diligently pursuing the purchase of, the real property in which the Center and/or Leased Premises is located ("Real Property").  As an inducement to Tenant in entering into this Lease, Landlord agrees to provide to Tenant within thirty (30) days from the Lease Date, proof of title (covering at least the five (5) years prior to the execution of this Lease) to the Real Property.  Landlord may provide such proof of title by either (i) a certified copy of a deed reflecting the owner(s) of the Center for the five (5) year period prior to the execution of this Lease, or (ii) a copy of a title search (covering at least the five (5) years prior to the execution of this Lease) for the Real Property.  Enforcement of this provision shall be in accordance with Tenant's remedies at law or in equity, and/or Paragraph 17 of the Lease.

**IN WITNESS WHEREOF,** the Landlord and Tenant hereby execute this Lease on the

date(s) given below.

**TENANT:**
M.G. Midwest, Inc.,
a Delaware corporation

Witness

Witness

By: _____
Its: Sr. V. P. - Development
Date: 1-3-2003

**LANDLORD:**
Shops at Forestdale, LLC
an Alabama limited liability company

Witness

Witness

By: _____
Its: _____
Date: 12/26/02

EXHIBIT "A"

LEGAL DESCRIPTION

A parcel of land located in the Northwest Quarter of Section 18, Township 17 South, Range 3 West of Jefferson County, Alabama and being more particularly described as follows:

Commence at the Western corner of Lot 1 of the Tomahawk Estates, Fifth Sector as recorded in Map Book 97, Page 61 of the Jefferson County Probate Office; thence proceed in a Southwesterly direction of a distance of 547.14 feet to the Point of Beginning; thence turn an interior angle of 90°00'00" and run in a Southeasterly direction for a distance of 202.74 feet; thence turn an interior angle of 90°08'20" and run in a Southwesterly direction for a distance of 114.40 feet; thence turn an interior angle of 145°15'22" and run in a Westerly direction for a distance of 26.38 feet; thence turn an interior angle 214°57'21" and run in a Southwesterly direction for a distance of 42.87 feet; thence turn an interior angle of 89°39'11" and run in a Northwesterly direction for a distance of 188.29 feet; thence turn an interior angle 89°59'46" and run in a Northeasterly direction for a distance of 179.00 feet to the Point of Beginning. Said parcel contains 35,523 square feet (0.82 Acres) more of less.

FORESTDALE, AL

### EXHIBIT "B"

### LANDLORD'S WORK

Landlord agrees to construct for Tenant the area designated as Leased Premises on Exhibit "D" in accordance with the plans attached hereto ("Tenant's Plans") and limited to those items set forth in this Exhibit "B" ("Landlord Work"). Landlord's Work shall be completed in accordance with all applicable governing codes, in a good and workmanlike manner, utilizing first quality new materials. **All plans and specifications prepared by Landlord are to be approved by Tenant in writing prior to the commencement of construction. (Attn: Jim Norris, A & E Coordinator, Movie Gallery 900 West Main Street, Dothan, AL 36301.)**

At a minimum, all plans and specifications prepared by the Landlord must include the following:

1. Site Plan
2. Landscaping Plan
3. Floor Plan
4. Electrical Plan
5. Plumbing Plan
6. Lighting Plan
7. Mechanical (HVAC) Plan
8. Front, Sides, and Rear Elevation Plans

Any additional work provided by Landlord shall be specified in Tenant's Plans or the plans prepared by Landlord, as approved by Tenant.

Any permits, fees, licenses, architectural drawings, engineering consulting services or anything of the sort necessary for the foregoing shall be provided by Landlord at his sole cost and expense, and shall be approved by Tenant before Landlord begins performing the Landlord Work outlined herein.

Landlord shall, at his sole cost and expense, secure from city or local governing body a final certificate of occupancy or the local equivalent, granted to the Tenant and providing for Tenant's right to do business in the respective location. The certificate shall be provided to Tenant's on-site representative or as specified by Tenant. Final shell inspections will be accepted if certificate is not issued until Tenant improvements are completed (i.e., fixtures, carpet, etc.).

To the extent the foregoing is insufficient to meet applicable governing standards, the foregoing shall be modified with Tenant's consent to meet such applicable governmental standards at Landlord's sole cost and expense.

Landlord Work obligations shall be deemed satisfied, provided that:

1. All improvements are (a) in good condition; (b) in compliance with all existing code requirements; and (c) are in compliance with Tenant's plans and specifications.

2. All electrical and mechanical systems shall be in good working order as of the Turn Over Date and Landlord warrants same for a period of at least one year (or more if so specified in the Lease).

3. Tenant has notified Landlord that Tenant has accepted Landlord's Work.

If Landlord's existing improvements are not in accordance with the above, they shall be brought into compliance within five (5) days after notice from Tenant of such non-compliance, after which time Tenant shall have the option to complete this work and offset costs from the Minimum Base Rent. Landlord and Tenant shall inspect the space and Landlord's Work prior to the Turn Over Date and shall determine any discrepancies or items that are not completed in accordance with Tenant's plans and specifications.

Landlord's Work shall include the following, and in all cases the work shall be performed in a good and workmanlike manner by Landlord or its agent, and all materials provided shall be first quality new materials and meet all governing codes and regulations. The term "provide" as used herein means furnish and install.

**EXHIBIT "B"**

A.    **SITE DEVELOPMENT:**

    1.    Parking areas shall be hard-surfaced with concrete, asphalt or other material (approved by the Tenant), properly striped and curbed and guttered.

    2.    All ADA requirements and all other governing codes must be adhered to in total site and building development.

    3.    Walks shall be surfaced with concrete, stone, brick paver or other hard surfaced material as specified by Landlord and approved by Tenant.

    4.    Soil issues with regard to contamination and stability should be addressed and corrected to levels acceptable to local and national governing agencies when applicable. Necessary tests are at Landlord expense.

    5.    All parking areas and walks must be provided with energy efficient artificial lighting at 1 footcandle minimum maintained and 5 footcandles average maintained at ground level at any part of the parking lot.

    6.    Landlord shall provide and install Tenant approved security lighting on the side(s) and rear of the building.

    7.    Dumpster pad and enclosure shall be in a location and of a design to be mutually approved by Tenant and Landlord.

    8.    Site drainage/catch basins shall be located throughout parking and planted areas.

    9.    Tenant will not accept any newly planted trees in front of the building that will, upon full growth maturity, block the view of pylon signage or the storefront.

B.    **BUILDING SHELL:**

    1.    Complete roofing system (including roofing membrane), insulation, roof deck and structure, which shall be weather tight and insulated to conform to the location energy code requirements.

    2.    Complete structural system, columns, beams and/or rafters (exposed construction) which conform to the approved plans and specifications which have been prepared or approved by an architect and/or structural engineer.

    3.    Free-span building with no freestanding interior columns. All wall support columns are to be positioned behind interior sheetrock allowing for uninterrupted display fixture flow around the perimeter walls. Any deviation from this standard requires notification and approval by Tenant.

    4.    Landlord shall provide a structural overhang canopy sufficient to cover the sidewalk with a minimum projection of 5' and a height of 6' extending across the entire storefront (storefront, for the purpose of this provision, is defined as all glass areas along the front or sides of the building). The preferred finish for said overhang is stucco, drivit, or similar panelized finish.

    5.    Building and site should be free of all Hazardous Substances, as defined in the Lease, including, but not limited to, asbestos, underground storage tanks, etc. (Note: Hazardous Substances shall be properly handled (i.e., encapsulated) as required by governing codes and regulations.)

    6.    Exterior insulated wall surfaces of the structure which are architectural concrete, cement plaster/stucco, synthetic stucco, brick, stone or other veneer selected by Landlord and approved by Tenant.

    7.    Primary and Secondary access/exit door(s) with frame and all required hardware in accordance with Tenant's Plans and specifications.

    8.    Blocking to be provided for Tenant's exterior sign at all available sign band areas.

## EXHIBIT "B"

9.     Entire building shell which has been designed and constructed to conform with all governing codes and regulations including, but not limited to, energy code requirements and ADA criteria.

**C.     INSULATION:**

1.     Ceiling and roof system shall have a combined insulated minimum R factor of R28 or greater.

2.     Exterior walls to have a combined minimum insulated R factor of R19.

**D.     FLOORING:**

1.     Provide a smooth and level concrete floor slab which is ready for Tenant specified floor coverings:

2.     Carpet in Sales Area, Stockroom, and Office per Tenant's specifications.

3.     Vinyl composition tile in restrooms per Tenant's specifications.

**E.     CEILING:**

1.     Provide 2' x 4' suspended acoustic ceiling laser-leveled, exposed metal grid system, per Tenant's specifications.

2.     Ceiling height to be 10' AFF (above finished floor).

**F.     FIRE SPRINKLER SYSTEM AND CENTRAL STATION REPORTING SYSTEMS:**

1.     Provide a complete fire sprinkler system according to code, if and only if, required by code.

2.     Provide additional drops for workroom, restrooms, and other necessary rooms or locations.

3.     Provide maintenance and/or inspections on system monitoring alarms.

4.     Specialty items or alarm fees shall be provided by Landlord as required by code.

**G.     DEMISING WALLS AND INTERIOR PARTITIONS:**

1.     Demising/perimeter walls shall be metal or wood studs covered with drywall to have a minimum one (1) hour fire rating or more, as required per applicable governing codes. Interior partitions shall be 3-5/8" metal studs covered with drywall and finished smooth (**no architectural, orange peel or rough surface**) to meet local fire code ratings.

2.     All walls shall be taped, sanded, primed, and painted per Tenant's specifications.

3.     All masonry and concrete walls shall have vertical furring strips to allow for future installations and fastening of drywall which is to be finished as noted above.

**H.     RESTROOMS:**

1.     Handicapped accessible restroom(s) shall be provided as required by code.

2.     Restrooms(s) shall include the following (per Tenant's Plans and specifications) and shall meet ADA requirements:

- Walls:  Drywall finished
- Plumbing:  Water closet(s), sink(s), fixtures and fittings (insulate all pipes below sinks)
- All handicapped hardware (grab bars, etc.)
- Vinyl tile for floor

**EXHIBIT "B"**

5.     Duct work to include positive duct return air, no plenum ceiling returns. Supply at least one (1) diffuser per 300 square feet contained in the Leased Premises as well as supplies and returns for storage room, office, and restrooms.

6.     HVAC system to include disconnect, weather disconnect to HVAC units, conduit, power wiring, thermostat and gas piping (where required).

7.     Each compressor to have (5) year extended warranty.

**M.    ELECTRICAL:**

1.     Provide one (1) separate electrical service and meter for Leased Premises. Service shall be underground wherever possible.

2.     Provide for Leased Premises one (1) 208/120 volt - 3-Phase, 4-Wire 200 Amp main distribution panel, or larger if power demand dictates, with a disconnect switch and a minimum of forty-two (42) 20 Amp circuits.

3.     For general lighting provide 2' x 4', three lamp fluorescent recessed troffers. A lighting pattern of no less than one (1) fluorescent fixture per 82 square feet of Leased Premises is required. Final lighting pattern per Tenant drawings. Each fixture to have energy saving electronic ballast (1 ea.) with a ballast factor of .88 and daylight spectrum (TL 850 Series) T-8 lamps installed as specified. Lights in workroom and restrooms to have wall switches.

4.     Sales floor area lighting is to be controlled by single contactor located in workroom.

5.     Provide one (1) 120-volt duplex convenience outlet approximately every 20 feet along perimeter walls or as per code.

6.     Provide ceiling mounted exit lights, emergency lights and night-lights as per local code and Tenant's specifications.

7.     Provide, per Tenant's Plans and specifications, 120-volt duplex outlets in all areas. Some of these will be dedicated outlets and circuits for computer, alarm, and telephone system installations.

8.     Provide in-ceiling 120-volt duplex outlets for televisions, marquees, lighted billboards, neon signs, etc., per Tenant's Plans.

9.     Provide wiring for all counter cabinets including computer cable and coaxial cable pulls per Tenant's Plans. These shall be terminated in ceiling above cash wrap until Tenant millwork completion.

**N.    SPECIALTY ELECTRIC:**

1.     Provide 20-amp/110 volt power to all available building sign band areas.

2.     Provide 20-amp/110 volt power from the electrical panel to the pylon sign location.

3.     Provide a single time clock to control all building and pylon signage.

4.     Provide wall mounted exterior security lights as per Tenant's drawings and specifications or by code. Exterior wall mounted security lighting and exterior storefront lighting are to be controlled by a single time clock.

5.     Provide one (1) 120-volt duplex outlets in workroom for alarm system, and telephone system. The outlet shall be located on the electrical distribution panel board.

6.     Provide conduit for telephone to leased space and terminate in workroom.

7.     Provide power for electric water cooler if code so requires.

8.     Provide power for hot water heater.

**EXHIBIT "B"**

# ELECTRICAL KEY

## Power Pole

| Symbol | Description |
|---|---|
| ⌀ | Power Pole Wiring For Coke Maching & Gum Ball Machine |
| ⌀ | 120-Volt Duplex Convenience Outlet |
| ▲ | 2-Line Telephone Outlet |
| SIGN | 20 Amp Sign Circuit W/Timer |
| W⌀ | 120-Volt Duplex Outlets<br>Mount 8" Above Glass On Wall Or 8" Away From Glass In Ceiling Tile |
| EP | Electrical Panel |
| ⎍ | Emergency Lighting |
| S | Showroom Light Switch |
| Ⓢ | Speakers |
| △ | 1-Line Telephone Modem Outlet |
| ⊕ | 20-Amp Isolated/Dedicated Outlets |
| ○ | 2 ea. 1" Conduits For Future Use |
| ⊗ | Exit Light |
| ⓌⒽ | Hotwater Heater<br>Mount In Ceiling When Possible Or Underneath Sink |

Key Incorporated 6/01

FORESTDALE, AL

## EXHIBIT "B"



| Flooring Schedule | |
|---|---|
| FC-1 | Carpet |
| FC-2 | Vinyl Composition Tile |
| FC-3 | Ribbed Tile Carpet * |

Tenant Specifications Available Through:

Xpress Source
(334) 793-7400
Contact:  John Howell or Press Thornton

* FC-3 Ribbed Tile Carpet Utilized In Front Sales
  Counter Area In Snowbelt Areas Only

FC-2

FC-1 | FC-1

FC-2

FC-1

FC-1
OR
FC-3 *

Specifications Incorporated 9/1/02

FORESTDALE, AL

### EXHIBIT "B"

# FINISH SCHEDULE



| Paint Schedule | |
|---|---|
| P-1 | White - Sherwin Williams Promar 400, Semi-Gloss Latex |
| P-2 | White - Sherwin Williams Promar 400, Oil Base |
| P-3 | 4" Solid Black Cove Base |

Specifications Incorporated 6/01

FORESTDALE, AL

**EXHIBIT "B"**

# LIGHTING SPECIFICATIONS

<u>Interior Lighting:</u>

2'x4' Three (3) Lamp Fluorescent Recessed Troffers Each With One (1) Energy Saving
Electronic Ballast With A Ballast Factor Of 0.88 And Daylight Spectrum (TL 850 Series)
T-8 Lamps And A Lighting Pattern Of No Less Than one (1) Fixture Per Each 82 Sq. Ft.

Fixture & Ballast:
Manufacturer:  Simkar – TY244-332B11-3L-FL4
Order Code - #54-08419-MG1-120V-With 72" Whip

Lamp:
Manufacturer: SLI – F32T8/850
Order Code - #01704-MG1

<u>Exit Lighting:</u>

Manufacturer: Best Lighting – EZXTE-MG1 LED - Exit Sign 7.5" High x 12" Wide

Manufacturer: Best Lighting – CXTEUIRW-MG1 LED – Combo Exit/Emergency Back-
Up Light (For Use Over Rear Exit Door)

<u>Emergency Back-Up Lighting:</u>

Manufacturer: Best Lighting – R-I-MG1 Emergency Lighting Unit

<u>Exterior Lighting:</u>

Wal-Pak Lighting – Cooper/Lumark MHWL-250MT (250 Watt Metal Halide)

Soffit Lighting – Cooper/Portfolio M5324T-740 (100 Watt Metal Halide) At A Ratio Of
One (1) Fixture Per Each 10 Linear Feet Of Structural Overhang

<u>Parking Lot Lighting:</u>

Metal Halide lamps only with a size, quanity, and configuration capable of providing a
minimum of one (1) footcandle minimum maintained and five (5) footcandles average
maintained at ground level at any part of the parking lot.

<u>Recommended Vendor For All Interior & Exterior Lighting:</u>

Xpress Source
Dothan, AL
(334) 793-7400
Mike Pierce or Press Thornton

Specifications Incorporated 11/01

FORESTDALE, AL

**EXHIBIT "B"**

# DOOR & HARDWARE SPECIFICATIONS

| Quanity | Door | Material | | | Frame | | | Hinge | | Latch | | | | | Accessories | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Aluminum/Glass | Steel | Wood (Solid) | Aluminum | Steel | Wood | Pivot | Butt | Cylinder | Privacy W/Lever | Push/Pull | Panic Bar | | Threshold | Weatherstrip | Viewer (Peep Hole) | Door Stop | Closer | Brass Kick Plates |
| 2 ea. | Storefront | X | | | X | | | X | | X | | | | | X | X | | | | |
| 4 ea. | Interior | | | X | X | | | | X | | X | | | | | | | X | X | X |
| 1 ea. | Rear Exit | | X | | | X | | | X | | | X | | | X | X | X | X | X | |

Specifications Incorporated 6/01

FORESTDALE, AL

**LEASE AMENDMENT**

THIS AMENDMENT ("Amendment") made and entered into this 31 day of December, 2009, by and between Y & B Holdings, LLC, whose address is 90F Glenda Trace, #348, Newnan, GA 30265 ("Landlord"), and MG Real Estate, LLC, a Delaware limited liability company, whose address is 900 West Main Street Dothan, AL 36301 ("Tenant").

**WITNESSETH:**

WHEREAS, Landlord [or its predecessor-in-interest] and Tenant's predecessor-in-interest entered into that certain Real Estate Lease dated January 3, 2003, as amended by that certain Assignment of Lease dated May (undated) 2003 (collectively the "Lease"), for the approximately 4,000 square feet of leased premises located at The Shops at Forestdale, 1445 Forestdale Blvd., Ste. 101, Birmingham, AL 35214 ("Leased Premises"); and

WHEREAS, Movie Gallery, Inc. and certain of its affiliates [including Movie Gallery US, LLC] filed voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Eastern District of Virginia (the "Bankruptcy Court"), case number 07-33849, on October 16, 2007; and

WHEREAS, pursuant to the Order Confirming Second Amended Joint Plan of Reorganization of Movie Gallery, Inc. and its Debtor Subsidiaries [including Movie Gallery US, LLC] Under Chapter 11 of the Bankruptcy Code with Technical Modifications entered on April 10, 2008 at docket number 2191 (the "Order"), Movie Gallery US, LLC assigned its interest in the Lease to M.G.A. Realty I, LLC k/n/a MG Real Estate, LLC on May 20, 2008. Further pursuant to the Order, Movie Gallery US, LLC entered into a Sublease Agreement with Tenant on May 20, 2008 ("Sublease") whereby Movie Gallery US, LLC is obligated to perform all obligations of Tenant under the Lease; and

WHEREAS, the Term of the Lease currently expires November 30, 2010; and

WHEREAS, Landlord and Tenant would like to amend the Lease to reduce rent and extend the term; and

NOW, THEREFORE, in consideration of the mutual covenants and agreements contained herein and for other good and valuable consideration the sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

1.    As of November 1, 2009 ("Effective Date"), the Term of the Lease shall be extended, so rather than expiring on November 30, 2010, the Term shall now expire on November 30, 2012 ("Extended Term").

2.    Beginning January 1, 2010 and continuing through November 30, 2010, Tenant's rent obligation shall be based on Base Rent and shall be fixed at a rate that is reduced from $13.00 per square foot per year to $8.47 per square foot per year ($33,880.00 annually, $2,823.33 monthly).  Tenant remains obligated for its share of CAM, Taxes and Insurance (if any) per the terms of the Lease.

3.    Beginning December 1, 2010 and continuing through November 30, 2012, Tenant's rent obligation shall be based on Base Rent and shall be fixed at a rate that is increased from $8.47 per square foot per year to $10.00 per square foot per year ($40,000.00 annually, $3,333.33 monthly).  Tenant remains obligated for its share of CAM, Taxes and Insurance (if any) per the terms of the Lease.

4.    Landlord shall have the right to terminate this Lease at any time upon forty-five (45) days prior written notice to Tenant.

---

AMENDMENT
BIRMINGHAM, AL (#200115)

5.    Paragraph 40, Section E of the Lease shall be amended to delete a bingo hall as a nuisance use; provided, however, that such bingo hall shall not interfere with the visibility of, access to, parking for, or the operation of, Tenant's business in the Leased Premises.

6.    Tenant retains its two (3 year) options to further extend the Term of the Lease under the terms set forth in the Lease.  Unless otherwise agreed to by the parties in writing, in the event that Tenant exercises its option(s) to further extend the Term of the Lease, the parties agree that the Minimum Base rent shall be calculated per the terms of the Lease as if the foregoing amendment and reduction did not occur.

7.    Landlord shall have the right to use Tenant's existing pylon pole located at the Leased Premises on the express conditions that if Landlord elects to use Tenant's existing pylon pole, then Landlord is fully responsible for (i) running a separate meter for Landlord's panel(s) on the pole prior to any such use (ii) the electrical and utility charges related to Landlord's use of the existing pylon pole (iii) the cost of Landlord's pylon panel, and (iv) any maintenance related to Landlord's use of the existing pylon pole. Additionally, Landlord does not have the right to relocate Tenant's pylon panel without Tenant's prior consent and Landlord must give Tenant thirty (30) days written notice of Landlord's intent to add to Tenant's existing pylon panel.

8.    Notwithstanding anything to the contrary, after the execution of this Agreement and on or before the lease expiration date or earlier termination date, Tenant and/or Movie Gallery US, LLC shall have the right to dispose of its personal property, remove its fixtures and equipment, and surrender the Leased Premises to Landlord in good, broom-clean condition, reasonable wear and tear excepted.   Any personal property of Tenant or Movie Gallery US, LLC that remains in the Leased Premises after the lease expiration date or earlier termination date shall be deemed abandoned and Landlord may retain, sell, or discard such items without liability to Tenant or Movie Gallery US, LLC.

9.    All notices to be given to Tenant or Landlord shall be in writing, deposited in the United States mail, certified or registered return receipt requested, with postage prepaid or by a regular overnight delivery service (i.e., Federal Express) marked for Priority Delivery and addressed as set forth above.  If to Tenant, then such shall be directed to Asset Management Department and a copy to the Office of the General Counsel, both at the same address provided above. Notices made by either party under the terms of this Agreement shall be deemed delivered three (3) business days after being deposited in the United States mail, as above provided, or one (1) business day after being accepted by an overnight delivery service.  A change of address by either party must be by notice given to the other in the same manner as above specified.

10.    If any term, covenant, condition or provision of this Agreement, or the application to any person or circumstance thereof, shall, to any extent, be invalid or unenforceable, then the remainder of this Agreement, or the application of such term or provision to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby; and each term, covenant, condition and provision of this Agreement shall be valid and be enforced to the fullest extent permitted by law. This Agreement shall be binding upon, and shall inure to the benefit of, the parties, their respective successors, heirs, executors, administrators, and assigns. The parties represent and warrant to the other that the undersigned are authorized to enter into and execute this Agreement on behalf of the Landlord and Tenant, respectively.  This Agreement contains the entire and only agreement between the parties, and no oral statements, representations, or written matter by any source not contained in this instrument shall have force or effect.

[END]


[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

AMENDMENT                                                              PAGE 2 of 3
BIRMINGHAM, AL (#200115)

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement on the date(s) given below.

**TENANT:**
MG Real Estate, LLC

By: _____

Its: SENIOR VICE PRESIDENT

Date: 12/31/09

**LANDLORD:**
Y & B Holdings, LLC

By: Ahmad B Yammout

Its: Managing Member

Date: 12/31/09

CBSi

PO Box 3227
Tuscaloosa, AL 35403

*Clair Robinson*

550 Greensboro Ave Tuscaloosa, AL 35401
205-345-3041 or 1-800-234-6073
Mon. – Thurs.: 7am-8pm (CST)
Fri.: 7am-3:30pm (CST)
Sat.: 7am-11am (CST)

→ *Bill Howard*
*V.P. 800 688 0048*
*X 3121*

01101260361-S1     331876699

**Date:** May 6, 2010
**Account #:** 01101260361
**Amount Due:** $ 386.07

Y&B Holding LLC
90 Glenda Trce Ste F
Newnan GA 30265-3868

*(800) 945 3251* *in charge of*
*acct*

*Jamie Harley    X3292*

**Creditor:** Birmingham Water Works Board

## IMPORTANT NOTICE

Dear Y&B Holding LLC,

The records of **Birmingham Water Works Board**
indicate that your account is now seriously past due
and has been placed with CBSi Collection Services
for collections.

*Please remit your payment of $ 386.07 in the
enclosed envelope.*

*If payment has already been made, or if you
would like the convenience of payment by phone,
contact us at 1-800-234-6073.*

Make your check or money order payable to **CBSi
Collection Services** and mail it in the enclosed
envelope.

NOTICE: Unless you notify this office within 30
days after receiving this notice that you dispute
the validity of the debt or any portion thereof, this
office will assume this debt is valid. If you notify
this office within 30 days from receiving this
notice, this office will: obtain verification of the
debt or obtain a copy of a judgment and mail you
a copy of such verification or judgment. If you
request this office in writing within 30 days after
receiving this notice this office will provide you
with the name and address of the original creditor,
if different from the current creditor.

**This is an attempt to collect a debt and any information obtained will be used for that purpose.**
**This communication is from a debt collector.**

201A1CBS001S1

825570

| NAME | Jake Meadows | | | | DATE 4/26/20?? | | |
|------|------|------|------|------|------|------|------|
| ADDRESS | | | | | ORDER NO. | | |
| CITY, STATE, ZIP | | | | | | | |

| SOLD BY | CASH | C.O.D. | CHARGE | ON ACCT. | MDSE. RETD | PAID OUT |
|---------|------|--------|--------|----------|------------|----------|

| QUAN. | DESCRIPTION | | PRICE | AMOUNT |
|-------|-------------|---|-------|--------|
| 1 | Sign Removal | | | 120 00 |
| 2 | | | | |
| 3 | Estimate (2) | | | |
| 4 | | | | |
| 5 | | | | |
| 6 | | | | |
| 7 | | | | |
| 8 | | | | |
| 9 | | | | |
| 10 | | | | |
| 11 | | | | |
| 12 | | | | |
| 13 | | | | |
| 14 | | | | |
| RECEIVED BY  Amad | | TAX | | |
| | | TOTAL | | 120 00 |

adams 24705



068771

# STATEMENT

| DATE | TERMS |
|------|-------|
| 3-25-10 | |

**TO** YdB Holdings

**ADDRESS** 1445 Forestdale Blvd

Blm Al,

**IN ACCOUNT WITH** C. J's Plumbing   ph. 229-1449

2441 Hemlock Dr

Hueytown Al. 35023

Repaired back flow
preventer to the following
meters #53010921 +
#01107552

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | | | | | 290 | ⁰⁰ |

adams DC5812



Estimate 5/6/10

Don Dumas

005 Pole - 460?

4/26-08

Clerk

1. Clean up
2. and ready
3. clutter
4. Desks
5. furniture
6. countertops
7. Display cases
8. 
11. Remove and
12. discard
13. 1445 Forest-hill Blvd
14. 
15. 

$10,000







Clay's Plumbing
1448 Forest Hall Blvd

M
Address ___

| Reg. No. | Clerk | Account Forward | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 1 | Svc. toilet flush | | | | | | | | |
| 2 | mount | | | | | | | | |
| 3 | | | | | | | | | |
| 4 | | | | | | | | | |
| 5 | repair seal | | | | | | | | |
| 6 | | | | | | | | | |
| 7 | leak | | | | | | | | |
| 8 | | | | | | | | | |
| 9 | | | | | | | | | |
| 10 | | | | | | | | | |
| 11 | | | | | | | | | |
| 12 | | | | | | | | | |
| 13 | | | | | | | | | |
| 14 | 9624-49 | | | | | | | | |
| 15 | 1778 | | | | | | | | |