1 | Robert C. Thorn, State Bar No. 97895
KIMBALL, TIREY & ST. JOHN LLP
2 | 1202 Kettner Boulevard, Third Floor
San Diego, CA 92101
3 | (619) 231-1422
(619) 234-7692 (facsimile)
4 |
5 |
Attorneys for Creditor
6 | INVESTCAL REALTY CORP
7 |
8 |
**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**RICHMOND DIVISION**
9 |
10 |
In re:                                    ) Case No. 10-30700-DOT
11 |                                          )
                                          ) **REQUEST FOR ALLOWANCE OF**
12 | HEC REAL ESTATE, LLC,              ) **ADMINISTRATIVE CLAIM**
                                          )
13 |            Debtor                     ) [11 USC 503(b)(1)(A)]
                                          )
14 |                                        ) Store number 005-584
                                          ))
15 | ———————————————————— )

        Creditor/Landlord submits that it is entitled to an administrative claim for rental and

additional rent owed in the amount of $30,863.01. Such amount is more specifically detailed as

$24,195.44 base rent, $1,592.57 common area maintenance and $5,075.00 for an accepted contract

for demo and cleanup, for the rental period February 3, 2010 ending July 11, 2010. Such amounts are

specifically delineated in the attached ledgers, with lease, Second Amendment to Lease and

supporting documents. The store number is 005-584 and the store location is 511 North Second

Street, in El Cajon, California 92021. The lease termination date is July 11, 2010. Creditor,

therefore, submits its administrative claim in the amount of $30,863.01.

Dated: August 4, 2010                    Respectfully submitted,

                                        By: _____
                                             Robert C. Thorn, Esq.
                                             KIMBALL, TIREY & ST. JOHN LLP
                                             ATTORNEYS FOR CREDITOR

-1-

RICHMOND DIVISION
FILED
AUG 10 2010
CLERK
U.S. BANKRUPTCY COURT

## *PROOF OF CLAIM WORKSHEET*
## *CASE NO. 10-30700-DOT*
## *HEC REAL ESTATE, LLC- Post Petition Rent Analysis*
### *(Date of bankruptcy filing – 02/02/10)*

| DATE | RENT | CAM | HVAC | TOTAL | DAILY RATE (30 DAYS) | |
|---|---|---|---|---|---|---|
| | | | | | | |
| | | | | | $ 285.10 | |
| | | | | | | |
| **POST - PETITION, PRE-TERMINATION ADMINISTRATIVE EXPENSE** | | | | | | |
| 02/03/10 through 7/11/10 | $24,195.44 | $1,592.57 | | $25,788.01 | | $25,788.01 |
| July 16, 2010 accepted contract for clean up expense | | | | $ 5,075.00 | | $ 5,075.00 |
| | | | | | | |
| **11 U.S.C. 502 (b)(6) CALCULATION** | | | | | | |
| 07/12/10 through 8/24/10 | $12,259.30 | $806.68 | | $13,065.98 | | $13,065.98 |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| **TOTAL CLAIM AMOUNT** | | | | | | $43,928.99 |

**Bankruptcy Code §502(b)(6)**



Po Box 712216 Santee Ca 92072-2216
License No. 665182 MBE/DBE Caltrans Certified

**Bid Proposal**

Date: July 16, 2010

Sentre Partners
619/400-8723
619/400-4323 Fax
Mike Harrison (mharrison@sentre.com)

PROJECT: Holly Wood Video; 511 2nd St, El Cajon CA

SCOPE OF WORK:

- DEMO AND REMOVE THE FOLLOWING:
  - ALL NEON LIGHTS ON EXTERIOR OF BUILDING
  - (3) METAL SIGNS AND FRAMING PER JOB WALK. ALL PLASTER ON STUCCO TO REMAIN

**BID AMOUNT: $2,875.00**

- REMOVE ALL BASE SHELVING, DISPLAYS, AND FENCING PER JOB WALK
- REMOVE (1) WINDOW SIGN

**BID AMOUNT: $2,200.00**

Best Regards,

*Pete Hernandez*
Pete@WSCDemolition.com
Cell: (619) 954-4192

**WORKING HOURS: REGULAR** ✓ **AFTER HOURS** _____
**Prevailing Wage : Yes:** _____ **No:** ✓
Note: Demolition Deposit or Recycling Permit fees *ARE NOT* included in this bid.
Please allow five working days notice for mobilization. Bid is valid for a 30 day period
**Please Read Exclusions Carefully**
**Identifying any electrical wires, conduits, low voltage cables, or piping removal is the responsibility of others.**
**WSC not responsible for down time or repair cost for unmarked utilities.**
Unless otherwise noted exclusions are layout, water control, power washing, traffic control, barricades, protective covers, shoring or bracing, weather protection, bonds, tire mark removal, surface
preparation,(mastic removals, sandblasting, grinding or roughing), dust control or duct clean up, repair to damage pipes or lines, locate, cut or tapping of utilities, erosion control, stand by, shutdowns, phasing,
hazmat removals, protective covers, noise control, sanitation and facilities, retention, and additional insurance requirements

4:24 PM
07/30/10

## North Second Street
## Customer Balance Detail
### All Transactions

**HEC Real Estate, LLC**

| Type | Date | Num | Memo | Item | Paid | Open Balance | Amount | Balance |
|---|---|---|---|---|---|---|---|---|
| Invoice | 01/01/2010 | 1 | Base Rent | Base Rent/4010-00 | Paid | | 8,553.13 | 8,553.13 |
| Invoice | 01/01/2010 | 1 | CAM Income | CAM Income/4120-00 | Paid | | 563.00 | 9,116.13 |
| Invoice | 02/01/2010 | 2 | Base Rent | Base Rent/4010-00 | Paid | | 8,553.13 | 17,669.26 |
| Invoice | 02/01/2010 | 2 | CAM Income | CAM Income/4120-00 | Paid | | 563.00 | 18,232.26 |
| Invoice | 02/01/2010 | 2 | Property Tax Reimb. | Property Tax Reimb/4410-00 | Paid | | 12,113.94 | 30,346.20 |
| Invoice | 03/01/2010 | 3 | Base Rent | Base Rent/4010-00 | Paid | | 8,553.13 | 38,899.33 |
| Invoice | 03/01/2010 | 3 | CAM Income | CAM Income/4120-00 | Paid | | 563.00 | 39,462.33 |
| Invoice | 04/01/2010 | 4 | Base Rent | Base Rent/4010-00 | Paid | 3,953.08 | 8,553.13 | 48,015.46 |
| Invoice | 04/01/2010 | 4 | CAM Income | CAM Income/4120-00 | Unpaid | 260.21 | 563.00 | 48,578.46 |
| Invoice | 05/01/2010 | 5 | Base Rent | Base Rent/4010-00 | Unpaid | 8,553.13 | 8,553.13 | 57,131.59 |
| Invoice | 05/01/2010 | 5 | CAM Income | CAM Income/4120-00 | Unpaid | 563.00 | 563.00 | 57,694.59 |
| Invoice | 06/01/2010 | 6 | Base Rent | Base Rent/4010-00 | Unpaid | 8,553.13 | 8,553.13 | 66,247.72 |
| Invoice | 06/01/2010 | 6 | CAM Income | CAM Income/4120-00 | Unpaid | 563.00 | 563.00 | 66,810.72 |
| Invoice | 07/01/2010 | 7 | Base Rent | Base Rent/4010-00 | Unpaid | 8,553.13 | 8,553.13 | 75,363.85 |
| Invoice | 07/01/2010 | 7 | CAM Income | CAM Income/4120-00 | Unpaid | 563.00 | 563.00 | 75,926.85 |
| Invoice | 08/01/2010 | 8 | Base Rent Pro-rated thru 8/24 | Base Rent/4010-00 | Unpaid | 6,621.78 | 6,621.78 | 82,548.63 |
| Invoice | 08/01/2010 | 8 | CAM Income Pro-rated thru 8/24 | CAM Income/4120-00 | Unpaid | 435.87 | 435.87 | 82,984.50 |
| Invoice | 08/01/2010 | 8 | Remove lighting/signage/haul away debris | Misc. Reimb./4840-00 | Unpaid | 5,075.00 | 5,075.00 | 88,059.50 |
| **Total HEC Real Estate, LLC** | | | | | | **43,894.33** | **88,059.50** | **88,059.50** |
| **TOTAL** | | | | | | **43,894.33** | **88,059.50** | **88,059.50** |

07/30/10
4:27 PM

# North Second Street
# All Transactions for HEC Real Estate, LLC
## All Transactions

| Type | Num | Date | Account | Amount |
|------|-----|------|---------|--------|
| Invoice | 8 | 8/1/2010 | 1200-00 · Accounts ... | 12,132.65 |
| Payment | 5134010 | 7/6/2010 | 12000 · *Undeposite... | 7,900.65 |
| Invoice | 7 | 7/1/2010 | 1200-00 · Accounts ... | 9,116.13 |
| Payment | 5133001 | 6/7/2010 | 12000 · *Undeposite... | 9,116.13 |
| Invoice | 6 | 6/1/2010 | 1200-00 · Accounts ... | 9,116.13 |
| Payment | 5132219 | 5/7/2010 | 12000 · *Undeposite... | 9,116.13 |
| Invoice | 5 | 5/1/2010 | 1200-00 · Accounts ... | 9,116.13 |
| Payment | 5130560 | 4/6/2010 | 12000 · *Undeposite... | 9,116.13 |
| Invoice | 4 | 4/1/2010 | 1200-00 · Accounts ... | 9,116.13 |
| Payment | 5128955 | 3/8/2010 | 12000 · *Undeposite... | 9,116.13 |
| Invoice | 3 | 3/1/2010 | 1200-00 · Accounts ... | 9,116.13 |
| Invoice | 2 | 2/1/2010 | 1200-00 · Accounts ... | 21,230.07 |
| Invoice | 1 | 1/1/2010 | 1200-00 · Accounts ... | 9,116.13 |
| **Total** | | | | |

## SECOND AMENDMENT TO LEASE

THIS AMENDMENT ("Amendment") made and entered into as of this 20th day of November, 2009, by and between Investical Realty Corporation, a California corporation, whose address is 2333 Camino del Rio South, Suite 210, San Diego, California 92108 ("Landlord"), and HEC Real Estate, LLC, a Delaware limited liability company, whose address is 9275 SW Peyton Lane, Wilsonville, OR 97070 ("Tenant").

### WITNESSETH:

WHEREAS, Landlord's predecessor-in-interest and Tenant's predecessor-in-interest entered into that certain Lease executed June 13, 1995 (the "Lease"), for the approximately 8,000 square feet of leased premises located at 511 North Second Street, City of El Cajon, California ("Premises");

WHEREAS, Movie Gallery, Inc. and certain of its affiliates including Hollywood Entertainment Corporation filed voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Eastern District of Virginia (the "Bankruptcy Court"), case number 07-33849, on October 16, 2007;

WHEREAS, pursuant to the Order Confirming Second Amended Joint Plan of Reorganization of Movie Gallery, Inc. and its Debtor Subsidiaries [including Hollywood Entertainment Corporation] Under Chapter 11 of the Bankruptcy Code with Technical Modifications entered on April 10, 2008 at docket number 2191 (the "Order"), Hollywood Entertainment Corporation assigned its interest in the Lease to MG Automation LLC k/n/a HEC Real Estate, LLC on May 20, 2008.  Further pursuant to the Order, Hollywood Entertainment Corporation entered into a Sublease Agreement with Tenant on May 20, 2008 ("Sublease") whereby Hollywood Entertainment Corporation is obligated to perform all obligations of Tenant under the Lease; and

WHEREAS, Landlord and Tenant desire to amend the Lease to, among other things, reduce Minimum Rent, provide Landlord with an early termination right and extend the current Lease Term.

NOW, THEREFORE, in consideration of the mutual covenants and agreements contained herein and for other good and valuable consideration the sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

1.  Capitalized terms used herein shall have the meaning assigned to such term in the Lease, unless the context in this Amendment otherwise requires or provides.

2.  The Expiration Date of the current Lease Term shall be June 30, 2011.  Notwithstanding forfeiture proceedings in state court, a judgment in unlawful detainer and lease forfeiture, the parties agree that this lease shall be deemed reinstated, in full force and effect. Notwithstanding any language to the contrary in this amendment, Landlord retains all rights to pursue a claim against original lessee(s) or assignors of the subject lease.

3.  From September 1, 2009 (the "Effective Date") through the Expiration Date of the current Lease Term, Minimum Rent shall be payable in equal monthly installments of $8,553.13(the "Adjusted Minimum Rent")

4.  Immediately upon Landlord's execution of this Amendment, Tenant shall send to Landlord, by overnight carrier to arrive on Monday, November 23, 2009, payment in the amount of $28,825.41, which represents Adjusted Minimum Rent and Additional Rent due for September, October and November of 2009 along with certain related legal fees incurred by Landlord totaling $1,551.00 (collectively, the "Past Rent Obligation").  Upon Tenant's payment of the Past Rent Obligation, Landlord acknowledges and agrees that Tenant is not in default under the Lease, and Landlord agrees to immediately (a) dismiss any legal proceedings filed by Landlord in connection with the

Past Rent Obligation, (b) take any action necessary to reinstate the Lease, and (c) permit Tenant to access the Premises for normal business operations.

5.    Upon Landlord providing Tenant with written proof of expenditure, Tenant agrees to promptly pay Landlord up to $750.00 for legal fees incurred by Landlord in carrying out Landlord's obligations under Section 4 of this Amendment. This amount shall be in addition to the Past Rent Obligation. Tenant shall pay Landlord the sum of $12,113.94 as and for real estate taxes due on or before February 10, 2010.

6.    As of the Effective Date and for the remainder of the Lease Term, Landlord shall have the right to terminate the Lease by providing Tenant with sixty (60) days prior written notice. The date of such termination shall be treated as the Expiration Date for purposes of the Lease. All options to extend the lease as provided by the lease or amendment are terminated.

7.    All notices to be given to Tenant or Landlord shall be in writing, deposited in the United States mail, certified or registered return receipt requested, with postage prepaid or by a regular overnight delivery service (i.e., Federal Express) marked for Priority Delivery and addressed as set forth above.  If to Tenant, then such shall be directed to Asset Management Department and a copy to the Office of the General Counsel, both at the same address provided above. Notices made by either party under the terms of the Lease shall be deemed delivered three (3) business days after being deposited in the United States mail, as above provided, or one (1) business day after being accepted by an overnight delivery service. A change of address by either party must be by notice given to the other in the same manner as above specified.

8.    If any term, covenant, condition or provision of this Amendment, or the application to any person or circumstance thereof, shall, to any extent, be invalid or unenforceable, then the remainder of this Amendment, or the application of such term or provision to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby; and each term, covenant, condition and provision of this Amendment shall be valid and be enforced to the fullest extent permitted by law. This Amendment shall be binding upon, and shall inure to the benefit of, the parties, their respective successors, heirs, executors, administrators, and assigns. The parties represent and warrant to the other that the undersigned are authorized to enter into and execute this Amendment on behalf of the Landlord and Tenant, respectively. The Lease and this Amendment contain the entire and only agreement between the parties, and no oral statements, representations, or written matter by any source not contained in this instrument shall have force or effect.  In the event of a discrepancy between the Lease and this Amendment, this Amendment shall prevail. Electronic signatures are deemed original.

IN WITNESS WHEREOF, the parties hereto have executed this Amendment on the date(s) given below.

TENANT:
HEC Real Estate, LLC

By:
Its:    SENIOR VICE PRESIDENT
Date:    11/20/2009

LANDLORD:
Investical Realty Corporation

By:
Its:
Date:    11/24/09

---

SECOND AMENDMENT TO LEASE                                          PAGE 2 of 2
November, 2009 (#005-584)

FIRST AMENDMENT TO LEASE

THIS FIRST AMENDMENT TO LEASE (the "Amendment") is between INVESTCAL REALTY CORPORATION, a California corporation, successor in interest to SST Properties, a California General Partnership ("Landlord"), and HOLLYWOOD ENTERTAINMENT CORPORATION, an Oregon corporation ("Tenant").

WHEREAS, Landlord and Tenant are parties to a Lease executed June 13, 1995, as amended by a Letter Agreement dated February 19, 2002, for Premises located at 511 North Second Street, City of El Cajon, California, consisting of approximately Eight Thousand (8,000) square feet (the "Lease"); and

WHEREAS, the Lease Term expires on August 24, 2005, and Tenant desires to continue its occupancy in the Premises in accordance with the terms set forth herein below; and

WHEREAS, Landlord and Tenant mutually desire to modify the Lease on the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the foregoing and other good and valuable consideration, Landlord and Tenant hereby agree to amend the Lease as follows:

1.  **Term.** The Lease Term is hereby extended for five (5) years commencing on August 25, 2005, and expiring on August 24, 2010 ("Extension Term"), subject to Tenant's two (2) Options to extend the Lease Term for periods of five (5) years each.

2.  Section 4 of the Lease is hereby deleted in its entirety and replaced with the following:

    **4.    RENT.**

    **4.1    Minimum Rent.**

    **(a)    Payment.** Tenant shall pay to Landlord, without notice or demand and without any offset or deduction, except as otherwise provided herein, as fixed annual minimum rent the amounts as calculated below ("Minimum Rent"), which Minimum Rent shall be paid in monthly installments in advance on or before the first (1st) day of each calendar month of the Lease Term commencing with the Minimum Rent Commencement Date set forth in Section 1.1(h) of this Lease and shall be considered delinquent if not so paid on or before the first (1st) day of each month; provided, however, that should Tenant be delayed due to weather, strike, union disagreement, riot, casualty, material or labor shortage, act of God and/or any other cause beyond Tenant's reasonable control, the Minimum Rent Commencement Date shall be extended one (1) day for each day Tenant is delayed. If the Lease Term commences on a day other than the last day of a calendar month, or expires on a day other than the last day of a calendar month, the Minimum Rent for such month shall be a prorated portion of the monthly Minimum Rent, based upon a thirty (30) day month.

    **(b)    Minimum Rent.** Minimum Rent for the initial Lease Term and Extension Term is as follows:

| Term | Rent Per Year | Monthly Rent |
|---|---|---|
| August 25, 1995-<br>August 24, 2000 | $140,000 | $11,666.67 |
| August 25, 2000-<br>August 24, 2005 | $161,000 | $13,416.67 |
| Extension Term:<br>August 25, 2005 –<br>February 24, 2008 | $161,000 | $13,416.67 |

    **(c)    Adjustment on Comparison Date.** Minimum Rent shall be increased on each Comparison Date by the Percentage CPI Increase. In the event the Percentage CPI Increase occurs on a day other than the first (1st) day of a calendar month, the Percentage CPI Increase for such month shall be prorated based on the actual number of days in said month. The Percentage CPI Increase shall not exceed the Percentage Increase Cap. Landlord shall notify Tenant of each increase by delivering a written statement setting forth the Index for the

Base CPI Month, the Index for the applicable Comparison CPI Month, the Percentage CPI Increase, the Percentage Increase Cap and the new Minimum Rent payable by Tenant. The Minimum Rent shall not be reduced from the last previous adjusted Minimum Rent by reason of any decrease in the Index. If Landlord's notice is given after the effective date of an increase, Tenant shall nevertheless be obligated to pay the new Minimum Rent from its effective date until the next periodic increase. In such event, within ten (10) days of Landlord's notice, Tenant shall pay Landlord the additional Minimum Rent for the period between the effective date of the increase and Landlord's notice, and thereafter shall pay the new Minimum Rent on or before the first (1st) day of each month.

(d)    **Definitions.** For purposes of this Section 4.1, the following definitions shall apply.

(i)    The "Index" shall mean the United States Department of Labor, Bureau of Labor Statistics, Consumer Price Index for all Urban Consumers, Los Angeles and Riverside and Orange County, (on the basis 1982-1984 = 100). If the format or components of the Index are materially changed after the execution of this Lease, Landlord shall substitute an index which is published by the Bureau of Labor Statistics or similar agency and which has been determined by independent third party sources to be comparable to the Consumer Price Index for all Urban Consumers in effect on the date of this Lease. Landlord shall notify Tenant of the substituted index, which shall be used to calculate the increase in the Minimum Rent.

(ii)    The "Comparison Date" shall be each of the following dates: Extension Term (February 25, 2008); first Option Period (August 25, 2010 and February 25, 2013); and second Option Period (August 25, 2015).

(iii)    The "Comparison CPI Month" for each Comparison Date shall mean the month immediately preceding the month in which such Comparison Date occurs.

(iv)    The "Base CPI Month" shall be defined as follows: (1) for the Comparison Date which occurs on February 25, 2008, the month in which the Extension Term begins (August 2005); (2) for the Comparison Date which occurs on August 25, 2010, the month which is two and one-half (2½) years after the Extension Term begins (February 2008); (3) for the Comparison Date which occurs on February 25, 2013, the month in which the first Option Period begins (August 2010); and (4) for the Comparison Date which occurs on August 25, 2015, the month which is five (5) years prior to the commencement of the second Option Period (August 2010).

(v)    The "Percentage CPI Increase" shall mean the increase in the Index which has occurred between the Base CPI Month and the Comparison CPI Month for each Comparison Date, provided the increase does not exceed the Percentage Increase Cap. In the event the Index has decreased, the Percentage CPI Increase shall be zero and the Minimum Rent shall remain unchanged.

(vi)    The "Percentage Increase Cap" shall be (i) six and one-quarter percent (6.25%) for each two and one half (2 ½) year adjustment period.

3.    Section 1.1(n) of the Lease is hereby deleted in its entirety and replaced with the following:

Tenant may use and occupy the Premises for the sale, rental, purchase, trading and/or licensing of prerecorded audio and/or video products, audio and/or video software, and entertainment and other software (including, but not limited to, video games); the sale and rental of video equipment; and the sale and/or rental of related accessories, including accessories used for demonstration, display, and training; the sale, rental and/or trading of electronic equipment, electronic hardware, accessories and peripherals, and the sale, rental, purchase, trading and/or use of any substitutes for, or items which are a

technological evolution of, any of the items contained in this Permitted Uses provision; the sale and/or rental of any related products, as well as all uses incidental hereto, including service and repair; the incidental sale of food products that are intended for off-premises consumption; for the sale of apparel and promotional merchandise; and for any other lawful uses which are not in violation of exclusive use restrictions in written leases between Landlord and other tenants located in the Shopping Center, to the extent such exclusives are in effect at the time of Tenant's change in use.

4.    Section 5 of the Lease is hereby amended with the addition of the following:

5.5    **Exclusivity.**  Landlord covenants and agrees that during the term of the Lease, including any Extension term and/or Option Periods, Tenant shall have the exclusive right in the Shopping Center to sell, rent, purchase, trade, license and/or distribute pre-recorded video cassettes, tapes, and disks, entertainment software (including, but not limited to, video games), and video merchandise (including hardware, accessories and peripherals), including the sale, rental, purchase and/or trading of any substitutes for, or items which are a technological evolution of, any of the foregoing items; provided, however, such restriction shall not apply to any existing tenants, to the extent their existing leases specifically allow such usage, or to their assignees or subtenants (provided that any such assignment or subletting does not require Landlord's prior consent to change the use from that which such existing tenant operated). Nothing contained herein shall limit or restrict any tenant, existing or future, from selling blank or unrecorded video cassettes or selling instructional and promotional video cassettes.

5.    This Amendment may be executed in counterparts and shall be effective when all parties have executed a copy of this Amendment.  A copy of this Amendment bearing an original signature shall constitute a counterpart, and all such counterparts shall, taken together, constitute one and the same Amendment.  It is the parties' desire to immediately confirm and communicate their respective signatures on this Amendment. It is agreed that a facsimile copy of a signed signature page of a counterpart Amendment shall evidence and constitute valid execution of this Amendment and shall be binding on a party to the same extent as the original signature counterpart copy.

6.    All other terms of the Lease remain unchanged and in full force and effect.

IN WITNESS WHEREOF, Landlord and Tenant have caused this Amendment to be executed as of the date set forth below.


**LANDLORD:**                                    **TENANT:**

**INVESTCAL REALTY CORPORATION,**               **HOLLYWOOD ENTERTAINMENT**
a California corporation                         **CORPORATION,** an Oregon corporation

By: _Geter H. Peckham_                           By: _____
                                                     Donald J. Ekman
Name: _Peter H. Peckham_                             General Counsel

Title: _President_                               Date: _2-5-05_

Date: _February 7, 2005_

## ADDENDUM I

## ACKNOWLEDGMENT OF
## LEASE COMMENCEMENT AND ANNIVERSARY DATE

The undersigned parties acknowledge that the lease described below is in full force and effect
and that Lessee has taken possession of the space.

Date of Lease: **May, 1995**
Lessor: **SST Properties, a California general partnership**
Lessee: **Hollywood Entertainment Corporation, an Oregon corporation**
Building Address: **511 2nd Street**
City/County/State/Zip: **El Cajon/San Diego/California/92019**
Building legal description: **See Exhibit A-1**

The lease commencement date, minimum rent commencement date, and expiration date of the
initial lease term as defined in paragraph **1.1** of above lease are as follows:

Lease Commencement Date (month, day, year): **August 25, 1995**
Minimum Rent Commencement Date (month, day, year): **August 25, 1995**
Expiration date (month, day, year): **August 24, 2005**

The entire lease is hereby affirmed and incorporated herein.

| LESSEE | LESSOR |
|---|---|
| (To be signed upon occupancy) | (To be signed upon occupancy) |
| Hollywood Entertainment Corporation | **SST Properties** |
| Printed name of company of firm | Printed name of company or firm |
| Donald J Ekman | JOHN M. TWOROGER |
| Printed name of person signing | Printed name of person signing |
| Signature | Signature |
| Vice President | Partner |
| Title of person signing | Title of person signing |
| September 26, 1995 | 10-4-95 |
| Date signed | Date signed |

SEP-22-2009 TUE 11:18 AM INVESTCAL REALTY CORP.    FAX NO. 6196839462    P. 07

PROJECT:

511 N. Second Street
El Cajon, California

LANDLORD:

SST PROPERTIES,
a California General Partnership

TENANT:

HOLLYWOOD ENTERTAINMENT CORPORATION,
an Oregon Corporation

## TABLE OF CONTENTS

1.     BASIC LEASE PROVISIONS AND ENUMERATION OF EXHIBITS

     1.1    Basic Lease Provisions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

     1.2    Significance of Basic Lease Provisions . . . . . . . . . . . . . . . . . . . . . . . 2

     1.3    Definitions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

     1.4    Enumeration of Exhibits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

2.     PREMISES

     2.1    Project . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

     2.2    Premises . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

     2.3    Common Areas . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

     2.4    Parking . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

3.     TERM; TENANT'S WORK

     3.1    Lease Term . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

     3.2    Tenant's Work . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

     3.3    Delivery of Premises . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

     3.4    Landlord's Title . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

4.     RENT

     4.1    Minimum Rent . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

     4.2    Additional Rent . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

5.     USE

     5.1    Permitted Uses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

     5.2    Uses Prohibited . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

     5.3    Operation of Business . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

     5.4    Compliance with Laws . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

6.     MAINTENANCE OF PREMISES

     6.1    Maintenance and Repair . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

7.     MAINTENANCE OF COMMON AREAS

     7.1    Maintenance and Repair by Landlord . . . . . . . . . . . . . . . . . . . . . . 10

     7.2    Failure to Maintain by Landlord . . . . . . . . . . . . . . . . . . . . . . . . . 10

8.   UTILITIES AND SERVICES

   8.1   Tenant's Obligation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

   8.2   Landlord's Obligations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

   8.3   Interruptions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

9.   PERSONAL PROPERTY TAXES

   9.1   Tenant's Obligation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

10.   LICENSES AND TAXES

   10.1   Tenant's Obligation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

11.   ALTERATIONS

   11.1   Alterations by Tenant . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

12.   LIENS AND ENCUMBRANCES

   12.1   Liens . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

   12.2   Encumbrances . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

13.   ASSIGNMENT AND SUBLETTING

   13.1   Assignment or Sublease . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

   13.2   Automatic Consent . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

14.   INDEMNIFICATION

   14.1   Indemnification . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

   14.2   Concurrent Negligence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

   14.3   Survival . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

15.   INSURANCE

   15.1   Property Insurance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

   15.2   Liability Insurance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

   15.3   Risk of Loss . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

   15.4   Waiver of Subrogation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

   15.5   Certificate of Insurance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

16.   DEFAULT BY TENANT

   16.1   Event of Default . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

   16.2   Remedies in Default . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

   16.3   Cumulative . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

17.   DEFAULT BY LANDLORD

      17.1   Default by Landlord  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

18.   DAMAGE BY FIRE OR OTHER CASUALTY

      18.1   Reparable Damage  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

      18.2   Irreparable Damage  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

      18.3   Landlord's Repair  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

      18.4   Repair and Restore  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

      18.5   Termination of Lease  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

      18.6   Damage During Last Year of Lease Term  . . . . . . . . . . . . . . . . . . . . . . . 18

19.   EMINENT DOMAIN

      19.1   Total Taking  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

      19.2   Partial Taking  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

      19.3   Damages  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

20.   SUBORDINATION AND ATTORNMENT; MORTGAGEE PROTECTION

      20.1   Subordination-Nondisturbance and Attornment  . . . . . . . . . . . . . . . . . . . 19

      20.2   Tenant's Certificate  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

      20.3   Mortgagee Protection Clause  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

21.   ACCESS BY LANDLORD

      21.1   Right of Entry  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

22.   SURRENDER OF PREMISES

      22.1   Surrender of Possession  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

      22.2   Holding Over  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

23.   RULES AND REGULATIONS  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

24.   QUIET ENJOYMENT

      24.1   Landlord's Covenant  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

25.   AUTHORITY OF PARTIES

      25.1   Corporate Authority  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

      25.2   Limited Partnerships  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

26.   SIGNS

      26.1   General . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

      26.2   Tenant's Interior Signs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

27.   AUCTIONS AND SALES

      27.1   General . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

      27.2   No Distress Sales . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

28.   HAZARDOUS MATERIALS

      28.1   Definitions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

      28.2   Use of Hazardous Materials . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

      28.3   Environmental Compliance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

      28.4   Landlord's Right of Entry and Testing . . . . . . . . . . . . . . . . . . 22

      28.5   Notification . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

      28.6   Remediation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

      28.7   Liability . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

29.   MISCELLANEOUS

      29.1   Successors or Assigns . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

      29.2   Broker's Commission; Agency Disclosure . . . . . . . . . . . . . . . . 25

      29.3   Partial Invalidity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

      29.4   Recording . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

      29.5   Notices . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

      29.6   Waiver . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

      29.7   Marginal Headings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

      29.8   Time . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

      29.9   Late Charges . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

      29.10  Choice of Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

      29.11  Legal Expenses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

      29.12  Acceptance of Keys . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

      29.13  Force Majeure . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

      29.14  Prior Agreements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

      29.15  Acceptance and Date of Lease . . . . . . . . . . . . . . . . . . . . . . . . . 27

iv

29.16  Consent . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

29.17  Dropbox  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

29.18  Workers' Compensation Insurance  . . . . . . . . . . . . . . . . . . . . . . . . . . 27

29.19  No Third-Party Benefit  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

SEP··GG····XXXXXXXX··XX  INDUSTRIAL REALTY CORP.  FAX NO. 6196839462  P. 13

## LEASE

THIS LEASE (the "Lease") is made and entered into as of the ___ day of May, 1995, by and between SST PROPERTIES, a California general partnership, and/or their assigns (the "Landlord") and HOLLYWOOD ENTERTAINMENT CORPORATION, an Oregon corporation (the "Tenant").

## RECITALS

A.    Landlord desires to lease certain space to Tenant, as more fully set forth herein, and Tenant desires to take and lease such space from Landlord, which space is more fully described below (the "Premises").

B.    As of the date of this Lease, the Premises consist of approximately 6,113 existing square feet of a free standing building (the "Building") located on a lot at 511 N. Second Street, El Cajon, California. The lot and Building shall hereinafter be referred to as the Premises. The parties acknowledge that Tenant shall expand the Building to a total of 8,000 or more Rentable Square Feet of space pursuant to Exhibit B. The legal description of the Premises is attached hereto and made a part hereof as Exhibit A-1.

NOW, THEREFORE, for and in consideration of the rents reserved hereunder and the terms and conditions hereof, Landlord hereby rents, demises and leases to Tenant, and Tenant takes and leases from Landlord, the above-described Premises all upon the following terms and conditions:

1.    **BASIC LEASE PROVISIONS AND ENUMERATION OF EXHIBITS.**

    1.1    **Basic Lease Provisions.**

| | | |
|---|---|---|
| (a) | Date: | May ____, 1995 |
| (b) | Landlord: | SST Properties,<br>  a California general partnership |
| | Address of Landlord: | 8799 Balboa Avenue, #270<br>San Diego, California 92123<br>Attention: John Tworoger |
| (c) | Tenant: | Hollywood Entertainment Corporation,<br>  an Oregon corporation |
| | Address of Tenant: | 10300 S.W. Allen Boulevard<br>Beaverton, Oregon 97005<br>Attention: Donald J. Ekman,<br>  Vice President and<br>  General Counsel |
| (d) | Tenant's<br>Trade Name: | Hollywood Video/Hollywood Video Superstores or such other name as Tenant may use. |
| (e) | Premises: | Approximately 6,113 existing Rentable Square Feet to be expanded to 8,000 or more Rentable Square Feet on an existing pad containing approximately 33,541 square feet of land area, more particularly described in Exhibit A-1. |

1

| | | |
|---|---|---|
| (f) | Initial Lease Term: | Ten (10) years from the Commencement Date. |
| (g) | Lease Commencement Date: | The "Commencement Date" and/or "Lease Commencement Date" shall be the earlier of the date on which Tenant opens the Premises for business with the public or October 1, 1995. |
| (h) | Minimum Rent Commencement Date: | The "Minimum Rent Commencement Date" shall be the earlier of the date on which Tenant opens the Premises for business with the public or October 1, 1995. |
| (i) | Expiration Date: | Tenth (10th) Anniversary of the ~~Fixed~~ Rent Commencement Date or as otherwise set forth in Section 3.1 below. |
| (j) | Option Periods: | Two (2) five (5) year option periods; see Section 3.1(b) |
| (k) | Minimum Rent: | See Section 4.1 below. |
| (l) | Additional Rent: | Taxes, Insurance and Common Area Expenses; see Section 4.2 below. |
| (m) | Percentage Rent Rate: | None. |
| (n) | Permitted Uses: | Tenant may use and occupy the Premises for the sale and/or rental of prerecorded audio and/or video products, audio and/or video software and entertainment and other software; the sale and rental of video equipment and the sale and/or rental of related accessories, including accessories used for demonstration, display and training; the sale of electronic equipment and the sale, rental and/or use of any substitutes for or items which are a technological evolution of any of the items contained in this use provision; any related products, as well as all uses incidental hereto, including service and repair; the sale of food products that are normally sold in movie theaters; the sale of apparel and promotional merchandise and any other lawful use, provided such use is approved by Landlord, which approval shall not be unreasonably withheld. |
| (o) | Security Deposit: | None. |

**1.2    Significance of Basic Lease Provisions.** Each reference in this Lease to any of the Basic Lease Provisions contained in Section 1.1 shall be deemed and construed to incorporate all the terms provided under each such Basic Lease Provision, provided that the Basic Lease Provisions shall be controlled by the specific terms and provisions of this Lease relating to the subject matter of those Basic Lease Provisions.

2



1.3    **Definitions.**

(a)    **Additional Rent.**    Includes real estate taxes, insurance premiums (including land, building and improvements included within the Premises), Common Area Costs and any payments required under Section 4.2(c) which shall be paid by Tenant.

(b)    **Automatic Consent.**    See definition under Section 13.2.

(c)    **Common Areas.**    See definition under Section 2.3(a).

(d)    **Premises.**    See definition under Recital (B) and the legal description attached as Exhibit A-1.

(e)    **Tenant.**    Hollywood Entertainment Corporation, an Oregon corporation.

1.4    **Enumeration of Exhibits.** The exhibits enumerated in this Section and attached to this Lease are incorporated herein by reference and are to be construed as a part of this Lease. Each party agrees to perform any obligations on its part stated in any and all such Exhibits:

| | |
|---|---|
| Exhibit A-1 | Legal Description of the Premises |
| Exhibit A-2 | Site Plan for the Premises |
| Exhibit B | Description of Tenant's Work |
| Exhibit C | Non-Disturbance Agreement |
| Exhibit D | Tenant's Estoppel Certificate |

2.    **PREMISES.**

2.1    **Project.**

(a)    **Definition.**    The Project is depicted in Exhibit A-2.    The depiction constitutes a representation by Landlord.  Tenant shall have only such rights in and to the Project as are specifically set forth herein.

(b)    **Representations.**    In no event shall Landlord be permitted to make structural alterations or improvements to the Premises, including, but not limited to, placing newspaper machines, vending machines or signage on behalf of Landlord or others on the exterior walls of the Premises or placed on the sidewalk(s) in front of or surrounding the Premises without Tenant's express written approval, which approval may be withheld for any reason. Landlord shall not be permitted to advertise merchandise or solicit on the sidewalk(s) or any other Common Area adjacent to the Premises.  Landlord shall not, without Tenant's express written approval, change the access to or visibility of the Premises nor reduce or restrict the parking available to the Premises without Tenant's express written approval.

(c)    **Improvements.**    The Premises shall be improved as set forth in the Description of Tenant's Work attached hereto and made a part hereof as Exhibit B, as more fully described below.

2.2    Premises.  Landlord hereby leases, rents and demises to Tenant, and Tenant hereby accepts from Landlord, subject to and with the benefit of the terms and provisions of this Lease, the Premises described in Section 1.1(e) above and generally depicted in cross-hatching on Exhibit A-2. Upon substantial completion of the Premises, Tenant's architect shall certify to the total number of Rentable Square Feet of space in the Premises and such amount of Rentable Square Feet shall be inserted into Section 1.1(e) above.

3



### 2.3    Common Areas.

(a)    **Definition.** The term "Common Areas" refers to all areas of the Premises outside the Building.

(b)    **Tenant's Rights.** Tenant and its employees and invitees are, except as otherwise specifically provided in this Lease, authorized, empowered and privileged to use the Common Areas during the Lease Term.

2.4    **Parking.** Tenant shall have the exclusive use of all forty (40) parking spaces on the Premises. Tenant shall have the right to mark said spaces "Hollywood Video Customer Parking Only." Tenant shall have the right, if necessary, to post signs in order to enforce these parking provisions as well as the right to tow cars. Any enforcement by Tenant of these parking provisions shall be at Tenant's expense. Furthermore, Landlord shall not permit, except to the extent required by law, any fire lane, loading zone or other restrictive parking to be located in the vicinity of Tenant's storefront and entrance to the Premises.

## 3.    TERM; TENANT'S WORK.

### 3.1    Lease Term.

(a)    **Lease Commencement Date; Minimum Rent Commencement Date.** This Lease shall be for the term set forth in Section 1.1(f) above (hereinafter referred to as the "Term" or "Lease Term") and shall commence on the Lease Commencement Date specified in Section 1.1(g) above. The terms and conditions of this Lease shall apply on and after the Lease Commencement Date. The Lease Term shall commence on the Commencement Date and shall terminate at midnight of the expiration date as set forth in Section 1.1(i) above (hereinafter referred to as the "Expiration Date"), provided that Tenant's rental obligations under this Lease shall commence as of the date set forth in Section 1.1(h) above (hereinafter referred to as the "Minimum Rent Commencement Date"). A "Lease Year" shall mean a calendar year commencing on January 1 of the calendar year following the calendar year in which the Lease Commencement Date occurred.

(b)    **Options to Extend.**

(1)    Tenant is granted the right to extend the term of this Lease for two (2) periods of five (5) years each (the "Option Periods"), on the terms and conditions set forth herein, provided that each said right to extend for each such Option Period (the "Options") may be exercised only in the event Tenant is not in default either at the time each said Option right is exercised or at the time each such Option Period is to commence and provided, further, that the Option right for any Option Period cannot be exercised unless the Option for the immediately preceding Option Period, if any, has been exercised. The words "Lease Term" or "Term," as used in this Lease, shall mean the term of this Lease as extended by Tenant pursuant to this Section.

(2)    To exercise each Option described in the Section above, Tenant shall notify Landlord in writing no later than one hundred twenty (120) calendar days prior to the expiration of the Initial Lease Term or the Option Period then expiring, if any.

(3)    In the event Tenant properly exercises its Option right(s) as provided herein, all the terms and conditions of this Lease shall apply during the Option Period(s) (except the Option right then exercised), including, but not limited to, Tenant's obligation to pay Additional Rent and other charges and expenses provided for in the Lease and provided that

4

(i) the Option right exercised by Tenant in order to extend the Term of the Lease shall terminate and be of no further force and effect and may not be exercised again by Tenant; (ii) no rental concession, reduced or free Minimum Rent, tenant improvement allowance or other concession previously granted Tenant by Landlord shall be due or payable to Tenant during or with respect to such Option Period; (iii) Minimum Rent during the particular Option Period shall be determined as set forth below. At Landlord's request, prior to the commencement of the particular Option Period, Tenant shall execute, acknowledge and deliver to Landlord an Amendment to Lease evidencing Tenant's exercise of its Option right and setting forth the commencement and expiration dates of the Option Period and term of the Lease and the Minimum Rent payable during the Option Period.

(4)    The Minimum Rent, as defined in Section 4.1 herein, applicable during the Option Period(s) shall be the amount set forth in Section 4.1 (the "Minimum Rent").

**3.2    Tenant's Work.** Tenant shall perform the work required of it as specified in and pursuant to the terms and provisions of the Description of Tenant's Work attached hereto and made a part hereof as Exhibit B. Landlord and Tenant acknowledge that this Lease is contingent upon Tenant's right to construct the improvements to the Premises as set forth in Exhibit B.

**3.3    Delivery of Premises.**

(a)    **Delivery Date by Landlord.** Landlord herein covenants and agrees to deliver the Premises upon execution of this Lease. In the event Landlord fails to deliver the Premises by said date, the Minimum Rent Commencement Date shall be extended after the date Tenant opens for business with the public by two (2) days for each day of such delay.

(b)    **Acceptance of Premises.** Tenant acknowledges that it has inspected the Premises and Tenant accepts the Premises in "AS IS" condition upon delivery of the Premises to Tenant. Notwithstanding the above, this paragraph shall in no way limit Landlord's liability for latent defects or affect Landlord's repair and/or maintenance agreements under this Lease.

**3.4    Landlord's Title.** Landlord covenants that upon commencement of the Initial Lease Term, Landlord will have fee simple title to the Premises and full right and authority to make this Lease and that to the best of Landlord's knowledge the Premises are free and clear of and from all liens, restrictions, leases and encumbrances, laws, ordinances, governmental rules or regulations or title restrictions or zoning or other matters which would materially and adversely restrict or prevent Tenant's operation of a retail store as described in Section 1.1(n) above. Upon Tenant's request, Landlord shall deliver to Tenant a Preliminary Title Report and all underlying documents shown as exceptions to title affecting the Premises. Upon the discovery of any document affecting title which would prohibit or restrict Tenant's use of the Premises for a retail entertainment software or video rental and sales store, then Tenant may terminate this Lease upon thirty (30) days' prior written notice to Landlord, unless Landlord is able to remove such prohibition or restriction within said thirty (30) day period. Notwithstanding the foregoing, Landlord understands and agrees that the Premises may be used by Tenant as a retail entertainment software or video sales and rental store and Tenant's ability to so use the Premises is a condition precedent to this Lease. Landlord covenants that so long as Tenant is not in default hereunder, Tenant shall have quiet and peaceful possession and enjoyment of the Premises and enjoy all rights herein granted without interference, except with respect to a taking under any governmental authority of eminent domain pursuant to Section 19 or destruction of the Premises pursuant to Section 18.

5



4.    **RENT.**

4.1    **Minimum Rent.** Tenant shall pay to Landlord, without notice or demand and without any offset or deduction, except as otherwise provided herein, as fixed annual minimum rent the amounts as set forth below (the "Minimum Rent"), which Minimum Rent shall be paid in monthly installments in advance, on or before the first day of each calendar month of the Lease Term, commencing with the Minimum Rent Commencement Date set forth in Section 1.1(h) of this Lease and shall be considered delinquent if not so paid on or before the first day of each month; provided, however, that should Tenant be delayed due to weather, strike, union disagreement, riot, casualty, act of God and/or any other cause beyond Tenant's reasonable control, the Minimum Rent Commencement Date shall be extended one day for each day Tenant is delayed. If the Lease Term commences or expires on a day other than the last day of a calendar month, the Minimum Rent for such month shall be a prorated portion of the monthly Minimum Rent, based upon a thirty (30) day month. The Minimum Rent schedule for the term of the Lease is as follows:

| Months | Rent Per Year | Monthly Rent |
|---|---|---|
| 1-60 | $140,000 | $11,666.67 |
| 61-120 | $161,000 | $13,416.67 |
| Option #1 | | |
| 121-180 | $185,150 | $15,429.17 |
| Option #2 | | |
| 181-240 | $212,918 | $17,743.17 |

4.2    **Additional Rent.**

(a)    **Taxes and Insurance.**

(1)    In addition to the Minimum Rent provided in Section 4.1 above, and commencing on the Lease Commencement Date set forth in Section 1.1(g) above, Tenant shall reimburse Landlord for all real estate taxes (as defined below) and insurance premiums (as set forth in Section 15.1). At Landlord's election, Tenant shall pay the real estate taxes and insurance premiums monthly in the same manner set forth in Section 4.2(b)(3) for payment of Common Area Costs.

(2)    The term "Real Estate Taxes" shall include all real estate taxes and assessments, whether special or general, and including any road improvement districts, water improvement districts, if any, and any other utility installation hookup, tie-in or similar charges or assessments that are levied upon and/or assessed against the Premises and/or payable during or with respect to the Lease Term and the reasonable costs of professional consultants and/or counsel to analyze tax bills and prosecute any protests, refunds and appeals for the period covered during the Lease Term.

(3)    Landlord shall provide to Tenant a copy of the tax bill for which Landlord is billing Tenant with evidence of payment by Landlord. Evidence of payment shall be a copy of Landlord's canceled check or a copy of the receipt for payment. Notwithstanding the foregoing, Tenant shall not be responsible for reimbursing to Landlord any penalties or late charges incurred by Landlord for its failure to make timely payment(s) of the Real Estate Taxes.

(4)    In the event of a special assessment for a public or private improvement, the life of which extends beyond the life of the Lease, the assessment for such improvement shall be paid by Landlord and amortized over the life of the improvement, not to exceed twenty (20) years, and

6



Tenant shall be responsible to pay only the amortized portion as it is amortized during the term of this Lease.

(5)     Tenant shall not be obligated to pay any taxes or assessments which were incurred while Tenant did not have the right to legally possess the Premises.  In addition, Tenant shall not be responsible to pay any development cost billed by the government as part of the property tax.

**(b)     Common Area Costs.**

(1)     As used in this Lease, the term "Common Area Costs" means costs reasonably incurred for operation, maintenance and repair of the Common Areas and supervision thereof (the cost of supervision and management shall be $150 per month), repairing the parking area (including, provided the work is approved by Tenant in advance, the amortized portion of repaving or putting a new coat thereupon based upon the useful life of the improvement), repainting the parking areas, cleaning, sweeping and other janitorial services, sanitation, snow and ice removal, maintenance of refuse receptacles, replanting existing landscaping, maintaining directional signs and other markers and upkeep of lighting and other utilities.  In no event shall the term "Common Area Costs" include any Capital Expenditures as hereinafter defined, principal or interest payments on the loans secured by mortgages on the Premises or any part thereof, depreciation or amortization of any improvements, costs and expenses incurred in connection with leasing space (including, but not limited to, leasing commissions, advertising and promotional expenses, legal fees for preparation of leases and rents payable with respect to any leasing office), costs recoverable by Landlord pursuant to its insurance policies, costs due to Landlord's default under this Lease and/or costs due to the negligence of Landlord, its employees, agents, contractors and assigns; nor shall any Common Area Costs include costs or expenses of the partnership or other entity which constitutes the Landlord not directly related to the Premises (such as accounting fees for partnership tax returns and income taxes of such entity), expenses incurred by Landlord not directly related to the land, the Premises and/or its operations (including, without limitation, compensation paid to officers, executives or partners of Landlord).   "Capital Expenditures" means those expenditures which, in accordance with generally accepted accounting principles, are not fully chargeable to current expenses in the year the expenditure is incurred.

(2)     Effective upon the Rent Commencement Date, Tenant shall pay to Landlord, upon demand but not more than once a month, the Common Area Costs based upon Landlord's estimates, subject to readjustments as hereinafter provided.  [Unless Tenant undertakes to maintain all of the ] *n/a* Common Areas at its own cost and expense and undertakes payment of Real Estate Taxes and insurance premiums,]Tenant's Common Area Costs shall not increase more than seven percent (7%) per year of the Initial Lease Term or any Option Period thereof.   Landlord and Tenant acknowledge that Tenant is the sole tenant of Landlord's property and, as a result, Tenant may undertake to maintain all or certain portions of the Common Areas at its own cost and expense, in which event Landlord will be relieved of its duty of Common Area maintenance to the extent it is so undertaken by Tenant.  Nothing herein shall be construed to require Tenant to undertake such Common Area maintenance or, once undertaken, to continue such Common Area maintenance.

(3)     Landlord shall have the right at the beginning of any calendar year to submit to Tenant a statement indicating Landlord's estimations of Tenant's Common Area maintenance and charges ("the Costs" or "Tenant's

7



Costs"). Tenant shall pay to Landlord on the first day of each month after receipt of such statement (until receipt of a succeeding statement) an amount equal to one twelfth (1/12th) of such amount. Landlord reserves the right, but not the obligation, to revise Landlord's estimation of Tenant's Costs. If any revised statement is submitted to Tenant after the beginning of a calendar year, then the first payment thereafter shall be adjusted to account for any underpayment or overpayment based on the prior statement. If Landlord so estimates Tenant's Costs, then, within approximately one hundred twenty (120) days after the end of the applicable calendar year, Landlord shall submit a statement indicating (i) Tenant's Costs and (ii) the sum of Tenant's payments for such calendar year. If such statement indicates that such sum exceeds Tenant's Costs, then Tenant shall deduct the overpayment from its next payment(s) pursuant to this Section. If such statement indicates that Tenant's Costs are greater than such sum, then Tenant shall pay the difference within thirty (30) days after the date of receipt of such statement.

(4)     Within ninety (90) days following the end of each calendar year, Landlord shall furnish Tenant with a statement, certified as correct by a certified public accountant or an officer of Landlord, showing the total Common Area Costs for the calendar year just expired and the amount of Tenant's Common Area Costs and payments made by Tenant during such calendar year under this Lease. If Tenant's Common Area Costs for such calendar year shall exceed Tenant's payments as shown on such statement, then Tenant shall, within thirty (30) days, pay the difference to Landlord. If the statement indicates an overpayment by Tenant, then Tenant shall be entitled to offset such excess against payments becoming due under this Lease or any other payment obligations under this Lease or otherwise receive a refund from Landlord for such amount. Landlord shall use its best efforts to minimize Common Area Costs in a manner consistent with good shopping center practices.

(5)     Tenant shall have the right to audit, inspect and receive a copy of the books and records of Landlord with respect to any costs or items which are passed through to Tenant upon ten (10) days' advance written notice by Tenant to Landlord. Landlord shall cooperate with Tenant in providing Tenant reasonable access to its books and records during normal business hours for this purpose. If the results of the audit show an overage to Tenant of more than two percent (2%) of the actual amount owed by Tenant, then Landlord shall pay the reasonable cost of such audit, and Landlord shall credit or refund to Tenant any overcharge of such items as discovered by the audit within thirty (30) days of completion of such audit.

(6)     Tenant shall not be obliged to participate in, or contribute to, by way of Common Area Costs or otherwise, a merchants' association or advertising and/or promotion fund.

(c)     Costs. All covenants and agreements to be performed by Tenant under any of the terms of this Lease shall be performed by Tenant at Tenant's sole cost and expense and without any abatement of rent, unless otherwise specifically provided in this Lease. If Tenant shall fail to pay any sum of money owed to any party other than Landlord, for which it is liable hereunder, or if Tenant shall fail to perform any other act on its part to be performed hereunder, and a failure shall continue for thirty (30) days after written notice thereof by Landlord, Landlord may, without waiving such default or any other right or remedy, but shall not be obligated to, make any such payment or perform any such other act to be made or performed by Tenant. All sums so paid by Landlord and all necessary, incidental costs, together with interest thereon at the rate as set forth in Section 16.2(b) from the date of expenditure by Landlord, shall be payable to

8



Landlord as Additional Rent within ten (10) days after demand, provided that Tenant shall have the right to contest any amount owing to a third party as long as Tenant has adequately protected Landlord against loss, damage or liens as may be reasonably determined by Landlord.

**5.  USE.**

**5.1    Permitted Uses.** Tenant may use the Premises for any business or purpose as set forth in Section 1.1(n) above.

**5.2    Uses Prohibited.** Tenant shall not do or permit anything to be done in or about the Premises, nor bring or keep anything therein, which will in any way unreasonably increase the existing rate of, or affect, any fire or other insurance upon the Premises, or cause a cancellation of any insurance policy covering said Premises or any part thereof or any of its contents. Tenant shall take all reasonable action to prevent odors, emissions, fumes, liquids or other substances or excessive noise from escaping or extending beyond the Premises and shall not use or allow the Premises to be used for any immoral or unlawful purpose. Tenant shall not commit or allow to be committed any waste in or upon the Premises and shall refrain from using or permitting the use of the Premises or any portion thereof as living quarters, sleeping quarters or for lodging purposes.

**5.3    Operation of Business.** Notwithstanding any other provision in this Lease, Tenant may close its business operations at the Premises for any period of time as long as Tenant continues to pay Rent as required in the Lease.

**5.4    Compliance with Laws.** Tenant shall, at its sole cost and expense, promptly comply with all federal, state, county or municipal laws, ordinances, rules, regulations, directives, orders and/or requirements, recorded covenants and restrictions now in force or which may hereafter be in force with respect to the Premises, Tenant's use and occupancy of the Premises and Tenant's business conducted thereon, including but not limited to the Americans with Disabilities Act. The judgment of any court of competent jurisdiction or the admission of Tenant in any action against Tenant, whether Landlord be a party thereto or not, that Tenant has violated any law, statute, ordinance or governmental rule, regulation, order, directive or requirement shall be conclusive of that fact as between Landlord and Tenant.

**6.  MAINTENANCE OF PREMISES.**

**6.1    Maintenance and Repair.**

(a)    **Maintenance and Repair by Tenant.** Tenant shall at all times throughout the Lease Term at its sole cost and expense keep the interior of the Premises (including the interior walls and nonstructural portions of the Premises, as well as exterior paint, exterior doors and entrances, all windows, floor coverings, sills, door closures, moldings, trim of all doors and windows), all partitions, door surfaces, fixtures and equipment (including exterior, interior and parking lot lighting), the roof, the roof surface, and that portion of the roof constructed or altered by Tenant in connection with Tenant's Work pursuant to Exhibit B, and the sprinkler mains in good order, condition and repair. Without limiting the generalities thereof, Tenant shall keep the glass of all windows, doors and showcases clean and presentable; replace immediately all broken glass in the Premises; at reasonable intervals paint or refinish the interior of the Premises; keep all plumbing, including pipes, drains, toilets, basins and water heaters, clean and in a good state of repair; and keep all utilities within the Premises, including circuit breaker and panel box and Tenant's meters, in a good state of repair. Notwithstanding the foregoing, Tenant shall be responsible for maintaining the improvements, whether or not structural, constructed or altered by Tenant in connection with Tenant's Work pursuant to Exhibit B. Furthermore, Tenant shall

9



be responsible to replace and repair the major parts of the heating, ventilating and
air conditioning system (the "HVAC").

(b)    **Failure to Maintain by Tenant.** If Tenant fails to keep and preserve the
Premises as set forth in Section 6.1(a) above, and after which Landlord has given
Tenant notice of such failure (pursuant to Section 16.1(c)), Landlord may, at its
option, put or cause the same to be put in the condition and state of repair agreed
upon, and in such case, upon receipt of written statements and copies of invoices
from Landlord's contractor(s) and/or vendor(s), Tenant shall promptly pay the
entire cost thereof as Additional Rent. Landlord shall have the right, without
liability, to enter the Premises for the purpose of making such repairs upon the
failure of Tenant to do so.

(c)    **Maintenance and Repair by Landlord.** Except for those matters
set forth in 6.1A and the work described in Exhibit B, which shall be at Tenant's expense as
provided therein, Landlord covenants and agrees, at its expense, without
reimbursement or contribution by Tenant, to keep, maintain and replace, if
necessary, the foundations, the plumbing system, the electrical system, the utility
lines and connections to the Building, if any, structural systems, including, without
limitation, the load bearing walls and floors, and slabs and masonry walls in good
condition and repair. Notwithstanding the foregoing, Landlord shall not be
responsible for maintaining the improvements, whether or not structural,
constructed or altered by Tenant in connection with Tenant's Work pursuant to
Exhibit B.

(d)    **Failure to Maintain by Landlord.** If Landlord fails to keep and preserve
the Premises as set forth in Section 6.1(c) above, and after which Tenant has given
Landlord notice of such failure (pursuant to Section 17), Tenant may, at its option,
put or cause the same to be put in the condition and state of repair agreed upon,
and in such case, upon receipt of written statements and copies of invoices from
Tenant's contractor(s) and/or vendor(s), Landlord shall promptly pay the entire
cost thereof to Tenant.

7.    **MAINTENANCE OF COMMON AREAS.**

7.1    **Maintenance and Repair by Landlord.** Landlord covenants and agrees that it
shall maintain or cause to be maintained the Common Areas in a "First Class" manner as
the term is understood in the greater San Diego area. The Common Areas shall consist
of all parking areas, landscaped areas, streets, sidewalks, driveways, loading platforms,
washrooms, lounges, shelters and other facilities available for joint use, all as they may
from time to time exist. All Common Area Costs (as defined in Section 4.2(b)) shall be
based upon competitive charges for similar services and/or materials that are available in
the general vicinity of the Premises.

7.2    **Failure to Maintain by Landlord.** If Landlord fails to keep and preserve the
portion of the Premises which are Landlord's responsibility as set forth in Section 6.1(c)
above, and after which Tenant has given Landlord notice of such failure (pursuant to
Section 17), Tenant may, at its option, put or cause the same to be put in the condition
and state of repair agreed upon, and in such case, upon receipt of written statements and
copies of invoices from Tenant's contractor(s) and/or vendor(s), Landlord shall promptly
pay the entire cost thereof to Tenant.

8.    **UTILITIES AND SERVICES.**

8.1    **Tenant's Obligation.** Tenant shall pay before delinquency, at its sole cost and
expense, all charges for water, gas, heat, electricity, power, telephone service, sewer
service charges and sewer rentals charged or attributable to the Premises, and all other
services or utilities used in, upon or about the Premises by Tenant or any of its

10



subtenants, licensees or concessionaires from the Lease Commencement Date and throughout the Lease Term hereof and the cost of installing meters thereon.

**8.2    Landlord's Obligations.** Landlord shall provide a service for collection of refuse and garbage, and Tenant shall pay the cost thereof, provided the cost is competitive with an identical service available to Tenant.

**8.3    Interruptions.** Landlord shall not be liable to Tenant in damages or otherwise if the said utilities or services are interrupted or terminated because of necessary repairs, installations or improvements, or any cause beyond Landlord's reasonable control, nor shall any such interruption or termination relieve Tenant of the performance of any of its obligations hereunder, except that if Tenant is unable to operate its business, there shall be an abatement of all rent hereunder during such time period.

## 9.    PERSONAL PROPERTY TAXES.

**9.1    Tenant's Obligation.** Tenant shall pay, or cause to be paid, before delinquency, any and all taxes levied, assessed and/or becoming payable during the Lease Term hereof upon all or any part of Tenant's leasehold improvements, equipment, furniture, fixtures and other personal property located in the Premises. In the event any or all of Tenant's leasehold improvements, equipment, furniture, fixtures and other personal property shall be assessed and taxed with the real property, Tenant shall pay to Landlord such taxes within thirty (30) days after delivery to Tenant by Landlord of a statement in writing setting forth the amount of such taxes applicable to Tenant's property.

## 10.    LICENSES AND TAXES.

**10.1    Tenant's Obligation.** Tenant shall be liable for, and shall pay throughout the Lease Term, all license and excise fees and occupation taxes covering the business conducted on the Premises. If any governmental authority or unit under any present or future law effective at any time during the Lease Term hereof shall in any manner levy a tax on rents payable under this Lease or rents accruing from use of the Premises or a tax in any form against Landlord because of, or measured by, income derived from the leasing or rental of said property, such tax shall be paid by Tenant, either directly or through Landlord. It is understood and agreed, however, that Tenant shall not be liable to pay any municipal, county, state or federal income, business and occupation or franchise taxes of Landlord, or any municipal, county, state or federal estate, succession, inheritance or transfer taxes of Landlord.

## 11.    ALTERATIONS.

**11.1    Alterations by Tenant.** Except for Tenant's Work described in Exhibit B, and nonstructural interior alterations costing ten thousand dollars ($10,000) or less, Tenant shall not make any alterations, additions or improvements in or to the Premises, including but not limited to penetration of the roof, without the prior written consent of Landlord, which consent shall not be unreasonably withheld. Any such alterations, additions or improvements consented to by Landlord, including roof penetration, shall be made at Tenant's sole cost and expense. Tenant shall provide Landlord with a copy of its plans for any such work and shall notify Landlord of such work at least five (5) days before commencing such work. Tenant shall provide its own trash container or containers for construction debris; shall promptly remove all construction and related debris from all Common Areas; immediately following completion of construction, shall return the Common Areas to the condition they were in immediately prior to construction; and shall repair and restore any portions of the Common Areas harmed as a result of the construction activities to the condition they were in immediately prior to construction. Tenant shall secure any and all governmental permits, approvals or authorizations required in connection with any such work and shall indemnify Landlord, defend Landlord against and hold Landlord harmless from any and all liability, costs, damages (including any damage to the Premises or Common Areas), expenses (including attorneys' fees) and any

11

and all liens resulting therefrom.  All alterations, additions and improvements (and expressly including all light fixtures and floor coverings), except trade fixtures, appliances and equipment which do not become a part of the Premises, shall immediately become the property of Landlord.  Landlord's review and/or approval of any request for alterations, additions or improvements in or to the Premises, and/or the plans or specifications with respect thereto, shall create no responsibility or liability on the part of Landlord, nor shall such review or approval evidence or constitute a representation or warranty by Landlord with respect to the action or undertaking approved or the completeness, accuracy, design sufficiency or compliance of such plans or specifications with laws, ordinances, rules and/or regulations of any governmental agency or authority. Tenant will provide at least ten (10) days' prior written notice to Landlord before any labor is performed, supplies are furnished, or services are rendered at the Premises, and Landlord will have the right to post notices of nonresponsibility on the Premises.

12.    **LIENS AND ENCUMBRANCES.**

12.1    **Liens.**  Tenant shall keep the Premises free from any liens arising out of any work performed, materials furnished or obligations incurred by Tenant.  Landlord shall also keep the Premises free from any liens arising out of any work performed, materials furnished or obligations incurred by Landlord.  Both Landlord and Tenant retain the right to contest any lien or encumbrance upon the Premises.

12.2    **Encumbrances.**  Tenant shall not cause or suffer to be placed, filed or recorded against the title to the Premises, or any part thereof, any mortgage, deed of trust, security agreement, financing statement or other encumbrance; and, further, in no event shall the lien of Tenant's mortgage, deed of trust or other security agreement or financing statement cover the Premises, or any part thereof, nor any leasehold improvements, alterations, additions or improvements thereto except trade fixtures, appliances and equipment which are owned by Tenant and which are not, and which do not become, a part of the Premises.

13.    **ASSIGNMENT AND SUBLETTING.**

13.1    **Assignment or Sublease.**  Except in the case of an Automatic Consent, as defined below, Tenant shall not assign, transfer, mortgage, pledge, hypothecate or encumber this Lease or any interest therein, nor sublet the whole or any part of the Premises, nor shall this Lease or any interest hereunder be assignable or transferable by operation of law or by any process or proceeding of any court, or otherwise, without the prior written consent of Landlord, which consent shall not be unreasonably withheld if assignee or sublessee intends to use the Premises for the same or other acceptable use.  Without in any way limiting Landlord's right to refuse to give such consent for any other reason or reasons, Landlord reserves the right to refuse to give such consent if, in Landlord's judgment, the proposed assignee's or subtenant's use of the Premises would mean that Hazardous Materials, as defined in Section 28.1 below, would be present on the Premises. Except in the case of an Automatic Consent, Tenant agrees to pay Landlord a processing fee not to exceed one thousand dollars ($1,000) for Landlord's attorneys' fees incurred in connection with the processing, review and/or documentation (including, but not limited to, assignments, pledges, consents, security agreements or financing statements and/or other security documents) of any such requested transfer, assignment, subletting, licensing or concession agreement, change of ownership, encumbrance or hypothecation of this Lease or Tenant's interest in and to the Premises. The one thousand dollars ($1,000) processing fee shall be due and payable at the same time Tenant submits documents to Landlord for processing.

13.2    **Automatic Consent.**  The sale or exchange of Tenant's stock in a public offering and the subsequent sale of Tenant's stock on a nationally recognized exchange or in NASDAQ or a change in ownership of Tenant as a result of a merger or reorganization or joint venture shall not be considered an assignment under this Section 13. Tenant shall have the absolute right, without prior approval of Landlord, to assign or sublet the

12



Premises to a corporation or entity that assumes all of Tenant's obligations and either (a) controls, or is controlled by, or under control with Tenant, (b) merges or consolidates with Tenant, or (c) acquires a substantial portion of the assets or stock of Tenant (an "Automatic Consent").

## 14.    INDEMNIFICATION.

**14.1    Indemnification.** Subject to the provisions of Section 15.4 below, Tenant will save and hold Landlord, and Landlord's officers, directors and/or partners harmless from and against all loss, damage, liability or expense (including reasonable attorneys' fees) resulting from, claimed by or against or incurred by Landlord or arising from any injury to any person or loss of or damage to any property caused by or resulting from any negligence or willful act or omission of Tenant or any officer, agent, contractor or employee of Tenant in or about the Premises. Subject to the provisions of Section 14.2 below, Landlord shall indemnify and hold Tenant harmless from any claims, causes of action, losses, costs, damages and fees (including reasonable attorneys' fees) for any cause whatsoever as a result of Landlord's negligent or willful act or omission relating to the Premises.

**14.2    Concurrent Negligence.** Notwithstanding the provisions of Section 14.1 above, in the event of the concurrent negligence or intentional misconduct of Tenant, its agents, employees, sublessees, invitees, licensees or contractors on the one hand, and that of Landlord, its partners, directors, officers, agents, employees or contractors on the other hand, which concurrent negligence or intentional misconduct results in injury or damage to persons or property and relates to the construction, alteration, repair, addition to, subtraction from, improvement to or maintenance of the Premises or Common Areas, a party's (the "Indemnifying Party") obligation to indemnify the other as set forth in this Section shall be limited to the extent of the Indemnifying Party's negligence and/or intentional misconduct, and that of its agents, employees, sublessees, invitees, licensees or contractors, including the Indemnifying Party's proportional share of reasonable costs, attorneys' fees and expenses incurred in connection with any claim, action or proceeding brought with respect to such injury or damage.

**14.3    Survival.** The obligations of Tenant and Landlord under this Section arising by reason of any occurrence taking place during the term of this Lease shall survive the expiration or earlier termination of this Lease.

## 15.    INSURANCE.

**15.1    Property Insurance.** Landlord will carry and maintain property insurance and loss of rent insurance (hereinafter collectively referred to in this Section as "Property Insurance") on the Premises. The amount of property insurance to be maintained by Landlord at Tenant's expense shall be the actual full replacement cost of the Premises, not including the foundation, plus loss of rent insurance covering loss of rental of the property for a period of twelve (12) months. Said insurance policy shall be with an insurance company or companies with general policy holder's rating of not less than A as rated in the most current available "Best's Key Rating Guide" and which are qualified to do business in the state in which the Premises are located. Landlord shall maintain, at Tenant's expense, during the term hereof, all risk property insurance (hereinafter, "Landlord's Property Insurance") covering fire and extended coverage, vandalism and malicious mischief, sprinkler leakage and all other perils of direct physical loss or damage and insuring the improvements and betterments located in the Premises, and all appurtenances thereto (excluding Tenant's personal property), for the full replacement value thereof. Landlord, upon request, shall furnish Tenant a certificate of such Landlord's Property Insurance.

13



**15.2    Liability Insurance.** Tenant shall, during the entire Lease term, keep in full force and effect a policy or policies of comprehensive public liability insurance and property damage insurance with respect to the Premises, and the business operated by Tenant and any sublessee of Tenant in the Premises, in which the combined single limit of liability shall be not less than one million dollars ($1,000,000). Said policy shall name Landlord and Landlord's lender as additional insureds on said policy and contain a clause that the insurer may not cancel or change the insurance coverage limits without first giving Landlord thirty (30) days' prior written notice. The above-described limits of liability shall be adequate as long as Tenant also maintains an umbrella policy of insurance with limits of liability of not less than three million dollars ($3,000,000). Should Tenant not maintain an umbrella policy with such limits, then the limits in the other policies shall be increased to two million dollars ($2,000,000). Said insurance policy shall be with an insurance company or companies with general policy holder's rating of not less than A as rated in the most current available "Best's Key Rating Guide" and which are qualified to do business in the state in which the Premises are located.

**15.3    Risk of Loss.** Except when caused by Landlord's, its agents' or its employees' negligent or intentional acts or omissions, Landlord shall not be liable for any damages, either to personal property or to persons, sustained by Tenant or others, caused by any defects in said Premises, or any service facilities, or hereafter occurring therein or due to any part or appurtenance thereof, including any and all furniture, fixtures and equipment becoming out of repair, or from an insured or uninsured loss caused by fire or from any act or omission of Tenant or any other sublessees or any other persons.

**15.4    Waiver of Subrogation.** Landlord and Tenant hereby mutually release each other from liability and waive all right of recovery against each other for any loss in or about the Premises, from perils insured against under their respective fire insurance contracts, including any all risk endorsements thereof, whether due to negligence or any other cause, provided that this Section shall be inapplicable if it would have the effect, but only to the extent it would have the effect, of invalidating any insurance coverage of Landlord or Tenant. Tenant shall, at the request of Landlord, execute and deliver to Landlord a form of waiver of subrogation in the form and content as required by Landlord's insurance carrier.

**15.5    Certificate of Insurance.** A certificate issued by the insurance carrier for each policy of insurance required to be maintained by Tenant under the provisions of this Lease shall be delivered to Landlord upon or before the delivery of the Premises to Tenant for any purpose and thereafter, annually, upon renewal at Landlord's request. Each of said certificates of insurance and each such policy of insurance required to be maintained by Tenant hereunder shall expressly evidence insurance coverage as required by this Lease. Any insurance provided by this Lease may be provided as part of the Tenant's blanket insurance policy. Tenant may self-insure all plate glass on the Premises. In the event insurance carried by Landlord covers the Premises and other property and duplicates insurance already carried by Tenant, Landlord shall reduce the total premiums by such an additional amount prior to determination of Tenant's cost.

16.    **DEFAULT BY TENANT.**

**16.1    Event of Default.** The occurrence of the following events will, at Landlord's option, constitute an event of default ("Event of Default"):

    **(a)    Failure to Pay Rent.** Failure to pay rent, including Minimum Rent, Additional Rent and late charges, on the date when due, where such failure shall continue for a period of ten (10) days after written notice thereof by Landlord to Tenant;

    **(b)    Abandonment of Premises.** Vacation or abandonment of the Premises for a period of thirty (30) consecutive days unless Tenant continues to pay Rent hereunder;

14



(c)    **Failure to Perform.** Failure to perform Tenant's covenants under this Lease (except default in the payment of Rent) where such failure shall continue for a period of thirty (30) days after written notice thereof by Landlord to Tenant, provided that in the event such cure reasonably requires more than thirty (30) days to complete, then Tenant shall not be in default if Tenant shall promptly commence the cure of such default and diligently pursue such cure to completion.

(d)    **Insolvency.** The making of a general assignment by Tenant for the benefit of creditors, the filing of a voluntary petition by Tenant, the filing of an involuntary petition by any of Tenant's creditors seeking the rehabilitation, liquidation, or reorganization of Tenant under any law relating to bankruptcy, insolvency, or other relief of debtors and, in the case of an involuntary action, the failure to remove or discharge the petition within sixty (60) days of the filing, the appointment of a receiver or other custodian to take possession of substantially all of Tenant's assets or this leasehold, Tenant's insolvency or inability to pay Tenant's debts or failure generally to pay Tenant's debts when due, any court entering a decree or order directing the winding up or liquidation of Tenant's debts when due, any court entering a decree or order directing the winding up or liquidation of Tenant or substantially all of Tenant's assets, Tenant taking any action toward the dissolution or winding up of Tenant's affairs, or the attachment, execution, or other judicial seizure of substantially all of Tenant's assets or this leasehold.

**16.2    Remedies in Default.**

(a)    **Termination.** In the event of the occurrence of any Event of Default, Landlord will have the right to give a written termination notice to Tenant and, on the date specified in that notice, this Lease will terminate unless on or before that date all arrears of Rent and all other sums payable by Tenant under this Lease and all costs and expenses incurred by or on behalf of Landlord have been paid by Tenant and all other Events of Default at the time existing have been fully cured to the satisfaction of Landlord.

(1)    **Repossession.** Following termination, without prejudice to other remedies Landlord may have, Landlord may (i) peaceably re-enter the Premises on voluntary surrender by Tenant; (ii) remove Tenant and any other persons occupying the Premises, using any legal proceedings that may be available; (iii) repossess the Premises or relet the Premises or any part of them for any term (which may be for a term extending beyond the Term), at any rental and on any other terms and conditions that Landlord in Landlord's sole discretion may determine, with the right to make reasonable alterations and repairs to the Premises; and (iv) remove all personal property.

(2)    **Unpaid Rent.** Landlord will have all the rights and remedies of a landlord provided by applicable law, including the right to recover from Tenant (i) the worth, at the time of award of the unpaid Rent that had been earned at the time of termination; (ii) the worth, at the time of award, of the amount by which the unpaid Rent that would have been earned after the date of termination until the time of award exceeds the amount of loss of rent that Tenant proves could have been reasonably avoided; (iii) the worth, at the time of award, of the amount by which the unpaid Rent for the balance of the Term after the time of award exceeds the amount of the loss of rent that Tenant proves could have been reasonably avoided; and (iv) any other amount and court costs necessary to compensate Landlord for all detriment proximately caused by Tenant's default. The phrase worth, at the time of award, as used in clauses (i) and (ii) above, will be computed at ten percent (10%) per annum, and as used in clause (iii)

15



above, will be computed by discounting that amount at the discount rate of the Federal Reserve Bank of San Francisco at the time of award.

**(b)    Continuation.** Even though an Event of Default may have occurred, this Lease will continue in effect for so long as Landlord does not terminate Tenant's right to possession. Also, Landlord may enforce all of Landlord's rights and remedies under this Lease, including the right to recover Rent as it becomes due, and Landlord, without terminating this Lease, may, during the period Tenant is in default, enter the Premises and relet them, or any portion of them, to third parties for Tenant's account. Tenant will be liable to Landlord for all costs Landlord incurs in reletting the Premises, including without limitation, brokers' commissions, expenses of remodeling the Premises and similar costs. Such costs shall not include costs normally paid for by a new tenant and in no case include costs beyond restoring the Premises to a vanilla shell or the condition at the time of delivery to Tenant if less than a vanilla shell. Reletting may be for a period shorter or longer than the remaining Term. Tenant will continue to pay the Rent on the date that it is due. No act by Landlord under this Lease, including acts of maintenance, preservation, or efforts to lease the Premises or the appointment of a receiver on application of Landlord to protect Landlord's interest under this Lease, will terminate this Lease unless Landlord notifies Tenant that Landlord elects to terminate this Lease. In the event that Landlord elects to relet the Premises, the rent that Landlord receives from reletting will be applied to pay the following in the order listed:

> **(1)**    any indebtedness from Tenant to Landlord other than Minimum Rent, Additional Rent, Real Property Taxes and other amounts owing to Landlord under this Lease;

> **(2)**    all costs, including maintenance, incurred by Landlord in reletting, except those costs specifically excluded above; and

> **(3)**    Minimum Rent, Additional Rent, Real Property Taxes and other amounts owing to Landlord under this Lease.

After deducting the payments referred to above, any sum remaining from the rental Landlord receives from reletting will be held by Landlord and applied in payment of future Rent as Rent becomes due under this Lease. In no event will Tenant be entitled to any excess rent received by Landlord. If, on the date Rent is due under this Lease, the rent received from the reletting is less than the Rent due on that date, Tenant will pay to Landlord, in addition to the remaining Rent due, all costs, including maintenance, that Landlord incurred in reletting that remain after applying the rent received from reletting; provided, however, such costs shall not include costs normally paid for by a new tenant and in no case include costs beyond restoring the Premises to a vanilla shell or the condition at the time of delivery to Tenant if less than a vanilla shell. So long as this Lease is not terminated, Landlord will have the right to remedy any default of tenant, subject to the notice provisions of Section 16.1, to maintain or improve the Premises, to cause a receiver to be appointed to administer the Premises and new or existing subleases, and to add to the Rent all of Landlord's reasonable costs in so doing, with interest at ten percent (10%) per annum from the date of the expenditure.

**16.3    Cumulative.** Each right and remedy of Landlord provided for in this Lease or now or later existing at law, in equity, by statute or otherwise, will be cumulative and will not preclude Landlord from exercising any other rights or remedies provided for in this Lease or now or later existing at law or in equity, by statute or otherwise. No payment by Tenant of a lesser amount than the Rent, or any endorsement on any check or letter accompanying any check or payment as Rent, will be deemed an accord and satisfaction of full payment of Rent. However, Landlord may accept this payment without prejudice

16



to Landlord's right to recover the balance of Rent or to pursue other remedies. Notwithstanding the foregoing, Landlord agrees to use its reasonable best efforts to mitigate its damages resulting from a default by Tenant.

17. **DEFAULT BY LANDLORD.**

17.1 **Default by Landlord.** Landlord shall not be in default unless Landlord fails to perform obligations required of Landlord within a reasonable time, but in no event, except as otherwise provided for in this Lease, less than thirty (30) days after written notice by Tenant to Landlord and to the holder of any mortgage or deed of trust covering the Premises whose name and address shall have theretofore been furnished to Tenant in writing in accordance with Section 20.3 below. Said notice shall specify wherein Landlord has failed to perform such obligation; provided, however, that if the nature of Landlord's obligation is such that more than thirty (30) days are required for performance, then Landlord shall not be in default if Landlord commences performance within such thirty (30) day period and thereafter diligently prosecutes the same to completion. Tenant further agrees not to invoke any of its remedies under this Lease until any such mortgagees and/or deed of trust holders have been provided an opportunity to cure as set forth in Section 20.3 below. If default cannot be cured within the time period provided for within this paragraph, Tenant shall have the right to terminate this Lease as a result of Landlord's default or offset any claimed amount against any Minimum Rent, Additional Rent or other sum then or thereafter due Landlord.

18. **DAMAGE BY FIRE OR OTHER CASUALTY.**

18.1 **Reparable Damage.** If fire or other casualty insurable under a standard fire and extended risk policy of insurance covering the Premises from time to time shall render the whole or any material portion of the Premises untenantable, and if the Premises can reasonably be expected to be reparable within one hundred eighty (180) days from the date of such event, then Landlord shall repair and restore the Premises to its condition prior to the fire or other casualty within such one hundred eighty (180) day period (subject to delays for causes beyond Landlord's reasonable control) and notify Tenant that it will be doing so, such notice to be mailed within ninety (90) days from the date of such damage or destruction, and this Lease shall remain in full force and effect, but the Minimum Rent and Additional Rent and other costs for the period during which the Premises are untenantable shall be abated.

18.2 **Irreparable Damage.** If fire or other casualty insurable under a standard fire and extended policy issued from time to time covering the Premises shall render the whole or any material part of the Premises untenantable and the Premises cannot reasonably be expected to be reparable within one hundred eighty (180) days from the date of such event, or if an uninsurable casualty shall render the whole or any portion of the Premises untenantable, then Landlord, by notice in writing to Tenant mailed within ninety (90) days from the date of such damage or destruction, may terminate this Lease effective upon a date within thirty (30) days from the date of such notice. The Minimum Rent, Additional Rent and other costs for the period during which the Premises are untenantable shall be abated and, upon Termination, all prepaid rents and/or deposits shall be returned to Tenant, and neither Landlord nor Tenant shall have any other obligations or responsibilities under this Lease.

18.3 **Landlord's Repair.** In the event Landlord elects to restore or repair the Premises within the one hundred eighty (180) day period set forth in Section 18.1, then Landlord, upon Tenant's reopening of the Premises for business with the public, shall provide Tenant with two (2) days of free rent for each day that the repairs exceed one hundred eighty (180) days. In the event that such damage or destruction cannot be repaired within two hundred forty (240) days, then Tenant, at its option, by written notice to Landlord may terminate this Lease effective upon such notice.

17



**18.4    Repair and Restore.**  If Landlord or Tenant does not terminate this Lease pursuant to its rights herein, then Landlord shall repair and restore the Premises to their condition prior to the fire or other casualty within that time period reasonably necessary for such repair and restoration (subject to delays for causes of the type described in Section 29.13) and the Minimum Rent shall be abated during the restoration and/or repair period.  In no event shall Landlord be obligated to repair or restore any special equipment or improvements installed by Tenant.  Landlord's obligation to rebuild and repair under this Section shall in all events be limited to the extent of the insurance proceeds available to Landlord for such restoration, and Tenant agrees that promptly after completion of such work by Landlord, it will proceed with reasonable diligence and at its sole cost and expense to rebuild, repair and/or replace its signs, fixtures and equipment.

**18.5    Termination of Lease.**  In the event of termination of this Lease pursuant to this Section, Minimum Rent, Additional Rent and other costs shall be apportioned on a per diem basis and paid to the date of such casualty.

**18.6    Damage During Last Year of Lease Term.**  Notwithstanding anything to the contrary herein contained, in the event the Premises shall be damaged or destroyed by fire or otherwise in excess of thirty percent (30%) of the full replacement cost of the Premises during the last year of the Term (unless Tenant has exercised its option to extend the Term as provided for in Section 3.1), either party shall have the option to terminate this Lease as of the date of such damage or destruction by giving written notice to the other party within ninety (90) days following the date of such damage or destruction.

## 19.    EMINENT DOMAIN.

**19.1    Total Taking.**  If all the Premises are taken by the power of eminent domain exercised by any governmental or quasi-governmental authority, this Lease shall terminate as of the earlier of: (a) the date Tenant is required to vacate the Premises; or (b) the date title passes to the condemning authority, and upon such date of termination, all Minimum Rent, Additional Rent and other costs due hereunder shall be paid to that date.  The term "eminent domain" shall include the taking or damaging of property by, through or under any governmental or quasi-governmental authority, and any purchase or acquisition in lieu thereof, whether or not the damaging or taking is by the government or any other person.

**19.2    Partial Taking.**  Tenant may terminate this Lease for any of the following events of Partial Taking:

    (a)    If more than ten percent (10%) of the floor area of the Premises shall be taken or appropriated.

    (b)    The Premises, after the taking, would no longer qualify as a Superstore (based on the industry's standard definition of "Superstore").

    (c)    The existing access to the Premises is reduced or eliminated.

    (d)    The visibility of the Premises from N. Second Street is materially reduced.

    (e)    The parking available to the Premises is reduced by more than twenty percent (20%).

Tenant may terminate this Lease by written notice given to Landlord.

**19.3    Damages.**  Landlord reserves all rights to the entire damage award or payment for any taking by eminent domain, and Tenant shall make no claim whatsoever against Landlord for damages for termination of its leasehold interest in the Premises or for interference with its business.  Tenant hereby grants and assigns to Landlord any right Tenant may now have or hereafter acquire to such damages and agrees to execute and deliver such further instruments of assignment thereof as Landlord may from time to time request.  Tenant shall, however, have the right to claim from the condemning authority all compensation that may be recoverable by Tenant on account of any loss incurred by Tenant in removing Tenant's merchandise, furniture, trade fixtures and equipment or for damage to Tenant's business, loss of business and/or loss of leasehold interest; provided,

18



however, that Tenant may claim such damages only if they are awarded separately in the eminent domain proceeding and not as part of Landlord's damages.

20.    **SUBORDINATION AND ATTORNMENT; MORTGAGEE PROTECTION.**

20.1    **Subordination-Nondisturbance and Attornment.**    Upon written request of Landlord, or any mortgagee or beneficiary of Landlord, Tenant shall, in writing, subordinate its rights hereunder to the interest of any ground lessor of the land and to the lien of any mortgage or deed of trust, now or hereafter in force against the lot and/or Building, and to all advances made or hereafter to be made thereon; provided, however, that the ground lessor, or the mortgagee or trustee named in said mortgage or trust deed, shall agree to execute a Non-Disturbance Agreement in favor of Tenant in the form attached hereto as Exhibit C. In the event any proceedings are brought for foreclosure, or in the event of the exercise of the power of sale under any mortgage or deeds of trust, upon any such foreclosure or sale, Tenant agrees to recognize such beneficiary or purchaser as Landlord under this Lease, provided all of Tenant's rights under this Lease continue unabated.

20.2    **Tenant's Certificate.**    Tenant shall at any time and from time to time upon not less than twenty (20) days' prior written notice from Landlord execute, acknowledge and deliver to Landlord a statement in writing in the form specified in Exhibit D:   (a) certifying that this Lease is unmodified and in full force and effect (or, if modified, stating the nature of such modification and certifying that this Lease as so modified is in full force and effect) and the date to which the rental and other charges are paid in advance, if any; (b) acknowledging that there are not, to Tenant's knowledge, any uncured defaults on the part of Landlord or Tenant hereunder, or specifying such defaults if any are claimed; and (c) setting forth the Minimum Rent Commencement Date and Expiration Date of the Lease Term hereof. Any such statement may be relied upon by any prospective purchaser or encumbrancer of all or any portion of the Premises.

20.3    **Mortgagee Protection Clause.**    Tenant agrees to give any mortgagees and/or trust deed holders, by certified or registered mail, a copy of any notice of default served upon Landlord, provided that prior to such notice Tenant has been notified in writing (by way of Notice of Assignment of Rents and Leases or otherwise) of the addresses of such mortgagees and/or trust deed holders. Tenant further agrees that if Landlord shall have failed to cure such default within the time provided for in this Lease, then the mortgagees and/or trust deed holders have an additional thirty (30) days within which to cure such default, provided that if more time is required to complete such performance, the mortgagees and/or trust deed holders shall not be in default if they commence such performance within the thirty (30) day period and thereafter diligently pursue its completion, in which event Tenant shall not exercise its remedies hereunder as long as the mortgagee and/or trust deed holder is diligently pursuing its remedies necessary to cure such default.

21.    **ACCESS BY LANDLORD.**

21.1    **Right of Entry.**    Landlord or Landlord's employees, agents and/or contractors shall have the right to enter the Premises at any reasonable time during Tenant's normal business hours to examine the same, to show them to prospective purchasers and to make such repairs, alterations, improvements or additions as Landlord may deem necessary or desirable (so long as Landlord does not unreasonably interfere with Tenant's business operation) and are as allowed under the terms of this Lease. Nothing contained herein shall be construed to impose upon Landlord any duty of repair of the Premises except as otherwise specifically provided for herein. Landlord shall give Tenant not less than twenty-four (24) hours' notice if Landlord intends to enter the Premises during nonbusiness hours except in the event of an emergency, in which case no notice shall be required.

19

## 22.  SURRENDER OF PREMISES.

**22.1   Surrender of Possession.** On the last day of the Term of this Lease, or on the sooner termination thereof, Tenant shall peaceably surrender the Premises in good condition and repair, ordinary wear and tear excepted, consistent with Tenant's duty to make repairs as herein provided. On or before the last day of the Term of this Lease, or the date of sooner termination thereof, Tenant shall, at its sole cost and expense, remove all merchandise and trade fixtures and equipment from the Premises, and all property not removed shall be deemed abandoned. Tenant shall reimburse Landlord upon demand for any expenses incurred by Landlord with respect to removal, transportation or storage of abandoned property and with respect to restoring said Premises to good order, condition and repair. All modification, improvements, alterations, additions and fixtures, other than Tenant's trade fixtures and equipment, which have been made or installed by either Landlord or Tenant upon the Premises, shall remain the property of Landlord and shall be surrendered with the Premises as part thereof. Tenant shall promptly surrender all keys to the Premises to Landlord at the place then fixed for the payment of rent and shall inform Landlord of combinations to any vaults, locks and safes left on the Premises.

**22.2   Holding Over.** In the event Tenant remains in possession of the Premises after expiration of this Lease and without the execution of a new Lease, but with Landlord's written consent, Tenant shall be deemed to be occupying the Premises as a tenant from month to month, subject to all the provisions, conditions and obligations of this Lease insofar as the same can be applicable to a month-to-month tenancy, escalated to one hundred twenty-five percent (125%) of the Minimum Rent payable by Tenant immediately prior to the expiration of this Lease.

## 23.  RULES AND REGULATIONS.  Intentionally deleted.

## 24.  QUIET ENJOYMENT.

**24.1   Landlord's Covenant.** Tenant, upon fully complying with and promptly performing all the terms, covenants and conditions of this Lease on its part to be performed, and upon the prompt and timely payment of all sums due hereunder, shall have and quietly enjoy the Premises for the Lease Term set forth herein.

## 25.  AUTHORITY OF PARTIES.

**25.1   Corporate Authority.** If Tenant is a corporation, each individual executing this Lease on behalf of said corporation represents and warrants that he is duly authorized to execute and deliver this Lease on behalf of said corporation, in accordance with a duly adopted resolution of the board of directors of said corporation authorizing and consenting to this Lease, authorizing the specific officers signing this Lease to execute, acknowledge and deliver the same without the consent of any other officer or officers, resolving that such action and execution are in accordance with the bylaws of said corporation and resolving that this Lease is binding upon said corporation in accordance with its terms.

**25.2   Limited Partnerships.** If Landlord herein is a limited or general partnership, it is understood and agreed that any claims by Tenant against Landlord shall be limited to the assets of the limited or general partnership, and, furthermore, Tenant expressly waives any and all rights to proceed against the individual partners, or the officers, directors or shareholders of any corporate partner, except to the extent of their interest in said limited or general partnership.

## 26.  SIGNS.

**26.1   General.** Except for Tenant's initial signage which Landlord hereby acknowledges has been approved by Landlord, Tenant shall not place or suffer to be placed on the exterior walls or roof of the Premises any sign, awning, canopy, marquee, advertising matter, decoration, letter or other thing of any kind. Landlord shall not allow any signage

20



or other advertisements for Landlord or any third party to be placed upon the exterior walls or roof of the Premises without Tenant's express written approval. Tenant, prior to the commencement of this Lease, shall submit to Landlord and the proper government agencies its sign package. In the event Tenant does not obtain governmental approval of its sign package on or before it has obtained the government approvals for its work pursuant to Exhibit B, including all exterior neon and graphics, Tenant shall have the right to terminate this Lease.

**26.2   Tenant's Interior Signs.** Except as otherwise herein provided, Tenant shall have the right, at its sole cost and expense, to erect and maintain within the interior of the Premises all signs and advertising matter customary or appropriate in the conduct of Tenant's business, including the use of interior marquee-type signage which is placed in the windows and is visible from the outside. Tenant may replace the signage within the marquee from time to time without Landlord's consent.

## 27.    AUCTIONS AND SALES.

**27.1   General.** Tenant shall not conduct or permit to be conducted any sale by auction upon or from the Premises, whether said auction be voluntary, involuntary, pursuant to any assignment for the payment of creditors or pursuant to any bankruptcy or other insolvency proceeding, without the express written permission of Landlord.

**27.2   No Distress Sales.** No auction, fire, bankruptcy, "going out of business" or other distress sale of any nature may be conducted on the Premises without the prior written consent of Landlord.

## 28.    HAZARDOUS MATERIALS.

**28.1   Definitions.** As used in this Section, the following terms have the following definitions:

   **(a)**    "Agencies" means any federal, state or local governmental authorities, agencies, or other administrative bodies with jurisdiction over Tenant or the Premises.

   **(b)**    "Environmental Laws" means any federal, state or local environmental, health, or safety-related laws, regulations, standards, court decisions, ordinances, rules, codes, orders, decrees, directives, guidelines, permits or permit conditions, currently existing and as amended, enacted, issued or adopted in the future that are or become applicable to Tenant or the Premises.

   **(c)**    "Hazardous Materials" means any chemical, substance, material, controlled substance, object, condition, waste, living organism or combination that is or may be hazardous to human health or to the safety of the environment due to its radioactivity, ignitability, corrosivity, reactivity, explosivity, toxicity, carcinogenicity, mutagenicity, phytotoxicity, infectiousness or other harmful or potentially harmful properties or effects, including, without limitation, petroleum and petroleum products, asbestos, radon, polychlorinated biphenyls (PCBs) and all of those chemicals, substances, materials, controlled substances, objects, conditions, wastes, living organisms or combinations that are now or become in the future listed, defined or regulated in any manner by any Environmental Law based upon, directly or indirectly, their properties or effects.

   **(d)**    "Tenant's Parties" means Tenant's employees, agents, contractors, designees or subtenants.

**28.2   Use of Hazardous Materials.** Tenant will not use or allow the use of the Premises in a manner that may cause Hazardous Materials to be released or to become present on, under or about the Premises or other properties in the vicinity of the Premises.

21



**28.3   Environmental Compliance.**

(a)   Tenant and Tenant's Parties will not, at any time during the Term, cause or permit any Hazardous Materials to be brought upon, stored, manufactured, generated, blended, handled, recycled, treated, disposed or used on, under or about the Premises, the Building or the Project for any purpose, except for materials used in the normal course and scope of Tenant's business operations; that is, materials comprising or a part of Tenant's sale and/or rental of products incidental to its business, cleaning supplies, paints, office supplies and such other sundry items ("Permitted Hazardous Materials"). However, Tenant shall not dispose of on the Premises, or retain on the Premises, such Permitted Hazardous Materials in violation of any law, ordinance or other provision of this Section 28, and Tenant shall remove or cause to be removed such Permitted Hazardous Materials upon the termination of this Lease and Tenant's vacating of the Premises.

(b)   During the Term, Tenant will take reasonable steps to protect against intentional or negligent acts or omissions of third parties that might result directly or indirectly in the release, disposal or other placement of Hazardous Materials on or under the Premises.

(c)   No asbestos-containing materials will be manufactured or installed for any purposes or as part of the Premises, whether as part of Tenant's or Tenant's Parties' business operations or as tenant improvements.

(d)   Tenant will keep, operate and maintain the Premises in compliance with all, and will not cause or permit the Premises to be in violation of, any Environmental Laws.

**28.4   Landlord's Right of Entry and Testing.**   Landlord and Landlord's representatives have the right, but not the obligation, at any reasonable time during Tenant's normal business hours as long as it does not unreasonably interfere with the operation of Tenant's business, to enter onto and to inspect the Premises and to conduct reasonable testing, monitoring, sampling, digging, drilling and analysis to determine if Hazardous Materials are present on, under or about the Premises. If the investigation indicates the presence of any environmental condition that occurred during the Term as a result of Tenant's or Tenant's Parties' activities, or failure to act where Tenant had a duty to act, in connection with the Premises, Tenant will reimburse Landlord for the cost of conducting the tests.

**28.5   Notification.**

(a)   Tenant must give immediate written notice to Landlord of:

(1)   any enforcement, remediation or other regulatory action or order taken or threatened by any Agency regarding, or in connection with, the presence, release or threat of release of any Hazardous Material on, under, about or from the Premises, or any tanks on the Premises, or otherwise resulting from Tenant's use of the Premises;

(2)   all demands or claims made or threatened by any third party against Tenant or Tenant's Parties or the Premises relating to any liability, loss, damage or injury resulting from the presence, release or threat of release of any Hazardous Materials on, under, about or from the Premises or otherwise resulting from Tenant's use of the Premises;

(3)   any significant spill, release or discharge of a Hazardous Material on, under, about or from the Premises, including, without limitation, any spill, release or discharge required to be reported to any Agency under applicable Environmental Laws; and

22



(4) all incidents or matters where Tenant and Tenant's Parties are required to give notice to any Agency pursuant to applicable Environmental Laws.

**(b)** Tenant must promptly provide to Landlord copies of all materials, reports, technical data, Agency inspection reports, notices, correspondence and other information or documents relating to incidents or matters subject to notification under Section 28.5(a). Also, Tenant must promptly furnish to Landlord copies of all permits, approvals and registrations relating to Environmental Laws or Hazardous Materials, which Tenant receives or submits with respect to Tenant's operations on the Premises, including, without limitation, any underground storage tank registrations, installation permits, and closure permits.

## 28.6   Remediation.

**(a)** If any Hazardous Materials are released or found on, under or about the Premises arising out of Tenant's or Tenant's Parties activities, or failure to act where Tenant had a duty to act, in connection with the Premises, Tenant must promptly take all actions, at Tenant's sole expense, necessary to investigate and remediate the release or presence of Hazardous Materials on, under or about the Premises in accordance with Environmental Laws and the requirements of all Agencies. However, unless an emergency situation exists that requires immediate action, Landlord's written approval of these actions will first be obtained, and the approval will not be unreasonably withheld. Landlord's right of prior approval of these actions includes, but is not limited to, the selection of any environmental consultant to perform work on or related to the Premises, the scope of work and sampling activities to be performed by the consult before the report is final. Unless an emergency situation exists that requires immediate action, Tenant will provide Landlord with at least three (3) business days' advance notice of any sampling, and upon the request of Landlord, will split samples with Landlord. Tenant will also promptly provide Landlord with the results of any test, investigation or inquiry conducted by or on behalf of Tenant or Tenant's Parties in connection with the presence or suspected presence of Hazardous Materials on, under, about or from the Premises. Tenant must notify Landlord in advance and give Landlord the right to participate in any oral or written communications with regulatory agencies concerning environmental conditions on or arising from the Premises. Landlord has the right, but not the obligation, to assume control of any required remediation on the Premises at Tenant's expense if Tenant fails to notify Landlord and obtain Landlord's approvals as required under Section 28.6. Within thirty (30) days after Tenant's receipt of any letter it receives from an applicable Agency stating that any remediation of the Premises by Tenant was undertaken in accordance with all applicable Environmental Laws and that any residual contamination remaining after the remediation does not pose a threat to human health or the environment.

**(b)** If Tenant or Tenant's Parties have caused or permitted a release of Hazardous Materials that results in or threatens to result in Hazardous Materials becoming present on, under or about the Premises, threatens public health or safety or the environment, or is in noncompliance with any applicable Environmental Laws or requirements of this Section 28, Landlord may demand that Tenant promptly take action in accordance with Section 28.6(a). If Tenant does not respond within thirty (30) days (unless there is an emergency, in which case Tenant must respond as soon as practicable, but not more than three (3) days), Landlord has the right, but not the obligation, to enter onto the Premises and take all actions reasonably necessary to investigate and fully remediate the release or noncompliance at Tenant's sole expense, which sums will be immediately due and payable upon receipt of an invoice and will constitute Additional Rent under this Lease.

23



**28.7   Liability.**

(a)   **Tenant's Indemnification of Landlord.**  Tenant will indemnify, protect, defend and hold harmless Landlord and Landlord's partners, directors, officers, employees, shareholders, lenders, agents, contractors and each of their respective successors and assigns (individually and collectively "Landlord Indemnitees") from all claims, judgments, causes of action, damages, penalties, fines, taxes, costs, liabilities, losses and expenses arising (directly or indirectly) as a result of or in connection with Tenant's or Tenant's Parties' breach of any prohibition or provision of this Section 28.  This obligation by Tenant to indemnify, protect, defend and hold harmless Landlord Indemnitees includes, without limitation, costs and expenses incurred for or in connection with any investigation, cleanup, remediation, monitoring, removal, restoration or closure work required by the Agencies because of any Hazardous Materials present on, under or about the Premises as a result of or in connection with Tenant's or Tenant's Parties' breach of any prohibition or provision of this Section 28; the costs and expenses of restoring, replacing or acquiring the equivalent of damaged natural resources if required under any Environmental Law; all foreseeable consequential damages; all reasonable damages for the loss or restriction on use of rentable or usable space or of any amenity of the Premises; all reasonable sums paid in settlement of claimer; reasonable attorneys' fees; litigation, arbitration and administrative proceeding costs; and reasonable expert, consultant, and laboratory fees.  Neither the written consent of Landlord to the presence of Hazardous Materials on or under the Premises, nor the strict compliance by Tenant with all Environmental Laws, will excuse Tenant from the indemnification obligation.  This indemnity will survive the expiration or termination of this Lease.  Further, if Landlord detects a deficiency in Tenant's performance under this indemnity and Tenant fails to correct the deficiency within thirty (30) days after receipt of written notice from Landlord, Landlord has the right to join and participate in any legal proceedings or actions affecting the Premises that are initiated in connection with any Environmental Laws.  However, if the correction of the deficiency takes longer than thirty (30) days, Landlord may join and participate if Tenant fails to commence corrective action within the thirty (30) day period and after that fails to diligently proceed to correct the deficiency.

(b)   **Landlord's Indemnification of Tenant.**  Landlord will indemnify, protect, defend and hold harmless Tenant and Tenant's partners, directors, officers, employees, shareholders, lenders, agents, contractors and each of their respective successors and assigns (individually and collectively "Tenant Indemnitees") from all claims, judgments, causes of action, damages, penalties, fines, taxes, costs, liabilities, losses and expenses arising (directly or indirectly) as a result of or in connection with any Hazardous Materials existing on the Premises prior to the delivery of the Premises to Tenant or which are brought onto the Premises by some party outside the control of Tenant.  This obligation by Landlord to indemnify, protect, defend and hold harmless Tenant Indemnitees includes, without limitation, costs and expenses incurred for or in connection with any investigation, cleanup, remediation, monitoring, removal, restoration or closure work required by the Agencies because of any Hazardous Materials present on, under or about the Premises; the costs and expenses of restoring, replacing or acquiring the equivalent of damaged natural resources if required under any Environmental Law; all foreseeable consequential damages; all reasonable damages for the loss or restriction on use of rentable or usable space or of any amenity of the Premises; all reasonable sums paid in settlement of claims; reasonable attorneys' fees; litigation, arbitration and administrative proceeding costs; and reasonable expert, consultant and laboratory fees.  The strict compliance by Landlord with all Environmental Laws will not excuse Landlord from the indemnification obligation.  This indemnity will survive the expiration or termination of this Lease.  Further, if Tenant detects a deficiency in Landlord's performance under this indemnity and Landlord fails to correct the deficiency within thirty (30) days after receipt of



written notice from Tenant, Tenant has the right to join and participate in any legal proceedings or actions affecting the Premises that are initiated in connection with any Environmental Laws. However, if the correction of the deficiency takes longer than thirty (30) days, Tenant may join and participate if Landlord fails to commence corrective action within the thirty (30) day period and after that fails to diligently proceed to correct the deficiency.

## 29.    MISCELLANEOUS.

**29.1    Successors or Assigns.** All the terms, conditions, covenants and agreements of this Lease shall extend to and be binding upon Landlord, Tenant and their respective heirs, administrators, executors, successors, subtenants, sublessees, sublessees, assigns and marital communities, if any, and upon any person or persons coming into ownership or possession of any interest in the Premises by operation of law or otherwise.

**29.2    Broker's Commission; Agency Disclosure.** Tenant represents and warrants that it has incurred no liabilities or claims for brokerage commissions or finders' fees in connection with the execution of this Lease and that it has not dealt with or has any knowledge of any real estate broker, agent or salesperson in connection with this Lease except Brad Becker of Retail Properties Group, Inc. Tenant agrees to indemnify, defend Landlord against and hold Landlord harmless from all such liabilities or claims, including, without limitation, attorneys' fees. At the signing of this Agreement, Brian Quinn of Flocke & Avoyer Commercial Real Estate represented Landlord. Landlord agrees it shall pay a commission in the amount of $48,000 to Flocke & Avoyer Commercial Real Estate, which Flocke & Avoyer shall share equally with Retail Properties Group. Each party signing this document confirms that prior oral and/or written disclosure of agency was provided to him/her in this transaction.

**29.3    Partial Invalidity.** If any term, covenant or condition of this Lease or the application thereof to any person or circumstance is, to any extent, invalid or unenforceable, the remainder of this Lease, or the application of such term, covenant or condition to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby and each term, covenant or condition of this Lease shall be valid and be enforced to the fullest extent permitted by law.

**29.4    Recording.** Tenant shall not record or file this Lease or any form of Memorandum of Lease, or any assignment or security document pertaining to this Lease or all or any part of Tenant's interest therein, without the prior written consent of Landlord, which consent may be subject to such conditions as Landlord shall deem appropriate. If such consent is granted, Tenant will pay all recording fees, costs, taxes and other expenses for the recording. However, upon the request of Landlord, both parties shall execute a memorandum or "short form" of this Lease for the purposes of recordation in a form customarily used for such purposes. Said memorandum or short form of this Lease shall describe the parties, the Premises and the Lease Term and shall incorporate this Lease by reference.

**29.5    Notices.** Any notices required in accordance with any of the provisions herein or desired to be given hereunder, if to Landlord shall be delivered personally or if mailed then mailed by registered or certified mail and addressed to the address of Landlord as set forth in Section 1 or at such other place as Landlord may in writing from time to time direct to Tenant, and if to Tenant shall be delivered personally or if mailed then mailed by registered or certified mail and addressed to Tenant as set forth in Section 1 or at such other place as Tenant may in writing from time to time direct to Landlord. Notices shall be deemed given when delivered, if delivered personally, or three (3) business days after deposit in the United States mail as set forth above.

**29.6    Waiver.** The waiver by Landlord of any term, covenant or condition herein contained shall not be deemed to be a waiver of such term, covenant or condition or any subsequent breach of the same or any other term, covenant or condition herein contained.

25



The subsequent acceptance of Minimum Rent, Additional Rent or any other costs hereunder by Landlord shall not be deemed to be a waiver of any preceding default by Tenant of any term, covenant or condition of this Lease, other than the failure of Tenant to pay the particular sum so accepted, regardless of Landlord's knowledge of such preceding default at the time of the acceptance of such sum.

**29.7 Marginal Headings.** The marginal headings and article titles to the Sections and Subsections of this Lease are not a part of this Lease and shall have no effect upon the construction or interpretation of any part hereof.

**29.8 Time.** Time is of the essence of this Lease and each and all of its provisions in which performance is a factor.

**29.9 Late Charges.** Tenant hereby acknowledges that late payment by Tenant to Landlord in rent or other sums due hereunder will cause Landlord to incur costs not contemplated by this Lease, the exact amount of which will be extremely difficult to ascertain. Such costs include, but are not limited to, processing and accounting charges, and late charges which may be imposed upon Landlord by terms of any mortgage or deed of trust covering the Premises. Accordingly, if any installment of Minimum Rent, Additional Rent or any other costs due from Tenant shall not be received by Landlord or Landlord's designee on or before ten (10) days after the date such sum is due as set forth in Section 4 above, then Tenant shall pay to Landlord a late charge equal to five percent (5%) of the amount past due, but in no event more than the legal maximum on such past due amount. Any such late charges shall be billed by Landlord to Tenant on the next installment of Minimum Rent due under the Lease. Acceptance of such late charges by Landlord shall in no event constitute a waiver of Tenant's default with respect to such overdue amount, nor prevent Landlord from exercising any of the other rights and remedies granted hereunder. Any such late charge not billed to Tenant within ninety (90) days of any late payment shall be deemed waived by Landlord.

**29.10 Choice of Law.** This Lease shall be governed by the laws of the state of California.

**29.11 Legal Expenses.** If either party is required to bring or maintain any action (including assertion of any counterclaim or cross-claim, or claim in proceedings in bankruptcy, receivership or any other proceeding instituted by a party hereto or by others), or otherwise refers this Lease to an attorney for the enforcement of any of the covenants, terms or conditions of this Lease, the prevailing party in such action shall, in addition to all other payments required herein, receive from the other, all the costs incurred by the prevailing party at, and in preparation for, arbitration, trial, appeal, review and proceedings in bankruptcy court, including, but not limited to, matters unique to bankruptcy, including, but not limited to, such costs and reasonable attorneys' fees.

**29.12 Acceptance of Keys.** The acceptance of keys to the Premises by Landlord, its agents, employees, contractors or any other person on Landlord's behalf shall not be deemed or constitute an early termination of this Lease unless such early termination is evidenced in writing and signed by Landlord.

**29.13 Force Majeure.** In the event Landlord or Tenant is prevented, delayed or stopped from performing any act, undertaking or obligation under this Lease by reason of an "event of force majeure" including strikes, lockouts, labor disputes, failure of power, acts of public enemies of this state or the United States of America, riots, insurrection, civil commotion, delay caused by the failure of any government agency to issue a building or occupancy permit, inability to obtain labor or materials, governmental action or inaction and/or any other cause beyond the reasonable control of the party whose performance is so prevented, delayed or stopped, then the time for that party's performance shall be extended one (1) day for each day's prevention, delay or stoppage by reason of such event of force majeure.

**29.14  Prior Agreements.** THIS LEASE CONTAINS THE ENTIRE AGREEMENT OF THE PARTIES HERETO AND ANY AND ALL ORAL AND WRITTEN AGREEMENTS, UNDERSTANDINGS, REPRESENTATIONS, WARRANTIES, PROMISES AND STATEMENTS OF THE PARTIES HERETO AND THEIR RESPECTIVE OFFICERS, DIRECTORS, PARTNERS, AGENTS AND BROKERS WITH RESPECT TO THE SUBJECT MATTER OF THIS LEASE AND ANY MATTER COVERED OR MENTIONED IN THIS LEASE SHALL BE MERGED IN THIS LEASE, AND NO SUCH PRIOR ORAL OR WRITTEN AGREEMENT, UNDERSTANDING, REPRESENTATION, WARRANTY, PROMISE OR STATEMENT SHALL BE EFFECTIVE OR BINDING FOR ANY REASON OR PURPOSE UNLESS SPECIFICALLY SET FORTH IN THIS LEASE. NO PROVISION OF THIS LEASE MAY BE AMENDED OR ADDED TO EXCEPT BY AN AGREEMENT IN WRITING SIGNED BY THE PARTIES HERETO OR THEIR RESPECTIVE SUCCESSORS IN INTEREST. THIS LEASE SHALL NOT BE EFFECTIVE OR BINDING ON ANY PARTY UNTIL FULLY EXECUTED BY BOTH PARTIES HERETO.

**29.15  Acceptance and Date of Lease.**

    **(a)**    **Acceptance.** The submission of this Lease to Tenant does not constitute an offer to lease. This Lease shall become effective only upon the execution and delivery thereof by both Landlord and Tenant.

    **(b)**    **Date of Lease.** The date of this Lease shall be the date of acceptance hereof by Landlord as set forth on Page 1.

**29.16  Consent.** Except where otherwise expressly provided in this Lease, any consent or approval required under this Lease, pursuant to the terms of this Lease, may not be unreasonably withheld.

**29.17  Dropbox.** Tenant may install a drive-by dropbox at a location within the Common Area as set forth in Exhibit A-2. The dropbox will measure approximately 4 feet wide, 44 inches tall and 35 inches deep (4' wide x 44" high x 35" deep). It will be located so as to be visible from Tenant's front door, easily accessible to the vehicular traffic without exiting the vehicle and within one hundred (100) feet of the Premises.

**29.18  Workers' Compensation Insurance.** To the extent required by state and federal law, Tenant shall maintain a policy of workers' compensation insurance covering all persons employed by Tenant in the conduct of Tenant's operations on the Premises.

**29.19  No Third-Party Benefit.** Nothing in this Lease is intended to create any third-party benefit.

    IN WITNESS WHEREOF, the parties hereto have executed this instrument as of the day and year first above set forth.

LANDLORD:

SST PROPERTIES,
a California general partnership

By: _____

Name: JOHN M. TWOROGER

Title: GENERAL PARTNER

Date: 6-9-95

TENANT:

HOLLYWOOD ENTERTAINMENT CORPORATION, an Oregon corporation

By: _____

Name: Donald J. Ekman

Title: Vice President

Date: June 13, 1995

27

SEP-22-2004 THU 04:42 PM INVESTICAL REALTY CORP.      FAX NO. 6196839462      P. 40

## EXHIBIT A-1

### LEGAL DESCRIPTION OF THE PREMISES

The Premises are described as follows:

The land is situated in the
State of California
County of SAN DIEGO

Parcel 1 of Parcel Map No. 6228, in the City of El Cajon, County of San Diego, State of California, Filed in the Office of the County Recorder of San Diego County August 3, 1977 as File No. 77-315013 of official records.

## PROOF OF SERVICE

I am employed in the City of San Diego, county of San Diego, State of California. I am over the age of 18 years and not a party to the within mentioned action. My business address is 1202 Kettner Blvd., Third Floor, San Diego, California 92101. On August 5, 2010, I caused the document(s) named below to be served on the parties in this action as follows:

**DOCUMENT(S) SERVED:** *Proof of Claim; Request for Allowance of Administrative Claim*

**SERVED UPON:**        **See attached service list**

☒        **(BY MAIL)** I caused each envelope, with postage thereon fully prepaid, to be placed in the United States mail at San Diego, California. I am readily familiar with the practice of Kimball, Tirey & St. John LLP for collection and processing of correspondence for mailing, said practice being that in the ordinary course of business, mail is deposited in the United States Postal Service *the same day as it is placed for collection.*

☐        **(BY PERSONAL SERVICE - COURIER)** I caused to be delivered to an authorized courier or driver authorized by *[attorney service name]* to receive documents to be delivered on the same date. A Proof of Service signed by the authorized courier will be filed forthwith.

☐        **(BY PERSONAL SERVICE)** I delivered such envelope by hand to the offices of the addressee(s), on this date, at          , leaving said document(s) with          .

☐        **(BY OVERNIGHT CARRIER)** I am readily familiar with the practice of Kimball, Tirey & St. John for collection and processing of correspondence for overnight delivery and know that the document(s) described herein will be deposited in a box or other facility regularly maintained by          *[overnight company name]* for overnight delivery.

☐        **(BY FACSIMILE)** I caused to be transmitted the document(s) described herein at approximately          via ☐ the facsimile number(s) listed on the attached service list/☐ facsimile number(s)          . The facsimile machine I used complied with the California Rules of Court, Rule 2003(3) and no error was reported by the machine. Pursuant to California Rules of Court, Rule 2009(i)(4), I caused the machine to print a record of the transmission, a copy of which is attached hereto.

☒        **(FEDERAL)** I declare under penalty of perjury under the laws of the United States of America that the above is true and correct.

Executed on August 5, 2010, at San Diego, California.

Terry Devlin

## SERVICE LIST

Debtor:       HEC Real Estate, LLC
Case No.:     10-30700-DOT

Kimberly A. Pierro                    **Attorneys for Debtor**
Kutak Rock LLP
1111 E. Main St., Suite 800
Richmond, VA 23219-3500

Loc Pfeiffer
Kutak Rock L.L.P.
1111 East Main Street, Suite 800
Richmond, VA 23219-3500

Michael A. Condyles
Kutak Rock LLP
1111 E. Main Street, Suite 800
Richmond, VA 23219-3500

W. Clarkson McDow, Jr.                **U.S. Trustee**
Office of the U. S. Trustee
701 E. Broad St., Suite 4304
Richmond, VA 23219

1

## SERVICE LIST